UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| SHELDON GORDON, *et al.*, : | |
| : | Case No. 1:05CV2726 |
| Plaintiffs, : | |
| : | JUDGE KATHLEEN O'MALLEY |
| v. : | |
| : | |
| DAVID DADANTE *et al.*, : | <u>ORDER</u> |
| : | |
| Defendants. : | |

Before the Court is the Receiver's *Motion to Dispose of Estate Asset* (Doc. 280) in which he seeks to dispose of Dadante's former residence at 773 Village Trail, Mayfield Village, Ohio (the "Dadante residence") for the sum of $1,400,000. The Regalbuto Plaintiffs[1] have objected, arguing that: (1) the residence is not properly part of the Receivership; (2) certain encroachments present a barrier to the proposed sale; and (3) the proposed sale price is unjustifiably low. On June 6, 2007, the Court held a hearing during which the Regalbuto Plaintiffs and the Receiver provided additional testimony and information in support of their positions. The Court addresses the basis for each of the Regalbuto Plaintiffs' objections, in turn, below.

With respect to whether the Dadante residence is appropriately part of the Receivership, the Court finds that it is. During the hearing, counsel for the Regalbuto Plaintiffs argued that the residence was purchased by funds improperly diverted from Coffee King, Inc. ("Coffee King") and, therefore, in some manner rightfully belongs to Coffee King. The Court finds several flaws with this

---

[1] The background and parties are identified in greater detail in the Court's previous orders. <u>See</u>, e.g., June 6, 2007 Order.

analysis. First, the deed to the residence is in Dadante's name, not Coffee King's. Ohio Revised Code section 1335.04 requires any interest in land to be authorized in writing. No party has produced any writing indicating that Coffee King has an interest in the property at issue. Second, no party disputes that the money from the sale of the residence should be placed in the Receivership estate for distribution to the investors. Thus, because the Receiver intends to do exactly that, whether the residence was purchased with funds illegally appropriated from the IPOF entities, Coffee King, or some other defunct, shell corporation used to facilitate the fraud, the practical result would be the same. Further, the uncontradicted testimony at the hearing was that Coffee King, while it was in existence, was wholly owned by Dadante. By virtue of his settlement agreement with the Receiver, Dadante transferred any personal interest in the residence in partial satisfaction of his $8,500,000 settlement. It would be immaterial, therefore, whether that interest arose directly from his individual ownership of the residence, or indirectly from his interest in the residence by virtue of his 100% ownership of Coffee King, which, according to the Regalbuto Plaintiffs, has claim to the property.

The Regalbuto Plaintiffs also contend that the sale of the property should be forestalled due to the existence of two encroachments. According to various filings, the driveway of the Dadante residence encroaches on Michael Regalbuto's (one of the Regalbuto Plaintiffs') property, and a retaining wall from Mr. Regalbuto's property encroaches on the Dadante property. Mr. Regalbuto has informed the Court, by letter, that he will not agree to mutual easements and will demand the Receiver expend funds to remove a portion of the driveway if the sale is approved at $1,400,000. While the Court views this position as unproductive and contrary to Mr. Regalbuto's own interests,

it appears that Mr. Regalbuto is within his rights to make such a request.[2] The existence of encroachments, however, can be addressed by the aggrieved parties, all of whom apparently have notice of the issue, and it does not prevent the transfer of the property. If necessary to complete the sale, the Receiver has indicated that he can remove the encroaching portion of the driveway if Mr. Regalbuto demands it. Accordingly, if it is required to close the sale of the home, the Court authorizes the Receiver to expend funds from the Receivership estate to remove the encroaching driveway. As to the encroaching retaining wall, it is equally clear that, if Mr. Regalbuto cannot agree to mutual easements, the buyer may seek to have the wall removed at Mr. Regalbuto's expense. The Court, however, hopes to see a more amicable and reasonable resolution of the issue.[3]

The final, and primary, basis for the Regalbuto Plaintiffs' objection to the sale of the Dadante residence is that they feel that $1,400,000 is a "fire sale" price for the home. Generally speaking, the Dadante residence is a ranch-style home of high-quality, masonry construction with 5,150 square feet of living space on the main floor, and a finished, walk-out basement of about 4,500 square feet. It was completed in about 2004. The home sits on a lot just under two acres in size and was originally listed for sale with Adam S. Kaufman ("Kaufman") about sixty days ago at $1,895,000.

