# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| **SHELDON GORDON, et al.,** | : | |
| | : | **Case No. 1:05CV2726** |
| **Plaintiffs,** | : | |
| | : | **Judge Kathleen M. O'Malley** |
| **v.** | : | |
| | : | |
| **DAVID DADANTE et al.,** | : | <u>**ORDER**</u> |
| | : | |
| **Defendants.** | : | |

Before the Court are several position briefs filed by various interested parties at the invitation

of the Court.[1]  The Court imposed a briefing schedule to permit all interested parties to be heard on

the issue of the legal status of the various entities David Dadante ("Dadante") used to perpetuate a

massive fraud on a group of investors.[2]  The parties have fully briefed the issues and the Court has

considered the relevant law, parties' arguments, and the uncontested facts.  For the reasons discussed

---

[1] (*See Position Statement of Regalbuto Plaintiffs* (Doc. 257) Apr. 30, 2007; *Receiver's Position Statement Regarding Legal Status of IPOF Fund* (Doc. 258) Apr. 30, 2007; *Ferris, Baker Watts' Position Statement* (Doc. 259) Apr. 30, 2007; *Small Plaintiffs' Position Statement Regarding the Existence of a Limited Partnership* (Doc. 260) Apr. 30, 2007; *Regalbuto Plaintiffs' Brief In Response To Position Statement of Ferris Baker Watts* (Doc. 274) May 30, 2007; *Regalbuto Plaintiffs' Brief In Response To Position Statement of Small Plaintiffs* (Doc. 275) May 30, 2007; *Regalbuto Plaintiffs' Brief In Response To Position Statement of Receiver* (Doc. 276) May 30, 2007; *Receiver's Reply to Regalbuto Plaintiffs' Response to Position Statement* (Doc. 283) Jun. 6, 2007; *Ferris, Baker Watts' Reply to Regalbutto Plaintiffs' Response to Position Statement* (Doc. 285) Jun. 11, 2007; *Regalbuto Plaintiffs' Position Reply Memorandum* (Doc. 287) Jun. 13, 2007; Small Plaintiffs' Reply to Regalbuto *Plaintiffs' Memorandum in Response to Position Statement Regarding the Existence of a Limited Partnership* (Doc. 288) June 13, 2007; *Regalbuto Plaintiffs' Supplemental Position* Statement (Doc. 324) Oct. 17, 2007)
[2] (*See United States v. Dadante*, Case No. 07-cr-00336, Doc. 21, Plea Agreement of David Dadante, at 5-35 (Aug. 16, 2007) (hereinafter "Dadante Plea Agreement")).

in detail below, the Court finds that the entity used to defraud the investors in this matter originally operated as a general partnership and, later, was converted into a limited partnership.

**I      BACKGROUND.**

The history of this case is set forth in some detail in the Court's previous orders.  Certain points, however, bear reiteration.  On November 21, 2005, Sheldon Gordon filed a complaint against Dadante and requested that Mark Dottore (the "Receiver") be appointed receiver over various investment funds managed by Dadante.  In short, the complaint alleges that, using the names IPOF, L.P., IPOF Fund, GSGI, IPOF Fund II, L.P. (the "IPOF Fund"), Dadante solicited approximately fifty million dollars from a group of prominent members of the community to combine for investment in the stock market.  To entice the plaintiffs to invest, the complaint claims that Dadante told investors, among other things, that he was working with a major Wall Street investment bank (Goldman Sachs); that the IPOF Fund had returned over twenty-five percent per year; that their investments were secure; that the IPOF Fund would purchase stock from initial public offerings ("IPOs"); and, later, that the IPOF Fund would use a proprietary trading strategy to generate a guaranteed return.

According to the complaint, the Fund turned out to be a Ponzi scheme used by Dadante to defraud the plaintiffs out of millions of dollars.  To facilitate the scheme, Dadante allegedly made repeated misrepresentations, provided false account statements, and manipulated accounts.  The complaint also alleges that as much as twenty-six million dollars worth of the IPOF Fund's assets were improperly distributed to some investors as purported "returns" on their investment.  The complaint claims, however, that the Fund never realized any gains, and that "returns" were simply distributions made from the initial deposits of later investors.  The complaint asked the Court to

2

freeze the assets of Dadante and the IPOF Fund and appoint Mr. Dottore to act as receiver over those assets.

Shortly after the appointment the Receiver, it became clear to the Court that the plaintiffs' original capital investments were greatly diminished either through diversion of those assets to Dadante and his family, losses sustained by the IPOF Fund through its investments, or through the IPOF Fund's distribution of "returns" as described above.  Further, it became known that the primary remaining asset of the Receivership, (Innotrac Corporation stock held in accounts at certain "stakeholder" defendants), was encumbered by several million dollars of margin debt.[3]  Due to the complexities of the legal issues involved, and because the Receiver selected by the IPOF Fund's investors did not have a law degree, the Court appointed Mr. Robert Rapp, of the law firm Calfee, Halter & Griswold, to act as counsel to the Receiver.  Though Mr. Rapp was not known to, or affiliated with, the Receiver, the Court was aware of Mr. Rapp's reputation for extensive experience in securities law and for integrity in his professional dealings.

In the period that followed, the Receiver with the help of appropriate legal and financial professionals retained to aid him, investigated and began to marshal the assets of the IPOF Fund,

---

[3] Not only did the plaintiffs request the appointment of Mark Dottore, by name, as receiver over the IPOF Fund, they also implored the Court to freeze the Innotrac Corporation stock held by the stakeholder brokerages.  The plaintiffs argued that, absent a restriction on the sale of the partnership's assets, the brokerages would immediately liquidate the stock to satisfy their margin debts.  These fears were confirmed when, during a hearing, the brokerages indicated that they, in fact, intended to liquidate any IPOF Fund asset under their control in an effort to offset their margin debts.  Given the thinly-traded nature of the stock (typically trading fewer than 10,000 shares per day) and the substantial holdings of the brokerages (several million shares) the sale of the stock, *en masse*, would have caused a precipitous decline in the stock price, likely rendering the partnership's primary asset completely valueless.  The restriction on the liquidation of Innotrac stock continues to this day to protect the investors' interests in the partnership's assets.

including any claims the IPOF Fund, as a rights-bearing entity, could potentially assert against Dadante or other parties involved in his trading activities.  During this period, however, the relationships among many of the investors deteriorated.  Not unexpectedly, frictions arose among the plaintiffs based on alleged conduct prior to the creation of the Receivership,[4] and between certain plaintiffs and the Receiver based on disagreements as to how best to proceed with winding up the affairs of the IPOF Fund and pursuing its potential claims.[5]  It is these conflicts that have brought the issue of the legal status of the IPOF Fund to the forefront.[6]

[4] *See generally, Small v. Regalbuto*, No. 06-cv-1721, Compl. (July 17, 2006) (alleging, *inter alia*, that Frank and Michael Regalbuto violated securities laws and breached their fiduciary duties to certain investors).

[5] *See, e.g., Regalbuto Plaintiffs' Motion to Show Cause Why Receiver Mark Dottore Should Not Be Held in Contempt*, Sep. 11, 2007 (Doc. 315); *Regalbuto Plaintiffs' Motion to Remove Receiver for Cause and Show Cause Why Receiver Should Not Be Held In Contempt*, Aug. 1, 2007 (Doc. 299); *Regalbuto Plaintiffs' Motion for Further Accounting*, July 11, 2007 (Doc. 294); *Regalbuto Plaintiffs' Motion for Accounting*, May 3, 2007 (Doc. 263); *Motion to Terminate Receivership*, Jan. 26, 2007 (Doc. 179).

[6] At present, there are at least three "groups" of plaintiffs: (1) Cleveland Construction, Inc., Small Brothers Partnership, James W. Small, James Small, Jr., James W. Small (as Parent and Next Friend of N.S., Minor), Jon D. Small, Mark T. Small, and Timothy R. Small (collectively, the "Small Plaintiffs") who collectively represent the largest dollar volume of investment in the IPOF Fund and are collectively represented by counsel; (2) Frank Regalbuto, Jr., Frank Regalbuto, Jr. (as Parent and Next Friend of A.R., Minor), Frank Regalbuto, Jr. (as Parent and Next Friend of D.R., Minor), Frank Regalbuto, Jr. (as Parent and Next Friend of F.R., III, Minor), Frank Regalbuto, Jr. (as Parent and Next Friend of M.R., Minor), Frank Regalbuto, Jr. (as Parent and Next Friend of N.R., Minor), Joseph Regalbuto, Sr., Joseph Regalbuto, Sr. (as Parent and Next Friend of J.R., Jr., Minor), Michael Regalbuto, Sr., Michael Regalbuto, Sr. (as Parent and Next Friend of D.R., Minor), Michael Regalbuto, Sr. (as Parent and Next Friend of I.R., Minor), Michael Regalbuto, Sr. (as Parent and Next Friend of M.R., Jr.), Nancy J. Amantea, Carmen P. Arrigo, Jeffrey H. Berry, George W. Bostick, IV, Steven A. Calabrese, Raquel Castro, Sheldon Gordon, Domenic D. Ciricillo, James M. Ciricillo, Linda Ciricillo, Mary Ciricillo, Horace Consolo, John Consolo, Jr., John Consolo, Sr., Joseph Consolo, Thomas Consolo, Mary D'Angelo, Nicole Delauro, Susan Russell Giordano, David Koski, Robert J. Kups, Michael LaMonica, Robert LaMonica, William LaMonica, Frank Lariccia, Jr., Donald Lombardo, Anthony Lorello, Barbara Madrigal, Rodrigo Madrigal, Jr., Charles J. Magistro, Grace McKibben, Barbara Russell Melzer, James Mitchell, Angela Molitoris, Robert A. Montanari, David E. Nager,

4

In short, with respect to the pursuit of the potential claims of and against the Fund, the Regalbuto Plaintiffs do not believe that the Receiver is properly handling the Receivership estate. Their complaints fall into two major categories: (1) the Receiver is not the proper party to assert fraud-related claims against Dadante, the stakeholder defendants, or other third parties; and (2) the Receiver does not have the requisite authority to dispose of the assets of the IPOF Fund.  Both arguments turn on the whether the IPOF Fund is a distinct legal entity capable of pursuing claims and, if so, who may properly assert the claims of the IPOF Fund.[7]  These questions require the Court to examine the undisputed facts established in this case and to analyze Ohio business association jurisprudence.

