**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **SHELDON GORDON, et al.,** | : | |
| | : | **Case No. 1:05CV2726** |
| **Plaintiffs,** | : | |
| | : | **Judge Kathleen M. O'Malley** |
| **v.** | : | |
| | : | |
| **DAVID DADANTE et al.,** | : | **ORDER** |
| | : | |
| **Defendants.** | : | |

## I.    Introduction.

Before the Court is Mark Dottore's (the "Receiver") January 22, 2008 *Motion for Order Approving Settlement and for Ancillary Orders* (Doc. 337).  In his motion, the Receiver asks this Court to approve a settlement between the Receivership estate[1] and Ferris Baker, Watts, Inc., ("Ferris Baker") to enter a bar order and an injunction, and to dismiss certain claims.  The essential terms of the settlement require Ferris Baker: (1) to deliver 2,999,152 shares of common stock in Innotrac Corporation ("Innotrac") to the Receivership estate, free and clear of all claims, liens, or security interest – including an existing margin debt of over $9,000,000; and (2) to pay the Receivership estate the cash sum of $7,200,000.  In exchange, the Receiver, on behalf of the IPOF Fund and related entities, agrees to release Ferris Baker, its officers, directors, and employees (with the exception of Stephen Glantz) from any potential claims it may have for, *inter alia*, violations of antifraud provisions of the federal securities laws.  Finally, consummation of the settlement is conditioned upon this Court's entry of the Bar Order, Injunction and Dismissal of Claims attached

---

[1]    The entities comprising the Receivership estate are explained in detail in the Court's previous orders.

1

to the proposed Settlement Agreement as Exhibit A (the "Bar Order") and distribution of the settlement's proceeds is conditioned upon the execution of a release by individual investors.

On January 24, 2008, the Court issued an Order permitting interested parties to file written objections to the proposed settlement on or before Friday, February 22, 2008.  The Order permitted parties who filed written objections to address the Court at a March 12, 2008 fairness hearing.  On February 21, 2008, the Small Plaintiffs filed a position statement in support of the proposed settlement agreement.  On February 22, 2008, the Regalbuto Plaintiffs filed objections to the proposed settlement agreement.[2]  Four other Plaintiffs, some of whom are members of the Regalbuto Plaintiffs, also filed brief letters objecting to the terms of the settlement agreement.  On March 12, 2008, the Court held a fairness hearing during which it allowed any interested parties the opportunity to address the Court on the subject of the proposed settlement, whether or not they complied with the established prerequisites for doing so.

II.    **Discussion.**

    A.    **The Receiver's Fairness Assessment**

According to the Receiver, the proposed Settlement Agreement is the result of months of contentious negotiations between the parties.  The Receiver's motion seeking approval of the settlement is primarily composed of an assessment of the potential risks and rewards of pursuing the IPOF Fund's claims against Ferris Baker through litigation.  The critical considerations are: (1) IPOF Fund's potential claims against Ferris Baker; (2) IPOF Fund's damages; (3) IPOF Fund's chances of succeeding on its claims; and (4) the costs, in time and money, of pursuing the IPOF Fund's claims to trial.

---

[2]    The members of the various plaintiff groups are identified in greater detail in the Court's prior orders.

2

The Receiver's examination of the IPOF Fund and Ferris Baker's records shows that David Dadante ("Dadante") initially deposited $5,779,704.66 of IPOF Fund cash and 520,000 shares of Innotrac common stock into accounts at Ferris Baker.  According to the Receiver, Dadante purchased approximately 2,400,000 more shares of Innotrac stock through Ferris Baker.  In total, through his trading at Ferris Baker, Dadante used approximately $7,700,000 of the IPOF Fund's assets and an additional $9,000,000 of margin debt, loaned to Dadante by Ferris Baker, to accumulate the 2,999,152 shares of Innotrac common stock now held by the IPOF Fund in a Ferris Baker account.

The Receiver asserts that the IPOF Fund has potential claims against Ferris Baker under the federal securities laws and under certain state and common law theories.  The primary bases for the Receiver's claims are grounded in section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and SEC Rule 10b-5 (17 C.F.R. § 240.10b-5).  These provisions prohibit stock market manipulation that amounts to fraud.  Under section 10(b) of the Securities Exchange Act of 1934 and SEC Rule 10b-5, however, plaintiffs are limited to recovering their actual damages.  Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723, 734 (1975).  For a claim based on price manipulation, a purchaser is entitled to recover the difference between the price paid for a security and its true value but for the manipulation.  Affiliated Ute Citizens of Utah v. United States, 406 U.S. 128, 154-56 (1972).

According to the Receiver's analysis of the trading records, the IPOF Fund purchased Innotrac common stock through Ferris Baker at prices ranging from $2.60 per share to $11.38 per share.  The average price that the IPOF Fund paid for shares of Innotrac purchased at Ferris Baker was $5.68.  As part of his damages calculus, the Receiver implicitly assumes that the lowest price – $2.60 per share – is a reasonable reflection of the actual value of the IPOF Fund shares prior to any

of the alleged manipulation.  Subtracting the estimated, pre-inflation value of the Innotrac shares from the average price paid at Ferris Baker ($5.68-$2.60) yields a per share inflation estimate of $3.08.  By multiplying this number times the total number of shares purchased at Ferris Baker ($3.08 x 2,479,152), the Receiver has estimated the actual damages attributable to the alleged manipulation caused with the aid of Ferris Baker as $7,635,788.16.  The $7,200,000 cash payment portion of the settlement offered by Ferris Baker, therefore, represents a 94.3% recovery of those estimated damages.

In his motion to approve the settlement, the Receiver recognizes that the Regalbuto Plaintiffs have attempted to advance theories, including a civil RICO claim, that they believe would entitle them to damages beyond their actual losses – or that would require Ferris Baker to pay for all the damages caused by the fraud.  Citing 18 U.S.C. section 1964(c), the Receiver explained that it may be difficult to establish the type of non-fraud predicate act that could potentially open the door to treble damages.  Similarly, citing In re Rent-way Securities Litigation, 305 F. Supp 2d 491, 506 (W.D. Pa. 2003) the Receiver observed that the Private Securities Litigation Reform Act of 1995 generally precludes an assignment of joint and several liability among defendants absent a showing that the defendant knowingly violated securities law.  The Receiver, therefore, concluded that the Regalbuto Plaintiffs' proffered theories allowing for treble damages, punitive damages, and for

4

Ferris Baker to pay for damages arguably caused by other responsible parties, lacked sufficient certainty to contribute markedly to the possible settlement value of the case.[3]

Though the Receiver's negotiations with Ferris Baker were protracted and complex, in essence, the Receiver's fairness assessment turns on just a few key considerations.  First, the Receiver believes that the claims he is most likely to succeed upon would result in only an award of actual damages.  Second, the Receiver acknowledges that Ferris Baker has consistently denied liability for IPOF Fund losses caused by the David Dadante Ponzi scheme and, moreover, that Ferris Baker has asserted its claim for the margin debt incurred at the firm in connection with David Dadante's stock trading.  Finally, based on the Receiver's loss calculus, that the settlement represents almost all of the actual damages incurred by the IPOF Fund in connection with its dealings with Ferris Baker.

