# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| **SHELDON GORDON, et al.** | : | **Case No.  1:05-CV-2726** |
| **Plaintiffs,** | : | |
| | : | **JUDGE KATHLEEN O'MALLEY** |
| **v.** | : | |
| **DAVID DADANTE, et al.** | : | <u>**MEMORANDUM & ORDER**</u> |
| **Defendants.** | : | |

Before the Court are two Motions to Conduct a Status Conference from one group of Plaintiffs in the instant action.  (Docs. 435, 442.)  Also before the Court is a substantively related *pro se* motion to Remove the Receiver (Doc. 411) filed by a single plaintiff, an Unopposed Motion to Strike the Motion to Remove the Receiver (Doc. 414), and a Motion for an Independent Audit of the Receiver (Doc. 437).[1]  Finally, the Court reviews a Motion to Withdraw as Counsel for one particular plaintiff from Attorney Salvatore Zingale (Doc. 443).  For reasons more fully explained below, the Motions to Conduct a Status Conference (Docs. 435, 442) are <u>**DENIED**</u>, the pro se Motion to Remove the Receiver (Doc. 411) is <u>**STRUCK**</u>, the Motion to Strike the Motion to Remove the Receiver (Doc. 414) is <u>**GRANTED**</u>, the Motion for an Independent Audit of the Receiver is <u>**GRANTED**</u>, and the Motion to Withdraw as Counsel (Doc. 443) is <u>**GRANTED**</u>.

---

[1] The Motion for an Independent Audit of the Receiver (Doc. 437) actually appears within a responsive filing.  It was submitted for consideration by the Court because a portion of the first Motion to Conduct a Status Conference (Doc. 435) requested an "accounting" of the Receiver's hours and expenses.  The Court approaches this issue, accordingly, as it would cross-motions requesting the same effective relief.

## EVENTS PRECEDING THE PRESENT MOTIONS

The above-captioned action was brought by the victims of a Ponzi scheme.[2]  Over the past four years, this intricate and acrimonious litigation has evolved in such a way that it is difficult for the uninitiated to understand even seemingly straight-forward motions and orders. For example, the Court in this opinion sets forth case-specific procedural rules for future filings in this action that can only be understood fully through the lens of the past four years. Consequently, the Court finds it necessary to begin this order with a comprehensive summary of this litigation.

Broadly speaking, nine seminal events have informed this litigation.  They have been somewhat linear in nature, though, as will be evident below, not perfectly so.  These events are:

(1)   The filing of the initial complaint;

(2)   The initial discovery of the assets and liabilities underlying this litigation;

(3)   The Plaintiff's request to appoint Mark Dottore as the Receiver;

(4)   The early stages of the litigation prior to the current hostility between the Plaintiffs, both under the initial complaint and after the filing of the first amended complaint;

(5)   The claim by one group of plaintiffs that two other plaintiffs had committed fraud;

(6)   The resolution of claims against the named Defendant;

(7)   The uncovering of a potentially adverse relationship between plaintiffs represented by the same counsel;

(8)   The dispute over control over the assets and liabilities in this action;

(9)   The repeated disagreements between one group of Plaintiffs and the Receiver (whose actions have been supported by another group of Plaintiffs), regarding the wisdom of actions taken by the Receiver on behalf of the Fund (defined *infra*.)

---

[2] While there is substantial litigation regarding precisely which parties are liable and what precise damages were incurred by whom, there is little question that all of the Plaintiffs were severely aggrieved.

After discussing these events, the Court will describe the resulting status of the litigation. Those nine events, combined with a summary of the current state of the litigation, provide the context for the Court's instant orders.

### 1. The Filing of the Initial Complaint

#### A. The Initial Allegations

On November 21, 2005, Plaintiff Sheldon Gordon ("Gordon") filed a complaint against David Dadante ("Dadante"), several entities under Dadante's control, multiple investment brokerages, and various John Doe individuals and companies. (Compl. (Doc. 1.)) In sum, Gordon alleged that Dadante operated an elaborate "Ponzi-like" scheme, in which Dadante and entities under his control raised $50 million dollars from various limited partners, including Gordon, for a fraudulent and unregistered investment fund. (*Id*. at ¶ 7.) According to the complaint, Dadante first told his investors that the entities under his control (collectively, the "Fund") would invest in initial public offerings ("IPOs") and later explained to them that the Fund "would trade the Dow Jones Industrials" using a proprietary investment strategy. (*Id*. at ¶ 2.) The complaint further alleged that Dadante promised his investors guaranteed returns of between ten and twenty percent annually. (*Id*. at ¶ 3.)

The Complaint asserted that, to facilitate his scheme, Dadante made repeated misrepresentations, provided false account statements, and manipulated accounts, all while enriching himself with improper self-dealing. (*Id*. at ¶¶ 8-9.) The complaint further alleged that $26 million of the Fund's assets were distributed to certain investors as purported "gains" on their investment, but that the Fund never realized any actual gains, such that the $26 million paid to certain early investors as "returns" were, in reality, distributions made from the initial deposits of later investors. (*Id*. at ¶ 33.) Finally, the complaint averred that Dadante and the Fund

violated federal and state securities laws and the Racketeer Influenced and Corrupt Organizations Act ("RICO"), and committed common law fraud.  (*Id*. at ¶ 10.)[3]

### 2.  The Discovery of the Assets and Liabilities Underlying this Litigation

Shortly after the litigation commenced, it became apparent that one of Gordon's initial allegations was beyond dispute: Dadante had been operating a Ponzi scheme.  It also became apparent, however, that, while receipts from later investors were indeed used to pay earlier investors and the Fund had never experienced any real gains, the Fund was not without assets. The Fund did own certain stock, as explained below, and had certain inchoate assets in the form of potential legal claims against Dadante, the various brokerage firms through which Dadante had purchased and sold securities, and others..  The Fund, unfortunately, was also not without liabilities – Dadante had created huge margin debts at several of these brokerage firms as he used Fund assets to purchase stock.  Because the value of the stock he purchased had fallen precipitously, those firms were seeking to sell the stock to reduce the margin debts, and thus liquidate Fund assets.[4]  Consequently, the Court issued an Order protecting the Fund's stock from such liquidation.

### A.  The Fund's Assets

[3] As discussed further below, pursuant to a settlement agreement, judgment was ultimately entered against Dadante on claims for breach of fiduciary duty, mismanagement of partnership affairs, and constructive fraud.

[4] The term "margin debt" refers to credit extended by a brokerage firm to its client in connection with the  purchase of securities  (an activity commonly known as "purchasing on margin").  Margin creates leverage to purchase and hold larger amounts of securities.  However, margin debt incurred to purchase securities in an account is secured by the assets in that brokerage account.  When the market value of stock and other assets in the account  falls below a requisite value in relation to the margin debt in the account, however, a brokerage firm will demand additional funds or assets from the client (this is commonly known as a "margin call"). If the client does not deposit such funds or assets into the account, the brokerage firm may liquidate the assets in that account to reduce or cover the margin debt.  In the event an account is liquidated, the brokerage typically has the right to payment from the client for any debt that remains after such liquidation.

### i.   Stock Held by the Fund

Although many of the Fund's assets were distributed to early investors in an attempt by Dadante to hide his fraud, and others were simply stolen by Dadante to support a high-priced lifestyle, the parties learned that certain of the Fund's other liquid assets had been used to purchase approximately 4.3 million shares of common stock in a single entity, Innotrac Corporation ("Innotrac").  (*See* Order of June 6, 2007 at 3 (Doc. 284).)  While the complaint alleged that Dadante promised investors he would seek out profitable IPOs and engage in trading only in stocks described as the "Dow Jones Industrials" (Compl. ¶ 2), Innotrac did not engage in an IPO during the life of the Fund,  and its stock, which is traded in the Nasdaq Stock Market, was never a stock included among those comprising the Dow Jones Industrial Average (*see* Order of June 6, 2007 at 2).

Innotrac is a relatively small business services company that generally trades fewer than 10,000 shares per day.  (*See id.*)[5]  This limited volume allegedly allowed Dadante to manipulate the price of Innotrac's stock using a variety of different brokerages and stock manipulation methods.  (*See* Order of April 18, 2008 at 2-5 (Doc. 361).)[6]  The Fund, as a result of Dadante's activities, now owns approximately 34.3% of Innotrac's outstanding common stock.  *See* 2009 ANNUAL REPORT OF INNOTRAC CORPORATION at 10 (on-file with the SEC).

During the majority of this litigation, Innotrac stock generally traded at between $2 and $4 per share.  (*See, e.g.*, Order of September 7, 2008 at 2 (Doc. 393).)  The market value of these

---

[5] For purposes of comparison, on a typical day, roughly 18 million shares of Apple Computer trade hands.

[6] For example, prior to Dadante's alleged manipulation, the price of Innotrac stock was approximately $2.60 per share.  (*See* Order of June 6, 2007.)  After he purchased approximately 2.4 million more shares of Innotrac stock through a particular brokerage account, however, the price rose to as high as $11.38 per share.  This latter price does not appear to represent the actual value of the company – indeed, many believe that this price overstated the company's value by more than 425%.  (*See id.*)

shares to the Fund has, accordingly, generally ranged from approximately 8.6 million dollars to approximately 17.2 million dollars.  As the national economy has declined over the past few months, and the crisis in financial markets has taken its toll, however, Innotrac's stock price has fallen along with the rest of the world market.  As of the date of this Order, the stock is trading at approximately $1.65 per share, resulting in a market value of the Fund's shares of approximately 7.1 million dollars.

The Fund's holdings in Innotrac, unfortunately, are  illiquid.  Generally, thinly traded stock cannot be sold in the open market in volume, and efforts to dispose of the Fund's holdings in Innotrac face an additional difficulty:  although the Fund owns over 34% of Innotrac, this is not a controlling stake in the company.  Rather, Innotrac's "officers and directors own[] approximately 46.8% of the outstanding common stock."  2009 ANNUAL REPORT OF INNOTRAC CORPORATION at 10.  In other words, not only is the large volume of stock held by the Fund essentially impossible to sell in the open market, the Fund's ability to sell the shares as a block is significantly impaired because it represents a minority position..  (*See generally* Order of October 7, 2008 (Doc. 393).)

Through the course of this litigation, the largest Innotrac shareholder, who is also the firm's Chairman and CEO has made clear he and Innotrac management are committed to working with the Receiver to bring about the disposition of the Innotrac stock held by the Fund as a block, for fair value.  Among options available to the Fund, it may be possible to find a single buyer to purchase all outstanding shares of Innotrac.  Indeed, as discussed further below, one such deal was very nearly consummated in the fall of 2008, shortly prior to the  unexpected crises in financial markets and the crash in stock prices.  (*See generally id*.)

6

### ii.  Potential Legal Claims Belonging to the Fund

The Fund's assets also included various potential legal claims against Dadante, the brokerages through which Dadante had purchased and sold the Innotrac stock, and a number of other entities and professionals with whom Dadante dealt.[7]  For reasons that will be explained later in this order, the precise nature and value of these claims has been the subject of substantial dispute among the Plaintiffs.  (*See, e.g.*, Order of April 18, 2008 at 3-5.)  While all Plaintiffs believe that these claims have potential value, they differ widely on what that value is.  (*Id.*)

### B.  The Fund's Liabilities

The Innotrac stock owned by the Fund is  held in accounts located at the various brokerages through which Dadante effectuated the purchases and sales of that stock.  (*See* Order of June 6, 2007 at 3.)  That stock is encumbered by several million dollars of margin debt accumulated by Dadante.  (*See id.* at 3.)  Many of these margin debts exceed certain legal and regulatory  parameters such that the Fund's accounts have faced imminent margin calls from the inception of this litigation.  (*Id.*)  Indeed, absent Court intervention (described below), the brokerages threatened to engage in immediate and disorderly liquidation of the Fund's stock (*see id.*), which, as previously noted, has essentially no value if disposed of in this manner.  Just as Dadante's purchase of 34% of the stock was sufficient to manipulate the price upward, that same 34%, if liquidated all at once, would be sufficient to drive the stock to an artificially low price.  Such action would have proven disastrous for the Plaintiffs in this case, as the Fund would then have retained its massive margin debts, but possessed no tangible assets against which to balance them. (*Id.*)

---

[7] The brokerages were joined in this case as "stakeholder" defendants.  They are: Ferris, Baker Watts, Inc. k/n/a Royal Bank of Canada, Wachovia Securities, LLC, H&R Block Financial Advisors, Inc., Pershing, LLC, Advest, Inc., and McDonald Financial Group.  The other financial and professional entities and individuals are not expressly named as parties to the complaint, but are now known to the Court and the Parties.

