## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| **SHELDON GORDON,** *et al.*, | : | **Case No.  1:05-CV-2726** |
| **Plaintiffs,** | : | |
| | : | **JUDGE KATHLEEN O'MALLEY** |
| **v.** | : | |
| **DAVID DADANTE,** *et al.*, | : | **MEMORANDUM & ORDER** |
| **Defendants.** | : | |

Before the Court is the Receiver's Motion for Distribution of Funds.  (Doc. 457)  For the reasons detailed below, this motion is **GRANTED**, as modified in the attachment to this order.

## I.  PROCEDURAL HISTORY

This case has an extensive procedural history, recently detailed in the Court's June 26, 2009 and August 28, 2009 Orders.  (Docs. 447, 458).  Although that history is necessary to a full understanding of any order in this case – those prior orders, for example, define the parties to this action – this Order incorporates that history by reference and begins its recitation of the procedural history with the filing of the instant motion.[1]

On August 25, 2009, the Receiver asked this Court to approve a plan for the distribution of certain funds to the plaintiffs in this litigation.  (Doc. 457.)  Various parties have since filed responses to that motion.  First, several plaintiffs, including some historically at odds with the Receiver, have asked the Court to grant the Receiver's motion as filed.  (Docs. 464, 476; *see also* 11/10/09 Hrg. Tr. (containing the statement of Michael Regalbuto withdrawing his previous

---

[1] The Court is concerned with the speedy, yet just, resolution of this motion.  The history of this litigation (*see* Docs. 457, 458) is long and painful, and the Court is mindful of the need many plaintiffs have for the return of at least some of the money they invested in Dadante's fraudulent scheme.

objection (Doc. 465) and supporting the Receiver's motion)).  Second, other plaintiffs have asked this Court to consider requiring certain modifications to the Receiver's plan.  (Docs. 462, 467-1, 477.)  Last, Defendant H&R Block has asked this Court to order the Receiver to withhold certain funds from distribution.  (Docs. 461, 473-1.)[2]

On November 10, 2009, the Court held a hearing in this matter to allow interested parties an additional opportunity to present their arguments.

**II. LEGAL STANDARD**

This Court considers the Receiver's motion to distribute funds, and responses thereto, under traditional principles of equity.  *See SEC v. Basic Energy & Affiliated Res.*, 273 F.3d 657, 668 (6th Cir. 2001).  The Court is afforded broad discretion in applying these principles.  *United States SEC v. Infinity Group Co.*, 226 Fed. Appx. 217, 218 (3d Cir. 2007) ("District Courts have wide equitable discretion in fashioning distribution plans in receivership proceedings . . . ." (citing *SEC v. Fischbach*, 133 F.3d 170, 175 (2d Cir. 1997) (additional citation omitted)); *SEC v. Amerifirst Funding, Inc.*, No. 3:07-CV-1188, 2008 U.S. Dist. LEXIS 20044, at *9 (N.D. Tex. Mar. 13, 2008) ("[T]he district court, acting as a court of equity, [is] afforded the discretion to determine the most equitable remedy." (quoting *SEC v. Forex Asset Mgmt. LLC*, 242 F.3d 325, 332 (5th Cir. 2001))); *see also Quilling v. Trade Partners, Inc.*, 572 F.3d 293, 298 (6th Cir. 2009).  In exercising its discretion, this Court "must still provide the claimants with due process," although summary proceedings generally comport with this requirement so long as those "procedures permit parties to present evidence when the facts are in dispute and to make arguments regarding those facts."  *Basic Energy*, 273 F.3d at 668.

---

[2] To ensure that all parties wishing to be heard had such an opportunity, the Court provided two opportunities for any objections to be filed, and even accepted and docketed responses received in letter form.  (*See* Doc. 474.)