---

[2] The position appears contrary to Mr. Regalbuto's interests both as a potential creditor of Mr. Dadante's estate and as a homeowner. As a potential creditor, his position requires the estate to expend funds in order to preserve the ability to liquidate one of the few substantial assets of the estate. As a homeowner, it is clear that the encroaching retaining wall is far more important to the value of Mr. Regalbuto's property (and less easily removed) than the driveway encroachment would seem to be to the Dadante residence.

[3] According to Mr. Regalbuto, he was aware of the mutual encroachments while Mr. Dadante lived in the residence but felt, "as long as we're neighbors it's not a problem." The Court hopes that Mr. Regalbuto will reconsider whether it is appropriate to require the Receivership to spend money and reduce the recovery for all investors to fix an encroachment that was not a problem for years. Alternatively, perhaps, in the interest of being neighborly to the new occupant of the Dadante residence, Mr. Regalbuto will change his mind.

During the June 6, 2007, hearing, the Receiver's real estate agent, Kaufman, described the marketing of the home, the prices of recently sold homes within the area, the current state of the market for high-end homes in the Greater Cleveland area, and stated that he believes $1,400,000 is a fair price for the home. Kaufman is one of the preeminent brokers of luxury homes in Northeast Ohio. He sells many, if not most, of the homes with listing prices of over $1,000,000 and has sold nearly one-half billion dollars worth of property. At the hearing, Kaufman detailed the sales of a number of comparable homes on the same street as the Dadante residence, built to similarly high standards, but of varying sizes. According to Kaufman, those homes have been selling for between 60%-70% of their original asking prices. Kaufman stated, moreover, that the Dadante residence, if sold at $1,400,000, would be selling for more per square foot than the other homes on Village Trail.[4]

In response, the Regalbuto Plaintiffs claim that a private appraiser of the Dadante residence found the value of the home to be $1,750,000. Mr. Cheselka, however, could provide no information as to the qualifications or experience of the appraiser. Further, Mr. Cheselka admitted that the appraisal did not involve an examination of the interior of the home – indeed, it appears to have been little more than a drive-by – and he could not explain why the appraiser used a square footage

---

[4] Village Trail is a small, single-street development of about twenty recently-built, luxury homes. A brief description of some comparable homes on the same small street bears noting: (1) the home two doors down from the Dadante residence, sitting on about four acres, also of masonry construction, but with two floors above grade, totaling about 8,000 square feet with a 3,000 square foot basement, originally listed for over $3,000,000 and sold for $2,150,000; (2) a second home on the street, sitting on about three acres, also of masonry construction, but with two floors above grade, totaling about 4,500 square feet with an additional approximately 3,000 square foot basement, originally listed for $1,499,000 and sold for $900,000; (3) another home on the street , sitting on about four acres, also of masonry construction, but with two floors above grade, totaling over 8,000 square feet an additional 5,000 square foot basement, originally listed for $3,400,000 and is under contract for "the low $2,000,000s." In short, and in conformity with the general condition of the real estate market in Northeast Ohio, many of the homes on Village Trail are being sold for significantly less than the owners' expectations.

calculation that was inconsistent with standard appraisal practices.[5]

Mr. Cheselka also offered the statements of the builder of the Dadante residence, Michael Regalbuto,[6] who told the Court that the construction cost of the home was over $2,000,000 (in addition to a $180,000 lot). Michael Regalbuto further testified that the home is particularly unique, even within its price range, and contains the highest quality custom cabinetry, fixtures, landscaping, and other expensive refinements. Mr. Regalbuto placed great emphasis, moreover, on the existence and, in his view, superior nature of the residence's walk-out lower level. Specifically, Mr. Regalbuto argued that the lower level was superior to that found in other homes on the street and that the Court should, accordingly, include all square footage on that level in its value-per-square-foot calculation. Finally, the Regalbuto Plaintiffs suggested that the home was inadequately marketed for too short a time.