## II.    FACTS.

As noted above, in an effort to determine the proper status of the IPOF Fund and its various participants, the Court invited all interested parties to submit position briefs arguing their respective

Carmen Parise, Charles Parise, Basil Perin, Jr., Paul Perrotti, Dan Petrich, Frank Regalbuto, Frank Regalbuto, Jr. (as Parent and Next Friend of R.R., Minor), Joseph Regalbuto, Sr. (as Parent and Next Friend of N.R., Minor), Michael Regalbuto, Sr. (as Parent and Next Friend of R.R., Minor), Reggie Homes, Inc., Gina M. Rosson, Jane K. Russo, Cristie Sciuva, Ray Sciuva, Salvatore Sciuva, Theresa Sciuva, Albert Thomas Skinner, Betty Sustersic, Philip Sustersic, Ted Teresczuk Trust, Gae Teresczuk, Charles Valentine, Virginia Vitantonio, Carol C. Voase, Charlene M. Warner, West Asphalt Paving Company, Paulette York, and Michael Regalbuto, Sr. (collectively, the "Regalbuto Plaintiffs") who represent the second largest pool of investor claims and are also collectively represented by counsel; and (3) a number of remaining individual plaintiffs who are all *pro se* and have largely remained silent.  Other interested parties include the Receiver, various financial institutions and brokerages originally named as "stakeholder defendants," Dadante, the United States of America (the "government"), Innotrac Corporation, and a number of putative defendants named in the Regalbuto Plaintiffs' proposed Second Amended Complaint.  (*See* Doc. 176).
[7] Under Ohio law, a limited partner may not bring a claim in his or her own name to recover monies allegedly owed to the partnership by third-parties and generally may not assert claims on behalf of the partnership itself; only the general partner may assert claims on behalf of the partnership and its members.  *See* Ohio Rev. Code § 1782.56.

positions as to the nature of the business association among the parties.  As a result of these filings, the Court has been able to distill a considerable number of significant, uncontested facts.  It also became clear to the Court during its examination of the parties' submissions that, from the beginning, the parties involved with the IPOF-related entities (the "fund") failed to file and execute many of the typical documents that knowledgeable business people usually find necessary to cement either the legal status of an investment fund, their relationship with the entity in which they are participating, or their relationships with one another. [8]

Many of the facts set forth below are relevant to a number of issues; the undisputed facts, the relevance of which will be discussed in detail below, are as follows:

## A.  Coffee King, Inc.

On October 31, 1994, the Ohio Secretary of State issued a registration certificate to Dadante for an Ohio corporation called Coffee King, Inc. ("Coffee King").

David Dadante was the sole shareholder of Coffee King.

In early 1998, Dadante registered the fictitious name "D&D Publications" with the Ohio Secretary of State for use by Coffee King.

Neither the trade name IPOF Fund, nor any similar name was ever registered with the Ohio Secretary of State as a fictitious name of Coffee King.

On January 4, 2007, the Ohio Secretary of State cancelled Coffee King's articles of

---

[8] The simple, unfortunate truth is that the "legal" documents prepared in an effort to describe the nature of the parties' business relationship, rights, and responsibilities were drafted by Dadante himself; an individual who, in addition to being utterly bereft of integrity, also apparently lacks any sort of business or legal experience, training, or acumen.  (*See* Dadante Dep. (Doc. 323) 17:18-19:16 Sep. 14, 2007).  The result is a bizarre collection of documents that muddle and commingle important legal terms creating, essentially, a "Mad Lib" of business association law.

incorporation for failure to file or pay corporate franchise taxes.

**B. The IPOF Fund**.

While the IPOF Fund was in operation, plaintiffs who entrusted money to Dadante for

investment purposes would receive and execute an Acknowledgment in connection with their

contributions to the IPOF Fund.  The Acknowledgment's terms are important to the legal

status of the IPOF Fund; they read as follows:

THIS ACKNOWLEDGMENT shall serve to set forth the terms and conditions relative to the deposit of the sum of   [blank space for left for amount entrusted by investor]   ("the Funds") by the undersigned (hereafter referred to as the "Depositor.")

Recognizing that the IPOF Fund shall administer the above-noted sum on behalf of the Depositor under the terms and conditions agreed to and evidenced by this Acknowledgment, the Deposit[or] hereby acknowledges and accepts the following:

1.      The Deposit shall be placed into a dedicated account for the express and sole purpose of utilization of such funds, together with such funds of others, in order to purchase Initial Public Offerings of publicly-held stocks.  The purchases of stock shall be undertaken through utilization of the services of such licensed stock brokerage firm or firms as IPOF Fund shall elect, with reasonable and standard brokerage commissions being deducted from the net amount allocable to the Depositor.

2.      IPOF shall maintain separate records of the funds deposited by the Depositor; the amount realized from the purchase and ultimate sale of Initial Public Offerings; and the allocable pro-rata share of the brokerage commissions applicable to the Depositor.  IPOF shall be entitled to deduct expenses or other charges whatsoever relative to the acquisition and sale of such stock.

3.      Depositor acknowledges that the Deposit shall be held to the account of the Depositor for a period of no less than thirty (30) days from date of deposit and that, upon written notice to IPOF, within thirty (30) days from date of receipt of notice, Depositor shall be entitled to receive the net amount due to the depositor less the allocable brokerage commissions above noted.

4.      Depositor further acknowledges that the Depositors intention is to participate with others and that, dependant on the ultimate number of other depositors, the legal entity form of the IPOF Fund may be modified so as to allow for the inclusion of other depositors. HOWEVER, UNDER NO CIRCUMSTANCES, shall the right of the Depositor to withdrawn [sic] Depositor's funds as noted in Paragraph 3[] above shall [sic] be modified

7

by the modification of the legal entity.  As may be reasonably required, the Depositor agrees to execute such additional documents as presented by the IPOF fund in order to affect [sic] the change in the legal entity status.

5.      The Depositor states that he/she/it is aware of the Initial Public Offering market and is not guaranteed a particular return on Depositor's deposit, whereupon the Depositor voluntarily and with full knowledge waives any claims as may be asserted as to the IPOF Fund, its officers, representatives, shareholders and agents.

6.      The IPOF Fund acknowledges that each depositor shall have the same rights and responsibilities as addressed above and that it shall equally apply the terms of deposit above stated in respect to each depositor's funds so deposited with it.

7.      The Depositor states that he/she/it has full and exclusive authority to execute this Acknowledgment and hereby voluntarily offers to deposit the sum noted above and accepts the terms of deposit noted above.

8.      Addendum "A" attached - Interest Yields

IN WITNESS WHEREOF, I hereby execute this Acknowledgment; state that I am aware of the nature of my deposit; and extend the authorization to the IPOF Funds to utilize the funds for the sole and express purposes and under the terms noted above. [9]

(See Regalbuto Pls. Position Statement (Doc. 257, Ex. 4), Acknowledgment of Frank Regalbuto, Jan. 14, 1999; Receiver's Position Statement (Doc. 258, Ex. C) Acknowledgment (name redacted), Apr. 1, 2003.)

The Acknowledgement document includes space for the Depositor to sign and date the document, and identify a beneficiary.  The exhibit attached to the Regalbuto Plaintiff's Position Statement is signed by Frank Regalbuto, and dated January 14, 1999.

The January 14, 1999 document closes with the phrase, "on behalf of IPOF Fund, the undersigned accepts the deposit of the sum of [amount from first paragraph] deposited on the above date: IPOF FUND by David Dadante, President," and bears Dadante's signature.

---

[9] The April 1, 2003 Acknowledgment contains an additional paragraph which reads:  "9. Fund Manager receives interest once 4% return per quarter on investment is achieved."  The "Fund Manager" is not identified, nor is the "interest" defined.

On June 1, 2000, David Dadante signed a twenty-eight page limited partnership agreement for IPOF, L.P.  The agreement was executed by Dadante as general partner of IPOF, L.P. and as "attorney-in-fact" for the limited partners.  No copies bearing any of the individual signatures of the limited partners have been submitted to the Court.  (*See* Regalbuto Pls. Position Statement (Doc. 257, Ex. 3) IPOF, L.P. Agreement, June 1, 2000 (the "IPOF, L.P. Agreement")

At various times, the plaintiffs would write checks to "IPOF Fund."  The checks would be endorsed "for deposit only, IPOF Fund."  (*See* Regalbuto Pls. Position Statement (Doc. 257, Ex. 6) Checks, March 3, 2001)

In September 2001, Frank Regalbuto and Dadante executed a document entitled "Corporate Authorization Resolution" (the "Resolution").  (*See* Regalbuto Pls. Position Statement (Doc. 257, Ex. 7) Corporate Resolution.)  The Resolution identifies the business organization as "engaged in business under the trade name IPOF Fund," but discloses the tax identification number as 34-1784116.  *Id.*  The resolution makes no mention of Coffee King, Inc., and was not filed with the Ohio Secretary of State.