### B.    The Positions of the Interested Parties

At the Court's invitation, prior to the hearing in this matter, various parties filed position statements supporting or objecting to the proposed settlement agreement between the IPOF Fund entities and Ferris Baker.  The Regalbuto Plaintiffs as a group, and four individuals (some of whom are also members of the Regalbuto Plaintiff group) filed objections or raised concerns about the proposed settlement.  The Small Plaintiffs filed a statement in support of the settlement.  By their

---

[3]      Nevertheless, the Receiver has not abandoned any claims under RICO, state common law, or any other theory that would justify extraordinary damages, punitive damages, or an award of attorney's fees.  Indeed, it is foreseeable that, as a result of extinguishing the margin debt and recovering the shares, the Receiver may realize an economic benefit that rises beyond the actual damages for market manipulation combined with the investors' uninflated cost to purchase the Innotrac stock.  In such circumstances, that additional recovery would be justified by the aforementioned theories.  See infra, n. 13.

silence, other victims of the Dadante fraud have indicated an absence of objection and, hence, apparent deference to the Receiver's calculus relating to this settlement.  The parties' positions are summarized below; the Court's determinations with respect to those positions are found below in section II(C).

### 1.     The Regalbuto Plaintiffs' Objections.

The Regalbuto Plaintiffs objections have three bases: (1) forgiveness of the margin debt confers no benefit to the IPOF Fund investors; (2) the Innotrac stock has no real value; and (3) the cash component of the settlement is inadequate.

### (a)     Forgiveness of the Margin Debt.

The Regalbuto Plaintiffs' objection that the forgiveness of the margin debt conveys no real benefit seems to arise from a misunderstanding of the law and this Court's prior rulings.  According to the Regalbuto Plaintiffs, the Court's January 7, 2008 Order foreclosed the possibility that any of the individual investors of the IPOF Fund could be held liable for the margin debt accrued by the IPOF Fund at Ferris Baker.  Based on this belief, they contend it is a debt which they would not be required to repay and, thus, is not a "real" obligation.  The Regalbuto Plaintiffs' statement, however, is overbroad and misapprehends the Court's ruling.

In its prior Order, the Court reasoned that many of the individual investors may be able to demonstrate that they erroneously believed that they were limited partners in a limited partnership and made no representations to third parties that would have caused third parties to believe that they were general partners.  Thus, under such circumstances, Ohio law may not impose general liability upon the partners who, in good faith, believed that they possessed limited liability, despite the Court's finding that the IPOF Fund was a general partnership for a significant period.  See Ohio Rev.

6

Code § 1782.20. The application of this statute, however, does not yield the result that the Regalbuto Plaintiffs suggest. The statute does not insulate the *IPOF Fund* from its creditors. Instead, it only potentially insulates certain IPOF Fund *partners* from general liability. Stated differently, the *IPOF Fund* still must use its assets to pay legitimate debts. If, however, the IPOF Fund's assets are insufficient to satisfy all of the IPOF Fund's debts, *the personal assets of the investors* in the IPOF likely may not be called upon by the IPOF Fund's creditors to satisfy any shortfall.

The Court's ruling does not diminish the significant benefit that extinguishing the margin debt will have for the investors. As explained in the Court's January 7, 2008 Order, the investors may only recover the losses they have incurred to the extent there are assets available through the IPOF Fund, and its Receivership estate, to pay those losses. By way of example, based on the April 7, 2008 $3.25 closing price for Innotrac common stock, the amount realized by investors under each scenario may look like this: 2,999,152 shares sold for $3.25 yields $9,747,244 in cash to the Receivership estate for eventual distribution to claimants. Should the Receivership estate be required to satisfy the secured, priority margin debt, however, only $747,244 of the proceeds would be available to claimants. Thus, extinguishing the margin debt provides a real, certain benefit to any party who has a claim against the IPOF Fund in excess of $9,000,000. [4]

During the hearing, counsel for the Regalbuto Plaintiffs "reached th[e] understanding" articulated by the Court above: that if the Receiver were required to satisfy a margin debt, it would

---

[4]     Building on the discussion above relating to general liability, if the stock were sold for $2.25 per share it would yield $6,748,092. If the IPOF Fund were required to satisfy a $9,000,000 margin debt, there would be a $2,251,908 shortfall. Typically, members of a general partnership (like the IPOF Fund until 2004) could be called upon to satisfy the shortfall from their personal assets. The reasoning of the Court's January 7, 2008 Order may be viewed as illuminating a path by which some members of the IPOF Fund could avoid such liability. As discussed above, however, it does nothing to insulate the IPOF Fund *itself* from its creditors.

ultimately result in a reduced recovery for the investors.  (Hr'g Tr. at 30:24; <u>see</u> <u>also</u> <u>id.</u> at 29:24-31:8.)  Once counsel for the Regalbuto Plaintiffs understood the direct benefit that extinguishing the margin debt would have for his clients, he withdrew his objection to the extent it was based on his earlier mistaken belief that the forgiveness of the margin debt was valueless.  (<u>See</u> <u>id.</u>; <u>see</u> <u>also</u> 33:16-33:25.)

(b)      <b>The Innotrac Common Stock.</b>

Next, the Regalbuto Plaintiffs contend that the Innotrac stock is valueless.  Again, this objection largely appears to arise from the Regalbuto Plaintiffs' misunderstanding of the Receiver's intentions with respect to the Innotrac common stock.  In their motion, the Regalbuto Plaintiffs' claim that, "the fraud victims will not receive any value by keeping the Innotrac stock." (Doc. 343, at 3.)  During the settlement approval hearing, the Regalbuto Plaintiffs made clear that the primary reason they believed that the Innotrac common stock had no value as a component of the settlement was because they mistakenly believed that the Receiver intended to distribute the common stock directly to the IPOF Fund limited partners.  (Hr'g Tr. at 32:1-33:20)  The Regalbuto Plaintiffs apparently were concerned that, due to the illiquidity of the Innotrac stock, they would be given an asset that they could not divest for cash value.  (<u>Id.</u>)  Fortunately, during the hearing, counsel for the Regalbuto Plaintiffs grew to understand that the Receiver does not intend to distribute shares directly to the investors, but, instead, the Receiver intends to negotiate the sale of the shares, as a block, and to distribute the cash proceeds of *that* sale to the investors.  Upon reaching this understanding, counsel for the Regalbuto Plaintiffs stated:  "[b]ased on everything we've heard here today, we're asking two things.  That we be allowed to remove the objection and . . . I'd like to work together [with the Receiver] to wrap this up . . . ."  (Hr'g Tr. at 33:16-33:25.)  Thus, at the conclusion of the

8

hearing, the Court understood that any objection asserting that the shares had no value, or had a value lower than the value the Receiver afforded them in his settlement calculations, had been withdrawn.

### (c)  The $7,200,000 Cash Component of the Settlement.

In their final objection, the Regalbuto Plaintiffs argue that the cash component of the settlement is insufficient.  The crux of Regalbuto Plaintiffs' complaint is that the aggregate loss suffered by the IPOF Fund fraud victims was $48,512,700.  The Regalbuto Plaintiffs (arbitrarily) suggest that Ferris Baker may be liable for as much as 50% of the $48 million in aggregate damages.  Given the criminal conviction of a Ferris Baker broker, the Regalbuto Plaintiffs argue that the amount of the proposed settlement, when viewed within the context of probable success, is woefully insufficient.  The Regalbuto Plaintiffs also claim that it is conceivable that Ferris Baker itself could be convicted of a crime and, therefore, that there is some chance that a RICO claim could be brought against Ferris Baker.  Such a claim, the Regalbuto Plaintiffs contend, might result in an award of treble damages.  Finally, the Regalbuto Plaintiffs argue that the time and expense of litigating their case against Ferris Baker is not a significant factor to be considered for settlement purposes because litigating the matter would not be as protracted as the Receiver claims.