### C.  The Court's Injunction

On November 23, 2005 the Court enjoined the brokerage firms where  the Innotrac shares are held from liquidating any Fund assets or attempting to collect on any outstanding margin debt without prior permission from the Court.  (Doc. 7 at 5.)  On December 1, 2005, the Court extended this injunction to December 8, 2005.  (Doc. 16 at 4.)  On December 8, 2005, the Court made this injunction indefinite.  (*See* Order of December 9, 2005 (Doc. 25) (memorializing the Court's December 8, 2005 Order).)  Although the terms of this injunction have been slightly modified since this time, requiring, for example, the Receiver to actively seek to renew the injunction every 90 days if appropriate, the basic terms of that original injunction protect the Fund's main assets to this date.  (*See, e.g.*, Order of January 19, 2006 (Doc. 46); Order of January 7, 2008 at 3.)[8]

### 3.  The Plaintiff's Request to Appoint Mark Dottore as the Receiver

### A.  Gordon's Initial Request

When Gordon filed his complaint, he simultaneously filed an emergency motion asking that the case be sealed so as to avoid a devaluation of the Fund assets through a sudden and unrestrained market response to the filing of the complaint and requested that the Court appoint a receiver.  (Gordon's Br. of November 21, 2005 (Doc. 5).)[9]  In his emergency motion, Gordon

---

[8] The Court is, frankly, perplexed by recurring requests from the Objecting Plaintiffs (defined *infra*.) to lift this trading restriction.  (*See, e.g.*, Order of April 18, 2008 at 31.)  Were the Court to grant this request, it would result in the immediate loss in value to all Plaintiffs of millions of dollars and further complicate all Plaintiffs' claims in this already complex litigation.

[9] A receiver is an individual appointed by the Court to preserve and administer disputed assets during the course of litigation.  Many parties are not familiar with the unusual role of a receiver:

> Neither a plaintiff nor a defendant, the receiver functions as an arm of the court, appointed to ensure that prevailing parties can and will obtain the relief it orders. A receiver's authority, therefore, is defined solely by the order of the appointing court, which may provide for the administration of the receivership in any way it

stated that "[t]ime is of the essence" and entreated the Court to appoint a receiver lest his investment "be rendered worthless" and "Dadante … be permitted to abscond with Mr. Gordon's funds." (*Id*. at 1.)  Gordon argued that a receiver was absolutely necessary "to prevent fraud" and "preserve the assets [of the Fund] from irreparable loss through mismanagement." (*Id*. at 5) (citations omitted).  To that end, Gordon expressly urged the Court to appoint Mark Dottore (the "Receiver") as the receiver of the assets of the Fund:

> Plaintiff submits that Mr. Dottore is an individual who regularly serves as a receiver in court proceedings and he is well qualified to serve in the capacity as receiver in this case.

> Given the urgent and extreme circumstances in this case, and the qualifications of Mr. Dottore to serve in this regard, and the fact that Mr. Dottore is prepared to move swiftly to do those things required of him under the Order Appointing Receiver attached, Plaintiff prays that this Court appoint Mr. Dottore as the receiver in accordance with the terms of the Order Appointing Receiver.

(*Id*. at 2.)  Gordon also represented that he already had shared critical information regarding the allegations with Mr. Dottore and that Gordon and his counsel were familiar with Mr. Dottore's

---

> sees appropriate.  The district court, moreover, retains equitable power to review the actions of [a] receiver.

*SEC v. Loving Spirit Found.*, 392 F.3d 486, 490 (D.C. Cir. 2004) (citations omitted) (quotations omitted); *see also Javitch v. First Union Sec., Inc.*, 315 F.3d 619, 626 (6th Cir. 2003) ("Ohio courts have described a receiver as merely the administrative arm of the court who takes charge of the assets of the partnership for the purpose of conserving them to the ends of equity…" (citation omitted).).

Notwithstanding the Receiver's atypical role, it is important to contrast this with the Fund's position.  The Fund, of course, is a Plaintiff in this action.  (*See* Order of March 20, 2006 at 2-3 (granting the Receiver's request to align the Fund as Plaintiff in this action).)  To that extent, the "receiver has no greater rights or powers than [any other plaintiff] would have." *Eberhard v. Marcu*, 530 F.3d 122, 132 (2d Cir. 2008) (citing *Flaming v. Lind-Waldock & Co.*, 922 F.2d 20, 25 (1st Cir. 1990)).  The Receiver "may commence [or defend against] lawsuits, but stands in the shoes of the corporation [or partnership] and can assert only those claims [or defenses] which the corporation [or partnership] could have asserted." *Id*.  (citation omitted); *cf. Javitch*, 315 F.3d at 626 ("[Whether a receiver] stands in the shoes of an entity in receivership … depends on the authority granted by the appointing court and actually exercised by the receiver.").  Accordingly, the Fund's legal positions are accorded no greater or lesser weight than those of any other party.

9

expertise and experience in similar receivership actions and believed him to be the most appropriate choice for this appointment.  (*See* Order of June 6, 2007 at 3.)

### B.  The Court Grants the Plaintiff's Request

Ultimately, the Court agreed with Gordon's characterization of the urgency of the circumstances, temporarily sealed the case, and appointed Mr. Dottore as Receiver to "collect, preserve, and protect any assets belonging to the [Funds]" to " recover . . . assets transferred fraudulently or otherwise from the [Funds]" and to investigate the size of the loss and identify the victims.  (Order of November 23, 2005 at 3-4.)  On December 1, 2005, upon further motion of Mr. Gordon, the Court expanded the Receiver's authority to permit him to conduct an investigation into the assets of Dadante.  (Doc. 16.)  Broadly speaking, the Court appointed Mark Dottore to step into the role of general partner in a limited partnership, wholly divesting Dadante of any control over the Fund.  (*Id.* at 2.)  On December 8, 2005, the Court extended the appointment of the Receiver indefinitely.  (Order of December 9, 2005 (memorializing the Court's December 8, 2005 Order).)[10]

### C.  The Court Appoints Attorney Robert N. Rapp to Assist the Receiver

Shortly after the Receiver's appointment, it became clear to the Court that the Plaintiffs' original capital investments were greatly diminished either through diversion of those assets to Dadante and his family, squandering and mismanagement of assets by Dadante personally, losses sustained by the Fund through its investments, or through the Fund's distribution of "returns" to early investors.  (*See* Order of January 7, 2008 at 3.)  Due to the complexities of the legal issues involved, and because the Receiver selected by the Fund's investors did not have a law degree, the Court appointed Mr. Robert N. Rapp, of the law firm Calfee, Halter & Griswold LLP, to act

---

[10] On October 6, 2006, the Court expanded the Receivership estate to include additional assets under the control of Dadante.  (Doc. 150 at 2-3.)

as counsel to the Receiver.  (*See id*.)  Though Mr. Rapp was not known to, or affiliated with, the Receiver, the Court was aware of Mr. Rapp's reputation for extensive experience in securities law and for integrity in his professional dealings.  (*See id*.)[11]

### 4.  The Early Stages of the Litigation

#### A.  Litigation Under the Initial Complaint

For the first few months of the instant action, litigation proceeded under Gordon's original complaint.  During this time, the Receiver and Gordon were in accord with each other; both focused on establishing Dadante's liability for fraud, gaining control over his few remaining assets, and fully investigating the predicate facts underlying this action.  (*See*, *e.g.*, *generally* Order of January 5, 2006 (Doc. 40); Order of February 23, 2006 (Doc. 58); Order of March 20, 2006 (Doc. 66.).)

#### B.  The Number of Plaintiffs Expands

On March 16, 2006, Gordon sought leave to file an amended complaint that would add all of the limited partners in the Fund as Plaintiffs (Doc. 65) and the Receiver, through counsel, concurred in this request.  The Court granted Gordon leave to amend on March 20, 2006.  (Doc. 66).  On April 5, 2006, the Plaintiffs filed their First Amended Complaint ("FAC").  (Doc. 71.)

#### C.  The Receiver Continues to Pursue Claims Against Dadante

Over the next several months, the Receiver continued to pursue claims against Dadante. Although there was tertiary motions practice involving some of the brokerage houses at which Dadante had held the Fund's stock, the Receiver's primary concern was establishing Dadante's liability; secondarily, the Receiver sought to prevent further degradation of Dadante's assets and

---

[11] On June 23, 2006, the Receiver retained Attorney Robert Glickman from the firm McCarthy, Lebit, Crystal & Liffman to assist Mr. Rapp and advise on matters outside Mr. Rapp's primary area of expertise.  (*See* Doc. 107.)  Mr. Glickman's reputation for excellence and integrity was also well-known to this Court.

ensure that Dadante was not permitted to shelter any resources that rightfully belonged to the Fund.  (*See, e.g.*, *generally* Receiver's Br. of July 7, 2006 (Doc. 116.).)  For example, the Receiver came to believe that the valuable house possessed by Dadante had actually been purchased with money from the Fund.  (*See* Receiver's Br. of July 7, 2006 at 1-2.)

### D.  The Receiver's Successful Undertaking to Secure Tax Refunds for Investors

Early in the litigation, the Receiver also focused on ensuring that the Fund's limited partners recovered past taxes.  As a consequence of Dadante's Ponzi scheme, the Fund's limited partners had paid income taxes on what they believed to be the Fund's profits between 2001 and 2004.  This income, of course, had never actually occurred.  As a result, the limited partners' tax returns were incorrect, and each of them paid income tax on income that did not exist.

An early initiative by the Receiver was undertaken to pave the way for refunds for taxes overpaid by the Fund's limited partners.  The Receiver engaged tax professionals at the Cleveland accounting firm of Cohen & Company Ltd. to prepare corrected Partnership returns for the Fund and to issue proper tax forms.  Together, the Receiver and these tax professionals also presented to the Court the basis for determining that originally filed tax returns were invalid.  Due to the efforts of the Receiver and his tax professionals, the Fund's investors were able to secure tax refunds for five years, rather than being limited by the three year statute of limitations.

### 5.  The Claim by One Group of Plaintiffs that Two Other Plaintiffs had Committed Fraud

On August 17, 2006, one group of Fund investors, now known as the Small Plaintiffs, filed a complaint against two other investors, Frank and Michael Regalbuto (the "Regalbutos").  (*See Small v. Regalbuto*, No. 06-cv-1721 (Doc. 1).)[12]  The Small Plaintiffs allege that the

---

[12] One of the many tragic characteristics of this action is that a large number of the Plaintiffs are related to one another, and many of the rest were long-time friends prior to this litigation.  For instance, Frank and Michael Regalbuto are not the only Plaintiffs with this last name.  The litigation has strained many of these relationships.

Regalbutos paid themselves millions of dollars by misappropriating the Small Plaintiffs' investments.  (*See id*.)  They further allege that the Regalbutos breached a fiduciary duty to the Small Plaintiffs, and that this duty arose because the Regalbutos actively recruited the Small Plaintiffs to participate in the Fund through representations about the Fund and Dadante that the Regalbutos knew or had reason to know were not true.  (*Id*.)

The Regalbutos, for their part, concede that they authorized several hundred thousand dollars of "bonus" payments from the Fund to themselves.  (*See* Order of June 6, 2007 at 11 (referencing the *Small v. Regalbuto* litigation).)  Although they claim that they were legitimately entitled to the payments, they nonetheless concede that they received funds that were not made available to the other limited partners.  (*Id*.)

Whether the Regalbutos were entitled to the monies is still an unresolved issue, and the Court expresses no opinion here as to the veracity of any of the allegations in *Small v. Regalbuto*. The Complaint and Answer in that suit, however, provide a backdrop for the level of distrust and/or confusion among the Plaintiffs that has now come to characterize this litigation.