2

**III. DISCUSSION**

The parties before the Court are in agreement with much of the Receiver's plan. (Doc. 461 at 1 ("[H&R Block] files this <u>limited</u> objection to the [Receiver's] Plan . . . ." (emphasis added); Doc. 462 at 1 ("[The Small Plaintiffs] support the Receiver's intention to distribute available funds to the victimized investors in the IPOF Fund. The Small Plaintiffs also agree with the general method for making those distributions described in the Receiver's proposed Plan of Distribution from the Receivership Estate . . . ."). To the extent that some plaintiffs have requested certain clarifying language in the Receiver's plan, the Receiver has agreed with those suggested clarifications – to wit: making clear that each investor shall receive notice of each other investor's distribution, that any investor may object to the distribution received by any other investor, and that the Receiver will provide all investors written notice of the resolution of any objections to individual distributions.[3]

Three issues, however, merit discussion. First, the Court must consider precisely how the Receiver should calculate the relative amount of money distributed to each plaintiff. Second, the Court will address one plaintiff's proposal that certain money recovered not be made available for distribution to all plaintiffs. Finally, the Court will discuss H&R Block's contention that the Receiver should be ordered not to distribute a substantial quantity of funds because H&R Block and the Receiver are currently pursuing claims against each other in FINRA arbitration.

**A. The Method of Distribution**

**1. The Receiver's Proposal**

The Receiver has asked to distribute funds to the plaintiffs on a "pro rata" basis. The Receiver suggests that a plaintiff's share of the distribution of available IPOF Fund assets should be

---

[3] In his motion, the Receiver asked this Court to appoint a retired judge as special master, to review any unresolved objections to the Receiver's determinations. <u>No</u> party has disagreed with the Receiver's suggestion in this regard, and the Court finds his proposal to be a well-taken one. In a future, separate, order, the Court will appoint such an individual.

determined based on the net loss suffered by that plaintiff as a result of Dadante's fraud. Under this proposal, each plaintiff would receive a percentage of the assets of the IPOF Fund recovered to date and currently available for distribution.[4] His proposal is in-line with the proposition that "pro rata distributions are the most fair and most favored in receivership cases." *SEC v. Byers*, 637 F. Supp. 2d 166, 176 (S.D.N.Y. 2009) (Chin, J.).

### 1. The Alternative Proposal

Although a pro rata distribution is generally considered the most equitable option in most cases, however, it is not automatically true that it is the most equitable option here. The Small Plaintiffs, indeed, have proposed an alternative method of distribution to account for the difference between investors who received some portion of their initial investment back from Dadante as "profit," and investors who did not.

The Small Plaintiffs argue that early investors, who were paid "profits" from later investors, are in a materially better position than the later investors, who never received such a "profit." They argue:

> [The Receiver's plan] does not take into consideration that some Claimants . . . . have already realized a substantial return on their investment, even though their "net amount invested" may be greater than or equal to other Claimants who have not received such a return. . . . [The Receiver's] method of distribution is particularly inequitable since, given that the IPOF Fund was a Ponzi scheme, the higher returns paid to some Claimants were funded by the amounts from Claimants who invested later in the IPOF Fund . . . ." (emphasis removed)

---

[4] More specifically, his proposal involves a fairly straightforward mathematical calculation that takes into account the total funds invested by an individual in the IPOF Fund and the total amount received back from the Fund. In any distribution, then, the Receiver would determine the total net loss of all plaintiffs (by deducting total returns from total investment), and would use this to determine what percentage of each distribution should go to each plaintiff. Hypothetically, consider only three plaintiffs, one of whom suffered a net loss of $50,000 and two of whom suffered a net loss of $25,000. Under the Receiver's plan, he would distribute $2 dollars to the first plaintiff for every $1 he distributed to the second and third plaintiffs.

(Doc 462 at 2-3.) The Small Plaintiffs suggest that the distribution be structured so that every investor receives an equal *rate of return* on their initial investment, in order to account for what they believe to be an inequity:

> [The Smalls propose] that receivership assets will first be distributed to Claimants who received the lowest return on their investment and continue to be distributed in that manner until all Claimants have achieved the same rate of return. Once all Claimants have equal rates of return, receivership assets will be distributed pro rata, based on each Claimant's total amount invested in the IPOF Fund.