Kaufman responded to the Regalbuto Plaintiffs by explaining that the home possesses a number of factors that have negatively impacted its sales price. For instance: the Dadante residence stands on a lot that is less than one-half the size of the lots of other homes recently sold on the street, it only has three bedrooms (and two full baths – one of which is a small, shared, Jack-and-Jill style bath) above grade, it sits next to an eyesore (a home that remains unfinished after over three years), and, is located closer to the main road than the cited comparables. As to the lower level, Mr.

---

[5] In response to the Court's questioning, Mr. Cheselka, counsel for the Regalbuto Plaintiffs, promised that he would supplement the record with the appraiser's credentials and an explanation of why his methodology should be deemed appropriate. Unfortunately, and despite a second request for the appraisal information from the Court on June 8, 2007, Mr. Cheselka has not done so.

[6] This is the same Michael Regalbuto who, as owner of the neighboring property and one of the Regalbuto Plaintiffs, claims the encroachment discussed above.

Kaufman pointed out that only a portion of the lower level has a walk-out feature and that much of the lower level has no windows at all. As to the walk-out section, moreover, Kaufman pointed out that it looks out on the previously mentioned, unfinished property next-door. With respect to the marketing of the home, Kaufman explained that he has held a broker's lunch, listed the home on the MLS and other luxury home websites, engaged in print and direct mail advertising, and contacted clients he believed would be interested in the home. He explained that he believed the home had been marketed aggressively during the critical early days on the market and that it was on the market during the best time of the year for home sales.

After the conclusion of the hearing, the Court personally toured the property to assess the parties' positions relative to the value of the home. The Court spent several hours walking thorough the interior and around the grounds of the property with Mr. Kaufman. Further, the Court was shown each of the comparable, recently-sold properties on Village Trail cited by Kaufman. After holding a hearing, reviewing the issues raised by the parties, and personally examining the property, the Court is in a position to determine the issues and finds no fault with the Receiver's judgment that it is in the best interest of the Receivership to sell the Dadante residence for $1,400,000.

Though $1,400,000 is not as high a price for the property as the Regalbuto Plaintiffs had hoped for, the Court believes that it represents the current fair market value of the home. The Court understands that, though a home price may reflect many intangibles, every metric here refutes the Regalbuto Plaintiffs' contention that $1,400,000 is a "fire sale" price. Indeed, when examining factors such as lot size, home square footage, and number of bedrooms and bathrooms, the Dadante residence appears to be selling at a premium to other homes on the street. It is well-known, moreover, that a homeowner does not always recoup 100% of the cost of custom furnishings and

landscaping.[7]

For the foregoing reasons, and after considering the testimony and reputation of Mr. Kaufman, the comparable home sales, the current status of the real estate market, the Court's personal examination of the Dadante residence, and other factors, the Receiver's *Motion to Dispose of Estate Asset* (Doc. 280) is **GRANTED.**

Furthermore, given the statements made by Mr. Regalbuto and Mr. Cheselka during the June 6, 2007 hearing, the Court vacates its June 6, 2007 **SHOW CAUSE** order as to Mr. Cheselka.

**IT IS SO ORDERED.**

>                                  s/Kathleen M. O'Malley
>                                  **KATHLEEN McDONALD O'MALLEY**
>                                  **UNITED STATES DISTRICT JUDGE**

**Dated: June 13, 2007**

---

[7] Indeed, many of the custom refinements appear uniquely suited to the original owner, and the Receiver cannot expect to recover all of their costs. By way of example, a costly elevator in a ranch home, particularly one designed for one-floor living with a walk-out lower level, likely does not have the same utility as it would in other, multi-level homes. The high costs of custom painted, personalized, casino doors and a twenty-man jacuzzi also may not be reflected in a home's resale value.