There is no evidence that any participant in the IPOF Fund was ever told that they were making an investment in Coffee King or any other corporate entity, either as a shareholder or as a creditor (*i.e.* no participant has produced evidence that they hold an equity interest or a note relating to Coffee King or any dba thereof).

9

The Resolution identifies Dadante and Frank Regalbuto as agents of the organization and grants them both the power to, *inter alia*, open accounts, endorse checks, withdraw and deposit funds, borrow money, pledge security, etc.  *Id.*

Coffee King's tax identification number is 34-1784116.  *Id.*

On September 26, 2001, Dadante opened a bank account under the business name IPOF Fund.  Despite the name, this account also used the tax identification number 34-1784116.  Frank Regalbuto had signor authority for the account.  (*See* Regalbuto Pls. Position Statement (Doc. 257, Ex. 8) New Account Profile, Sep. 26, 2001.)

On October 1, 2001, Dadante and Frank Regalbuto executed a springing power of attorney designed to permit Frank Regalbuto to act as the "president" of the IPOF Fund should Dadante become unable to perform his duties.  The document is executed by Frank Regalbuto, as agent, and David Dadante, as "principal and president" of IPOF Fund which the power of attorney describes as an "incorporated" entity.  This document grants to Frank Regalbuto the power to act consistent with the powers conferred by the "articles of incorporation," "By-laws," and other corporate documents allegedly prepared and filed on behalf of the identified corporate entity.  (*See* Regalbuto Pls. Position Statement (Doc. 257, Ex. 9) Springing Power of Attorney, Oct. 1, 2001.)

On October 22, 2001, David Dadante, as general partner, applied to the Internal Revenue Service ("IRS") for a tax identification number ("EIN") on behalf of IPOF Fund Limited Partnership (trade name IPOF Fund).  The IRS issued IPOF Fund Limited Partnership the

EIN 30-0032853.  (*See* Receiver's Position Statement (Doc. 258, Ex. F) SS-4 Application, Oct. 22, 2001.)

In connection with the filing of 2001 income tax returns, Dadante, signing as general partner, distributed a notice to IPOF Fund participants stating, "[w]e have switched from a Sub-Chapter S Corp to a Limited Partnership effective 6-01-2000."  The notice instructed the recipients to discard a previous corporate return and file the new partnership returns with their tax forms for 2001.  (*See* Receiver's Position Statement (Doc. 258, Ex. B) ("Notice of Status Change"))

On January 30, 2002, Dadante's accountant sent him the 2000 Federal Income Tax Returns for IPOF Fund Limited Partnership.  (*See* Receiver's Position Statement (Doc. 258, Ex. G) Oct. 22, 2001 Letter from G. Wolanin, CPA to D. Dadante.)

In May 2003, Dadante opened a brokerage account for the "IPOF Fund" with Ferris Baker Watts.  On the account application, the IPOF Fund was described as a partnership.  In connection with this account, Dadante also filed a "partnership certification" listing himself as the general partner and Christopher Dadante as a limited partner.  (*See* Ferris Baker Watts' Position Statement (Doc. 259, Ex. A))

From tax year 2000 through tax year 2004, Dadante caused the IPOF Fund to file partnership tax returns to the IRS.  In addition, during that period Dadante sent Schedule K-1s (Partner's Share of Income forms) ("K-1") to the plaintiffs.  The K-1s: (1) used the EIN 30-0032853; (2) identified the entity as "IPOF Fund Limited Partnership;" (3) identified the plaintiffs as domestic, limited partners of the entity; and (4) identified each limited partner's percentage

11

share of profits, losses, and owned capital.  (*See* Receiver's Position Statement (Doc. 258, Ex. D) 2000 Form 1065 U.S. Return of Partnership Income (Jan. 30, 2002); Receiver's Position Statement (Doc. 258, Ex. E) 2000 Form 1065, Schedule K-1, Partner's Share of Income; Small Plaintiffs' Position Statement (Doc. 260, Ex. 2) collected Schedule K-1s, various dates.)

Despite Dadante's IRS filings, IPOF, L.P. was not certified by the Ohio Secretary of State as a limited partnership until April 29, 2004.  (*See* Receiver's Position Statement (Doc. 258, Ex. A) Limited Partnership Certificate, Apr. 29, 2004.)

In November 2005, Frank and Joseph Regalbuto submitted signed documents to Sky Bank declaring that the IPOF Fund was a partnership and identifying its EIN as 30-0032853. [10] (*See* Receiver's Reply Position Statement (Doc. 283, Exs. A, B) Sky Bank Documents.)

In Sheldon Gordon's November 21, 2005 complaint in this action, and again in the April 2006 Amended Complaint, joined by all participants in the IPOF Fund (including the Regalbuto Plaintiffs), the IPOF Fund is described as an Ohio Limited Partnership.  Compl. ¶¶ 17-18. [11]

By virtue of an August 16, 2007 plea agreement, the government asserted that it could prove beyond a reasonable doubt that the IPOF Fund operated as a limited partnership.  David

---

[10] One of the documents appears to indicate that the Sky Bank IPOF Fund account was originally opened on September 26, 2001.  The documents appear to change signing authority for the accounts from Dadante to Frank and Joseph Regalbuto, and change the mailing address from Dadante's to one of the Regalbuto's.  This action appears to have been taken in November 2005 in response to the discovery of the fraud by Dadante.

[11] In Gordon's original request to appoint Mark Dottore as Receiver, moreover, he claimed that in the absence of a Receiver, the rights of the investors would be placed in jeopardy, presumably because they lacked the individual authority to act on behalf of the partnership.

Dadante signed the plea agreement, admitting, under oath, that the IPOF Fund was a limited partnership. *See United States v. Dadante*, Case No. 07-cr-336, Dadante Plea Agreement, Aug. 16, 2007 (Doc. 21) ("Dadante Plea Agreement").

Throughout the course of the ponzi scheme, the stakeholder brokerage defendants understood the IPOF Fund to be an Ohio Limited Partnership. *See Ferris, Baker Watts' Position Statement* (Doc. 259) Apr. 30, 2007.

## III.  DISCUSSION.

When given sufficient facts, a court may determine the nature of a business relationship. *See Farmers Ins. Co. v. Ross & Lennan*, 29 Ohio St. 429, 429 (1876); ("whether there was a partnership between them or not became a question of law, which it was the duty of the court to decide."); *Cloud v. Baldwin*, No. 70795, 1997 WL 67757, at *3 (Ohio App. 8 Dist. Feb. 13, 1997); *Heinz v. Steffen*, 678 N.E.2d 264, 270-71 (Ohio App. 1996); *Berger v. Dare*, 649 N.E.2d 1316, 1319-20 (Ohio App. 1994).  Here, when reviewing the submissions made to the Court by the parties to aid in determining the legal status of the IPOF Fund, the deliberate factual assertions made in the parties' briefs may be considered judicial admissions. *See United States v. Burns*, 109 Fed. Appx. 52, 58 (6th Cir. 2004) (citations omitted).  In addition, the Court takes judicial notice, where appropriate, of the existence of certain public filings and records. *See Passa v. City of Columbus*, 123 Fed.Appx. 694, 697-98 (6th Cir. 2005); *Helwig v. Vencor, Inc.*, 251 F.3d 540, 569 (6th Cir. 2001).  Finally, and notably in this case, a party's own statement, made in the pleadings of a prior case, may also be considered by the Court as evidence. *Barnes v. Owens-Corning Fiberglas Corp.*, 201 F.3d 815, 829 (6th Cir. 2000) (citations omitted).

13

As a result of the facts detailed above, virtually every party with an interest in this, or any related case, asserts that the IPOF Fund is an Ohio Limited Partnership. This position is held on the record by the United States of America (through the Department of Justice), the Securities Exchange Commission (the "SEC"), Dadante, the Receiver, Ferris Baker Watts, and investors representing approximately fifty-two percent of the value of the IPOF Fund;[12] off the record virtually every brokerage, lawyer, or accountant dealing with the IPOF Fund at any time during or prior to the initiation of this suit has voiced the same opinion. *(See Receiver's Position Statement Regarding Legal Status of IPOF Fund (Doc. 258) Apr. 30, 2007; Ferris, Baker Watts' Position Statement (Doc. 259) Apr. 30, 2007; Small Plaintiffs' Position Statement Regarding the Existence of a Limited Partnership (Doc. 260) Apr. 30, 2007; Dadante Plea Agreement; United States v. Dadante*, Case No. 07-cr-00336, Doc. 21, *Information* (June 12, 2007)). Indeed, until this matter had proceeded for well over fourteen months, no party on any side of the litigation even once challenged the notion that the IPOF Fund was a limited partnership. Within the past nine months, however, the Regalbuto Plaintiffs began to argue that they were not limited partners with Dadante. (*See Position Statement of Regalbuto Plaintiffs* (Doc. 257). The Regalbuto Plaintiffs, now advised by their fourth group of lawyers, asks the Court to find that the IPOF Fund was not a limited partnership. In an effort to explain their delay in raising the issue, the Regalbuto Plaintiffs contend that, at a minimum, their first

---

[12] This majority of investors, as explained during a prior hearing, is comprised of the Small Plaintiffs, who have filed a position statement arguing that the IPOF Fund is a limited partnership, and other investors who have not deviated from the position taken in the original complaint in which they asserted that the IPOF Fund is a limited partnership.

14

two sets of lawyers committed malpractice when they overlooked the issue.[13]  The Regalbuto Plaintiffs primarily have championed the notion that the IPOF Fund is part of Coffee King, Inc., though, at times they have implied that the IPOF Fund was not a legal entity of any sort (*e.g.,* a joint venture, corporation, sole proprietorship, etc.).  In short, the parties' submissions present the Court with limited options:  finding the IPOF Fund to be a limited partnership, finding the IPOF Fund to be part of Coffee King, or finding the IPOF Fund to be nothing.