Again, this objection also seems to be based primarily on misunderstandings that were largely cleared up during the hearing.  First, as to the $48,000,000 loss figure, counsel for the Regalbuto Plaintiffs conceded that, in arriving at this figure, he did not deduct amounts previously returned to the investors in the form of fake or falsified "profits," relying instead only on the value of the initial investments.  Because the figure he was using contained certain investments that had already been returned to investors, counsel seemed to concede that his loss figure likely could not be supported by the evidence.  (See Hr'g Tr. at 34:6-35:19.)

9

In addition, the Court discussed at the hearing that the possibility of suing both Ferris Baker and some of its employees would not necessarily alter the scope of recoverable damages.  Thus, when it was pointed out that Ferris Baker and its employees, if deemed liable to the IPOF Fund, would be jointly liable for the same total damage figure, it appeared counsel for the Regalbuto Plaintiffs understood that the suggestion that naming additional defendants might increase the potential recovery for this single aspect of the IPOF Fund's losses was probably in error.  (See Hr'g Tr. at 16:20-17:19.)

### (d)    Summary of the Regalbuto Plaintiffs' Primary Concern

Notably, in their brief, the Regalbuto Plaintiffs stated that they, "would likely not object if the proposed settlement with [Ferris Baker] guaranteed that the IPOF Fund fraud victims would receive Sixteen Million Dollars."  (Objections of Regalbuto Plaintiffs to Proposed Settlement (Doc. 343), at 4.)  In other words, the crux of these investors concerns is that they hoped for a recovery from Ferris Baker which would result in a payout to them – by way of a disposition of the stock and additional cash payment – of $16,000,000.  During the hearing, Mr, Cheselka explained: "I will say, quite simply, that if we are talking about $16 million – plus in cash, my group stands prepared to remove any and all of our objections."  (Hr'g Tr. at 29:13-15.)  Thus, the Regalbuto Plaintiffs object to the settlement because they fear that, at the end of the day, the $16,000,000 figure will not be realized; they would prefer a deal which transfers the stock now, rather than hope for a sale later.

### 2.    Other Investors' Concerns.

The letters of objection filed by other individual plaintiffs largely duplicate the objections of the Regalbuto Plaintiffs and, therefore, many need not be readdressed in detail.  Some of the individual investors, however, raised two additional issues to the Court that are arguably related to

10

the settlement.  Those issues are (1) the Receiver's fees; and (2) the pursuit of other brokerages and alleged wrongdoers.

At least three of the plaintiffs separately wrote to the Court expressing concern over the fees incurred by the Receivership during the course of this matter.  These individuals largely contend that they cannot evaluate the ultimate benefit that the settlement will confer to them unless they know the sum of the fees incurred to date.

Finally, one plaintiff's letter indicated that he believes that the Receiver should disclose his theories of recovery against other responsible parties, and disclose the status of his efforts seeking recovery against those parties.

### 3. The Small Plaintiffs' Memorandum in Support.

On February 21, 2008, the Small Plaintiffs filed a memorandum in support of the settlement between Ferris Baker and the IPOF Fund entities.  In their brief filing, the Small Plaintiffs state that they believe the settlement with Ferris Baker has an economic benefit to the Receivership estate in excess of $25,000,000 (i.e., well over the $16,000,000 the Regalbuto Plaintiffs say they want), and that it is in the best interest of the Receivership estate.  The Small Plaintiffs also suggest that the settlement will foster additional agreements with other responsible parties and, therefore, facilitate an orderly and timely resolution of the matter.  The Small Plaintiffs conclude by urging the Court to approve the settlement agreement.

### C. The Court's Findings

As an initial matter, the Court finds perplexing the conduct of the Regalbuto Plaintiffs with respect to the settlement procedure.  When the Receiver filed his motion seeking approval of the settlement agreement, the Court gave the parties nearly thirty days to respond to the Receiver's

11

motion in writing.  The Court, moreover, blocked off a significant amount of time to hold a hearing – open to all interested parties – during which interested parties were presented a further opportunity to present their concerns to the Court (only one investor other than the Regalbuto Plaintiffs chose to address the Court).  Once again, however, it appears that the Court's attempt to achieve orderly progress in this matter has been frustrated by the Regalbuto Plaintiffs' disunity and confusion.  The point is well-illustrated by comparing the remarks made by counsel for the Regalbuto Plaintiffs during the hearing with the filings made to the Court after the hearing.

During the hearing, the Regalbuto Plaintiffs, in no uncertain terms, withdrew their objections. Michael Cheselka, counsel for the Regalbuto Plaintiffs, began his comments to the Court by paraphrasing William Shakespeare thus: "I come here today not to bury Caesar but to praise him." (Hr'g Tr. 29:12-13 (citing William Shakespeare, Julius Caesar act 3, sc. 2).)  Mr. Cheselka then proceeded to explain that the Regalbuto Plaintiffs sought to remove their objections and work together with the Receiver (Caesar) in an effort to resolve the matter.  In Court, Mr. Cheselka stated:

> [W]e're asking two things.  That we be allowed to remove the objection and we be given – you know, I'm tired of sitting here by myself.  There's an empty chair right here [gesturing toward the Receiver's table].  And to bring things to a head in the shortest amount of time to work and share the discovery that we've got, the knowledge we possess, the collective memory of [the Regalbuto Plaintiffs] . . . I'd like to work together to wrap this up, too, and so would the people I represent, including Frank Regalbuto.

(Id. 33:17-34:2.)  Time and again during the hearing, Mr. Cheselka admitted that the Regalbuto Plaintiffs' objections were either withdrawn or were based on a misunderstanding of the terms of the settlement.  (See id. at 31:13-16 ("I mean, as we go forward, we're willing to remove our objections to this settlement in hopes that we can do a better job of working together on settling any of the ancillary and outstanding claims that be there;" id. at 32:1-33:15 (stating that the objection to

12

receiving the 2,999,152 shares of Innotrac common stock was based on the mistaken belief that the
Receiver intended to distribute the shares to the investors individually "absent a private sale" of the
block as a whole with the cash proceeds distributed to the investors); id at 35:14-19 ("we're coming
here today saying if we're in the neighborhood of 16, 18, 19 [million dollars] and the prospect of
bringing a few more million to the table, we're not going to fight this tooth and nail . . . ."); id. at
36:11-12 ("As I said, I didn't come here to bury Caesar, but simply to praise."); id. at 50:4-50:14
("Just for the record, your Honor, removing the objections was based on the consideration, on the
understanding of the agreement as put forth here today, but secondly . . . [that we] be given an
opportunity to discuss with Mr. Glickman, Mr. Dottore, the opportunity to help with this process.").)
Because the Regalbuto Plaintiffs' objections were the primary objections to the settlement, and they
were admittedly based on misunderstandings, the Court completed the hearing without the detailed
inquiry into the bases for the objections that it otherwise would have conducted:

> THE COURT:                    Okay.  Let me just look to make sure I don't have any
> other questions for you.
>     Okay.  Given that you interpreted the settlement to be a direct distribution of the
> shares to the shareholders, to the investors, now I understand your point about the margin
> debt.
>     I was having a hard time grasping it, but if you – if we're talking about the shares
> being held by the IPOF Fund, then the release of the margin debt does have value, correct?
> MR. CHESELKA:      Correct.
> THE COURT:                    I mean, you agree with me?
>     Okay.  And ultimately that's the best way to maximize value to the investors is to get
> some value from those shares that can be distributed as cash value.
> MR. CHESELKA       Understood.