### 6.  The Resolution of Claims Against the Named Defendant

Notwithstanding the growing tensions between the various participants in the Fund, which had not at that point been reflected on the record of the instant litigation, on January 9, 2007, the Receiver reached a settlement with Dadante.  Judgment was entered against Dadante in the amount of $8.5 Million dollars on claims for breach of fiduciary duty, mismanagement of partnership affairs, and constructive fraud.  (Order of January 9, 2007 (Doc. 168).)  While the potential damages incurred by the Fund resulting from the alleged conduct of Dadante likely exceeded that figure by a substantial measure, the Court agreed with the Receiver's conclusion that a larger, token, judgment would have risked the depletion or loss of Dadante's limited assets and simultaneously expended substantial sums to pursue a likely unenforceable judgment.  (*See*

Order of June 6, 2007 at 7-9.)  No party objected to this settlement, and it was ultimately approved by the Court.  (*See* Order of January 9, 2007 at 1.)[13]

### 7.  The Uncovering of a Potentially Adverse Relationship Between Plaintiffs Who Were Represented by the Same Counsel

As the relationship between the Objecting Plaintiffs and Small Plaintiffs deteriorated, an additional division between the Plaintiffs emerged.  Frank Regalbuto has at times asserted positions legally adverse to the other Objecting Plaintiffs – for example, he has claimed "a priority entitlement to separate, special payments from the assets of the Receivership that could exceed millions of dollars."  (Order of June 6, 2007 at 18; *see also*, *e.g.*, Objecting Plaintiffs' Br. of May 3, 2007 at 4 ("Frank Regalbuto purchased the Chatsworth Road property for Dadante to avert a foreclosure.  Frank Regalbuto is the true owner of that property and is entitled to have that money returned to him. Frank Regalbuto is entitled to the income generated by the Chatsworth property until he has been reimbursed for the amount he advanced to forestall foreclosure.").)  The Court reaches no conclusion on whether Frank Regalbuto is entitled to payments to which the other Plaintiffs are not, but notes this situation to illustrate the complicated relationships underlying this litigation.  The ethical issues raised by this potentially adverse interest will be discussed in a forthcoming order.

### 8.  The Dispute Over Control of the Assets and Liabilities in this Action

#### A.  The Regalbutos Question the Fund's Legal Status

The previously referenced lawsuit in *Small v. Regalbuto* also foreshadowed a major dispute between the Plaintiffs in this action regarding who should control the Fund, a dispute

---

[13] Later that year, Dadante pled guilty to criminal charges relating to his previously described conduct, and was, consequently, sentenced both to a substantial term of imprisonment, and a substantial order of restitution in the amount of $28,351,643.82, ordered payable to the Fund's limited partners (*See United States of America v. Dadante*, 1:07-CR-336), thereby closing any gap between the civil settlement and the total value of the losses incurred.

that, although long-since resolved as a matter of law (*see* Order of January 7, 2008), continues to strongly influence the unfortunate tenor of this litigation.  As previously explained, at the inception of the litigation, Plaintiff Sheldon Gordon asked the Court to appoint Mark Dottore as Receiver to control the Fund.  An assumption underlying the Court's determination was, of course, that the Fund was an entity over which a Receiver could legally exercise control.  In particular, the Court presumed, as pled in the Complaint and never previously disputed, that the Fund was an Ohio Limited Partnership.  Indeed:

> virtually every party with an interest in this, or any related case, assert[ed] that the [] Fund [was] an Ohio Limited Partnership.  This position [was] held on the record by the United States of America (through the Department of Justice), the Securities Exchange Commission (the "SEC"), Dadante, the Receiver, Ferris Baker Watts, and investors representing approximately fifty-two percent of the value of the [] Fund; off the record virtually every brokerage, lawyer, or accountant dealing with the [] Fund at any time during or prior to the initiation of this suit … voiced the same opinion.

(*Id.* at 14.)[14]  It was only in the <u>other</u> action, *Small v. Regalbuto*, that an alternate view was first expressed.  (*See Small v. Regalbuto*, No. 06-cv-1721, Regalbutos Br. of November 14, 2006 at 2-3 (Doc. 25) ("[I]t has been represented in prior pleadings that this Honorable Court should appoint a Receiver to represent a number of limited partners in [the Fund].  The Regalbutos question whether any such limited partnership exists.").)  At the time, this was a surprising assertion, as the Regalbutos had previously taken the position that each of the Plaintiffs was a limited partner in the Fund.  (*See* FAC at ¶ 111 ("Plaintiffs [including Frank and Michael Regalbuto] are purchasers of … securities in the form of limited partnership interests in [the Fund].").)

---

[14] Of course, these assumptions did not make it so.  Until the events described in this section, however, the Court was not aware of any need to consider this issue.

## B. The Objecting Plaintiffs Assert that Frank Regalbuto Should Control the Fund

Ultimately, a group of Plaintiffs began to assert that the very Receiver they originally requested: (1) was not the proper party to assert fraud-related claims against Dadante, the stakeholder defendants, or other third parties; and (2) did not have the requisite authority to dispose of the assets of the Fund. (*See* Order of January 7, 2008 at 5 (Doc. 332).) These Plaintiffs (including Mr. Gordon), then led by Frank Regalbuto, play a prominent role in this litigation and are now known as the Objecting Plaintiffs.[15]

Although this dispute was couched in the posture of a disagreement as to the Fund's status as a Limited Partnership, it was "clear from the parties' submissions that the primary point of contention [was] not the legal status of the [] Fund." (*Id*. at 18.) Rather, the parties "raised that issue in an effort to determine who rightfully controls the entities that Dadante used to perpetrate the fraud." (*Id*.)[16] In particular, the Objecting Plaintiffs asserted that "Frank Regalbuto should control the [] Fund as opposed to the Receiver." (*Id*.)[17]

---

[15] This group of investors was referred to as the "Regalbuto Plaintiffs" in prior orders (*See, e.g.*, Order of June 6, 2007 at 4-5), but that moniker has become problematic: (1) because of the apparently divergent interests between Frank Regalbuto and the other Objecting Plaintiffs and; (2) because attorneys for that group now purport not to be controlled by or even represent Frank Regalbuto, even though Frank Regalbuto asserts that he does, in fact, control this group. It is, also, for these reasons that the Court does not presently attempt to define the group's membership. These issues will be discussed in more detail in a forthcoming Order addressing the Small Plaintiffs' Pending Motion to Disqualify Counsel for the Objecting Plaintiffs. (*See* Small Plaintiffs' Br. of March 23, 2009 (Doc. 433).)

[16] Although this issue is discussed in considerably more depth in the Court's January 7, 2008 Order, it is worth noting that the Receiver might still properly assert claims on behalf of the Fund even if it were not a Limited Partnership. (*See, e.g.*, Order of October 6, 2006 at 3 (Doc. 150) ("[The Receivership Estate shall include] any corporation, partnership trust and/or other entity which is directly or indirectly owned by or under the direct or indirect control of Dadante.").)

[17] Indeed, the Objecting Plaintiffs attempted to achieve this result even prior to securing a court ruling on this issue. On January 19, 2007, the Objecting Plaintiffs moved to amend the complaint in the instant action to assert claims against the stakeholder defendants, various professionals, and Innotrac Corporation, which would have effectively wrested control of the

16

The Objecting Plaintiffs' arguments are addressed in considerable detail in this Court's January 7, 2008 Order.  Broadly speaking, the Objecting Plaintiffs' primarily asserted that the Fund and Dadante's personal assets were actually under the control of a now-defunct corporation known as "Coffee King," that Frank Regalbuto controlled Coffee King, and that, consequently, Frank Regalbuto controlled the Fund and Dadante's personal assets.  (*See id.* at 7.)  This argument, however, failed for three independently sufficient reasons: (1) the Fund was never under the control of Coffee King (*see id.* at 17-22); (2) the Fund would be under the control of the Receiver even if it had been part of Coffee King (*see id.* at 22-24) and; (3) Coffee King, as a defunct corporation, is prohibited by Ohio law from exercising "any rights, privileges, immunities, powers … or authority" (*id.* at 24-25).

Ultimately, in a rather exhaustive opinion addressing the issue, the Court concluded that the Fund was, as everyone had previously assumed, a limited partnership properly under the control of the Receiver.  (*See id.* at 30 ("virtually every factor considered by any Ohio court as evidence of partnership is present here"); *see also generally id.* at 30-39 (analyzing the Fund's status during the relevant time period as an Ohio Limited Partnership properly under the control of the Receiver).)

### C. The Fight Over Control of the Fund, Although Long-Since Resolved, Continues to Inform This Litigation

Although the Objecting Plaintiffs' claims on these matters were ultimately rejected, it is abundantly clear that the subtext behind most, if not all, of the acrimony between the Plaintiffs in

---

underlying litigation and the inchoate assets of the Receivership Estate from the Receiver.  (*See* Doc. 176.)  On April 19, 2007, apparently displeased because those claims and similar third-party claims filed by the Regalbutos in *Small v. Regalbuto* had been stayed by this Court, the Objecting Plaintiffs filed a third suit, this time in state court.  (*See Regalbuto v. Dottore*, Case No. CV-07-622036 (Cuyahoga Cty. C.P. Apr. 19, 2007)).  That suit, which directly violated the terms of certain of this Court's Orders, also was not permitted to proceed.  (*See* Order of June 6, 2007 at 13-17.)

this action relate to the polarizing opinions of the Plaintiffs regarding Frank Regalbuto's role vis-à-vis the Fund and this litigation.  The Objecting Plaintiffs continue to assert that he should be entitled to pursue legal action in the manner he sees fit, whereas the Small Plaintiffs assert that he is guilty of fraud himself, and certain other Plaintiffs, while not asserting claims against Mr. Regalbuto, believe the Receiver should continue to control the Fund and marshal its assets.  The Court reiterates this state of affairs to try to explain the context behind the repeated and reflexive hostility in this case, which, among other actions, has extended to unorthodox legal strategy on the part of the Objecting Plaintiffs.  (*See*, *e.g.*, Notice of Appeal of March 9, 2008 (Doc. 432) (appealing a docket entry that had appeared only as the result of a clerical error); Sixth Circuit Order of June 15, 2009 (Doc. 445) (granting the motion to dismiss the March 9, 2008 appeal); Order of April 18, 2008 at 6 (explaining that the Objecting Plaintiffs were mistaken in asserting that the Fund's status as a limited partnership meant that the Fund was fully shielded from any liability and could not be made to pay margin debt); Order of June 6, 2007 (expressing concern that the Objecting Plaintiffs were advocating a position under which each of them could be held individually liable for the debts of the partnership, including its massive margin debts).)

**9.  The Repeated Disagreements Between One Group of Plaintiffs and the Receiver**

In the time since the Objecting Plaintiffs first asserted that Frank Regalbuto should control the Fund, one of the most persistent themes of this litigation has been the Objecting Plaintiffs' vigorous disagreement with the Receiver's various positions in this action.  Although it is unnecessary to catalogue all of the disputes that have occurred between the Objecting Plaintiffs and the Receiver, a summary of the types of allegations that have been exchanged is critical.  Very broadly speaking, the disputes fall into three categories: (1) substantive strategic objections to each of the Receiver's proposed settlements with stakeholder defendants; (2)

attempts to terminate the Receivership and/or obtain control of the litigation from the Receiver and; (3) requests for additional information regarding the Receiver's activities and expenditures.

Prior to discussing the concerns of the Objecting Plaintiffs, however, the Court does wish to note the contrasting view of many other Plaintiffs, who have indicated that they believe the Receiver is obtaining strong results.  (*E.g.*, Small Plaintiffs' Br. of November 17, 2008 at 1 (Doc. 415) ("The Receiver has actively sought and obtained significant recoveries for Plaintiffs").)  In their filings and off the record, they cite not only the Receiver's tangible progress, but the very difficult circumstances posed by cases such as this.  *Cf. Donell v. Kowell*, 533 F.3d 762, 779 (9th Cir. 2008) ("Ponzi schemes leave no true winners once the scheme collapses – even the winners were defrauded, because their returns were illusory.  Those who receive gains from innocent participation in the scheme may be required to disgorge those amounts, long after the money has been spent…. Most of [this] scheme's 5,200 net losers are likely to recover only pennies on the dollar of their initial investment."); *In re Tiger Petroleum Co.*, 319 B.R. 225, 227 (Bankr. N.D. Okla. 2004) ("Eventually, the weight of what he had done fell so heavily upon [the perpetrator of the Ponzi scheme] that, rather than face the consequences of his actions, he committed suicide, leaving investors with millions of dollars in losses and little if any prospect of recovery.").