(*Id.* at 3.) In other words, the Small Plaintiffs suggest that if an investor contributed $100,000 to the fund, but received $50,000 in false profits, this investor should not receive any money until all other investors have received 50% of their initial investment as well.

The Small Plaintiffs do not cite to any court that has ever employed this method of distribution, and the Court has found none. As previously implied, however, this lack of precedent does not necessarily mean that their plan is not the most equitable here.

### 2. The Receiver's Plan is the Most Equitable

As an initial matter, the Court notes that neither proposal is "perfect," because no proposal can be.[5] The fundamental reality of this litigation is that a large number of individuals were defrauded and no court order can erase that fraud, certainly not a court order that enables the distribution of only a fraction of the stolen assets. The task at hand, however, is to do justice to the extent possible, particularly with the knowledge that many of the plaintiffs deposited their entire savings into this Ponzi scheme. It is against this backdrop that the Court ultimately concludes that the Receiver's proposal is the more equitable of the proposals before it.

Although the Small's proposal is not without merit, it creates inequities that the Court finds somewhat worse than those it attempts to cure. First, the Court must consider the many investors

---

[5] The Court also considered a number of possible plans *sua sponte*, including a hybrid between the Small Plaintiff's plan and the Receiver's plan. None of these plans ultimately appeared more equitable than that proposed by the Receiver, however.

5

who simply returned their "profits" into the IPOF Fund.  The hypothetical investor above may have taken her $50,000 check *and returned it to Dadante*.  It is not equitable to treat such an investor as having suffered a $150,000 loss of which 33% has been returned (and who should not recover any money until other investors have achieved a 33% recovery), rather, such an investor should be treated as having suffered a $100,000 loss of which none has been returned.

Second, the Court is mindful that the individuals who received some portion of their investment back from Dadante were told that they were receiving a profit.  The investor who deposited $100,000 and then received $50,000 believed that she had $150,000: $100,000 in the IPOF Fund, and $50,000 in profit from her investment.  Just as it is inequitable to think of such an investor as having a claim for $100,000 from the IPOF Fund, so, too, it is inequitable to withhold any payment at all until other investors have achieved a 50% rate of return.  The reality is that such an investor may well have spent the initial $50,000 (believing that she had $100,000 in reserve) and may now be desperately in need of capital.

It is perhaps for reasons such as these that courts consistently favor pro rata distributions, such as the one currently proposed by the Receiver.  As the Third Circuit recently observed:

> [T]he Courts of Appeals repeatedly have recognized that pro rata distribution of a defrauder's assets to multiple victims of the fraud is appropriate and that District Courts act within their discretion in approving such distributions.  *See, e.g., SEC v. Credit Bancorp, Ltd.*, 290 F.3d 80, 89 (2d Cir. 2002) (explaining that "the use of a pro rata distribution has been deemed especially appropriate for fraud victims of a 'Ponzi' scheme" and collecting cases); *United States v. 13328 and 13324 State Highway North*, 89 F.3d 551, 553-54 (9th Cir. 1996) (collecting cases).

*Infinity Group*, 226 Fed. Appx. at 218-219; *see also Quilling*, 572 F.3d at 301 (collecting cases). This Court reaches the same conclusion here: among a host of options that can never truly make the victims whole, the Receiver's plan for a pro rata distribution of the funds collected to date is the most equitable.

6

### 2. Tracing is Inequitable

The Receiver's proposal makes no distinction as to the source of recovered funds, even if it is possible to determine that a particular investor's money was not actually used by Dadante for a particular purpose.  For example, the Receiver proposes that all investors share in the current distribution of proceeds available from the settlement of claims with Ferris, Baker, Watts, Inc. ("Ferris Baker"), even if a particular investor's funds were not actually committed by Dadante to his trading activities at Ferris Baker, and were instead used in some other element of, or at some other time during, Dadante's fraudulent scheme.  One plaintiff has questioned this practice, at least to some degree.  (*See* Doc. 467-1.)  This plaintiff notes that certain investments might be traceable to particular investors, and argues that ordering distribution among all plaintiffs, regardless of the source of the funds, would be no different than dividing up the recovered assets of a burglar among all of the burglar's victims, rather than returning assets to their original, rightful, owners.  (*Id.*)