As discussed in detail below, the Court finds none of the choices offered by the parties to be wholly satisfactory for the entire relevant period.  The parties' failure to address other potential outcomes or suggest an alternative form of business association makes the Court's task of sifting through the wreckage of this debacle somewhat more difficult.  Given the apparent investment-related inexperience of the IPOF Fund participants, the acrimony among the parties, and the admitted fraud of Dadante, however, this is unsurprising.  In any event, the agreements at issue, the actions of the parties, and Ohio law determine the proper nature of the business relationship among the participants in the IPOF Fund.  As explained below, this does not always comport with the parties' current views, or the nomenclature of the agreements and other documents used in "organizing" (a term the Court uses loosely here) the IPOF Fund.  *Allen v. Niehaus*, Nos. 000213, 000235, 2001 WL 1589169, at *6 (Ohio App. Dec. 14, 2001) (citations omitted) (stating that a partnership exists when,

---

[13] Specifically, the Regalbuto Plaintiffs argue that the first firm representing the IPOF Fund purposely called the IPOF Fund a limited partnership to protect Steven Wasserman, who worked with Dadante on IPOF Fund matters while he was a partner at the firm.  The Regalbuto Plaintiffs charge the second law firm with malpractice for failing to investigate the IPOF Fund's relationship to Coffee King prior to filing the amended complaint.  A third attorney representing the Regalbuto Plaintiffs has also withdrawn.  As of this moment, the Regalbuto Plaintiffs have not argued that the third attorney's contention that no collective entity existed, rather than suggesting that the IPOF Fund was a part of Coffee King, amounted to legal malpractice.

15

"parties have acted in such a way that a partnership has come into operation.  The relevant inquiry is not whether the parties intend that the law describe their relationship as a partnership, but rather whether they intend a relationship that includes the essential elements of partnership."); *Madden Investment Co. v. Stephenson's Apparel*, 832 N.E.2d 780, 782 (Ohio App. 2005).

At the outset, the Court rejects the notion, proffered at times (though not recently) on behalf of the Regalbuto Plaintiffs, that the IPOF Fund is nothing.  It is undisputed that the entity was governed pursuant to various agreements, held the collective interests of various parties, operated under a fictitious name, maintained accounts, engaged in business activities in pursuit of profit, and held itself out to both private and governmental entities as an identifiable business organization. These are the hallmarks of a business entity.  The discussion below, therefore, focuses on what *type* of business association the IPOF Fund was, and not whether the IPOF Fund was a distinct entity at all.

Accordingly, the Court must decide, based on the parties' submissions, what type of entity the IPOF Fund was, and is, under Ohio law.  The Court undertakes such a finding by analyzing Ohio law with a mind towards balancing the competing equities.  On the one hand parties should not be rewarded with limited liability when they improperly draft legal instruments, enter into unclear agreements, and fail to abide by Ohio's statutory scheme for forming business associations or engaging in commercial activities using a fictitious name.  To state it differently, as a general principle, individuals seeking to form a business association must not be permitted to avoid their liabilities to, and/or create legal uncertainty for, outside parties who deal with the business association by failing to discharge their statutory duties with respect to the formation or registration of the entity.  To permit such conduct would incentivize the ill-advised actions undertaken here.  On

16

the other hand, parties who rely on the representations of an untrustworthy individual should not necessarily be thrust into membership in an association of a type they did not intend to join – complete with attendant liabilities to third parties. Fortunately, as discussed below, the Ohio General Assembly has created protections for individuals who participate in an entity believing, whether from deception or ignorance, that it is of a different type. With these considerations in mind, the Court turns to the task of determining the legal status of the IPOF Fund by examining the undisputed facts and applying Ohio law to those facts.

### A. Coffee King.

The Court finds it necessary to address first the issue of Coffee King. Simply stated, the Regalbuto Plaintiffs now suggest that the IPOF Fund and Coffee King are the same, whereas all other interested parties (the government, the SEC, Dadante, the Receiver, the brokerages, and the remaining plaintiffs) recognize that Coffee King is defunct and irrelevant. In numerous recent filings, including its position statement regarding the nature of the IPOF Fund, the Regalbuto Plaintiffs contend that Coffee King, and not the IPOF Fund, is the relevant business entity for purposes of this lawsuit. In brief, the Regalbuto Plaintiffs argue that the IPOF Fund is actually a trade name or "dba" of Coffee King and, thus, that any assets and claims of the IPOF Fund (and presumably any claim against it) actually belong to Coffee King.[14]  1The Regalbuto Plaintiffs'

---

[14] The Regalbuto Plaintiffs also appear to believe that Dadante's personal assets belong to Coffee King. (*See Regalbuto Plaintiffs' Objection to Sale of Real Estate By Receiver* (Doc. 271) (arguing that Dadante's former residence (deeded to Dadante) somehow belongs to Coffee King); *see also Coffee King, Inc. v. Cantanese*, No. CV-07-634618 (Cuyahoga Cty. C.P. Sep. 4, 2007)). If anything, because Dadante is undisputedly the sole shareholder of Coffee King, the opposite would be true and Coffee King's assets would inure to Dadante (and, as explained below, pass from Dadante to the Receivership).

argument with respect to Coffee King can be distilled to three contentions, each entirely dependent on the validity of the preceding assertion, and none of which can withstand scrutiny.

First, the Regalbuto Plaintiffs assert that the IPOF Fund is currently either a corporate subsidiary of Coffee King, or a trade name (sometimes referred to as a "dba") of Coffee King, because the IPOF Fund initially utilized Coffee King's tax identification number to establish certain bank accounts. Next, the Regalbuto Plaintiffs argue that, because the IPOF Fund is really Coffee King, and the Court's order appointing a Receiver made no mention of Coffee King, the Receiver neither has control over the primary assets of the estate, nor the authority to bring claims on behalf of the IPOF Fund. In other words, all actions taken by the Receiver on behalf of the IPOF Fund are illegitimate because the IPOF Fund is merely the corporation Coffee King, an entity over which the Receiver has no authority. Finally, the Regalbuto Plaintiffs believe that, by virtue of the power of attorney noted above, Frank Regalbuto, as "de facto president" of the IPOF Find and Coffee King, is the proper party to pursue the IPOF Fund's claims and distribute its assets. (*Regalbuto Plaintiffs' Brief In Response To Position Statement of Receiver* (Doc. 276) at 15-17).[15]

---

[15] To emphasize, it is clear from the parties' submissions that the primary point of contention here actually is not the legal status of the IPOF Fund. Instead, the parties have raised that issue in an effort to determine who rightfully controls the entities that Dadante used to perpetrate the fraud. Indeed, virtually all the briefing addresses whether Frank Regalbuto should control the IPOF Fund as opposed to the Receiver, and little time was devoted to the implications that the legal status of the IPOF Fund may have beyond the issue of control. For instance, as noted below, the Regalbuto Plaintiffs seem to ignore the fact that *if* the IPOF Fund is nothing more than an arm of Coffee King, a now defunct corporation, then no one, not even its "de facto" president," would have the right to assert claims on its behalf. As discussed below, the issue of control is more simply resolved because, by virtue of this Court's authority and its previous orders, it rests with the Receiver whether the IPOF Fund is a partnership or not, and whether the IPOF Fund is part of Coffee King or not. Nevertheless, the Court, herein, resolves the ultimate question of the legal status of the IPOF Fund as it likely will have implications for this litigation irrespective of who exercises control over the IPOF Fund.

18

As discussed below, each one of these "Coffee King" arguments is flawed and thus has no practical impact on the status of this litigation.  The Court addresses each point in turn.

>    **1.    IPOF Fund's Use of Coffee King's Tax Identification Number to Open An Account Does Not Make IPOF Fund a Part of Coffee King.**

The Regalbuto Plaintiffs' contentions with respect to Coffee King predominantly rely upon the mistaken belief that the use of Coffee King's tax number on some of the IPOF Fund's early bank accounts conclusively establishes that the IPOF Fund is a trade name ("dba") of Coffee King[16] and, therefore, that all of its assets (even those in accounts that were established using other tax identification numbers) belong to the Coffee King corporation.[17]  The Regalbuto Plaintiffs have not cited any authority for this contention, nor has the Court's own extensive research into the issue uncovered any support for this argument.  In the absence of guidance to the contrary, the Court finds that this argument lacks merit and ignores the realities of the case.

It is true that the IPOF Fund, at some time, used accounts originally set up for Coffee King and D&D Publications (a registered trade name of Coffee King), though at least one D&D Publications' account used Dadante's son's social security number.  Dadante, however, used numerous bank accounts under numerous names and aliases to perpetrate his fraud, all the while representing that the participants were investing in the IPOF Fund (and not Coffee King).  The Regalbuto Plaintiffs do not suggest that monies placed into accounts under names and aliases other than Coffee King belong to those other entities

---

[16] As noted above, Dadante never registered the "IPOF Fund" or any other similar name as trade name of Coffee King.

[17] Incongruously, despite the significance that the Regalbuto Plaintiffs place on the use of *Coffee King's tax number*, they argue that the use of the *IPOF Fund's tax number* on filings submitted to the IRS and on K-1s sent to the IPOF Fund's participants is essentially meaningless, and does not establish that the IPOF Fund was a limited partnership.

Furthermore, while it is true that at least one or two documents Dadante used to open bank accounts referred to Coffee King or D&D Publications, a dba of Coffee King, other filings and evidence overwhelmingly establish that the IPOF Fund was not connected to Coffee King in any way. The Acknowledgement, for instance, described the IPOF Fund as engaged in the business of investing in Initial Public Offerings, and it is undisputed that this was the business in which the participants believed they were investing. During his deposition, Dadante explained that Coffee King was established to sell flavored coffee over the internet. (Deposition of David Dadante, Sep. 14, 2007 at 16:7-16:22) The Regalbuto Plaintiffs have given no indication that, contrary to the stated purpose of the IPOF Fund, they intended to invest in a business that was selling flavored coffee over the internet.