(id. at 36:13-37:3; see also id. at 37:13-18 ("[The Court:] Anything else? [Mr. Cheselka:] Not unless

13

you have another question. [The Court] I don't – I don't think so.  You've sort of changed the whole – I had several questions, but now that I understand where you are coming from . . . ").)

Nevertheless, despite the Regalbuto Plaintiffs' clear disavowal of their objections during the hearing, two days after the hearing, the Regalbuto Plaintiffs, *through the same counsel*, filed a two-paragraph *Supplemental Memorandum in Support of the Regalbuto Plaintiffs' Objections to the Proposed Settlement* (Doc. 351).  In their supplemental memorandum, to the astonishment of the Court, the Regalbuto Plaintiffs state that they, "did not intend to convey that they withdrew their objections to the proposed settlement." (Doc 351, at 1).  Still, the Regalbuto Plaintiffs continued to admit that if $9,000,000 cash were added to the proposed settlement (presumably in lieu of the Innotrac shares) they would withdraw their objections, but that at present the proposed settlement "[wa]s not sufficient."  (Id. at 2.)

The confusion created by the Regalbuto Plaintiffs' supplemental filing is multiplied by other documents recently presented to the Court.  On March 26, 2008, for example, Frank Regalbuto (the designated leader of the Regalbuto Plaintiffs) faxed a letter to the Receiver instructing the Receiver to, "disregard anyone's letters in regards to the settlement of our lawsuits," informing the Receiver that "I (Frank Regalbuto) represent myself also and I faxed you a letter . . . please contact me not my attorneys." (Doc. 357, Ex. B.)  The previous letter Mr. Regalbuto refers to, also sent to the Receiver, seeks, without explanation, the sum of $205,000,000 in damages and, more troubling, insists that he, "expect[s] to lay out a disbursement plan together of whatever each depositor will receiver dollar wise.  *All contracts and debts with our Companies must be paid first*."  (Id., Ex. A. (emphasis added).)  These communiqués raise grave concerns with the Court.

14

Unfortunately, it is now unclear to the Court exactly who the Regalbuto Plaintiffs believe speaks on their behalf.  From the Court's perspective, Mr. Cheselka is counsel of record and, unless that changes, his representations to the Court are binding on all the Regalbuto Plaintiffs.  Because each Regalbuto Plaintiff submitted a letter on their own behalf relating to the settlements, moreover, the Court does not know whether it is those "letters" Mr. Regalbuto asks the Court to ignore.  And, while Mr. Regalbuto may, of course, choose to represent himself, as a non-attorney he may not represent other individuals.  Only the individual investors themselves may discharge Mr. Cheselka from his representation of *them*.  If they do, moreover, they then will have the choice to either obtain new counsel on their own behalf or to represent themselves and speak on their own behalves individually and not through Mr. Regalbuto or anyone else. [5]

Added to this confusion is confusion regarding exactly what Mr. Regalbuto is requesting from the Receiver.  In June, 2007, the Court noted that Frank Regalbuto claimed "a priority entitlement to separate, special payments from the assets of the Receivership that could exceed

---

[5]     On April 14, 2008, two more attorneys entered appearances on behalf of the Regalbuto Plaintiffs. (See Doc. 358.) In their notice of appearance, Messrs. Michael and William Goldstein note that their representation is pursuant to the "participation agreement of October 2006" signed by all Regalbuto Plaintiffs designating Frank Regalbuto as the representative of each Plaintiff.  The Court has never seen this document and it is unclear how or whether it conveys to Frank Regalbuto the right to choose legal representation on behalf of other individuals.  The Court renews its caution to the Regalbuto Plaintiffs and their attorneys.  The individual Regalbuto Plaintiffs should be certain that they understand the nature of the agreements and representation to which they are permitting Frank Regalbuto to bind them.  Those plaintiffs also need to be aware of the financial obligations that may be imposed upon them individually by these agreements and the extent to which they may be obligated to pay some portion of the distributions they receive over to previous, current, and, perhaps, future counsel.  New counsel for the Regalbuto Plaintiffs should be certain that it is possible to ethically represent the Regalbuto Plaintiffs as a group.  Finally, the Court notes that Mr. Cheselka has not yet filed a motion to withdraw as counsel for the Regalbuto Plaintiffs – further muddling the issue of representation.

millions of dollars." (June 6, 2007 Order, (Doc. 284), at 18 (citing Regalbuto Plaintiffs' *Motion for an Accounting* (Doc. 263), at 3-4.).) As a result, due to "the obvious conflict of interest" arising from these priority payments, the Court ordered Mr. Cheselka to show cause why he should not be barred from representing plaintiffs other than Frank Regalbuto. (Id. at 20.) At a June 11, 2007 hearing, however, Mr. Cheselka stated that Mr. Regalbuto did *not* believe that he was entitled to a priority or distinct claim against the Receivership estate that was different from the other creditors of the IPOF Fund. (June 6, 2007 Hr'g Tr. at 45:13-46:7; see also id. at 49:13-17 ("[The Court:] I just heard Mr. Cheselka say despite the prior pleadings they have backed off those requests, and there is no priority claim being made by Mr. Regalbuto. Is that correct? [Mr. Cheselka:] That's absolutely correct.").) Based on the representations made at the June 6, 2007 hearing, the Court vacated its show cause order and permitted Mr. Cheselka to continue to represent Mr. Regalbuto and other plaintiffs. (See June 13, 2007 Order (Doc. 286).) Mr. Regalbuto's recent letters, however, have again brought the potential conflicts of interest among the Regalbuto Plaintiffs to the fore.[6]

---

[6]     Though the Court has never heard of attorneys referred to as "companies," to the extent the statement implies that Mr. Regalbuto intends to seek payment for the attorneys he has retained from the proceeds of the Receivership, he is advised that the Court has not authorized such payments, nor does it intend to. This holds true for any party or group who has retained counsel in this matter. The proceeds of the Receivership will be distributed directly to the victims of the fraud – not to counsel. It would be manifestly unfair to require parties who are *pro se* to share in the fees for attorneys who did not represent them and whom they did not hire or to require one represented party to pay for another's chosen, but different, counsel. Parties who have retained counsel may satisfy any contractual arrangements they have with such counsel from the proceeds those parties recover. Only the expenses of the Receivership estate will be paid out of the fund.

16

1.      **The Parties' Objections.**

(a)      **The Significance of Ferris Baker's Margin Debt**

As discussed above, it appears that all parties now agree that extinguishing the margin debt confers a significant benefit upon the Receivership estate.  Indeed, even in their Supplemental Memorandum in Support of the Objections of the Regalbuto Plaintiffs (Doc. 351), the Regalbuto Plaintiffs make no mention of the margin debt.  To the extent such an objection remains, however, the Court finds that it has little weight.