While the views of these less vocal Plaintiffs' are not generally discussed separately in this Order, it is important to understand both (1) that the Objecting Plaintiffs' criticism of the Receiver is not shared by all and; (2) that the views of these other Plaintiffs (whose collective claims actually exceed in value the collective claims of the Objecting Plaintiffs), are given no more or less consideration than the Objecting Plaintiffs simply because the Objecting Plaintiffs have filed more motions, demanded more responses from the Receiver, and required more attention from the Court.

### A.  The Objecting Plaintiffs' Substantive Strategic Disagreements

#### i.  Opposition to the Dadante Settlement

The first dispute between the Objecting Plaintiffs and the Receiver was the settlement with Dadante himself.  On December 19, 2006, the Receiver filed a motion for authority to resolve the Fund's claims against Dadante for $8,500,000.  (Doc. 162.)  As noted above, this motion was unopposed when filed and the settlement was ultimately approved by the Court.  The Objecting Plaintiffs, however, later moved for relief from the order approving the settlement pursuant to Federal Rule of Procedure 60(b)(6).  (*See* Objecting Plaintiffs' Br. of January 16, 2007 (Doc. 174).)[18]

Very broadly speaking, although the settlement with Dadante was for a sum of money vastly exceeding Dadante's assets and which exceeded any money that Dadante, who, as noted, is now incarcerated, might be expected to obtain in the foreseeable future, the Objecting Plaintiffs believed that the Receiver should aggressively pursue claims to the fullest extent allowed by law against Dadante.  (*Id*.)  The Receiver, for his part, noted that he had conducted an investigation of Dadante's assets, which revealed that most of Dadante's assets were in the form of personal and real property, much of which was ill-maintained, improperly insured, and at risk.  (*See* Court Order of June 6, 2007 at 7-9.)  In particular, the Receiver was concerned that, without a quick settlement, the value of Dadante's primary asset, his home, would be depleted rapidly by virtue of its mortgage, insurance, and maintenance costs.  (*See id*.)  The Receiver also did not see the wisdom in expending substantial sums (in the farm of attorneys fees and other expenses) to pursue a likely unenforceable judgment.  (*See id*.)

---

[18] The procedural posture for many of these disputes is somewhat unusual, as the Fund, Objecting Plaintiffs, and Small Plaintiffs are all "Plaintiffs" in this action.

The Court, for its part, generally concurred in the Receiver's assessment.  (*See id.*) Among other things, the Court understood if a criminal restitution order were to issue, as it ultimately did, the investors would be fully protected from the <u>remote</u> possibility that Dadante might someday have sufficient assets available to him to "make the investors whole."  In those circumstances, and given Dadante's current financial status, a more substantial civil judgment simply would not benefit the limited partners and certainly would not be worth the cost of pursuing it.  The Court also did not find that the Objecting Plaintiffs were entitled to the extraordinary remedy contemplated by Rule 60(b)(6).  (*See id.*)[19]

### ii.  Opposition to the Ferris, Baker Watts Settlement

#### a.  The Receiver's Position[20]

The second substantive dispute between the Objecting Plaintiffs and the Receiver concerned the Receiver's proposed settlement with Ferris, Baker Watts, Inc. ("Ferris Baker"), one of the brokerages through which Dadante had perpetrated his fraud.  (*See* Order of April 18, 2008.)  The Receiver proposed a settlement that required Ferris Baker: (1) to deliver 2,999,152 shares of common stock in Innotrac Corporation ("Innotrac") to the Receivership estate, free and clear of all claims, liens, or security interest – including an existing margin debt of over $9,000,000; (2) to pay the Receivership estate the cash sum of $7,200,000.  (*Id.* at 1.)  In

---

[19] At the time of that opinion, the Court had not yet reached a determination regarding the Fund's status as a Limited Partnership.  The June 6, 2007 Order did note that the Objecting Plaintiffs might have been entitled to move for relief under Rule 60(b)(6) in the event that the Fund was ultimately found to be some entity to which the Receiver could not assert legitimate control.  As previously mentioned, however, the Court's Order of January 7, 2008, concluded that the Fund was an Ohio Limited Partnership over which the Receiver could and should properly exercise control.

[20] The majority of this section quotes directly from the Court's Order of April 18, 2008. Given the importance of a thorough understanding of the dispute over the Ferris Baker settlement and the length of this section, however, the Court has elected not to employ block quotations.

exchange, the Receiver agreed to release Ferris Baker from any potential claims for violations of antifraud provisions of the federal securities laws.

According to the Receiver, the proposed Settlement Agreement was the result of months of contentious negotiations between the parties.  (*Id*. at 2.)  The Receiver's motion seeking approval of the settlement was primarily composed of an assessment of the potential risks and rewards of pursuing the [] Fund's claims against Ferris Baker through litigation.  (*Id*.)  The critical considerations are: (1) the Fund's potential claims against Ferris Baker; (2) the Fund's damages; (3) the Fund's chances of succeeding on its claims; and (4) the costs, in time and money, of pursuing the Fund's claims to trial.  (*Id*.)

The Receiver asserted that the Fund had potential claims against Ferris Baker under the federal securities laws and under certain state and common law theories, but that the Fund would be limited to recovering its actual damages.  (*Id*. at 3.)  In the context of the claim against Ferris Baker, this would only be the difference between the price paid for a security and its true value but for the manipulation.  (*Id*.)  The Receiver, thus, concluded that the $7,200,000 cash payment represented a 94.3% recovery of estimated damages attributable to price manipulation.  (*Id*. at 4.)

Though the Receiver's negotiations with Ferris Baker were protracted and complex, in essence, the Receiver's fairness assessment turned on just a few key considerations.  (*Id*. at 5.)  First, the Receiver believed that the claims he was most likely to succeed upon would result in only an award of actual damages.  (*Id*.)  Second, the Receiver acknowledged that Ferris Baker has consistently denied liability for Fund losses caused by the David Dadante Ponzi scheme and, moreover, that Ferris Baker has asserted its claim for the margin debt incurred at the firm in connection with David Dadante's stock trading.  (*Id*.)  Finally, based on the Receiver's loss calculus, the Receiver asserted that he believed the settlement represented almost all of the actual damages incurred by the Fund in connection with its dealings with Ferris Baker.  (*Id*.)

22

### b.  The Objecting Plaintiffs' Concerns

The Objecting Plaintiffs, for their part, raised three objections to this settlement, that: (1) forgiveness of the margin debt conferred no real benefit; (2) the Innotrac stock had no real value; and (3) the cash component of the settlement was inadequate.  (*Id*. at 6.)  The Objecting Plaintiffs also disputed the Receiver's damage calculation, asserting instead that damages were $48,000,000.  (*Id*. at 25.)  While the precise source of this figure was unclear, it included money that had actually been returned to investors during the course of the Ponzi scheme and purported to include <u>all</u> money lost by the Fund rather than any losses particular to Ferris Baker.  (*Id*.)  It also assumed, as indicated above, that all money deposited into the Fund was lost; that the Innotrac stock had literally no value.  (*Id*.)

The Court, in light of the Objecting Plaintiffs' concerns, elected to hold a hearing so that it could better understand their position.  At that hearing, however:

> [T]he [Objecting Plaintiffs, in no uncertain terms, withdrew their objections…. Time and again during the hearing, Mr. Cheselka [Objecting Plaintiffs' then-current counsel] admitted that the Regalbuto Plaintiffs' objections were either withdrawn or were based on a misunderstanding of the terms of the settlement. (*See* [Hrg. Tr. of March 18, 2008] at 31:13-16 ("I mean, as we go forward, we're willing to remove our objections to this settlement in hopes that we can do a better job of working together on settling any of the ancillary and outstanding claims that be there;" *id*. at 32:1-33:15 (stating that the objection to receiving the 2,999,152 shares of Innotrac common stock was based on the mistaken belief that the Receiver intended to distribute the shares to the investors individually "absent a private sale" of the block as a whole with the cash proceeds distributed to the investors)….
>
> Because the [Objecting] Plaintiffs' objections were the primary objections to the settlement, and they were admittedly based on misunderstandings, the Court completed the hearing without the detailed inquiry into the bases for the objections that it otherwise would have conducted…. *see also id*. at 37:13-18 ("[The Court:] Anything else? [Mr. Cheselka:] Not unless you have another question. [The Court] I don't – I don't think so. You've sort of changed the whole – I had several questions, but now that I understand where you are coming from . . . . ").)

(Order of April 18. 2008 at 12-13.)  To the shock of the Court, however, two days after the hearing, the Objecting Plaintiffs submitted a two paragraph memorandum stating only that they "did not intend to convey that they withdrew their objections to the proposed settlement."  (*Id*. at 14.)  This submission was signed by the very same lawyer who had unambiguously withdrawn the Objecting Plaintiffs' opposition to the settlement.

### c.  The Court's Conclusions

Although discussed in considerably more detail in its April 18, 2008 Order, the Court ultimately concluded that the position taken by the Receiver [and the Small Plaintiffs] was the most legally sound.  The Court first found that the $7,200,000 cash payment represented over 94% of the actual damages attributable to Ferris Baker.  (Order of April 18, 2008 at 26.)  In doing so, the Court explicitly rejected the $48,000,000 damages assessment of the Objecting Plaintiffs.  (*Id*. at 25-26.)  The Court then concluded that, although illiquid and thus of limited current benefit to the Plaintiffs, as a legal matter shares of Innotrac do indeed have potential value.  (*Id*. at 26-27.)  Finally, the Court concluded that extinguishment of the enormous margin debt owed by the Fund was indeed an important consideration, if for no other reason than that the stock could never be sold in any form without such action.  (*Id*. at 28-29.)  The Court, accordingly, approved of the settlement.  (*Id*. at 29-30.)

### iii.  Opposition to the McDonald Financial Group Settlement

For completeness, the Court notes that a dispute similar to the one with respect to Ferris Baker occurred over a settlement with McDonald Financial Group ("McDonald").  (*See generally* Order of October 16, 2008.)  There was no evidence, however, that McDonald had been involved to the same degree as other brokerages firms  First, the Receiver's report suggested that:

> only de minimus transactions involving Innotrac occurred in the McDonald account.  The Receiver explained that the McDonald account was primarily used

24

to receive and then hold Innotrac stock (causing that account to incur substantial margin debt) as part of the overall fraudulent scheme. The Receiver's investigation determined that when Mr. Dadante attempted to purchase additional Innotrac stock, McDonald prevented him from doing so. (See Doc. 390 at 17-18.) For this reason, the Receiver believes that the extent of McDonald's liability is somewhat speculative when compared to the other brokerage firms that have been involved in this litigation. Whereas Mr. Dadante directly manipulated the price of Innotrac by trading in other brokerage accounts, he did not engage in any significant trading at McDonald.

(*Id*. at 4-5.) Consequently, the Receiver proposed a settlement where McDonald would: (1) deliver to the Fund the roughly 130,000 shares of Innotrac stock held in the McDonald account; and (2) forgive over $550,000 of secured margin debt. (*Id*. at 2.) In exchange, the Receiver proposed to release McDonald from any claims for violation of the antifraud provisions of the securities laws. (*Id*.)

The Objecting Plaintiffs did not contest that McDonald played no role in Dadante's stock manipulation. They did, however, assert that the settlement did not convey sufficient value because: (1) McDonald violated a duty by accepting an illegally created margin debt, and thus gave nothing of value by forgiving that debt; (2) Innotrac Stock has no real value and; (3) certain adverse tax consequences might flow from the settlement. (*Id*. at 6.) The Objecting Plaintiffs did not provide the Court with any legal theory as to how a more favorable position might be reached with McDonald through litigation, even setting aside the costs inherent in such a strategy. (*See generally* Objecting Plaintiffs' Br. of August 29, 2008 (asserting simply that the Receiver should demand two million dollars in cash from McDonald).) The Objecting Plaintiffs, indeed, did not provide citation to any case or statute at all. (*See generally id*.)