Although this analogy is understandable, it is misplaced.  Whereas a burglar's various crimes are all truly independent of a each other, in a Ponzi scheme, each victim is used to defraud the others.  This is why "[t]racing . . . has been almost universally rejected by courts as inequitable." *See Byers*, 637 F. Supp. 2d at 177 (S.D.N.Y. 2009) (collecting cases).  This principle is well-established:

> In the original Ponzi scheme case, *Cunningham v. Brown*, 265 U.S. 1 (1924), the Supreme Court held that "tracing" fictions should not be used to pursue individual recoveries when a fraud ensnares multiple victims whose funds are commingled.  *See id.* at 12-13.  Instead, the Court held that all innocent victims should share equally in the recovered funds because equity demands equal treatment.  *See id.*

*Infinity Group*, 226 Fed. Appx. at 218; *see also SEC v. Loewenson*, 290 F.3d 80, 89 (2d Cir. 2002) ("In [a Ponzi] scheme, whether at any given moment a particular customer's assets are traceable is a result of the merely fortuitous fact that the defrauders spent the money of the other victims first." (citation and quotation marks omitted)).

7

Under the circumstances of this case, the Court concludes that it is appropriate to pool all moneys recovered by the IPOF Fund and distribute them on a pro rata basis to investors.[6]

### 3. The Receiver Need Not Set Aside Funds for H&R Block

H&R Block Financial Advisors, Inc. ("H&R Block") argues that the Receiver should be ordered to set-aside funds to protect its interests. The Court ultimately finds this argument poorly taken for three independently sufficient reasons, but believes that some context is necessary. Accordingly, the Court will begin its analysis with a brief explanation of the relationship between the Receivership and H&R Block, prior to discussing H&R Block's current objection.

### a. The Relationship Between the Receivership and H&R Block

The Receiver is currently asserting various claims against H&R Block: he seeks both damages and a determination that H&R Block has no valid claim to IPOF Fund assets that H&R Block currently holds, or in which H&R Block has a security interest. In particular, H&R Block holds 604,396 shares of Innotrac Corporation ("Innotrac") stock as a security interest against margin debt accumulated by Dadante. H&R Block has not only denied liability, but also has asserted that the Receivership is liable for that margin debt, a contention that the Receivership denies. To paint these competing claims with a broad stroke, H&R Block contends that it is entitled to payment for the substantial margin debt incurred by Dadante ($975,905.42), whereas the Receiver argues that H&R Block is liable to the Receivership for $1,250,000 and that H&R Block must return the Innotrac shares on which it asserts a security interest.

---

[6] This determination does not, however, preclude offsetting of funds against individual investors for equitable reasons. For example, it may ultimately be appropriate to offset a distribution otherwise due a particular investor if that investor unreasonably caused the Receivership to expend money that would otherwise have been paid to investors. (*See* Doc. 477.) In light of the pending audit of the Receivership, however, the Court does not authorize such an offset in connection with the distribution of currently available funds.

8

On February 5, 2007, H&R Block moved to stay proceedings in this Court in favor of arbitration.  Although this Court declined to grant such a stay, H&R Block vigorously asserted its rights to arbitration and ultimately prevailed before the Sixth Circuit, which issued its mandate on December 9, 2008.  Accordingly, H&R Block and the Receivership are now asserting their competing claims in FINRA arbitration.[7]

### b.  H&R Block's Argument

H&R Block argues that, prior to allowing the Receiver to distribute *any* funds, this Court must consider the value of H&R Block's pending claim against the Receivership:

> As the Court is aware, [H&R Block] holds 604,396 of the 4,321,771 Innotrac shares that comprise a significant portion of the Receivership Estate from which the Receiver now seeks to make a distribution to the IPOF Fund investors.  Those shares are subject to a lien in favor of [H&R Block] for the discharge of all indebtedness owed to it.  The amount of debt currently due and owing to [H&R Block] is $975,905.42.