The Regalbuto Plaintiffs, moreover, have produced no evidence to the Court that any participant signed or viewed any document representing that the entity in which they were participating was Coffee King (no corporate records, stock certificates, quarterly reports, annual statements, etc.). Instead, virtually every piece of information provided to the participants (Acknowledgements, statements, checks, letters, and years worth of K-1s), represented that the parties were participating in the IPOF Fund, and made no mention of Coffee King. Indeed, the record shows that investors, including Frank Regalbuto made their checks out to IPOF Fund – not Coffee King, or "Coffee King dba IPOF Fund." Further, IPOF Fund was not a registered trade name of Coffee King. Notably, while the IPOF Fund used some bank accounts that purportedly were established on behalf of Coffee King, it also used numerous other bank accounts established in the names of other entities and individuals. The record shows that the IPOF Fund also utilized accounts set up for IPOF Fund, L.P. (using the IPOF Fund's tax identification number), GSGI (using Coffee

20

King's tax number), David Dadante and his son (using their individual social security numbers), and Web Studio (using Dadante's son's tax identification social security number).  (*See Regalbuto Plaintiffs' Brief In Response To Position Statement of Receiver* (Doc. 276) Ex. I).  In total, an examination of Dadante's plea agreement reveals that Dadante used over thirty different accounts with nearly a dozen different names[18] during the course of the fraud.  (*See Dadante Plea Agreement*, at 7-8).  In short, the only thing that suggests that the IPOF Fund was a part of Coffee King and not a separate entity is the sporadic use of a tax identification number and an initial reference to Coffee King in an effort to open one of many bank accounts.[19]

Finally, Dadante's improper use of Coffee King's tax identification number is neither surprising nor controlling.  Dadante, after all, was committing a massive fraud and his initial failure to account properly for the deposits of the plaintiffs is not particularly astonishing.  The Court, moreover, does not believe that Dadante's deposit of IPOF Fund monies into accounts originally opened on behalf of Coffee King made those assets property of Coffee King any more than Dadante's deposit of IPOF fund monies into his personal account would make those his personal assets.  No party has provided any authority holding to the contrary.  Frankly, the unsupported

---

[18] In fact, of the thirty accounts, only two appear to have included the name Coffee King. (*Id.*)

[19] To the extent the Regalbuto Plaintiffs also rely on the power of attorney's reference to the IPOF Fund as an "incorporated" entity to show that it was part of Coffee King, that reliance is misplaced.  First, the power of attorney describes the IPOF Fund as an *independent* corporate entity incorporated in the State of Ohio and does not make any mention of Coffee King.  This actually demonstrates that the IPOF Fund was intended to be an independent entity (which also further undercuts the argument that it is nothing) and not a subsidiary or dba of Coffee King.  It is undisputed, moreover, that IPOF Fund never filed any articles of incorporation, and instead tardily filed a certificate of limited partnership (discussed below).  Thus, the power of attorney, which repeatedly refers to documents that were neither drafted nor filed, is apparently little more than another aspect of the fraud that Dadante perpetrated on all of his partners, and most directly on Mr. Regalbuto.

suggestions to the contrary are overly simplistic and ignore the practical realities of the case.  In sum, the Court finds that the sole fact that Dadante once used accounts originally set up for Coffee King to further the IPOF Fund fraud does not establish that the IPOF Fund, *an unregistered entity*, can properly be deemed a dba or subsidiary of Coffee King.

### 2. Even if IPOF Fund Were Part of Coffee King It Would Still Be Under the Control of the Receiver.

Next, the Regalbuto Plaintiffs argue that, because IPOF Fund is a dba of Coffee King, it is not part of the Receivership estate.  Instead, according to the Regalbuto Plaintiffs, Coffee King is outside the Receivership and under the control of Frank Regalbuto.  The Regalbuto Plaintiffs' conclusion that the IPOF Fund is under the control of Frank Regalbuto is premised on two assertions:  first, that IPOF Fund is part of Coffee King; second, that the assets of Coffee King should be under the control of Frank Regalbuto and not the Receiver.  Having already discussed and rejected the Regalbuto Plaintiffs' first premise, the Court properly could dismiss the entire argument.  Nevertheless, given the consistent effort to insert Coffee King into these proceedings, a discussion of the failings of the second premise is warranted.

At the outset, the Court observes, if Coffee King were an integral part of Dadante's fraud, that it would have been well within the Court's authority to appoint a receiver over Coffee King, a corporation, particularly under the circumstances of this case.  *See* Fed. R. Civ. P. 66 (discussing actions involving the appointment of a receiver); *Liberte Capital Group, LLC v. Capwill*, 462 F.3d 543, 551-52 (6th Cir. 2006) (detailing the powers of a district court presiding over a receivership); *see also* Ohio Rev. Code § 2735.01 (authorizing appointments of receivers in equity or where a corporation has forfeited its rights); Ohio Rev. Code § 1701.90 (authorizing appointments of

22

receivers to wind up the affairs of a corporation where, as here, the articles of incorporation have been canceled); *Geraldo v. Savage*, No. L-88-278, 1989 WL 65090, *2 (Ohio App. June 16, 1989) (holding that appointment of a receiver is appropriate when the property of a business association is in danger of being lost or materially damaged). The Regalbuto Plaintiffs' argument, however, claims that the Court has not *specifically* appointed a receiver over the assets of Coffee King, and therefore, (because the Regalbuto Plaintiffs erroneously believe that IPOF Fund is part of Coffee King) control of Coffee King rests with Frank Regalbuto by virtue of a power of attorney appointing him "defacto president" of IPOF Fund.

Though it is true that the Court's Orders describing the assets under control of the Receivership estate did not mention Coffee King by name, it is specious to argue that, to the extent Coffee King possessed any claims or assets, they are not contemplated by the Orders. On August 8, 2006, the Receiver advised the Court that his investigation of the assets of Dadante revealed that Dadante used various entities and fictitious names to perpetrate his fraud. At that time it was not entirely clear what, or how many, entities Dadante used to perpetuate the IPOF Fund fraud. Thus, the Receiver specifically requested, via motion, that the Court expand the Receivership estate to include the assets of any company or entity in which Dadante held an interest or control as well as Dadante's personal estate. (*See Motion to Expand Receivership Estate,* Doc. 135). The issue was opposed by Dadante (though not by any of the Regalbuto Plaintiffs), fully briefed, and, on October 6, 2006, the Court granted the Receiver's motion, expanding the estate to include Dadante's estate and: "*any corporation, partnership trust and/or other entity which is directly or indirectly owned by or under the direct or indirect control of Dadante . . . .*" (*See* Order of October 6, 2006, Doc 150 at 3 (emphasis added)).

23

Given the undisputed fact that Dadante was the only officer and sole shareholder of Coffee King, the Court cannot envision any scenario under which Coffee King would not fall into the category of the entities he controls (as the sole officer of Coffee King) or his estate (by virtue of his personal ownership of 100% of Coffee King) or both.  As such, even if IPOF Fund was part of Coffee King (it was not) and even if the Court's initial Order appointing a receiver did not contemplate Coffee King, its subsequent Order expanding the Receivership estate placed Coffee King's assets squarely within the control of the Receiver.  Frank Regalbuto, therefore, cannot claim the right to control Coffee King by virtue of his power of attorney.  Once the control of Coffee King's assets passed to the Receiver, neither Dadante as sole owner and "president" of Coffee King, nor Frank Regalbuto, as Dadante's attorney-in-fact, could regain control of Coffee King absent the Court's permission.  In other words, Frank Regalbuto's power of attorney bestowed upon him only the control over IPOF Fund which Dadante possessed and Dadante had been stripped of the right to control the IPOF Fund. [20]

### 3. Neither Frank Regalbuto, Nor Any Other Party Can Assert the Claims of Coffee King.

Finally, even in the absence of the Court's above determinations, the Regalbuto Plaintiffs' arguments championing Frank Regalbuto as the proper party to assert claims in favor of Coffee King would falter.  The Regalbuto Plaintiffs acknowledge that, "Coffee King is presently not an active

---

[20] The Court also notes that the "Power to Act as President of IPOF Fund" described in the power of attorney grants the "de facto" president the power to "perform all duties of that office as may be delineated in the Articles of Incorporation, By-Laws, or other documents . . . ."  As noted above, it is undisputed that there are no Articles of Incorporation or By-Laws for IPOF Fund.  The office of "de facto" president, therefore, is essentially powerless. Dadante purported to bestow a power upon Mr. Regalbuto that did *not* exist.  Dadante's willingness to defraud even his closest friends apparently knew no bounds.

Ohio Corporation." (*See Regalbuto Plaintiffs' Response To Position Statement of Receiver* (Doc. 276) at 16).  Without citing any authority, however, the Regalbuto Plaintiffs contend, "[t]hat fact alone does not preclude Coffee King, Inc., from being involved in this litigation," (*Id.*) and "the cancellation of Coffee King, Inc.'s charter is not determinative," (*See Regalbuto Plaintiffs Position Reply Memorandum* (Doc. 287) at n.2).  It is unremarkable that the Regalbuto Plaintiffs could find no support for these statements because Ohio law is directly to the contrary.  Indeed, the Ohio Revised Code unambiguously states: "**No person shall exercise or attempt to exercise any rights, privileges, immunities, powers, franchises, or authority under the articles of a domestic corporation after such articles have been canceled** . . . ."  Ohio Rev. Code § 1701.97 (emphasis added).[21]  As a result, even if the Regalbuto Plaintiffs were correct in their assertion that the IPOF Fund is a dba of Coffee King (they are not) and were correct that, as a dba of Coffee King, the IPOF Fund is not part of the Receivership (they are not) Frank Regalbuto could not exercise the rights he believes he holds by virtue of the power of attorney discussed above (which, the Court observes, describes the entity as IPOF Fund and makes no mention of Coffee King).