As the Receiver observes in his motion, absent the settlement agreement, Ferris Baker certainly would assert the margin debt as a counterclaim in any action.  The Court need not take any position with respect to the validity of the margin debt to recognize that it would be the subject of protracted, costly litigation.  Given the nature of the margin lien, moreover, it is possible that, if it were found to be enforceable, it would be a priority lien.  If the Receiver were required to satisfy the margin debt, therefore, it would have a $9,000,000 impact on the settlement proceeds.  Extinguishing this margin debt provides a definite, concrete benefit to the Receivership estate.  While it is true that the eventual benefit of owning the Innotrac common stock is to some extent uncertain, the value of the margin debt is not.  By forgiving (or conceding the invalidity of) margin debt, Ferris Baker has, in essence, agreed to return – unencumbered – to the IPOF Fund that which it owns.  For these reasons, the Court finds that extinguishing the margin debt conveys a substantial benefit to the IPOF Fund that must be part of the overall fairness assessment of the settlement.

(b)      **The Value of the 2,999,152 Shares of Innotrac Common Stock**

As discussed above, upon realizing that the Receiver does not intend to distribute the shares of Innotrac stock directly to the IPOF Fund investors, the Regalbuto Plaintiffs, and other parties,

17

appeared to have withdrawn their objection.  The Regalbuto Plaintiffs' recent supplemental filing, however, clouds the issue by apparently reasserting their demand that Ferris Baker substitute $9,000,000 in cash for the Innotrac common stock, allowing Ferris Baker to retain the stock and, thus, retain any amount over $9,000,000 which sale of the shares might eventually garner.

To the extent any valid objection to receiving the Innotrac common stock in lieu of its cash equivalent remains,[7] it appears to be based largely on the contention that the stock has no value.  The Court recognizes that the stock is fairly thinly-traded and that it would be difficult, and perhaps disastrous, to liquidate 2,999,152 shares on the open market.  It is also true that the value of a single share of Innotrac stock has fluctuated significantly over the past few years – even in the absence of any manipulation.  Nevertheless, the Court rejects the contention that the stock is "valueless" for a host of reasons.

Though the value of Innotrac common stock has fluctuated dramatically over the past few years, it has never been valueless on the open market.  At its absolute lowest point since the filing of this matter, shares of Innotrac common stock traded for $1.34.  Though that amount is substantially lower than the $3.00 per share that the Regalbuto Plaintiffs target, it is by no means an insignificant amount.  Even at $1.34, the shares held in the Ferris Baker accounts would have a value in excess of $4,000,000.  Since the beginning of 2008, however, the stock largely has maintained a share price in excess of the $3.00 sought by the Regalbuto Plaintiffs.  On April 10, 2008, for instance, the closing price for a share of Innotrac common stock was $3.74.  That number sets the

---

[7]     Given the Regalbuto Plaintiffs' statements during the hearing and the Court's deadline for submitting objections to the settlement, the Court would be well within its rights to reject the Regalbuto Plaintiffs' recent filing and to find their objections withdrawn.  Even in the absence of any objections, however, the Court is duty-bound to analyze the fairness of the settlement.  Thus, in the interest of fully explaining the Court's fairness findings it undertakes to address the parties' concerns as well.

18

total value of the Ferris Baker shares at over $11,000,000 – well in excess of the $9,000,000 mark that the Regalbuto Plaintiffs believe, when added to the cash payment, would constitute fair compensation for the losses allegedly caused by Ferris Baker.  The Court is, of course, well aware that the nature of the IPOF Fund's Innotrac stock holdings precludes it from liquidating the stock in the market for a fair price.  It is unrealistic to believe that the Receiver could sell 2,999,152 shares of Innotrac stock into a market that trades an average of approximately 5,000 shares per day without consequences.  Despite this, however, it is disingenuous to claim that the stock has no value.

Given the circumstances of this case, and the size of the Receiver's interest in Innotrac, it is important to look beyond the securities market in which the stock trades – both to ascertain the true value of the asset and, eventually, to divest the asset for a fair price.  In ascertaining the value of such an illiquid asset, we must look beyond the daily share price and examine the true nature of the holding.  In total, the Innotrac common stock held by the Receiver represents over a one-third interest in that company.  Innotrac is not a multi-national juggernaut of a corporation, but nor is it an emerging company without revenue, capital, or a business model.  Instead, Innotrac Corporation is a publicly traded company, in operation for almost twenty-five years, with over a thousand employees.  Indeed, though the company has not always been profitable, for 2007, Innotrac Corporation reported significant growth and profitability on revenues of over $120 million.  The Receiver's holdings represent a substantial interest in the corporation.  Indeed, in some circumstances, a large block of shares can command a premium.  Thus, looking at Innotrac Corporation, and the ownership interest that the IPOF Fund's common stock represents, the Court cannot agree that the asset is valueless.

The Receiver, furthermore, has expressed to the Court that he continuously has been attempting to negotiate the sale of the IPOF Fund's Innotrac shares.  At the March 12, 2008 hearing, moreover, the Receiver indicated that he has been engaged in meaningful negotiations aimed at a bloc sale of the Innotrac stock at not less than $3.00 per share.  Indeed, the Receiver informed the Court that his *minimum* target for the disposition of the shares is $3.00 per share.  The Receiver further represented that the CEO of Innotrac is also committed to seeking a fair disposition of the IPOF Fund's shares.  In sum, the Receiver explained that, in his best business judgment, he has every reason to believe that, in a private block transaction, the value of the Innotrac stock held by the Fund is not less than $3.00 per share, and could be worth more.  Given this fact, the Receiver and his counsel indicated their belief that a transfer of the shares to Ferris Baker for $3.00 per share would fail to maximize shareholder value. [8]

### (c)    The $7,200,000 Cash Component and Other Objections.

The Regalbuto Plaintiffs have also objected to the cash component of the settlement as being too low.  Based on the Receiver's actual loss calculation, which establishes a pre-manipulation price of $2.60, however, the $7,200,000 represents better than a 94% recovery of the excess amount paid by the IPOF Fund.  The Receiver's calculations are thoroughly supported, and, excluding general, conclusory allegations relating to the *total* losses of the IPOF Fund, no party has offered any supportable, contrary figures.  Finally, as discussed in detail below, the Court finds that it is more useful to analyze the settlement as a whole, under the totality of the circumstances, as opposed to deconstructing each term of the settlement.

---

[8]    The Court notes, moreover, that Ferris Baker has never agreed to the substantial cash outlay that the Regalbuto Plaintiffs propose and, in light of the pending sale of Ferris Baker, is not likely in a position to do so now.

Certain plaintiffs have suggested that it is impossible to ascertain the true value of the settlement with Ferris Baker absent a full understanding of the Receivership's fees.  While the Court understands the parties' concerns with respect to the costs of this matter, it does not find this objection particularly strong for a number of reasons.

The Receivership's fees are hourly, and not contingent – this is critical to resolving the objection for two reasons:  (1) the fees have already been incurred; and (2) the settlement value has no bearing on the fees.  Stated another way, the Receivership has already incurred significant fees during its discovery, investigation, pursuit, and marshalling of the assets, as well as during the negotiation process.  Most of those fees have already been approved and, in some cases, paid.  Additionally, in a true sense, because the Receiver's fees are hourly and not contingency-based, the amount of the settlement has no bearing on the fees, and vice-versa.  In other words no matter how the Ferris Baker settlement is valued, the Receivership's fees are flat, and will not change.