The Court, for its part, was ultimately "persuaded that the McDonald settlement [was] indeed fair and equitable to the Receivership estate." (Order of October 16, 2008 at 8.) Most critically, as previously indicated, McDonald simply inherited Dadante's stock portfolio; essentially no trades were made through McDonald. (*See id*.) Indeed, no party advanced an

alternate theory of recovery against McDonald, let alone one likely to yield more benefit than the Receiver's proposal.[21]

### iv.  Opposition to Efforts to Settle with Innotrac

The most recent substantive dispute between the Objecting Plaintiffs and the Receiver concerned efforts to settle potential claims against Innotrac itself.  In short, the Objecting Plaintiffs have asserted that the Receiver should be aggressively pursuing legal action against Innotrac and its officers and directors. They believe that Innotrac's officers or directors engaged in fraudulent activity by facilitating Dadante's accumulation of Innotrac stock.  (*See generally* Order of October 7, 2008 (Doc. 393).)  The Receiver, conversely, has represented that he does not believe that the Fund would have readily provable claims against Innotrac.  (*See* Receiver's Br. of October 6, 2008 at 8-11 (Doc. 392).)  The Receiver also asserts that he has reviewed the Objecting Plaintiffs' allegations, and has not found a firm factual basis to support the claims they hope to bring.  (*Id.*)  Indeed, he concluded that, at best, the "assertion of claims against Innotrac would be difficult and extremely expensive, with much uncertainty as to any final result or recovery." (*Id.* at 10.)  For this reason, the Receiver has focused on attempting to cooperate with Innotrac to find some way to dispose of the Fund's shares in a way that will maximize the value of those shares owned by the Fund.[22]

On October 5, 2008, the Receiver helped negotiate the sale of 100% of the outstanding Innotrac stock to a third entity, GSI Commerce, Inc. ("GSI") for $4.03 per share.  (*See* Order of

---

[21] The Court's Order also referenced the proposed settlement with Innotrac, discussed *infra*.  The Court at the time felt that the settlement demonstrated that Innotrac's stock had liquid value.  The Court would have reached the same conclusion even absent the Innotrac settlement, although the Court would undoubtedly have conducted a different analysis on the record, particularly with respect to the tax issue.

[22] The Court is aware, however, that the Receiver has entered into a Tolling Agreement with Innotrac, thus preserving his ability to bring claims based on additional evidence adduced in discovery or his continuing investigation.

October 7, 2008.)  This sale would have resulted in a recovery for the Fund in excess of 17.5 million dollars over and above the settlement with Ferris Baker, resulting in a potential cumulative recovery for the Fund of more than 24.7 million dollars.  (*Id*. at 1.)  This appeared to be an outstanding achievement on the part of the Receiver, given that even the Objecting Plaintiffs had repeatedly taken the position, both in written filings and in open court, that they believe that <u>any</u> recovery from Innotrac that would provide the Receivership estate with a value of $3.00 or more per share in return for the Innotrac shares held by the estate would be both fair and adequate.  (*Id*. at 4-5.)  So, too, this compared favorably to the Government's total damage calculation in the criminal case against Dadante, which was approximately 28.3 million dollars (*see United States of America v. Dadante*, 1:07-CR-00336 (Hrg. Tr. of December 12, 2007 at 49:12-14) ("in terms of the actual out-of-pocket loss that has been definable and identified by the government, it is $28,351,643.82.")), particularly in light of the outstanding possible claims that the Fund retained against a number of other potential defendants.

Completion of the transaction between Innotrac and GSI was conditioned on, among other things, a minimum market price of GSI stock during a period of time ahead shareholder approvals.  The crisis in U.S. financial markets and the collapse of stock prices generally resulted in the market price of GSI stock falling below the minimum value, and both Innotrac and GSI agreed to terminate the transaction.

### B.  The Objecting Plaintiffs Repeated Attempts to Remove the Receiver

Separate and apart from their substantive disagreements with the Receiver's strategy, the Objecting Plaintiffs (or Frank Regalbuto personally) have made numerous attempts to remove the Receiver.  As previously discussed, the first of these attempts took the form of the assertion

that only Frank Regalbuto had the right to speak on behalf of the Fund.[23]   Additionally, the Objecting Plaintiffs filed two separate motions seeking to remove the Receiver more directly. (*See* Objecting Plaintiffs' Br. of January 26, 2007 (Doc. 179); Objecting Plaintiffs Br. of August 1, 2007 (Doc. 299).)  The first motion alleged that:

> … [Receiver] Mark Dottore ("Dottore"), has exacerbated that schism that developed between the Plaintiff investors. Dottore has overtly and covertly taken sides in disputes that have arisen between the investors. Dottore has overtly and covertly tried to undermine one group of investor Plaintiffs in order to further his own interests and the interests of a competing group of investor Plaintiffs.

(Objecting Plaintiffs' Br. of January 26, 2007 at 2.)[24]

The second motion was somewhat different.  It asserted that the Receiver should be removed for cause for failing to provide notice to the Objecting Plaintiffs regarding his compensation and the compensation of his staff.  (Objecting Plaintiffs' Br. of August 1, 2007 at 1-2.)  It asserted that this was a violation of Local Rule 66.1  (*Id.*)  Although not explicitly contained within the second motion, the Court notes that the Objecting Plaintiffs have, off the record and during various hearings, leveled persistent negative allegations at the very Receiver one of their own members insisted be appointed.  The mistrust felt by the Objecting Plaintiffs towards the Receiver is, undoubtedly, one of the reasons they have labored to remove him.

---

[23] To be precise, the <u>first</u> of these attempts took the form of the assertion that no one had the right to speak on behalf of the Fund and that all Plaintiffs had the right to pursue whatever claims they wished individually, because the Fund was, in essence, no type of legal entity at all. (*See, e.g.*, Objecting Plaintiffs' Br. of January 16, 2007 at 3.)  The Court does not address that initial claim here, as it was ultimately abandoned in favor of the claim that Frank Regalbuto had the right to control the Fund.  (*See generally* Order of January 7, 2008.)  The Court did, however, briefly address why that position was legally unsupportable in its January 7, 2008 Order.  (*Id.* at 16.)

[24] Although the issue of inadequate familiarity with the record on the part of the Objecting Plaintiffs' many counselors is addressed directly below, the Court notes that it removed the leading clause from the above paragraph.  The initial sentence of the above paragraph begins: "The Receiver selected by this Court, Mark Dottore…"  (Objecting Plaintiffs' Br. of January 26, 2007 at 2.)  Of course, the Court did not "select" the Receiver, Plaintiff Sheldon Gordon, <u>a member of the Objecting Plaintiffs</u>, did.  (*See* Gordon's Br. of November 21, 2005.)  The Court appointed the Receiver pursuant to Gordon's request.

The Court, however, has not found these previous motions well-taken.  With respect to the first motion, a Court simply cannot remove a receiver because his actions offend a particular plaintiffs' group, even when that offense is clearly genuine.  This is particularly true where, as here, two or more groups of plaintiffs are diametrically opposed to each other: to over-generalize, the Small Plaintiffs have continually expressed their desire to settle the various claims of the Fund, the Objecting Plaintiffs have continually expressed their desire for aggressive litigation.  Any receiver would necessarily be more inclined to view one of these strategies as the most advantageous; such a conclusion on his part does not establish bias.  As the Court noted when denying that first motion:

> The [Objecting] Plaintiffs are correct that there appears to be a schism among the investors and other interested parties in this matter.  The Court, however, does not see this as a reason to terminate the Receivership.  **To the contrary, a Receivership is particularly important where a large group of plaintiffs have interests that are partially aligned or overlapping, but cannot agree as to how to best protect those interests**.

(*See* Order of June 6, 2007 at 10) (emphasis added).

The second motion simply was not correct as a matter of law – the Receiver had in no way violated the Local Rules.  (Order of January 25, 2008 at 11.)  The Court explained:

> The Court reminds the [Objecting] Plaintiffs that at the time the initial directives of the Receivership were established, the dynamic among the parties was decidedly different.  Indeed, at the time of his appointment, Mr. Dottore – the individual chosen by the Plaintiffs to be the Receiver – had not previously handled or been involved in any matters before this Court.  Prior to his appointment, the Court discussed the receivership and Mr. Dottore's experience with the parties' then-current counsel, and ultimately agreed that Mr. Dottore was a satisfactory choice.  Since his appointment, the Receiver has been thorough and diligent in a difficult task that has exposed himself to myriad attacks, personally and professionally.  Despite these attacks, the Receiver has given the Court no reason to question his single-minded desire to maximize the assets in the Receivership estate and, thus, maximize the possible return to all his investors.

(Order of January 25, 2008 at 11-12) (emphasis removed).  The Court, in sum, did not find either of the Objecting Plaintiffs' two motions to remove the Receiver well-taken.

## C.  The Objecting Plaintiffs' Previous Requests for an Accounting

In part as a result of the animosity described above, the Objecting Plaintiffs have twice previously requested billing information from the Receiver in formal motions practice.  (*See* Objecting Plaintiffs' Br. of May 3, 2007; Objecting Plaintiffs' Br. of August 11, 2007.)  The Court found the substance of those requests generally reasonable as, indeed, did the Receiver himself.  (*See* Order of June 6, 2007; Order of January 25, 2008.)  The Court was, however, disheartened by the procedure employed in making those requests to the extent that extensive formal motions practice seemed unnecessary.  (*See* Order of January 25, 2008 at 13-15.)

The Court was, furthermore, concerned that the Objecting Plaintiffs implied subterfuge on the part of the Court itself in "preventing" the Objecting Plaintiffs from receiving a full accounting.  The Court explained:

> The Court notes that, since the inception of the Receivership, the Receiver has submitted his expenses directly to the Court for approval.  Though the [Objecting] Plaintiffs imply otherwise, there was no sinister motive behind not requiring the docketing of monthly reports or individualized notice.  Indeed, it was the plaintiffs' own counsel who submitted a proposed order to the Court suggesting the procedure to be employed – i.e., the submission of requests for interim reimbursement to the Court only.  The reason for this procedure was to guard against improper public disclosures of information which could impact the share price of the Innotrac stock, an understandable and laudable goal. For fourteen months, thereafter, no party objected to the Receivership, to the mechanism established to fund it, or to the absence of additional reporting or information. The Court believed that this was the product of: (1) the fact that the court-appointed Receiver was chosen by the Plaintiffs; (2) the Court's understanding, by virtue of its previous Orders, that information in the hands of the Receiver was available to interested parties at their expense; and (3) the parties' desire to minimize the expenditure of resources.

(*Id*. at 12.)

Finally, to provide further context for the instant order, the Court notes that the Objecting Plaintiffs have also previously complained about the Receiver's expenses at hearings and conferences, as well as through other vehicles.  For example, when the Receiver negotiated a settlement worth as much as 16 million dollars with Ferris Baker, the Objecting Plaintiffs

30

asserted that the Receiver had expended too much money in reaching that settlement.  (*see* Order of April 18, 2008 at 21-23.)  The Court rejected this objection, finding that the Receiver's fees were actually <u>far</u> less than would have been charged against the settlement recovery had contingency fee counsel been employed, as the Objecting Plaintiffs requested.  (*Id.*)

### 10. The Resulting Fairness of the Litigation Process

#### A.  The Court has Employed an Open and Participatory Process

The Court has gone to extraordinary lengths to attempt to fully understand the concerns of all Plaintiffs in this action – the limited partners have been invited to submit individual statements to the Court on multiple occasions and have been permitted to give extensive testimony.  (*See, e.g.*, *generally* Hrg. Tr. of September 4, 2008; Hrg. Tr. of March 12, 2008.) The Court emphasizes that the processes it has employed are not typical in a case of this nature and have been designed explicitly to give voice to all Plaintiffs in this action.  As the Court explained in response to a prior assertion that it was not taking the Objecting Plaintiffs' concerns seriously by approving the Receiver's proposed settlements:

> [Parties must remember that] there is no obligation on the Court to follow any particular procedure for its approvals of proposed settlements…. The Receiver could have simply asked the Court to approve the settlement based on a direct report to the Court.  The Court chose to employ a more open, participatory process, however, in order to make it clear to the victims that it was prepared to listen to, and carefully consider, all of their concerns, and to provide the Court with the maximum amount of information it could obtain regarding the fairness and wisdom of the proposed settlement.