(Doc. 461 at 2; Doc. 461 at 2 n.1 ("The issue of [H&R Block's] right to collect this margin debt is currently pending in FINRA arbitration proceeding[s]."").)  H&R Block argues that "[i]t is virtually impossible that the INOC shares in question (and in which [H&R Block] has a perfected security interest) will be sufficient to satisfy the damages sought by [H&R Block] in the FINRA arbitration." (Doc. 473-1 at 1-2.)  Accordingly, H&R Block argues that the Receiver should be ordered to set-aside money to satisfy any future judgment it obtains:

> The arbitration proceedings now pending before FINRA will determine the value of [H&R Block's] claim against the IPOF Fund and the Receiver's claim against [H&R Block] on behalf of the IPOF Fund.  The Receiver's Proposed Plan proposes a distribution of the assets of the Receivership estate to the investors in the IPOF Fund,

---

[7] Earlier in the course of the Receivership litigation in this Court, H&R Block commenced its own arbitration case against the Receiver seeking a declaration of its claimed rights and alleged security interest in the assets held in the brokerage accounts, which today consist entirely of shares of common stock of Innotrac Corporation.  That arbitration case was stayed by agreement, until it was eventually consolidated with the arbitration case brought by the Receiver.  The Court understands that the arbitration case(s) is/are currently proceeding through normal prehearing processes and procedures.

without making reference to [H&R Block's] security interest in the stock . . . . Therefore, the Court should require that the Proposed Plan include a reserve sufficient to protect [H&R Block's] rights and interests so that if and when the FINRA arbitration panel rules that [H&R Block's] is entitled to recover the margin debt it is owed, there will be funds available in the Receivership Estate to satisfy that award.

(Doc. 461 at 3-4.)

### c. The Court Rejects H&R Block's Argument for Three Independently Sufficient Reasons

H&R Block's argument begins from a demonstrably correct premise: that the Receiver is responsible for protecting the interests of all valid creditors, and not merely the plaintiffs.  (*See generally* Docs. 461, 473.)  *It is entirely unclear, however, that H&R Block is a valid creditor.*  As H&R Block itself concedes, whether H&R Block is or is not a valid creditor is an issue  "currently pending in FINRA arbitration proceeding[s]."  (Doc. 461 at 2 n.1.)  Even if H&R Block is a valid creditor, moreover, it has not given this Court any reason to believe that H&R Block's professed security interest is insufficient to satisfy its asserted damages.  Finally, even if H&R Block is ultimately determined to be a valid creditor and even if its professed security interest is insufficient to satisfy any damages, it is clear that the Receiver has sources from which he may well recover ample assets to satisfy any judgment against the Receivership.[8]

### i. H&R Block Does Not Have a Valid Interest in this Cash Distribution

H&R Block's asserted interest in this cash distribution is simply speculative at this point.  In short, H&R Block seeks the equitable equivalent of a prejudgment attachment, as its entire argument

---

[8] As explained below, H&R Block argues that it <u>may</u> ultimately prevail in FINRA arbitration against the Receivership and that, <u>if</u> H&R Block's security interest is insufficient to satisfy this hypothetical future judgment, <u>then</u> the Receivership would be unable to satisfy that hypothetical judgment, <u>assuming</u> the Receiver never recovers any additional funds.  To be sure, counsel for H&R Block makes this position sound remarkably reasonable, and did so particularly well during oral argument.  Even persuasive argumentation, however, cannot square this obvious circle.

is premised on the notion that it will prevail on all aspects of the pending arbitration.[9]  Yet, H&R lock does not present any evidence to this Court that would allow the Court to conclude that H&R Block is likely to prevail before FINRA on its claims.  It is true, of course, that H&R Block has attached a copy of its standard Investors Account Agreement to its objections.  (Doc 461-1.)  Even accepting that this Court believes that David Dadante, who pled guilty to running a massive Ponzi scheme and defrauding the plaintiffs in this action, accepted such an agreement, it would still be unclear why that agreement would allow this Court to conclude both that H&R Block's claims are valid and that the Receivership's claims are not.  On the current record, it would be inequitable for this Court to order that funds be reserved for H&R Block's speculative interest, and withheld from those with an established actual interest.[10]