> **B     The IPOF Fund.**

Having decided that the IPOF Fund is not a dba, subsidiary, or otherwise, a part of Coffee King, the Court turns to the governing agreements of IPOF Fund to determine its legal status.

> **1.     The Nature of the IPOF Fund Before April 29, 2004.**

From its origination until April 29, 2004, the primary governing document of the IPOF Fund was the Acknowledgement, set forth in full above.  Though that document does not spell out what

---

[21] Coffee King's inability to assert claims is of no practical consequence to this or, likely, any other matter because Coffee King appears to have no claims, debts, assets, or ongoing business operations of any sort.

25

type of entity the IPOF Fund is, it is apparent that, during the course of the IPOF Fund's existence, Dadante referred to the entity as IPOF, L.P.  As noted above, moreover, Dadante, in 2000, explained to the IPOF Fund's participants that he was changing the business structure of the IPOF Fund to a limited partnership.  There is no evidence that any of the IPOF Fund participants made an objection to the change in status.[22]  For a number of years thereafter, Dadante sent tax information to the participants referring the IPOF Fund as a domestic limited partnership.  It was not until April 29, 2004, however, that the IPOF Fund or any of its agents registered as an entity with the Ohio Secretary of State.  "A failure to comply with the filing requirements has been interpreted in Ohio to mean that the [purported limited] partnership was a general partnership, as a matter of law." *Heinz v. Steffen*, 678 N.E.2d 264, 271 (Ohio App. 1996) (emphasis added) (citing *Battista v. Lebanon Trotting Assn.*, 538 F.2d 111, 114 (6th Cir. 1976); *see also* Ohio Rev. Code § 1782.08. Accordingly, the Court finds that the IPOF Fund could not have been a limited partnership prior to its April 24, 2004 registration.  Indeed, as explained below, the Court finds that, from its inception until April 29, 2004, the IPOF Fund could not have been a limited liability company, a corporation, a limited partnership, or any other limited liability business association that has, as a prerequisite to formation, a registration requirement.[23]

---

[22] As discussed below, the participants' silence on the issue is unsurprising because the change in status was completely consistent with paragraph four of Acknowledgement.

[23] Because all of the assets of the business entity "managed" by Dadante and known at times by varying names, but predominantly as IPOF Fund, passed to the IPOF, L.P. on April 29, 2004, the nature of the IPOF Fund prior to its registration on April 24, 2004 does not appear to be particularly critical to the case.  In an effort to present a more complete background and to better explain and chronicle the developments of the IPOF Fund, however, the Court briefly addresses the legal status of the IPOF Fund prior to April 29, 2004.

26

a.   **The IPOF Fund, at Inception, Was Not A Limited Liability Partnership, a Limited Liability Company, or a Corporation.**

It is important to consider the suggestion that the IPOF Fund was a limited liability entity (including, as the Regalbuto Plaintiffs suggest, a part of Coffee King) from the perspective of an innocent creditor.

Generally speaking, it would create unjust results if the Court were to find that the IPOF Fund, L.P. was a dba of Coffee King, Inc, or another entity bearing a fictitious name and possessed of the severely limited liability afforded to corporations.  To do so would limit the liability of the individuals making representations on behalf of the entity (IPOF Fund), without placing the public on notice through appropriate filings with the Ohio Secretary of State.  It is likely for this reason, in part, that Ohio requires the registration of trade names and entities seeking corporate protections or other limitations on their liability.  *Compare* Ohio Rev. Code § 1701.04 (requiring registration for corporations); Ohio Rev. Code § 1705.04 (requiring registration for limited liability companies); Ohio Rev. Code § 1782.08 (requiring registration for limited liability partnerships); and Ohio Rev. Code § 1329.01 (requiring businesses to report the use of trade names and fictitious names with the Secretary of State) *with* Ohio Rev. Code § 1777.02 (only requiring registration of a partnership using a fictitious name); *Grenada Bank v. Willey*, 705 F.2d 176, 178 (6th Cir. 1983) (finding that a failure to register as a limited partnership precludes partners from claiming limited liability as to third parties who are without actual notice) and *In re Tower Metal Alloy Co.,* 200 B.R. 598, 607 (Bankr. S.D. Ohio 1996) ("In Ohio, partnerships are not required to register with the state to do business."). In short, without registering IPOF Fund, L.P. as a trade name of Coffee King, a hypothetical creditor (and the general public) would have no way of knowing that when dealing with Dadante and/or the

27

entity, they were dealing with an association possessing limited liability.[24]  It is for this additional reason that the Court is loath to limit the liability of IPOF Fund by finding it to be a part of Coffee King, Inc. (or finding the IPOF Fund to be a limited partnership prior to April 29, 2004) despite the failure of Dadante to register IPOF Fund as an entity with limited liability.

### b.      Until April 2004, the IPOF Fund Was a General Partnership.

Generally, when a partnership fails to register as a limited partnership, Ohio courts have found it to be a general partnership.  *See Heinz*, 678 N.E.2d at 271; *see also Grenada*, 705 F.2d at 178 (emphasis added) (stating that courts, "construing the Uniform Limited Partnership Act are in accord that a failure to comply with the statutory requirements for establishing a limited partnership, such as recording, *does not void the creation of an association between the partners*, but does preclude those partners from claiming the status of limited partners . . . ."); *Battista*, 538 F.2d at 114; *cf* Ohio Rev. Code § 1782.20.  In *Heinz* and *Battista*, the courts began with the premise that a partnership existed, and proceeded to analyze whether the partnership (or partner) possessed limited liability.  The Courts found that, due to a failure to register, they did not.  Here, however, the question of whether the participants in the IPOF Fund were partners in any capacity is a primary point of contention.  Accordingly, the Court must examine more closely the formation of a partnership within Ohio.

---

[24] Here, as noted above, it appears that at least one creditor, Ferris Baker Watts, would have had notice of limited liability by virtue of the application and partnership certification described above.  Though this does not alter the Court's conclusions with respect to the nature of the IPOF Fund prior to April 29, 2004, it does provide an additional basis upon which to find that the IPOF Fund held itself out to be a partnership and, as a result, should be equitably barred from disavowing that status.  (See, *infra*, section III(B)(1)(b)-(c); n.30)

In Ohio, the "test of partnership," as applied by the courts has remained largely unchanged for over a century.  Generally, in Ohio when individuals engage in a joint business and share in the profits as principals – even absent a written agreement – they will be considered partners.  *Goubeaux v. Krickenberger*, 185 N.E. 201, 205 (Ohio 1933) (*citing Harvey v. Childs*, 28 Ohio St. 913 (1876) ("'The evidence must show that the persons taking the profits, shared them as principals in a joint business, in which each has an express or implied anthority [sic] to bind the other.'")); *deVillers v. Sliwinski*, No. 92-CA-27, 1993 WL 183490, at *3 (Ohio App. May 20, 1993) ("A general partnership may arise informally, although sound business practice advises that the rights and duties of the partners be spelled out in a written agreement."); *see also* Ohio Rev. Code § 1775.06.[25]  It is undisputed that the participants of the IPOF Fund were entitled to receive a share of the profits.  (*See* Acknowledgement).  As noted above, Ohio Revised Code section 1775.06 (D) states that:  "The receipt by a person of a share of the profits of a business is prima-facie evidence that he is a partner in the business. . . ."  In *Small v. Regalbuto*, No. 06cv1721 (N.D. Ohio) (the "Small case"), also before the undersigned, Frank Regalbuto admitted that he wrote over $500,000 in checks payable

---

[25] Under the Ohio Revised Code, a court considers profit participation when examining the question of partnership:

> (A) Except as provided by section 1775.15 of the Revised Code, persons who are not partners as to each other are not partners as to third persons.
> (B) Joint tenancy, tenancy with a right of survivorship, tenancy in common, tenancy by the entireties, joint property, common property, or part ownership does not of itself establish a partnership, whether such co-owners do or do not share any profits made by the use of property.
> (C) The sharing of gross returns does not of itself establish a partnership, whether or not the persons sharing them have a joint or common right or interest in any property from which the returns are derived.
> (D) The receipt by a person of a share of the profits of a business is prima-facie evidence that he is a partner in the business, . . . .

Ohio Rev. Code § 1775.06 (emphasis added).

29

to himself drawn on a Sky Bank account titled "IPOF Fund," in his Answer, Counterclaim, and Third Party Complaint. (*See Small*, October 31, 2006 Ans. & Third Party Compl. (Doc. 19) ¶¶ 27-29, 32, 33). It is also evident that many of the other plaintiffs were receiving distributions of a share of the "profits" from the Fund. At the outset, therefore, there is "prima facie evidence" that the IPOF Fund was a partnership. Ohio Rev. Code § 1775.06. Still, though profit participation is evidence of partnership, it is not necessarily determinative and the Court must look deeper. *Goubeaux*, 185 N.E. at 205 (internal citations and quotations omitted) ("Participation in the profits . . . though cogent evidence of a partnership, is not necessarily decisive of the question.").

As the Regalbuto Plaintiffs contend, courts have considered numerous factors beyond the distribution of profits in determining whether a partnership has been formed and, generally, no single factor is controlling. *In re Estate of Nuss*, 646 N.E.2d 504, 507 (Ohio App. 1994) ("Since every business relationship is unique, no single fact or circumstance can operate as a conclusive test for the existence of a partnership."). The Court agrees that the question of whether the IPOF Fund was a partnership requires an examination of factors beyond the sharing of profits.[26] The Regalbuto Plaintiffs argument unravels, however, after an examination of those other factors.