Furthermore, at this time it appears likely that, because the Receivership operates on an hourly basis, the fees will be well below the level of fees the Court would expect under a contingency arrangement.  For illustrative purposes, many standard fee agreements include fees of 25% or 33% for settlement, and as much as 40% if the claims proceed to trial.  See, e.g., In re Rite Aid Corp. Sec. Litig., 396 F.3d 294, 303 (3d Cir. 2005) (noting: "one study of securities class action settlements over $10 million that found an average percentage fee recovery of 31%.").  These numbers do not include expenses – in contrast to the bills submitted by the Receiver and his professionals – another significant cost.  Thus, if the Ferris Baker settlement has a value of

21

$16,000,000,[9] the parties could expect to pay anywhere from $4,000,000 to $5,280,000 for the settlement in attorneys' fees (and up to $6,400,000 if that amount was secured after a trial), plus many thousands more in expenses.  The Receivership, however, has achieved settlement without costing the litigants anything close to that amount.

Notably, and something that appears often overlooked, is the marginal benefit of the Receivership.  It is true that it has taken over two years to reach this initial settlement, and it is also true that to achieve this result significant, and costly, efforts have been made.  Upon approval of this settlement, however, the Receiver and the other litigants may well be in an excellent position to resolve their remaining issues expediently.   Thus, the wisdom of securing hourly-based representation should become more evident as the case progresses.  Again, for illustrative purposes, compare the fees that would be incurred for a $5,000,000 settlement of a second claim over the next few months.  A contingency agreement could cost the IPOF Fund investors from $1,250,000 to $1,650,000 plus expenses.  The Receivership's approved fees and expenses over such a period, however, would be a small fraction of those amounts.  In short, as is common in cases of this nature, the bulk of the effort – and expense – is frontloaded.  The Court, moreover, finds that even though most of the expenses incurred by the Receivership predate the settlement agreement, and may be leveraged into additional settlements, those expenses are still well below the amounts that likely

---

[9]    Arguably, in fact, the settlement is worth just over $16,200,000, in certain terms. The settlement has resulted in forgiveness of a $9,000,000-plus debt and a cash payment of $7,200,000.  Those are certain, easily defined benefits.  What appears to concern some parties is the ultimate economic benefit of the settlement – i.e., what the investors will eventually receive once the Innotrac stock is sold and the Receiver's fees are paid.  This type of post-recovery calculation, however, does not necessarily control an analysis of actual damages or appropriate attorney's fees.

would be sought by any plaintiffs' attorney who possesses the level of skill necessary to adequately represent the plaintiffs, much less secure these results.

As a final comment to the objections to the uncertainty of the Receiver's fees, the Court notes that, subsequent to the filing of any objection relating to the Receiver's fees, the Receiver filed his second accounting. This 400-plus page accounting details all of the fees incurred by the Receivership for the first eighteen months of its existence. The Court finds that the information contained in these reports provides an adequate basis upon which to ascertain the scope of Receivership fees. As such, and in the absence of any reiteration of this point subsequent to the Receiver's disclosure, the Court finds the objection to be largely moot.

Finally, prior to the hearing addressing the proposed settlement, at least one Plaintiff expressed some concern about the progress of negotiations with other parties who potentially bear responsibility. During the hearing, however, counsel for the Receiver addressed the efforts the Receivership was making in pursuit of resolution with other parties. The Court, moreover, recently provided a formal avenue for the litigants to further advance the matter and explained that the time for the Receiver to file complaints was rapidly approaching. In light of these recent developments, therefore, the Court finds this issue to be moot.

### 2.    The Fairness of the Settlement.

After considering the Receiver's fairness assessment and the parties' objections, the Court is persuaded that an analysis of the Ferris Baker settlement must begin with the Receiver's damages estimate associated with whatever claims he would assert against Ferris Baker. The Receiver has provided the Court with a detailed discussion of the potential actual damages arguably caused by acts and conduct in regard to the IPOF Fund account at Ferris Baker that he believes operated as a fraud

23

and deceit upon IPOF Fund. These potentially recoverable actual damages are comprised of the excess amount over a fairly determined value paid by IPOF Fund to purchase Innotrac stock due to alleged market manipulation, and the value of the stock presently held in the Ferris Baker margin account.  As discussed earlier, based on the Receiver's calculation of the $5.68 un-weighted average purchase price for Innotrac shares at Ferris Baker, the excess cost component of actual damages could be as high as $7,635,788.16.  Given the thinly traded nature of Innotrac common stock, the parties have established $3.00 per share as the approximate, uninflated value of the shares remaining in the account.  Thus, though the total loss due to the manipulation of the stock at Ferris Baker could reach $7,635,788.16, the Receiver has agreed to accept $7,200,000 plus 2,999,152 shares of Innotrac stock – free of encumbrance – held at Ferris Baker.

While the Regalbuto Plaintiffs have offered a figure of over $48,000,000 as the total damages due to the fraud, the Court finds that it overstates the amount of actual damages attributable to Ferris Baker's alleged activities.  First, while it is unclear precisely how the Regalbuto Plaintiffs arrived at that figure, it is clear that the figure is at least partially derived from the investors' total deposits into the IPOF Fund.  (See Hr'g Tr. at 34:6-35:19.)  Unlike the Receiver's number, therefore, the amount suggested by the Regalbuto Plaintiffs includes funds previously returned back to certain IPOF Fund investors during the course of the Ponzi scheme.[10]  As noted above, moreover, during the hearing counsel for the Regalbuto Plaintiffs acknowledged that his figure included amounts previously returned to investors and appeared to recognize that the figure was likely unsupportable.  (See Hr'g Tr. at 34:6-35:19.)  Further, the $48,000,000 does not appear to take account of losses *due*

---

[10]     The Court further observes that the Receiver's calculation of damages, less amounts returned to investors as "dividends," is very near to the calculations of the FBI and United States Attorney's office. (See generally, United States v. Dadante, No. 07 CR 00336.)

*to market manipulation*.  In other words, that figure assumes that every dollar deposited into the IPOF Fund was lost, and that all of it was lost as a result of market manipulation.  Such a statement is flawed, however, because Dadante engaged in trading activities in some equities that no parties have suggested were manipulated (thus, arguably every dollar was not lost due to market manipulation).  More importantly, however, not only does that figure fail to account for the "profits" paid out to the investors, it fails to account for the assets that remain in the IPOF Fund.  Though some of those assets may be encumbered by significant liens, the Receiver has shown that it is possible to extinguish those liens and, therefore, achieve a positive net value for some of the IPOF Fund's current assets (thus, clearly, every dollar was not lost).   The Regalbuto Plaintiffs' number, moreover, purportedly represents *all* the damages incurred by the IPOF Fund, and is not limited to *Ferris Baker's* alleged proportional share.  For these reasons, the Court finds the Receiver's suggestion that the actual – and attainable – damages relating to Ferris Baker's alleged conduct is approximately $7,635,000 to be the more supportable, and better reasoned, estimate.