(Order of April 18, 2008 at 26.)

The resolution of various pending motions against their preferred positions notwithstanding, the Court reiterates that the Objecting Plaintiffs are themselves victims of Dadante's fraud.  They have been and will continue to be afforded the same status as all of Dadante's victims.  Indeed, it saddens and concerns the Court that the advice that these victims have received during the pendency of this litigation has at times compounded their difficult

31

situation.  The Court emphasizes that it has gone to extreme lengths to avoid causing any further loss to the Objecting Plaintiffs.  As the Court has previously stated:

> [I]t is clear that the Court's recommendation that the various parties in this case seek independent counsel, whose sole interest would be to protect their *respective individual rights*, has gone unheeded.  The formerly unrepresented plaintiffs were within their rights to ignore the Court's warnings….

> [T]he Court has yet to sanction counsel for the [Objecting] Plaintiffs for any violation of its Orders or the Rules, despite filings which would have justified such sanctions.   Instead, the Court has heretofore excused the filing of voluminous and unnecessary motions, notices, and other papers, some of which are replete with open attacks on the other parties and, at times, not-so-thinly veiled criticisms of the Court's own reasoning, competence, and impartiality….

> Recognizing the tensions and frustrations among the litigants, the Court … has given the parties wide latitude to air their grievances and voice their arguments.  In sum, though the level of tension among the parties remains high, the Court has taken great pains to address all matters raised by the [Objecting] Plaintiffs with the same care and impartiality it address all matters before it, in this or in any litigation.

(Order of January 25, 2008 at 5-6) (emphasis in original).  The Court is compelled, however, to attempt to document some of the costs that these Plaintiffs are imposing on their fellow partners and victims.

### B.  The Objecting Plaintiffs Have Imposed Unreasonable Costs on Other Victims

Although the Court remains committed to an open and participatory process, the Court has become concerned with the Objecting Plaintiffs' tactics to the extent that they tax the resources of the other parties in this action, and deplete the potential recovery from the Receivership Estate, even when not appearing calculated to lead to a legally successful outcome.  As the Court observed two years ago:

> [T]he Court is particularly troubled by the [Objecting] Plaintiffs' willingness to force the Receiver to needlessly expend hundreds of hours responding to unauthorized filings. Indeed, the Court observes that the [Objecting] Plaintiffs, though it may not be their conscious intent, often have impeded the orderly progress of the Receivership and caused the depletion of its assets by the filing of ill-informed pleadings and/or taking insupportable positions.  The Court finds this

particularly unfortunate, and ironic, given the [Objecting] Plaintiffs claim that their desire is "to recoup the investors' losses." The Court sympathizes with all the victims of this massive fraud, and the [Objecting] Plaintiffs may be assured that recouping the investors' losses is also the  paramount goal of the Court.

…

Many of these filings have proven just short of frivolous, yet required countless hours of professional time to resolve.  Indeed, in several filings, one of the [Objecting] Plaintiffs took the position that he should be permitted to enter Dadante's home at will.  Though that position later was abandoned, it required responsive filings, a hearing, and orders from the Court.  The Court and the Receiver, thus, were required to expend a significant amount of resources addressing the issue. Shortly before the issuance of this Order, moreover, another of the [Objecting] Plaintiffs filed a notice of encroachment seeking to impede the sale of the Dadante home by claiming that it encroached on his property. (*See* Doc. 264). The irony of this filing is particularly palpable because yet another of the [Objecting] Plaintiffs (indeed a family member of the party who claims encroachment) *apparently built the encroaching driveway and both houses*. (*See* Doc. 263). It appears, however, that the resolution of this issue could require further expenditures if the involvement of surveyors or attorneys is required to engage in negotiations or to file suit to correct any possible negligence in the construction of the driveway.

(Order of June 6, 2008 at 14-15.) (emphasis in original).

The Objecting Plaintiffs, of course, have an absolute right to aggressively pursue valid legal theories.  Nevertheless, they have at times engaged in behavior that almost seems designed to deplete the limited resources of the Fund.  (*See*, *e.g.*, Order of January 25, 2008 (addressing discovery motions that could have been resolved without resort to motions practice); Order of April 18, 2008 (discussing the Objecting Plaintiffs' submission of a two paragraph filing that disclaimed the extensive position that those Plaintiffs had taken in open court); Notice of Appeal of March 9, 2009 (containing an attempt by the Objecting Plaintiffs to appeal a non-existent order of this Court).)  While the Court remains committed to ensuring that the Objecting Plaintiffs' concerns are heard, the Court is mindful that it must protect all of Dadante's victims, not merely the ones who file the largest number of motions.

### C.  The Pace of Litigation

In part as a result of the aggressive motions practice in this action, aspects of the instant litigation have moved unusually slowly.  As the Court previously explained:

> In several papers before the Court, the [Objecting] Plaintiffs bemoan the progress of this matter.  This is somewhat vexing to the Court for a number of reasons.  First, given the nature of the Receiver's charge – *i.e.,* to assess and attempt to marshal the assets of the estate – much of the "progress" in the matter must necessarily occur outside the docket, in the form of investigations, accountings, and negotiations.  Surely, counsel for the [Objecting] Plaintiffs must understand this reality.  Second, since the largest single asset of the estate is publicly traded stock, both the [] Fund and the Receiver are required by law to refrain from public disclosures of any discussions which could affect the value of those shares.  Again, all counsel who choose to participate in this proceeding, including counsel for the [Objecting] Plaintiffs, have an obligation to understand the legal niceties involved in it, especially those relating to the securities laws.  Finally, to the extent there has been a delay in the movement of this Court's docket, the most significant source of that delay has been the parties' aggressive motion practice.  To that end, the Court observes that the parties have filed over forty separate motions and over one hundred other papers within the past 12 months – many of which were completely unnecessary – though virtually every motion (excluding those addressed here) has been resolved. The motions addressed here, moreover, are largely a product of the ceaseless quarrelling among the parties and were assigned a low priority due to their redundancy, triviality, and, in some instances, frivolity.

(Order of January 25, 2008 at 9.)  Added to these realities is now the unexpected downturn in the economy and crisis in financial markets, which have slowed the effort to sell the Fund's Innotrac stock through a mechanism that will maximize its value.  It is apparent as well that the restructuring, sale, or general uncertainty of the financial condition of certain putative defendants has otherwise hampered the orderly progress of this litigation and the resolution of claims.  The Court today issues its case-specific rules in part to ensure that legitimate and substantive concerns from any party may be more quickly addressed.

## **CURRENT BACKGROUND**

### 1.  The Objecting Plaintiffs' Most Recent Counsel Enters an Appearance

On March 12, 2009, Attorney James G. Dawson entered an appearance on behalf of the Objecting Plaintiffs.  Mr. Dawson is the tenth lawyer to appear in this case on behalf of some subsection of the Objecting Plaintiffs.  Indeed, over the last fourteen months alone, the Objecting Plaintiffs have chosen to hire and fire three different counsel of record.[25]

### 2.  The Pending Motions

#### A.  Pending Motions 1 & 2: Motions to Conduct a Status Conference

On March 31, 2009, the Objecting Plaintiffs filed a Motion to Conduct a Status Conference.  (Doc. 435.)  On April 8, 2009, the Receiver filed a response to this Motion.  (Doc. 437.)  On May 21, 2009, the Objecting Plaintiffs filed a second Motion to Conduct a Status Conference, simply repeating their March 31 filing.  (Doc. 442.)  These motions, as noted above, raise questions about the Receiver's billing and request termination of the receivership, although they stop far short of the allegations of fraud contained in the *pro se* motion, discussed below.

#### B.  Pending Motion 3: Motion for an Independent Audit

On April 8, 2009, as previously indicated, the Receiver filed a response to the Objecting Plaintiffs' Motion to Conduct a Status Conference.  (Doc. 437.)  Although stylized simply as a

---

[25] Confusingly, there is currently a pending motion to withdraw as counsel for Frank Regalbuto from an attorney who is not, as far as the Court can tell, currently counsel of record in this action.  (*See* May 27, 2009 Br. of Frank Regalbuto (Doc. 443); (*but cf.* Order of January 25, 2008 (discussing this very attorney's prior participation in the case and noting that he had been dismissed by Frank Regalbuto and previously allowed to withdraw).)  That Motion is **GRANTED** and will not be discussed with the other pending motions.  While the Court expresses no opinion at this time as to whether that attorney should be permitted to withdraw from *Small v. Regalbuto*, in which he <u>has</u> actively participated and in which his withdrawal is opposed, there is assuredly no reason to prevent counsel from withdrawing from an action to which he is not currently involved.  There are a number of questions that this motion raises, regarding, for example, the allegedly "pro se" filing discussed below, but the Court declines to address those at this time.

responsive filing, that brief is more properly understood as a motion for an independent audit of the receivership, asking that the Court conduct an inquiry of the Receiver's billing practices and, hopefully, put an end to the complaints relating thereto.  The receiver also states that, if an adjustment in billing practices is necessary, now may be the time to make that determination.

### C. Pending Motions 4 & 5: Motion to Remove the Receiver and Unopposed Motion to Strike the Motion to Remove the Receiver

On November 7, 2008, Frank Regalbuto filed a *pro se* motion seeking leave to bring suit against the Receiver for what Frank Regalbuto believes to be fraudulent billing practices.  (Doc 411.).  In this motion, Mr. Regalbuto points to a number of billing entries with which he takes issue.  On November 12, 2008, the Receiver filed a response to that motion as well as a motion to strike the *pro se* motion, asserting, among other claims, that the motion was prepared with the obvious assistance of unidentified counsel.  (Doc. 414.)  On November 17, 2008, the Small Plaintiffs filed a motion in opposition to Frank Regalbuto's *pro se* motion.  (Doc. 415.)  On November 18, 2008, the Receiver filed a supplemental memorandum in support of his motion to strike.  (Doc. 417.)  The Motion to Strike is unopposed.

### ANALYSIS

### 1. Pending Motions 1 & 2: the Motions to Conduct a Status Conference

### A. The Motions to Conduct a Status Conference Largely Seek Information Readily Available Without Imposing Costs on the Fund, Other Victims, or the Court

The frequently changing counsel retained by the Objecting Plaintiffs has created a fairly trenchant problem.  While the Objecting Plaintiffs themselves undoubtedly have the right to select their own representation subject to the ethical rules, it is the Objecting Plaintiffs, rather than the other victims, the Fund, or the judiciary, who must bear the cost of ensuring that new counsel fully understands these admittedly complicated proceedings and their history.

The instant requests for a "status conference" (Docs. 435, 442) largely ask the Court to revisit matters that have been addressed repeatedly in this case or ask the Receiver to share information that he has shared repeatedly with many former counsel for the Objecting Plaintiffs. To take one particularly relevant example, the Motions seek this status conference in part to discuss "[t]he need of the Receiver to submit to the [Objecting] Plaintiffs a complete and accurate accounting (with supporting documentation) of all expenses incurred to date in the subject case." (Objecting Plaintiffs' Br. of March 31, 2009 at 2; Objecting Plaintiffs' Br. of May 29, 2009 at 2.) Yet, as discussed above, this Court has twice previously taken formal steps to ensure that the Objecting Plaintiffs have access to all appropriate information that is not privileged or otherwise confidential.[26] Indeed, the Court has already discussed the issue of a proper accounting in some depth:

> On July 6, 2007, Mark Dottore (the "Receiver") filed an accounting summarizing the expenses incurred by the Receivership estate since its inception. Shortly thereafter, the [Objecting] Plaintiffs, unsatisfied with the detail of the Receiver's accounting, filed a Motion for Further Accounting (Doc. 294)….
>
> On January 2, 2008, the Receiver filed a response…. The Receiver states that he has made numerous attempts to reach counsel for the [Objecting] Plaintiffs, to resolve issues relating to the production of the various categories of information that the [Objecting] Plaintiffs seek. According to the Receiver, however, counsel for the [Objecting] Plaintiffs has been unreachable. The Receiver, moreover, also claims that he provided all non-privileged documents to counsel for the [Objecting] Plaintiffs in September of 2007 – after the request for further accounting was made. The Receiver explains that, since the production of those documents, counsel for the [Objecting] Plaintiffs has not requested any additional information from the Receiver, nor communicated with the Receiver in any way. Finally, the Receiver objects to counsel for the [Objecting] Plaintiffs' propensity to resort immediately to costly motion practice rather than resolving disputes by communicating directly with the Receiver.
>
> It appears to the Court that the Motion for Further Accounting largely arises from the communication difficulties described above. Apparently, the Receiver

---

[26] Of equal importance, the Receiver and his staff have spent substantial time and expense personally reviewing this very information with previous counsel for the Objecting Plaintiffs.