> ii.     **On the Evidence Before the Court, H&R Block's Security Interest is Sufficient to Cover its Asserted Damages**

Although H&R Block argues that "[i]t is virtually impossible that the [Innotrac] shares in question (and in which [H&R Block] has a perfected security interest) will be sufficient to satisfy the damages sought by [H&R Block] in the FINRA arbitration," (Doc. 473-1 at 1-2), this argument is not supported by the current record.  H&R Block seeks damages in the amount of $975,905.42 and

---

[9] H&R Block asserts that *D.B. Zwirn Special Opportunities Fund, L.P. v. Tama Broad., Inc.* somehow supports its position that the Receiver must reserve funds pending the outcome of H&R Block's speculative claim against the Receivership.  *See* 550 F. Supp. 2d 481, 492 (S.D.N.Y. 2008) (Scheindlin, J.).  Yet, the quoted portion of Judge Scheindlin's opinion stands only for the proposition that a Receiver's "sole loyalty and responsibility lies with the Court and the assets, rather than with any of the parties."  *Id*.  Nothing in her opinion contemplates H&R Block's present request, given that H&R Block has not yet established a legitimate claim on the Receivership's assets.

[10] H&R Block's argument might be stronger if the Court did not expect the Receiver to collect substantial additional assets in the future.  In other words, H&R Block has not given the Court reason to believe that the Receivership will be judgment proof in the future, and the Court finds none.

holds a perfected security interest in 604,396 shares of stock valued at $985,165.48.[11]  H&R Block has not offered any support for the novel proposition that it is "virtually impossible" that $985,165.48 is insufficient to satisfy a claim for $975,905.42 in damages.[12]  Equity, then, does not support withholding money from this cash distribution, given that H&R Block has a perfected security interest that is apparently sufficient to satisfy any potential future judgment.

### iii.  The Receivership Retains Assets in Excess of H&R Block's Claim for Damages

Even if H&R Block had a valid claim for $975,906.42, and even if H&R Block's perfected security interest is insufficient to satisfy that claim, equity still would not demand that H&R Block receive a set-off from this distribution.  Entirely ignored by H&R Block in its briefing is that *the Receivership retains assets worth considerably more than $975,905.42*.  That those assets are either not liquid as of the date of this opinion or remain inchoate (in the form of legal claims against other alleged participants in Dadante's fraud) does not make them any less real, particularly given that H&R Block is itself asserting a right to protect a speculative judgment obtained at some hypothetical point in the future.[13]

---

[11] On December 31, 2009, Innotrac closed at $1.63 a share.  While the stock has fluctuated over the course of the past year, where the Court to use an average, that number would be substantially higher than $1.63.

[12] Of course, as alluded to above, the Innotrac shares currently are not liquid for reasons that have been detailed by the Court in its past orders.  (*See* Doc. 447.)  This does not make them without value, and H&R Block has not made any argument that the illiquidity of its perfected security interest somehow makes that interest infirm.

[13] Certain of these assets are particularly noteworthy because they are only available to H&R Block because of the efforts of the Receiver.  Specifically, in his negotiations with Ferris Baker, the Receiver obtained an agreement from Ferris Baker to forgive its security interest in 2,999,152 shares of the Innotrac stock held by the IPOF Fund – a security interest that was in place when H&R Block accepted its own security interest.  (*See* Doc. 361.)  In other words, H&R Block is in a *more* secure position today – having potential access to a greater number of Innotrac shares to satisfy H&R Block's claims – because of the Receiver's efforts.

## IV. CONCLUSION

For the aforementioned reasons, the Receiver's Motion for Distribution of Funds (Doc. 457) is **GRANTED**, as modified in the attachment to this order.


**IT IS SO ORDERED.**

s/Kathleen M. O'Malley
**KATHLEEN McDONALD O'MALLEY**
**UNITED STATES DISTRICT JUDGE**

**Dated: January 11, 2010**