While it is true that no *single* factor will determine the existence of a partnership, virtually every factor considered by any Ohio court as evidence of partnership is present here. The Regalbuto

---

[26] The Court notes that it is unclear whether the IPOF Fund realized any profits at any time. Further, based on the admissions of Frank Regalbuto, certain individuals clearly reaped benefits from the IPOF Fund, perhaps beyond the amounts "earned" by their partnership shares. (*See Small* case October 31, 2006 Ans. & Third Party Compl. (Doc. 19) ¶¶ 27-29, 32, 33). Still, it is undisputed that the IPOF Fund was at least designed to return proceeds to its members based on the amounts they deposited. (*See* Acknowledgement ¶¶ 1-2, 6)

Plaintiffs do not contest that *for years*[27] Dadante sent K-1s to IPOF members describing the entity as a partnership.  Though, as the Regalbuto Plaintiffs point out, this is not dispositive of the issue, it is strong evidence that the entity was a partnership.  *See Berger v. Dare*, 649 N.E.2d 1316, 1319 (Ohio App. 1994) (finding that filing income tax as a partnership is considered evidence that an entity is a partnership) *In re Needleman*, 204 B.R. 524, 527 (Bkrtcy. S.D. Ohio 1997) (same).  Additionally, the Regalbuto Plaintiffs admit that the IPOF Fund maintained accounts in its own name, and that some of those accounts required the signatures of Dadante and Frank Regalbuto.  Both the opening of checking accounts in an entity's name and the joint signature requirement are evidence of partnership.  *deVillers*, 1993 WL 183490, at *4 (finding that representing an entity is a partnership and opening a checking account that requires both signatures is evidence of partnership).  It is also undisputed that the IPOF Fund was, to many third parties, held out to be a partnership.  *See Harvey v. Harvey*, 632 N.E.2d 956, 961 (Ohio App. 1993) (when determining the existence of a partnership, a court may consider "whether it appeared to others that the business was run as a partnership.").

Other critical aspects of partnership include whether each individual contributed to the enterprise and whether more than one member had authority to bind the organization.  *In re Needleman*, 204 B.R. at 527 ("Each partner must contribute something to the partnership, whether

---

[27] At one point in the briefing, the Regalbuto Plaintiffs insist that they had no reason to believe that they were engaged in a partnership with Dadante.  Given as many as four years' worth of detailed tax forms describing the IPOF Fund as a limited partnership and Dadante's letter indicating that the entity was changed to a limited partnership on June 1, 2000, this contention strains credulity.  The idea that these communications would be ignored or overlooked, moreover, is also dubious because Dadante's letter instructs the recipient to take action by replacing a previous tax return with the 2001 partnership tax return.  (*See* Notice of Status Change).  Thus, it is difficult to imagine that anyone who filed their 2001 tax returns was ignorant of the status change.

it be money, property, labor and skill, or some or all of them; the contributions need not be identical or equal."); *Simandl v. Schimandle*, 445 N.E.2d 734, 736 (Ohio App. 1982) ("A court can properly find a partnership exists from evidence that there has been a sharing of net profits from a continuing business operated by two or more persons, where each is capable of binding the business entity."). The very terms of the Acknowledgment presuppose a contribution, and the fact that participants contributed money to the venture is undisputed. Indeed, some participants have admitted to contributing more to the enterprise than just money, acts which are also consistent with partnership. *Id.* at 530 (finding that relationships, goodwill, and personal contacts can be considered contributions to a partnership). With respect to the authority to bind the IPOF Fund, Frank Regalbuto has admitted to possessing actual authority to bind the partnership on a wide array of issues. In filings submitted to the Court through his attorney, Frank Regalbuto has admitted that he and Dadante opened an IPOF checking account together and that "Dadante and Frank Regalbuto agreed that no check would be written on that account unless both Dadante and Frank Regalbuto signed that check." (Regalbuto Plaintiffs' Position Statement, Apr. 30, 2007 (Doc. 257) at 7.) Indeed, according to various documents attached to the Regalbuto Plaintiffs' position statement, Frank Regalbuto not only opened an IPOF checking account with Dadante (See Statement of Position of Regalbuto Plaintiffs (Doc. 257) at 7; Frank Regalbuto Aff. ¶ 4, Apr. 5, 2007), but actually co-signed (with Dadante) checks drawn on the IPOF account. (Id.) More surprising, given the Regalbuto Plaintiffs' position on the issue, the Regalbuto Plaintiffs attached a resolution that reveals that Frank Regalbuto had additional actual authority to bind the business entity known as IPOF Fund. The resolution, for example, authorizes Frank Regalbuto (and David Dadante) to exercise extensive powers on behalf of the IPOF Fund including: opening accounts, endorsing checks, borrowing money, and pledging security.

32

(Regalbuto Plaintiffs' Position Statement, Apr. 30, 2007 (Doc. 257) at Ex. 7.).  It is undisputed, therefore, that persons other than Dadante, at least Frank Regalbuto, had actual authority to bind the business.  Further, though the Regalbuto Plaintiffs insist that the business was solely under the control of Dadante, that is clearly not the case.  Frank Regalbuto undisputedly participated actively in the business and has admitted to soliciting millions of dollars for the IPOF fund at the direction of Dadante. (*See* Small October 31, 2006 Ans. & Third Party Compl. (Doc. 19) ¶ 25; Regalbuto Pls' Position Reply, June 13, 2007 (Doc.287) at 3). [28]

To the extent the Regalbuto Plaintiffs contend either: (1) that they were not partners because they did not agree to share in any losses; or (2) it would be unfair to impute general partnership liability to a group of partners who believed they were limited partners or had some other status that would preserve them from personal liability, neither point is well taken.  (Regalbuto Pls' Position Reply, June 13, 2007 (Doc.287) at 9-10).  First, the subjective expectations a party may have for sharing in an endeavor's losses do not bear on the issue of partnership.  *Madden Invest. Co.*, 832 N.E.2d at 782 ("The duty to share in [a partnership's] losses is . . . a product of statute, not the subjective expectations of the persons concerned.  [And] [w]hether a partnership exists must be otherwise determined.").  Second, as discussed below, the Ohio General Assembly has contemplated the unfortunate circumstances, like those in the case at bar, where members of an entity do not anticipate joining a venture that would place them at risk for personal liability.  Accordingly, having considered the parties' arguments, the facts, and examined the potential business associations

---

[28] Indeed, Mr. Regalbuto has bemoaned the role he played in the IPOF Fund in more than one submission to this Court, indicating the remorse he feels because he unknowingly allowed Dadante to use him as an instrument of his fraud.

available in Ohio, the Court finds that the IPOF Fund was a general partnership until April 29, 2004. [9]2

### c. Despite the Failure to Register as a Limited Liability Entity, Most Investors Likely Do Not Face General Liability.

As mentioned above, one consideration that weighed heavily on the Court when determining the nature of the IPOF Fund was the potential liability for innocent partners – *i.e.,* the plaintiff investors. As at least one stakeholder defendant has argued, if the investors were not protected by valid limitations of liability arising under Ohio law, *each* could be individually liable for the millions of dollars in margin debt incurred by the Fund. Fortunately, the Ohio General Assembly has enacted a statute that insulates innocent participants in certain circumstances. In addition to the reasons discussed above, therefore, it would be particularly difficult to justify, based on equitable considerations, a finding that an unregistered organization had limited liability where, as here, the state's legislature has specifically enacted a statute to protect someone from a finding of individual liability where that person erroneously believed that he or she was participating in an entity possessed of limited liability. Ohio Revised Code section 1782.20, squarely addresses many of the concerns of the litigants who claim they were unaware of the status of the fund; it reads, in part:

---

[29] Even if the Court were to ignore registration requirements, it seems that the most likely candidate for the entity created by Dadante would be a business trust, and not a corporation. In Ohio, "The so-called 'business trust' is a voluntary combination or pooling of capital by a number of persons for the purpose of investment for profit . . . . It has never been a popular business device in Ohio." *Berry v. McCourt*, 204 N.E.2d 235, 239 (Ohio App. 1965). Further, "[A business trust] is a device for profit making which arises from the consensual combination of capital and a contractual agreement by a number of investors. By an underlying contract, or in the provisions of a business trust instrument, or both, the parties agree on the operations of the venture." *Id.* at 240. Clearly, the parties here intended to pool their capital and be governed by a contractual agreement (the Acknowledgement), but Dadante did not register the entity as a trust and did not represent to third parties or investors that the IPOF Fund was a business trust. *See* Ohio Rev. Code § 1746.04.

34

**Obligations of person erroneously believing himself to be a limited partner**

> [W]hen no certificate of limited partnership has been filed, a person who contributes to a business enterprise and who erroneously but in good faith believes that he has become a limited partner in the enterprise is not a general partner in the enterprise and is not bound by its obligations by reason of making the contribution, receiving distributions from the enterprise, or exercising any rights of a limited partner, if, within a reasonable time after ascertaining the mistake, he does either of the following:
>
> > (1) Causes an appropriate certificate of limited partnership to be executed and filed;
> >
> > (2) Takes the action that is necessary to withdraw from the enterprise . . . .