It is against the backdrop of the Receiver's $7,635,000 actual damages estimate that the Court attempts to ascertain the total value of the settlement that will inure to the investors.  Litigants generally may settle their claims for whatever they believe they are worth, and the Court will not usurp the Receiver's judgment absent a compelling need.  In light of the fact that this settlement has been proposed in the context of a Receivership, and because there are a number of unrepresented parties, it is incumbent upon the Court to make at least a basic assessment of the fairness of the

settlement. [1]

As an initial matter, the $7,200,000 cash payment represents over 94% of the actual damages as estimated by the Receivership.  The sole question for the Court, therefore, is whether the addition of 2,999,152 shares of unencumbered Innotrac common stock raises the value of the proposed settlement to an amount that represents a reasoned consideration of the risks attendant in litigation as compared to the potential fruits of a successful trial.  The Court finds that it does.

It is important to understand that, according to the Receiver's estimate, $7,635,000. represents a full recovery of actual damages due to market manipulation from Ferris Baker (even if not from all potentially responsible parties).  Thus, due to the risks of litigation and the costs of litigation in time and money, a reasoned settlement need not necessarily rise to the level of 100% of the actual damages figure.  Instead, a number that both accurately compares an estimate of the percentage chance of success, and accounts for the costs of litigation, may fall well short of that

---

[1]     The Court notes that this is not a class-action; it is a Receivership over a limited partnership fund.  As such, there is no obligation on the Court to follow any particular procedure for its approvals of proposed settlements.  Specifically, the Court had no obligation to set up a formal procedure for the filing of objections by interested parties and was not required to conduct a formal fairness hearing.  The Receiver could have simply asked the Court to approve the settlement based on a direct report to the Court.  The Court chose to employ a more open, participatory process, however, in order to make it clear to the victims that it was prepared to listen to, and carefully consider, all of their concerns, and to provide the Court with the maximum amount of information it could obtain regarding the fairness and wisdom of the proposed settlement.

threshold.[12] See, e.g., In re Cendant Corp. Litig., 264 F.3d 201, 241 (3d Cir. 2001) (finding no abuse of discretion in a district court's approval of a settlement where, inter alia, "the total settlement amount of nearly $3.2 billion represents a 36-37% recovery rate by the plaintiff Class") (citing In re Prudential Sec., Inc., L.P. Litig., MDL No. 1005, 1995 WL 798907 (S.D.N.Y. Nov. 20, 1995) (approving settlement of between 1.6% and 5% of claimed damages); In re Crazy Eddie Sec. Litig., 824 F. Supp. 320 (E.D.N.Y. 1993) (settlement of between 6% and 10% of damages); In re Michael Milken & Assoc. Sec. Litig., 150 F.R.D. 57 (S.D.N.Y. 1993)); In re Suprema Specialties, Inc. Sec. Litig., No. 02-168, slip op., 2008 WL 906254 at *6-*7 (D.N.J. Mar. 31, 2008) (approving a settlement that amounted to nearly 22% of plaintiffs' expert's damages estimate); In re PNC Financial Servs. Grp., Inc., 440 F. Supp 2d 421, 435-36 (W.D. Pa. 2006) (finding, in a securities action, that: "the components of the proposed settlement constitute a very reasonable range of settlement when compared to the best possible recovery discounted by the attendant risks of proceeding to trial" when a settlement included $193 million in total compensation (including certain

---

[12]     As discussed above, given the unique circumstances of this matter, the Court's
paramount focus is on specifically addressing the objections filed by the parties.
Nevertheless, though the Court is not obligated to scrutinize the settlement in the
manner in which it would examine a class action settlement, some of the
considerations relevant to a class action settlement fairness hearing are relevant to the
Court's consideration of this proposed settlement.   Accordingly, though it is
unnecessary to explicitly recount each of the factors courts have found useful in
considering the fairness of a class action settlement, the Court bears them in mind in
its consideration of the totality of the circumstances here.  See, e.g., Girsh v. Jepson,
521 F.2d 153, 157 (3d Cir. 1975) (identifying (1) the complexity, expense, and
possible duration of the litigation; (2) the reaction of the class to the settlement; (3)
the stage of the proceedings and the amount of discovery completed; (4) the risks of
establishing liability; (5) the risks of establishing damages; (6) the risks of
maintaining the class action through trial; (7) the ability of the defendants to
withstand a greater judgment; (8) the range of reasonableness of the settlement fund
as compared to the best possible recovery; and (9) the range of reasonableness of the
settlement fund to a possible recovery in light of all the attendant risks of litigation,
as nine factors to aid a court in considering the fairness of a proposed settlement).

illiquid components) in a matter where "if all potential claims were to be sustained and plaintiffs were to enjoy complete acceptance of their theories by the finder of fact, the class would establish approximately $1.5 billion in aggregate damages."); In re Datatec Sys., Inc. Sec. Litig., No. 04-CV-525, slip op., 2007 WL 4225828, at *4 ("Lead Plaintiffs' counsel asserts that the potential recovery in this litigation is approximately $6,900,000.  The Settlement of $750,000 represents roughly 10.87% of the possible damages. This percentage is within the range of settlements approved in other securities cases."); In re Heritage Bond Litig., 2005 WL 1594403 (C.D. Cal. Jun. 10, 2005) ("the Settlement Fund of $27,783,000.00, which represents 36% of the class' total net loss . . . of approximately $78 million, is an exceptional result in this case."); In re Corel Corp., Inc. Sec. Litig., 293 F. Supp. 2d 484, 489-90 (finding that where, "the proposed settlement of $7,000,000 plus interest amounts to, at worst, 15% of the maximum provable damages," it "is fair and reasonable in light of the best possible recovery."); . In re Gen. Instrument Sec. Litig., 209 F. Supp. 2d 423, 431 (E.D. Pa. 2001) (noting: "plaintiffs have recovered 11% of the high-end range of damages reported by their expert and almost twice as much as the high-end of what defendants' expert opined could be recovered," finding that given hurdles that would likely arise at trial: "the proposed settlement is within the range of reasonableness.").  Here, however, the Court believes that the value of the settlement likely represents very nearly a 100% recovery.

It appears clear to the Court that the value of the 2,999,152 shares of Innotrac common stock also conveys a significant value to the investors.  Much of that value is only available because the margin debt will be extinguished by virtue of this settlement.   Thus, even if the Receiver were only able to secure $1.34 per share – the lowest price at which the stock has sold many years – for the Innotrac stock, the total economic value of the settlement would reach $11,218,863.  That figure

28

amounts to significant recovery damages as well as a return of a large portion of the $2.60 original, uninflated purchase price of the Innotrac common stock.  While a sale at $1.34 would be a monumental disappointment for the IPOF Fund investors, the Receiver, Innotrac, and the Court, the Court cannot find that it is unreasonable to settle claims – no matter how strong – at an early stage over 90% of the actual damages a party reasonably believes it could achieve at trial.  In any event, all of the information before the Court indicates that the individuals closest to the issue reasonably believe that the Receiver may realize as much as $3.00 per share for the Innotrac stock.  The Court has been given no reason to doubt those expectations.  A sale at or above $3.00 per share would drive the ultimate economic value of the settlement above $16,000,000.  Thus, in addition to a 94% recovery of damages, the economic value of the settlement, should a sale occur at $3.00, would also result in a modest return on the IPOF Fund's initial investment in Innotrac stock at the uninflated price of $2.60.[13]  As such, the Court finds that, when considering all the aspects of the settlement, the objections and statements in support of the settlement, and the facts and circumstances unique to this matter, the Settlement Agreement, in its entirety, is reasonable.[14]

---

[13]  As noted above, because the margin debt has been extinguished, a sale above $2.60 would push the economic benefit over $16,000,000 – a number that exceeds the total purchase price of the Innotrac shares at Ferris Baker (2,479,152 shares x $5.68 = $14,081,583).  Thus, the potential still exists for the IPOF Fund investors, by virtue of this settlement, to obtain value for claims that would represent a recovery of punitive or exemplary damages, attorney's fees, interest, or some other measure of damages available under claims beyond the antifraud provisions of federal securities law.