> believed that the documents provided subsequent to the [Objecting] Plaintiffs'
> motion for a more detailed accounting contained all the information necessary to
> satisfy the [Objecting] Plaintiffs' requests. The [Objecting] Plaintiffs' recent
> supplemental statement, however, asserts that the documents have not provided
> the information they desire….
>
> The [Objecting] Plaintiffs' requests for specific categories of data are largely
> unopposed and the Court finds them generally to be reasonable.

(Order of January 25, 2008 at 2-3) (footnotes omitted). The Court is, accordingly, concerned that new counsel fails to make any reference to prior, highly relevant, orders. New counsel, as well, does not explain whether he seeks additional information not provided in the prior reports or many meetings between the Receiver, his staff, and past counsel for the Objecting Plaintiffs, or whether new counsel simply seeks information of which he does not happen to have possession or has never sought from prior counsel.

So, too, the Court is troubled at the degree to which new counsel's motions appear to evince critical misunderstandings of the case. For example, they seek to learn what particular claims the Receiver intends to pursue <u>and</u> seek to lift the very stays that allow the Receiver to pursue those claims. Counsel, in other words, would appear to be arguing that the stays should be lifted, *without having ever taken the time to understand why those stays were initially imposed*.

### B. Applicable Law

Because the motions to conduct a status conference raise concerns with the Court about unreasonable multiplication of the instant proceedings, these motions are in large part reviewed through the lens of 28 U.S.C. § 1927, which states that an attorney who "multiplies the proceedings in any case unreasonably and vexatiously" may be sanctioned by the court.[27] While

---

[27] A "court may impose sanctions sua sponte under § 1927 or the court's inherent powers as long as it provides notice and an opportunity to be heard." *United States CFTC v. Lake Shore Asset Mgmt.*, No. 07-C-3598, 2007 U.S. Dist. LEXIS 74615, at *28 (N.D. Ill. Oct. 4, 2007); *see also Davis v. Bowron*, 30 Fed. Appx. 373, 375 (6th Cir. 2002).

parties may ask a court to reconsider its findings when "clear errors or manifest injustice threaten[,]….  where litigants have once battled for the court's decision, they should neither be required, nor without good reason permitted, to battle for it again."  *Int'l Ore & Fertilizer Corp. v. SGS Control Servs.*, 38 F.3d 1279, 1287 (2d Cir. 1994.)  Indeed, "sanctions under 28 U.S.C. § 1927 are appropriate when an attorney seeks to resurrect matters already concluded."  *Home Indem. Co. v. Arapahoe Drilling Co.*, No. 92-2123, 1993 U.S. App. LEXIS 21937, at *10 (10th Cir. Aug. 27, 1993) (citing *Knorr Brake Corp. v. Harbil, Inc.*, 738 F.2d 223, 228 (7th Cir. 1984); *cf. Sweeney v. Resolution Trust Corp.*, 16 F.3d 1, 6-7 (1st Cir. 1994) (affirming the grant of Rule 11 sanctions in response to the filing of a repetitive motion).

More generally, sanctions are warranted when "an attorney objectively 'falls short of the obligations owed by a member of the bar to the court and which, as a result, causes additional expense to the opposing party.'" *Followell v. Mills*, No. 07-6504, 2009 U.S. App. LEXIS 5930, at *30-31 (6th Cir. March 18, 2009) (quoting *Red Carpet Studios Div. of Source Advantage, Ltd. v. Sater*, 465 F.3d 642, 646 (6th Cir. 2006)).  The Sixth Circuit has explained that "[t]he purpose of sanctions under § 1927 is 'to deter dilatory litigation practices and to punish aggressive tactics that far exceed zealous advocacy.'" *Id*.  Sanctions under § 1927 require more than negligence, or even incompetence, but they do not require subjective bad faith.  *Id*. at 31.  Indeed,  "a court may sanction an attorney under § 1927 for unreasonably and vexatiously  multiplying the proceedings despite the absence of any conscious impropriety."  *Rentz v. Dynasty Apparel Indus.*, 556 F.3d 389, 396 (6th Cir. 2009).  Sanctions may be imposed when there is "some conduct on the part of the subject attorney that trial judges, applying the collective wisdom of their experience on the bench, could agree falls short of the obligations owed by a member of the bar to the court and which, as a result, causes additional expense to the opposing party."  *Royal Oak Entm't, LLC v.*

*City of Royal Oak*, No. 07-1904, 2009 U.S. App. LEXIS 5439 (6th Cir. March 17, 2009) (quoting *Ridder v. City of Springfield*, 109 F.3d 288, 298 (6th Cir. 1997)).[28]

Of course, a court has alternatives to sanction at its disposal in the face of duplicative motions and can, in its discretion, simply deny such motions.  *Spotts v. United States*, No. 98-00047, 2006 U.S. Dist. LEXIS 60898, at *3-4 (S.D. W. Va. Aug. 8, 2006) ("Petitioner's repetitive filing of duplicative motions and documents will be routinely denied by this Court without any further consideration") (emphasis removed); *Binder v. Wash. Gas - D.C. Div.*, No. 2:95-CV-319, 1995 U.S. Dist. LEXIS 21386, at *9 (E.D. Va. Oct. 6, 1995) (denying "numerous and repetitive" motions to strike).  It is evident that "[t]he decision to impose or deny sanctions pursuant to Section 1927 rests within the sound discretion of this Court."  *GNP Commodities,*

---

[28] The Sixth Circuit recently noted an apparent conflict within its § 1927 jurisprudence:

> There is tension within this court's jurisprudence as to the proper standard to apply in determining whether sanctions are warranted under § 1927. The district court relied upon the following standard set forth in *Wilson-Simmons v. Lake County Sheriff's Department*, 207 F.3d 818 (6th Cir. 2000):

> Sanctions under § 1927 are warranted when an attorney has engaged in some sort of conduct that, from an objective standpoint, falls short of the obligations owed by a member of the bar to the court and which, as a result, causes additional expense to the opposing party. . . . [W]hen an attorney knows or reasonably should know that a claim pursued is frivolous, or that his or her litigation tactics will needlessly obstruct the litigation of nonfrivolous claims, a trial court does not err by assessing fees attributable to such actions against the attorney. Bad faith is not required to support a sanction under § 1927. *Id.* at 824 (citations and internal quotation marks omitted).

> A more recent case, however, states that sanctions are appropriate under § 1927 only where the attorney "intentionally abuses the judicial process or knowingly disregards the risk that his actions will needlessly multiply proceedings." *Red Carpet Studios*, 465 F.3d at 646.

*Garner v. Cuyahoga County Juvenile Court*, 554 F.3d 624, 645 (6th Cir. 2009).  This Court need not resolve the apparent conflict today, and notes only that it is bound by the earlier precedent absent instruction from the Sixth Circuit to the contrary.  *Cf. White v. Columbus Metro. Hous. Auth.*, 429 F.3d 232, 241 (6th Cir. 2005) ("When an opinion of this court conflicts with an earlier precedent, we are bound by the earliest case.") (citations omitted); *Habich v. City of Dearborn*, 331 F.3d 524, 530 (6th Cir. 2003) (same).

*Inc. v. Wotton*, No. 90-C-3523, 1991 U.S. Dist. LEXIS 2199, at *2 (N.D. Ill. Feb. 22, 1991). Whatever its course of action, however, a Court must not allow one party's unreasonable conduct to impose excessive costs on others.

### C.  Attorney Dawson is in Violation of Three Prior Court Orders

Attorney Dawson's filings represent examples of unreasonable conduct.  To that end, more troubling than counsel's aforementioned failure to reference prior orders in his briefing, is new counsel's direct violation of three of those orders.  As previously described, the current briefing asks, in part, for detailed information from the Receiver.  The Court has made clear that no party may file a motion seeking information from another party to this action without following the procedures detailed in Local Rule of Civil Procedure 37.1, which provides, among other requirements, that parties must utilize informal procedures prior to the filing of a motion and that that parties must certify their compliance with the procedures contained in Local Rule 37.1 in any motion ultimately filed with the Court.  As the Court stated in response to a prior motion filed by the Objecting Plaintiffs that sought what appears to be the very same information sought by new counsel today:

> From the Court's perspective, the entire account displays a vivid, familiar picture of the miscommunication and misinterpretation that has characterized this matter for the past nine months.  *In the future, the parties are advised that Court will treat such motions as it would a discovery-related dispute*.  Under the local rules, the parties involved should first attempt to resolve the issue *cooperatively and among themselves;* if the parties reach an impasse, they should seek the Court's guidance via telephone, letter, and motion – in that sequence.  *See* Local Rule Civ. P. 37.1.

(*Id*. at 15) (emphasis in original).[29]  Indeed, on April 18, 2008, the Court again addressed the issue of counsel for the Objecting Plaintiffs seeking documents or explanations from the Receiver:

---

[29] New Counsel did call the Court's staff to inquire about the general procedure for requesting a status conference, which he was told needed to be requested in writing with notice

As a final note, the [Objecting] Plaintiffs' motions seeking documents or explanations from the Receiver address precisely the types of issues that the Court instructed the parties to resolve, or to attempt to resolve, informally.  (*See* Order, January 25, 2008.)  These filings – particularly in the absence of any attempt to resolve the matter outside the Court – are singularly unhelpful and wasteful of the Court's and the parties' resources. Furthermore, because they largely address discovery-type issues, they likely run afoul of the strictures of Local Rule 37.1.

Accordingly, from this point forward, the parties are **ORDERED** to attempt to resolve, informally, any ancillary concerns or issues that do not address the merits of the case, requests for documents, or any aspect of litigation that the Court might construe as discovery-related. If, in the Court's judgment, a party fails to make a good-faith attempt to resolve such issues prior to moving the Court, the Court will impose sanctions.

(Order of April 24, 2008 at 32.)

The Court, too, directs Attorney Dawson to its Order of June 6, 2007:

Indeed, the Court observes that the [Objecting Plaintiffs], though it may not be their conscious intent, often have impeded the orderly progress of the Receivership and caused the depletion of its assets by the filing of ill-informed pleadings and/or taking insupportable positions…. In sum … the Court, out of an abundance of caution and sympathy, will give the benefit of the doubt to the [Objecting Plaintiffs] and declines to sanction them for contempt at this time…. Instead, the Court takes this opportunity to … forewarn counsel for the [Objecting Plaintiffs] and all parties to this litigation, that they should consider more carefully whether future filings comport with the requirements of Federal Rule of Civil Procedure 11, are vexatious, or run afoul of this Courts orders.  <u>A second measure of leniency will not be forthcoming.  Indeed, any future violation of this Court's orders will be met with the severest of sanctions.</u>

(Order of June 6, 2007 at 16) (emphasis added).

In light of the wholly unanticipated situation raised by the Small Plaintiffs' Motion to Disqualify Attorney Dawson (Doc. 433), which will be addressed in a separate Order, the Court will not impose sanctions <u>in this Order</u>, despite the wording of its prior orders.  (*Cf.* Order of January 25, 2008 ([T]he Court has yet to sanction counsel for the [Objecting] Plaintiffs for any violation of its Orders or the Rules, despite filings which would have justified such sanctions.

---

to all parties.  This, assuredly, does not excuse any of the violations of the Court's prior orders found on the face of that filing.