This statute alters the balance of equity between innocent participants and innocent creditors (described above at 14-15) by protecting certain parties, who have relied in good faith on the representations of an untrustworthy individual such as Dadante, from being saddled with liabilities as a result of Dadante's conduct.  Rather than thrust general liability upon all members of the organization, the Ohio General Assembly (through section 1782.20) has decided to protect innocent parties (who act "in good faith") from general liability, while potentially imposing general liability upon parties who invited it.[30]  In other words, under Ohio law, there is no compelling need for the Court to strain to find that the IPOF Fund was a corporation (or other limited liability entity), despite all outward appearances, simply to preserve innocent investors from general liability.[31]  The Court's

---

[30] General liability still may be imposed:  "[a] person who makes a contribution . . . and who knew or should have known either that no certificate of limited partnership has been filed . . . is liable as a general partner to any third party who actually believed in good faith that the person was a general partner, but only to the extent that the third party acted in reasonable reliance on that belief . . . ."  Ohio Rev. Code § 1782.20(C).

[31] As a result, a court's focus, in equity, should be on outside parties engaging in commerce with a business entity.  Those outside parties' protections (*i.e.* their notice of limitation of liability) generally arise only from an entity's compliance with registration requirements.  *Grenada Bank*, 705 F.2d at 178.  For this additional reason the Court cannot find prior to April 2004, the IPOF Fund was a valid manifestation of any of the limited liability entities described above.

35

finding that the IPOF Fund was a general partnership prior to registration,therefore, is properly grounded in both law and equity

Despite the Court's finding that the IPOF Fund was a general partnership until April 29, 2004, investors other than Dadante likely have the right to be treated as limited partners *vis-à-vis* third parties. This is particularly the case because, as discussed above, all third parties, including the IRS, thought they were dealing with a limited partnership. The Regalbuto Plaintiffs' current claim that the IPOF Fund is not a limited partnership does not undercut the application of this status since (a) that claim is asserted now solely as a strategy to avoid the realities of a Receivership to which the Regalbuto Plaintiffs belatedly object; and (b) there is no evidence that anyone knew that Dadante's representations relating to the limited partnership status of the IPOF Fund were not truthful.

### 2.     The IPOF Fund Became a Limited Partnership on April 29, 2004.

On April 29, 2004, the IPOF Fund registered as a limited partnership. *See* Ohio Rev. Code § 1782.08. The document was executed by Dadante as sole general partner. *See* Ohio Rev. Code § 1782.11. Submitted to the Court in connection with the briefing on this issue, moreover, is an agreement of limited partnership for IPOF, L.P. dated June 1, 2000 (which comports with the date upon which, according to Dadante, the business entity changed). (*See* Doc. 173, Ex. A.) The parties do not appear to contest the authenticity or accuracy of these documents. Instead, the Regalbuto Plaintiffs challenge whether they are bound by those documents. (*See* Regalbuto Pls' Position Statement, Doc. 257, at 3-6) Specifically, the Regalbuto Plaintiffs assert that they cannot be limited partners for two reasons: (1) they are not called partners; and (2) they did not execute the limited

36

partnership agreement.  As detailed below, the first contention finds no support in the law and the second contention is at odds with the facts. [2][3]

First, the Regalbuto Plaintiffs contend that, because the Acknowledgement refers to them as depositors, they are not limited partners.  This argument places undue import on nomenclature.  The simple fact that the investors are termed "depositors" and not partners is not controlling and, in any event the term "depositor" does not appear to have any legal significance.[33]  The agreement could have called Dadante a "confidence man," the plaintiffs "victims," and the Fund a "scam" and these terms, despite their accuracy, similarly would have no legal significance.  As discussed above, the subjective beliefs of the parties have little bearing on the issue, instead the clear terms of the agreements and the rights conveyed by those terms control the business relationships of the parties.  *Allen*, 2001 WL 1589169, at *6.

---

[32] The Court finds the Regalbuto Plaintiffs' citation to *Troelstrup v. Index Futures Group, Inc.*, 130 F.3d 1274, 1277-78 (7th Cir. 1997) to be inapposite.  In *Troelstrup,* the Seventh Circuit found that a brokerage account was not *sui juris*.  That case differs in many important respects: (1) the contention here is not whether a brokerage account, standing alone, is a rights bearing entity, but whether the IPOF Fund, which owns the accounts, is a rights bearing entity; (2) in *Troelstrup,* court found that the account, by itself, lacked structure, but this Court does not make that finding with respect to the IPOF Fund; (3) finally, the Court observes that the Regalbuto Plaintiffs are predominantly arguing that the IPOF Fund is part of a different rights bearing entity – Coffee King, Inc. – and not that the IPOF Fund is not sufficiently structured to be an entity at all.

[33] "Depositor" appears that this is simply a term Dadante created.  The Regalbuto Plaintiffs, however, seem to be asking the Court to fashion a new legal relationship for the "depositor" and the IPOF Fund.  This relationship, apparently, would involve no liability between depositors, limited (or no) liability to third parties, no registration requirements or notice to the public, and the right to bring claims individually as members of the organization, collectively on behalf of the organization, or some combination of the two.  The Court, however, can find no basis for such an entity in Ohio's statutory scheme relating to business associations.

Second, the Regalbuto Plaintiffs contend that they did not execute the Agreement of Limited Partnership of IPOF, L.P.  While it may be true that each depositor did not individually sign the IPOF, L.P. Agreement, or the certificate, it is not disputed that Dadante signed the documents on behalf of the limited partners.   Each of the plaintiffs, moreover, admits to signing the Acknowledgement (*See* Regalbuto Pls' Position Statement, Doc. 257, at 3-6).  Paragraph four of the Acknowledgement reads:

> 4.      *Depositor further acknowledges that the Depositors intention is to participate with others and that, dependant on the ultimate number of other depositors, the legal entity form of the IPOF Fund may be modified so as to allow for the inclusion of other depositors.*  HOWEVER, UNDER NO CIRCUMSTANCES, shall the right of the Depositor to withdrawn [sic] Depositor's funds as noted in Paragraph 3[] above shall be modified by the modification of the legal entity.  *As may be reasonably required, the Depositor agrees to execute such additional documents as presented by the IPOF fund in order to affect [sic] the change in the legal entity status.*

(Acknowledgement, ¶ 4 (emphases added)).  By the plain terms of this agreement, the IPOF Fund participants permitted Dadante to modify "the legal entity form" of the IPOF Fund.  In short, by signing the Acknowledgement, the participants agreed to permit Dadante to modify the legal status of the entity, and to do whatever was required of them to effect that change.  Importantly, limited partners' signatures are not required to form an Ohio limited partnership.  *See* Ohio Rev. Code §§ 1782.08, 1782.11.  In Ohio, moreover, the actual signatures of the individuals involved in a partnership are not required for its formation.  *Dayton Monetary Assoc. v. Becker*, 710 N.E.2d 1151, 1155-56 (Ohio App. 1998) ("requiring personal signatures from each partner and filing voluminous individually signed documents with the county recorder is incompatible with the purpose of the fictitious-name statute.  The intent . . . is simply to afford the public information as to the identity of persons conducting the business, to prevent deception and confusion.").  Rather, the limited

38

partners' actual signatures became unnecessary to form the IPOF Fund limited partnership once they authorized Dadante to change the legal status of the entity on their behalf.  Accordingly, the Court finds that on April 29, 2004, the IPOF Fund became a limited partnership and the participants of in the IPOF Fund became limited partners.

Finally, for additional reasons largely based in equity, the Court finds that the participants are limited partners.  Each individual, moreover, agreed to permit the modification of the entity and agreed to do whatever was necessary to effect that modification.  Furthermore, it is uncontested that – for years – the parties involved received tax forms and letters indicating that they were limited partners.  The Court finds that, through these documents, the parties were on notice of their status as limited partners for a significant time period.  Nothing in the record, however, indicates that any individual took any action to repudiate or disavow their status as a limited partner prior to IPOF Fund's receivership.  Indeed, not only were the IPOF Fund participants silent for years while the IPOF Fund operated, they remained silent on the issue until over a year after the Receivership was put in place.  Last, as discussed above, the IPOF Fund held itself out to third parties as a limited partnership. [34]  The Court, therefore, finds that the individuals involved in the IPOF Fund likely would be estopped from denying that they were limited partners.

---

[34] As indicated above, to the extent the Regalbuto Plaintiffs argue that the power of attorney can be read as an indication that the IPOF Fund was something other than a limited partnership, the Court is unpersuaded.  As an initial matter, it appears that the Regalbuto Plaintiffs would have the Court overlook the IPOF Fund's lack of by-laws, share certificates, and failure to register as a corporation or a trade name.  This is somewhat surprising given their insistence that the lack of a pre-2004 certificate of limited partnership precludes a finding that the IPOF Fund was a limited partnership from its inception (a point the Court agrees with).  Further, the power of attorney was a private agreement between Frank Regalbuto and Dadante and there is no evidence that others were made aware of the agreement.  It does not, therefore, change the Court's conclusion.

Additionally, because the Regalbuto Plaintiffs have failed to persuade the Court that the IPOF Fund is a dba of Coffee King, the distinction between "depositor" (*i.e.* creditor) and limited partner has no practical difference.  As creditors, the Regalbuto Plaintiffs would still be able only to assert claims against the general partner and the limited partnership for the monies they lost – all of which would be resolved by the Receiver and this Court with the proceeds of the receivership estate.  Under these circumstances it would be unrealistic, unproductive, and grossly inequitable to find – after the fact – that some participants were limited partners and some were not.

## IV.    CONCLUSION

For the foregoing reasons, the Court finds that: (1) the IPOF Fund constituted a general partnership until April 29, 2004; and (2) that the IPOF Fund became a limited partnership on April 29, 2004 when the appropriate documents were filed with the Ohio Secretary of State.

**IT IS SO ORDERED.**

**s/ Kathleen M. O'Malley**
**KATHLEEN McDONALD O'MALLEY**
**UNITED STATES DISTRICT JUDGE**

**Dated:  January 7, 2008**

40