[14]  As discussed above, moreover, it is worth noting that the Receiver's fees are likely to be far below those typically found in a contingency agreement.  Thus, a greater sum will likely be available for eventual distribution to the IPOD Fund fraud victims.  This factor also plays a role in the Court's consideration of the totality of the circumstances.

As a final note, no party has objected to any of the Release conditions or the imposition of the Bar Order.  According to the Receiver, the Release and Bar Order were necessary conditions in securing the settlement, and the settlement would not stand in their absence.  After its own review of the Release and Bar Order, the Court finds the conditions found therein to be both fair, and fairly typical, conditions to impose in exchange for settlement.  Entry of a bar order that is required by a proposed settlement agreement is within a court's authority and discretion.  See In re Munford, Inc., 97 F.3d 449, 455 (11th Cir. 1996); CFTC v. Equity Fin. Grp., 2007 U.S. Dist. LEXIS 53310 (D.N.J. 2007); S.C. Nat'l Bank v. Stone, 749 F. Supp. 1419, 1431 (D.S.C. 1990).  Accordingly, the Court approves the Settlement Agreement and declines to require modification of any aspect of the Settlement Agreement, its attendant Releases, or the Bar Order.  Within seven (7) days of the date of this Order, the Court will enter the *Bar Order, Injunction and Dismissal of Claims* attached the proposed settlement agreement as Exhibit A.

## III.    Other Pending Issues

A number of ancillary motions, largely mooted by recent developments, also remain on the Court's docket in this matter.  With respect to those motions, the Court orders as follows:

The Regalbuto Plaintiffs' *Motion to Lift Stay on Discovery* (Doc. 327) seeks to lift the discovery stay in this matter to depose David Dadante in relation to his purchases of Innotrac stock.  Given the posture of the case, particularly the forthcoming deadlines to settle or file suit, however, the Court finds that such a deposition would be premature at this time.  If it becomes clear that the claims of the IPOF Fund must proceed to litigation then, at that time, the Court likely will be inclined to lift the discovery stay in this matter.  At this time, however, the *Motion to Lift Stay on Discovery* (Doc. 327) is **DENIED**.

30

Receiver's *Motion for Leave to File Response to Supplemental Statement of Regalbuto Plaintiffs* (Doc. 331) is unopposed and **GRANTED**.

On January 14, 2008, the Regalbuto Plaintiffs filed a *Motion to Lift Freeze on Trading Innotrac Corporation Stock* (Doc. 334).  Despite its filing date, the Regalbuto Plaintiffs' motion to lift the freeze continues to argue that Coffee King, Inc., (a defunct Ohio corporation), and not the Receivership, is the appropriate entity to initiate recoveries for the investors.  On January 7, 2008, however, the Court found Coffee King to be wholly irrelevant to this action.  Accordingly, the Regalbuto Plaintiffs' *Motion to Lift Freeze on Trading Innotrac Corporation Stock* (Doc. 334) is **DENIED as moot.**

The Regalbuto Plaintiffs have also filed a *Motion to [Compel the Receiver to] Provide Documents For Review* (Doc. 345).  In this motion, the Regalbuto Plaintiffs ask for documents submitted to the Court in connection with the Receiver's fee petitions.  Based on an examination of the voluminous documents provided by the Receiver in connection with his second accounting – subsequent to the filing of the motion – the Court finds that the Regalbuto Plaintiffs' *Motion to [Compel the Receiver to] Provide Documents For Review* (Doc. 345) must be **DENIED** as moot. [15]

Joseph A. Ingrisano's unopposed *Motion for Leave to Withdraw as Counsel of Record* for Ferris, Baker Watts (Doc. 348) is **GRANTED**.

To the extent the Regalbuto Plaintiffs' *Response to the Receiver's Second Accounting Report* (Doc. 354) requests relief, it is improper.  Such a request is better formed in a motion to compel that

---

[15]    To the extent this motion, or the Regalbuto Plaintiffs' *Response to the Receiver's Second Accounting Report* challenge redactions to certain exhibits to the Receiver's accounting, the Receiver has explained that such redactions are mandated by applicable law; the Court, of course, has been provided with unredacted versions which are not part of the public record.

31

explains in detail each of the redacted entries for which the Regalbuto Plaintiffs seek more information and, based on the Receiver's recent response, why they believe that the entries are not subject to a privilege or are otherwise barred from disclosure.  In addition, the Court finds the contentions raised by the Regalbuto Plaintiffs' motion to be akin to discovery disputes and refers them to the procedures discussed in Local Rule 37.1 with the admonishment that it is within the Court's discretion to sanction a party for failing to abide by the Rules or require an unsuccessful party under such circumstances to pay the expenses of the successful party.  See Fed. R. Civ. P. 37(a)(5).

As a final note, the Regalbuto Plaintiffs' motions seeking documents or explanations from the Receiver address precisely the types of issues that the Court instructed the parties to resolve, or to attempt to resolve, informally.  (See Order, January 25, 2008.)  These filings – particularly in the absence of any attempt to resolve the matter outside the Court – are singularly unhelpful and wasteful of the Court's and the parties' resources.  Furthermore, because they largely address discovery-type issues, they likely run afoul of the strictures of Local Rule 37.1.  Accordingly, from this point forward, the parties are **<u>ORDERED</u>** to attempt to resolve, informally, any ancillary concerns or issues that do not address the merits of the case, requests for documents, or any aspect of litigation that the Court might construe as discovery-related.  If, in the Court's judgment, a party fails to make a good-faith attempt to resolve such issues prior to moving the Court, the Court will impose sanctions.  The Court further advises the parties that it views duplicative and repetitive filings (See, e.g., Docs. 179 & 263; Docs. 299 & 315) in this matter as vexatious and, in the future, intends to impose sanctions for such conduct.

IV.     **CONCLUSION**

For the foregoing reasons the Receiver's *Motion for Order Approving Settlement and for Ancillary Orders* (Doc. 337) is **GRANTED.**  The Regalbuto Plaintiffs' *Motion to Lift Stay on Discovery* (Doc. 327), *Motion to Lift Freeze on Trading Innotrac Corporation Stock* (Doc. 334), and *Motion to [Compel the Receiver to] Provide Documents For Review* (Doc. 345) are **DENIED.**  The Receiver's *Motion for Leave to File Response to Supplemental Statement of Regalbuto Plaintiffs [in Support of a More Complete Accounting]* (Doc. 331), and the Receiver's *Motion for Leave to File a Response to the Supplemental Memorandum in Support of the Objections of the Regalbuto Plaintiffs* (Doc. 357) are **GRANTED**.  Ferris, Baker Watts' unopposed *Motion for Leave to Withdraw as Counsel of Record* (Doc. 348) is **GRANTED**.

**IT IS SO ORDERED**.

s/Kathleen M. O'Malley
**KATHLEEN McDONALD O'MALLEY**
**UNITED STATES DISTRICT JUDGE**

**Dated: April 18, 2008**

33