Instead, the Court has heretofore excused the filing of cumulative and unnecessary motions, notices, and other papers, some of which are replete with open attacks on the other parties and, at times, not-so-thinly- veiled criticisms of the Court's own reasoning, competence, and impartiality.").)  The Court, additionally, considers that the sole "responsive" filing to either of Attorney Dawson's motions (Doc. 437) is concerned with issues other than those raised on the face of the motions themselves (the implications of that filing are also discussed below) and, thus, that the cost imposed on the Fund by this particular filing is relatively low.  The Court notes, however, that it has expended considerable resources as a result of this motion and sanctions could be justified on that basis alone.  *Cf. Donnelly Corp. v. Gentex Corp.*, No. 1:93-CV-530, 1996 U.S. Dist. LEXIS 7976, at *2-3 (W.D. Mich. Feb. 9, 1996) ("Rule 16 simply makes explicit the power already given to the courts by the United States Constitution, Article III, as an independent branch of government to manage court affairs.  Such powers include the power to sanction attorneys and reject pleadings which violate court orders.  However, the imposition of sanctions is a matter within the broad discretion of the Court." (citations omitted)).

### D.  The Court Will Apply Case-Specific Procedural Rules to this Litigation

The Court cannot continue to allow the Objecting Plaintiffs to impose costs on the other victims, the Fund, and the Court by repeatedly changing counsel and electing to retain counsel that does not or cannot become educated as to the history of this litigation.  *Cf. Colokathis v. Wentworth-Douglass Hospital*, 693 F.2d 7, 9 (1st Cir. 1982) ("This was an appropriate case for dismissal.  The court had endured four and a half years of delay and confusion, contributed to by at least seven different attorneys for the plaintiff."); *Delahey v. Disney Theatrical Prods.*, No. 08-775, 2008 U.S. Dist. LEXIS 76954, at *13 (D. Md. Sept. 25, 2008) ("Arguments made on behalf of the Plaintiff belong to him, and he cannot dissociate himself with them simply by changing counsel."); *United States v. $ 247,052.54*, No. 05-4798, 2007 U.S. Dist. LEXIS 52037,

43

at *2-3 (N.D. Cal. July 6, 2007) ("Dobbs says he should not be bound by his previous stipulation because he retained new counsel after the parties reached that agreement.  This argument is baseless." (quotation omitted)).  In light of the number of times that the Objecting Plaintiffs have imposed such costs on the other victims, the Court must not only deny the instant motions, but create case-specific rules for the protection of all parties.[30]

Against the almost unprecedented backdrop of this litigation, to preserve the assets of the Fund, to protect all parties to this action, and to conserve future judicial resources, the Court now **DENIES** these Motions to Request a Status Conference (Docs. 435, 442) and **HOLDS** that all future motions must include a certification that the signatory:

A.  Has carefully read the: (1) Order of June 6, 2007 (Doc. 284); (2) Order of January 7, 2008 (Doc. 332); (3) Order of January 25, 2008 (Doc. 339); (4) Transcript of March 12, 2008 (Doc. 353); (5) Order of April 18, 2008 (Doc. 361); (6) Transcript of September 4, 2008  (Doc. 390) and; (7) instant order.[31]

B.  Has obtained all reasonably necessary information from prior counsel, if a party has been represented by prior counsel.[32]

Non-compliant briefs will be **STRICKEN** sua sponte and, to the extent that brief violates an additional court order (e.g., failure to consult under Local Rule 37.1), <u>counsel will be found in</u>

---

[30] These rules protect even the Objecting Plaintiffs themselves, who almost certainly could not be well-represented by counsel who did not comply with these rules.  Indeed, counsel who did not comply with these rules, even absent this Court's instant order, would arguably be violating his or her obligations under the Ohio Rules of Professional Responsibility.

[31] This certification, of course, does not in any way excuse counsel's failure to become familiar with myriad other orders, briefs, and transcripts in this case that may be highly relevant to a particular submission.

[32] In the situation where one party has been represented by numerous counsel, it may well be necessary for new counsel to certify that he or she has spoken with multiple past counsel and to identify each by name and date of discussion.

contempt of court and severely sanctioned.  The Receiver shall serve a copy of this Opinion and Order upon any new party joined to this action.[33]

### 2. Pending Motion 3: Motion for an Independent Audit

The next issue before the Court, although filed as a response to one of the Objecting Plaintiffs' motions (Doc. 437), is in large part a new motion.  (Receiver's Br. of April 8, 2009.) In this filing, the Receiver asks this Court to order an independent audit of the Receiver's accounts to resolve the accusations that the Receiver himself is defrauding the Plaintiffs or spending excessive quantities of their money.  (*Id.*)

As a general rule, it is sound practice for a court managing a large receivership case to order some type of audit *at the conclusion of litigation* upon the request of an impacted party, and to make adjustments to fee and expense awards as needed at that point.  *See Arcadia Theatre Co. v. Sablosky,* 209 A.2d 375, 380 (Pa. 1964); *Goff v. Rosen,* No. 18469, 1998 Ohio App. LEXIS 2801, at *9 (Ohio Ct. App. June 24, 1998).  Recent events in the world's financial markets have reinforced this point of view, as it is evident that even highly sophisticated financial professionals can be misled absent independent verification of proper accounting practices.  While the Court finds the Receiver's settlements with Ferris Baker and McDonald, and proposed settlement with Innotrac evidence of strong work-product, the Court is not in a position to fly-speck every entry in the Receiver's billings for that work-product, or detect all potentially questionable billing practices.  Furthermore, in a case as large as the one at bar, honest professionals may well disagree about precisely what constitutes an appropriate charge.[34]

---

[33] The Court will not apply the aforementioned requirements should some *new party* (as distinct from new counsel) to this action need to file an emergency motion with the Court, although such a party would be required to submit a certification as soon as practicable.

[34] In this respect, the Court analogizes to having trained internal corporate counsel review outside counsel's billing practices.  So, too, the Court hopes that an outside auditor may be able

Finally, although the Court can find no analogous caselaw, the Court concludes that in a case as long and complex as the one at bar, interim audits may be appropriate.

The Court bases this conclusion on four factors: (1) the Objecting Plaintiffs have made their desire for an exceedingly specific accounting clear on many occasions, including details that would violate attorney-client privilege or SEC regulations were they revealed.  Although the Court is concerned, as mentioned before, about allowing these Plaintiffs to deplete the Fund's resources, it is reasonable to seek some measure of independent verification of professionals who are performing such extensive work; (2) the Small Plaintiffs have in the past sought an audit for entirely different reasons – namely, to determine what percentage of the Receiver's expenses are created by arguably frivolous filings from the Objecting Plaintiffs (*see* Small Plaintiffs' Br. of August 25, 2007); (3) the Receiver believes this audit is necessary to satisfy the Objecting Plaintiffs and eliminate needless expenses caused by the Receiver's many efforts to respond to the requests for information from Objecting Plaintiffs' changing counsel and; (4) the Court believes that independent verification of the Receiver's charges will safeguard the interests of the Fund's partners, and of the Receiver himself, going forward.

The Court, consequently, **<u>ORDERS</u>** the independent audit of the Receiver and the professionals working with him.  Pursuant to a separate Order entered on this date, the Court appoints Dr. B. Thomas Florence ("Dr. Florence"), the Analysis Research Planning Corporation ("ARPC"), and the employees and contractors of ARPC (collectively, the "auditors") as independent auditors in this action.

---

to identify potential cost-savings and best-practices that may save the Fund expenses moving forward.

**3.  Pending Motions 4 & 5: Motion to Remove the Receiver and Unopposed Motion to Strike the Motion to Remove the Receiver**

The penultimate motion before the Court is a "pro se" filing from Frank Regalbuto seeking to remove the Receiver.  (Doc. 411.)  In broad terms, this motion asks the Court to remove the Receiver because he has breached his fiduciary duty to Frank Regalbuto.  (Frank Regalbuto Br. of November 7, 2008 at 3.)  The Court declines to discuss this motion on its merits, because also pending before the Court is an unopposed motion to strike this "pro se" filing.  (Doc. 414.)[35]

In his unopposed motion, the Receiver contends that the "pro se" motion was obviously written by a lawyer, rather than by Frank Regalbuto.  The Small Plaintiffs, too, have made similar contentions.  (Small Plaintiffs Br. of November 17, 2008.)  Frank Regalbuto did not, as previously indicated, dispute any of these contentions.  The Court, for its part, independently concludes that the brief does not resemble the various writings of Frank Regalbuto currently on the docket of, or informally submitted to, this Court.  It further concludes that the submission generally appears to have been written by someone with legal training.

It is well-established that a litigant may not hold himself out as pro se if he is receiving help from attorneys in preparing his briefs.  *See, e.g.*, *Duran v. Carris*, 238 F.3d 1268, 1272-1273 (10th Cir. 2001) (collecting cases).  A ghostwritten submission is "inconsistent with the

---

[35] Prior to addressing the Motion to Strike, the Court feels compelled to address one procedural aspect of the "pro se" motion.  In his Motion to Remove the Receiver, Frank Regalbuto asserts, among other claims, that he speaks for other plaintiffs.  (Frank Regalbuto's Br. of November 7, 2008 at 6 ("Frank Regalbuto speaks for the remaining plaintiffs.").)  The Court chooses not to now address the connection between this statement and the pending motion to prevent counsel from representing Frank Regalbuto and the other Objecting Plaintiffs (*see generally* Small Plaintiffs' Br. of March 23, 2009).  The Court wishes to make clear, however, that "one pro se litigant cannot represent another."  *Nocula v. UGS Corp.*, 520 F.3d 719, 724 (7th Cir. 2008); *Lucarelli v. United States*, 65 Fed. Appx. 926 (6th Cir. 2003) (same); *McKnight v. Middleton*, No. 08-CV-3896, 2008 U.S. Dist. LEXIS 92020, at *7 (E.D.N.Y. Nov. 12, 2008) ("[A] pro se litigant cannot represent another individual – not even his own child or grandchild.").

intent of procedural, ethical and substantive rules of the Court." *Ostevoll* v. *Ostevoll,* No. C-1-99-961, 2000 U.S. Dist. LEXIS 16178, at *30 (S.D. Ohio August 16, 2000).  As one court aptly explained:

> When … complaints drafted by attorneys are filed bearing the signature of a plaintiff outwardly proceeding pro se, the indulgence extended to the pro se party has the perverse effect of skewing the playing field rather than leveling it. The pro se plaintiff enjoys the benefit of the legal counsel while also being subjected to the less stringent standard reserved for those proceeding without the benefit of counsel. This situation places the opposing party at an unfair disadvantage, interferes with the efficient administration of justice, and constitutes a misrepresentation to the Court.

*Laremont-Lopez v. Southeastern Tidewater Opportunity Ctr.*, 968 F. Supp. 1075, 1078 (E.D. Va. 1997) (emphasis added).  This Court will continue to strike ghostwritten submissions from any party and will, in the future, entertain motions for contempt against a party submitting ghostwritten material.  *See Laremont-Lopez*, 968 F. Supp. at 1080 ("This Opinion and Order sets forth this Court's unqualified FINDING that [ghostwriting is] in violation of its Rules and will not be tolerated in this Court.").

The Court, accordingly, concludes that Frank Regalbuto's "pro se" Motion to Remove the Receiver (Doc. 411) is not a pro se filing and **GRANTS** the Receiver's motion (Doc. 414) to **STRIKE** said submission.[36]

---

[36] The Court notes that, to the extent Frank Regalbuto's motion raises concerns about the Receiver's billing practices, those concerns are being addressed by the Court's decision to order an independent audit of those practices.

## CONCLUSION

For the aforementioned reasons, the Motions to Conduct a Status Conference (Docs. 435, 442) are **DENIED**, the *pro se* Motion to Remove the Receiver (Doc. 411) is **STRUCK**, the Motion to Strike the Motion to Remove the Receiver (Doc. 414) is **GRANTED**, and the Motion with Withdraw as Counsel (Doc. 443) is **GRANTED**.  Furthermore, the Court **ORDERS** an audit of the Receiver, **ORDERS** all parties and counsel to follow case-specific procedures outlined in this order, and **ORDERS** the Receiver to serve a copy of this opinion upon any new party to this action.


**IT IS SO ORDERED.**

**s/Kathleen M. O'Malley**
**KATHLEEN McDONALD O'MALLEY**
**UNITED STATES DISTRICT JUDGE**

**Dated: June 26, 2009**