**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| SHELDON GORDON, *et al.*, | ) | CASE NO. 1:05CV2726 |
| | ) | |
| Plaintiffs, | ) | JUDGE CHRISTOPHER A. BOYKO |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | JONATHAN D. GREENBERG |
| DAVID DADANTE, *et al.*, | ) | |
| | ) | **REPORT & RECOMMENDATION** |
| Defendants. | ) | |
| | ) | |

On September 5, 2017, this matter was referred to the undersigned for a Report and

Recommendation on all outstanding matters.[1]  (Doc. No. 770.)  As recently identified by the

Court, these matters consist of (1) the parties' dispute over fees incurred by the Receiver during

the period January 6, 2014 through September 30, 2017; and (2) a potential award of additional

compensation to the Receiver, above and beyond his agreed hourly rate.  (Doc. No. 755.)

The parties have fully briefed the above issues, the Court has conducted two hearings

regarding the same, and the matter is now ripe for review.  For the following reasons, it is

recommended the Receiver's Application for Fees (Doc. No. 795) be granted in part and denied

in part as follows.  It is recommended a total of $106,608.50 be deducted from the Receiver's

Fee Application, consisting of $13,801.00 in Receiver fees and $92,807.50 in fees incurred by

---

[1] This matter was previously referred to the undersigned, on August 18, 2017, for a
settlement conference on all objections to the Receiver's fees and request for additional
compensation.  (Doc. No. 766.)  As noted above, on September 5, 2017, the referral was
expanded to include a Report & Recommendation with regard to these issues.  (Doc. No. 770.)

the Receiver's counsel.

It is further recommended, based on a variety of factors including the complexity of the instant case and the unprecedented recovery achieved by the Receiver, that the Court order an award of additional compensation to the Receiver, above and beyond his agreed hourly rate, in the amount of $1,203,175.

## I.     Introduction

It is an unfortunate reality that victims of a Ponzi scheme rarely recover their losses. Here, after twelve long years of litigation, the Plaintiff investors in this action (all of whom are victims of David Dadante's fraudulent misrepresentations) have been fortunate to recover an extraordinary 110% of their investments.  This unprecedented result is due, in no small measure, to the hard work, dedication, skill, and judgment of the Court-appointed Receiver and his team. While all are grateful for this tremendous result, difficult questions regarding compensation for the Receiver remain to be decided as this matter finally draws to a close.  In resolving these questions, the Court has been required to balance the interests and concerns of the Plaintiff investors against the right of the Receiver to just and reasonable compensation for the truly remarkable recovery achieved through his efforts.

Considerations of equity have guided the Court's recommended resolution of the remaining compensation issues in this case.  The Court has carefully read and considered all of the Plaintiff investors' arguments, whether submitted *pro se* or through counsel.  While the individual circumstances are upsetting, the Court must discharge its duty to resolve these issues through the proper application of equitable principles and with objectivity and fairness to all interested parties.  With this in mind, the Court recommends the remaining compensation issues

-2-

in this case be resolved as set forth below.

## II.    Relevant Procedural History[2]

### A.    The Filing of the Complaint and Appointment of Mark Dottore as Receiver

On November 21, 2005, Plaintiff Sheldon Gordon filed a Complaint against David Dadante ("Dadante"), several entities under Dadante's control, multiple investment brokerages, and various John Doe individuals and companies.  In sum, the Complaint alleged Dadante solicited approximately $50 million from a group of community members to form investment funds under the names IPOF, L.P., IPOF Fund, GSI, IPOF Fund II, L.P. (the "Fund").  Plaintiff claimed Dadante told investors, among other things, that he was working with a major Wall Street investment bank; the Fund had returned over 25% per year; their investments were secure; the Fund would purchase stock from initial public offerings ("IPOs"); and, later, that the Fund would use a proprietary trading strategy to generate a guaranteed return.  (Doc. No.1.)

The Complaint alleged, however, that neither Dadante nor the Fund fulfilled any of these promises.  Instead, Plaintiff claimed the Fund was a Ponzi scheme used by Dadante to swindle his friends and acquaintances out of millions of dollars.  To facilitate his scheme, Dadante allegedly made repeated misrepresentations, provided false account statements, and manipulated accounts, all while enriching himself by improperly self-dealing.  The Complaint asserted violations of federal and state securities laws and the Racketeer Influenced and Corrupt

---

[2] The procedural history of this action is extraordinarily lengthy and complicated. Indeed, the record reflects over 800 docket entries spanning twelve years.  The Court will not attempt to set forth a detailed accounting of the entire history of this arduous litigation.  Rather, this Report & Recommendation will limit its discussion of the procedural history to that which is necessary to provide context to the Court's recommended disposition of the particular issues addressed herein.

Organization Act ("RICO"), as well as common law fraud.

On that same date, Plaintiff also filed an Emergency Motion in which he requested the Court seal the case, freeze all Fund assets, and appoint a Receiver.[3]  (Doc. No. 5.)  Therein, Plaintiff argued a Receiver was absolutely necessary to prevent fraud and preserve the assets of the Fund from irreparable loss through mismanagement.  To that end, Plaintiff specifically requested Mark Dottore (the "Receiver"), by name, to be the Receiver of the assets of the Fund. (*Id*. at 1.)  Plaintiff represented he had shared critical information regarding the allegations with Mr. Dottore and indicated Plaintiff and his counsel were familiar with Mr. Dottore's expertise and experience in similar receivership actions.  Plaintiff indicated Mr. Dottore was "well qualified to serve in the capacity as a receiver in this case."  (*Id*. at 1)

A proposed Order attached to Plaintiff's Motion provided that "the Receiver and his agents, including his counsel and any accountants that are appointed by the Court, shall be entitled to reasonable compensation for services rendered and reimbursed for expenses incurred" as set forth therein.  (Doc. No. 5-1 at ¶ 12.)  In particular, Plaintiff's proposed Order provided Mr. Dottore would be compensated at his "normal hourly rates," which was identified at the time as $195 per hour.  (*Id*. at ¶ 13.)  The proposed Order also authorized Mr. Dottore to utilize the

---

[3] A receiver is an individual appointed by the Court to preserve and administer disputed assets during the course of litigation.  As one court explained: "Neither a plaintiff nor a defendant, the receiver functions as an arm of the court, appointed to ensure that prevailing parties can and will obtain the relief it orders. A receiver's authority, therefore, is defined solely by the order of the appointing court, which may provide for the administration of the receivership in any way it sees appropriate. The district court, moreover, retains equitable power to review the actions of [a] receiver." *SEC v. Loving Spirit Found*., 392 F.3d 486, 490 (D.C. Cir. 2004) (citations omitted) (quotations omitted); *see also Javitch v. First Union Sec., Inc*., 315 F.3d 619, 626 (6th Cir. 2003) ("Ohio courts have described a receiver as merely the administrative arm of the court who takes charge of the assets of the partnership for the purpose of conserving them to the ends of equity…" (citation omitted)).

services of an accountant, David S. Linscott, at the rate of $185 per hour, and permitted him to retain counsel "with disclosure of the ordinary and customary hourly rate of counsel."  (*Id.* at ¶ 15-16.)  Finally, as relevant herein, Plaintiff's proposed Order indicated the Receiver should file with the Court monthly applications (or less frequent, "if he deems appropriate") for payment of fees and expenses.  (*Id.* at ¶ 17.)

After conducting a hearing, the Court (through then-assigned District Judge Kathleen O'Malley) agreed with Gordon's characterization of the urgency of the circumstances, temporarily sealed the case, and appointed Mark Dottore as Receiver for certain limited purposes, including collecting, preserving, and/or freezing the assets of the Funds, obtaining possession of all accounting books and records, and hiring accounting professionals with prior Court approval.  (Doc. No. 7.)  In addition, the Court indicated "the Receiver, and his agents, and any accountants that are approved by the Court, shall be entitled to reasonable compensation for services rendered and reimbursement for expenses which are related to the Receiver's limited duties, rights, and obligations under this order or any future orders of the Court."  (*Id.* at 6.)

Thereafter, on December 1, 2005, the Court found "it is in the best interests of all parties to this action that Mark E. Dottore continue as Receiver in accordance with the terms of this Order."  (Doc. No. 16 at 1.)  The Court then expanded the Receiver's duties and authorized him to "hire an accountant, and qualified and competent securities advisors, including a securities investment advisor and a securities attorney, as the Receiver deems necessary to carry out his duties."  (*Id.* at 2.)  With regard to compensation, the Court stated that "[r]easonable expenses, costs, and fees (including reasonable attorney's fees) incurred by or on behalf of the Receiver or any of the Receiver's Agents in connection with any action, suit, or proceeding, whether civil,

-5-

administrative, or arbitrative, will be paid by the Fund in advance of any final disposition of the

proceeds of the Fund or non-first-party-position (as previously provided) claim against the

Fund." (*Id.* at 6.)  Further, the Court noted "[t]he Receiver and professionals which he selects

under the supervision of this Court shall be paid from the proceeds collected, from, or on behalf

of, the Fund on a first position priority basis." (*Id.* at 5.)

> **B.      Early Stages of the Litigation**

> **1.      Identification and Protection of Fund Assets**

Early on, the Receiver focused his energies on identifying and protecting Fund Assets.

One of these assets was approximately 4.3 million shares of common stock in a company called

Innotrac Corporation ("Innotrac").  As the Court has explained in previous Orders, Innotrac was

a relatively small business services company that generally traded fewer than 10,000 shares per

day.  (Doc. No. 447 at 5.)  This "limited volume allegedly allowed Dadante to manipulate the

price of Innotrac's stock using a variety of different brokerages and stock manipulation

methods." (*Id.*)  As a result of Dadante's activities, the Fund owned approximately 34.3% of

Innotrac's outstanding common stock.[4]  (*Id.*)

The Innotrac stock owned by the Fund was held in accounts located at the various

brokerages[5] through which Dadante effectuated the purchases and sales of that stock.  (*Id.* at 7.)

---

[4] In June 2009, the Court noted Innotrac stock typically hovered between $2 and $4 per share.  (Doc. No. 447 at 5.)  Thus, the market value of these shares to the Fund generally ranged from approximately $8.6 million to $17.2 million.  (*Id.* at 5-6.)

[5] The brokerages were joined in this case as "stakeholder" defendants. They were: Ferris, Baker Watts, Inc. k/n/a Royal Bank of Canada; Wachovia Securities, LLC; H&R Block Financial Advisors, Inc.; Pershing, LLC, Advest, Inc.; and McDonald Financial Group.  (*Id.* at fn 7.)

It soon became apparent the Innotrac stock was encumbered by several million dollars of margin debt[6] accumulated by Dadante.  (*Id.*)  Many of these margin debts exceeded certain legal and regulatory parameters such that the Fund's accounts faced imminent margin calls from the inception of the litigation.  (*Id.*)  Indeed, "the brokerages threatened to engage in immediate and disorderly liquidation of the Fund's stock."  (*Id.*)  Given the trading history of Innotrac stock, the Court determined "the immediate, disorderly liquidation of roughly one-third of the outstanding common stock of a small company would prove disastrous for Fund investors, rendering the stock (their sole asset) virtually worthless."  (Doc. No. 284 at 3.)  Accordingly, the Court enjoined the various "stakeholder" defendants (i.e., the brokerages) from liquidating any Fund assets they held without prior permission from the Court, including the Innotrac stock.  (Doc. Nos. 16, 25.)

On December 9, 2005, the Court extended the appointment of Mr. Dottore as Receiver indefinitely.  (Doc. No. 25.)  Among other things, the Court authorized the Receiver to direct sales of Innotrac stock held by the IPOF Fund.  Several months later, the Court issued an Order (Doc. No. 66) which extended the trading restrictions on the Innotrac stock and realigned Defendants IPOF LP, IPOF Fund, and IPOF II, LP, as Plaintiffs.  The Receiver was ultimately

---

[6] As Judge O'Malley explained in a previous Order: "The term 'margin debt' refers to credit extended by a brokerage firm to its client in connection with the purchase of securities (an activity commonly known as 'purchasing on margin'). Margin creates leverage to purchase and hold larger amounts of securities. However, margin debt incurred to purchase securities in an account is secured by the assets in that brokerage account. When the market value of stock and other assets in the account falls below a requisite value in relation to the margin debt in the account, however, a brokerage firm will demand additional funds or assets from the client (this is commonly known as a 'margin call'). If the client does not deposit such funds or assets into the account, the brokerage firm may liquidate the assets in that account to reduce or cover the margin debt. In the event an account is liquidated, the brokerage typically has the right to payment from the client for any debt that remains after such liquidation." (Doc. No. 447 at fn 4).

granted sole voting power over the 4,321,771 shares of Innotrac stock held by the Fund.  (Doc. No. 281.)

During this general time period, the Receiver undertook a variety of strategies to preserve Fund assets and protect investors.  For example, the Receiver successfully pursued efforts to secure tax refunds for investors.  Specifically, as a consequence of Dadante's Ponzi scheme, the Fund's limited partners had paid income taxes on what they believed to be the Fund's profits between 2001 and 2004.  The limited partners' tax returns were incorrect, however, as each of them paid income tax on income that did not exist.  The Receiver engaged tax professionals to prepare corrected Partnership returns for the Fund and to issue proper tax forms.  The Receiver and these tax professionals also presented to the Court the basis for determining that originally filed tax returns were invalid.  Due to the efforts of the Receiver and his tax professionals, the Fund's investors were able to secure tax refunds for five years, rather than being limited by the three year statute of limitations.  (Doc. No. 447 at 12.)  Additionally, the Receiver pursued claims against Dadante, ultimately resulting in a settlement for the amount of $8.5 million on claims for breach of fiduciary duty, mismanagement of partnership affairs, and constructive fraud.[7]  (Doc. No. 168.)  *See also* Doc. No. 447 at 13.

**2.      Growing Dissatisfaction by some Plaintiffs with the Receiver**

On April 5, 2006, Plaintiff, with leave of Court, filed an Amended Complaint, which added all the investors in the Fund, comprising 100 additional plaintiffs.  (Doc. Nos. 66, 71.)

---

[7] Dadante later pled guilty to criminal charges relating to his previously described conduct, and was sentenced to a substantial term of imprisonment, and an order of restitution in the amount of $28,351,643.82, ordered payable to the Fund's limited partners.  *See United States of America v. Dadante*, Case No. 1:07-CR-336 (N.D. Ohio)(Doc. No. 27).  *See also* Doc. No. 447 at 14.

Like the previous Complaint, the Amended Complaint asserted claims for violations of federal

and state securities laws, RICO, and common law fraud.  (Doc. No. 71.)

Matters proceeded relatively smoothly until the summer of 2006.  At that time, "the

relationship among the investors deteriorated, and divisions emerged among the investors who

previously had spoken with one voice."  (Doc. No. 284 at 4.)  One group of investors in

particular (variously described over the years as the "Regalbuto Plaintiffs" or the "Objecting

Plaintiffs")[8] began to express dissatisfaction with the Receiver.  (*Id*. at 5.)  In January 2007, the

Objecting Plaintiffs filed a Motion to Terminate the Receivership or to Remove the Receiver and

for an Accounting.[9]  (Doc. No. 179.)  In an Order issued on June 6, 2007, the Court denied the

Motion to Terminate Receivership or Remove the Receiver, but granted, in part, the request for

an accounting, as follows:

> At the outset, the Court reminds the [Objecting] Plaintiffs that the Receiver has
> been authorized by the Court to take actions that the Court has approved and

---

[8] The Court will not attempt to define the precise membership of this group of Plaintiffs. It is sufficient for purposes of this Report & Recommendation to note that one group of Plaintiffs, in particular, grew to distrust and repeatedly challenge the actions of the Receiver. For ease of reference only, this decision will refer to this group of Plaintiffs as the "Objecting Plaintiffs."

[9] In their Motion, the Objecting Plaintiffs argued the receivership should be terminated or Mark Dottore should be removed as Receiver because: (a) Mr. Dottore "has exacerbated [a] schism that developed between the investors"; (b) the Receiver's job is largely completed because the assets have been identified and secured; and (c) the Receiver does not have the authority to pursue the claims of the Fund because it was not a limited partnership.  (Doc. No. 179.)  Another group of plaintiff investors (referred to in previous Court Orders as the "Small Plaintiffs") vigorously opposed the Objecting Plaintiff's motion.  (Doc. No. 188.)  The "Small Parties" include Plaintiffs Cleveland Construction, Inc., Small Brothers Partnership, James W. Small, James Small, Jr., James W. Small as Parent and Next Friend of N.S., Minor, Jon D. Small, and Mark T. Small.

found to be in the best interest of the investors.  The Court remains convinced that, but for the Receivership, all fund assets would have been depleted long ago.  The Court notes, further, that there are costs inherent in any Receivership, it takes money to recoup money – in this case, thousands have been expended in the effort to recover millions in assets and to mitigate millions more in debt.  Nevertheless, to avoid any implication that the information is unavailable or incomplete, the Court orders the following with respect to the [Objecting] Plaintiffs' request for an accounting:

> Within thirty (30) days of the date of this order, the Receiver shall prepare a summary accounting of the Receivership. The summary shall include, at a minimum: (a) the expenditures to professionals including the Receiver, by type, for each month of the Receivership; (b) a list of the assets of the Receivership since its inception; (c) a monthly summary of the expenditures made to maintain the Dadante home (including taxes and insurance); and (d) a monthly summary of other expenses, receipts, dispositions, and disbursements from the Receivership.

(*Id*. at 17).

Shortly thereafter, on July 6, 2007, the Receiver filed his First Accounting Report for Period from Inception through June 28, 2007.  (Doc. No. 292.)  Therein, Mr. Dottore indicated (1) cash receipts of $1,151,338.77; (2) cash disbursements of $1,142,654.70, 118.62; (3) a cash balance of $8,684.07; and (4) non-cash assets of $1,456,118.62, not including the Innotrac Stock.  (*Id*.)

Shortly thereafter, the Objecting Plaintiffs filed a Motion for a Further Accounting (Doc. No. 294), which the Court granted.  Specifically, in January 2008, the Court ordered the Receiver to file a more detailed accounting and, further, to update his accounting every 90 days.  (Doc. No. 339 at 3-4.)  In this Order, the Court also acknowledged the Objecting Plaintiffs' "displeasure with the Receiver," as documented in "numerous papers and during previous hearings."  (*Id*. at 7.)  In particular, the Court noted the Objecting Plaintiffs' belief "the Receiver should liquidate all the holdings of the Receivership (especially the shares of Innotrac held by

the Fund) and bring suit against various parties;" as well as their anger regarding the approximately $1,000,000 cost of the Receivership to date.  (*Id*. at 7.)  In the course of this discussion, the Court addressed the Objecting Plaintiffs' argument that, instead of a Receivership, the Court should hire outside counsel to pursue litigation on behalf of the Fund on a contingency fee basis.  Judge O'Malley discussed the downside to such an arrangement, as follows:

> In addition, the alternative litigation strategy which has been proposed by the [Objecting] Plaintiffs, moreover, is not without substantial costs.  They and their counsel have urged the Court to hire outside (and in some cases out-of-state) attorneys who have indicated a willingness to pursue litigation on behalf of the IPOF Fund and its limited partners on a contingency fee basis.  The contingency fees proposed have ranged from twenty-five to forty percent of the value of any recovery achieved (over and above expenses, of course).  The Court observes that the recently proposed settlement between [stakeholder defendant] Ferris Baker Watts, Inc., and the IPOF Fund has a value in excess of $16,000,000.  For illustrative purposes, if that settlement were approved, a twenty-five percent contingency fee would have cost the IPOF Fund participants over $4,000,000, and a forty percent fee would have cost the plaintiffs over $6,400,000 – for that settlement alone.  Expenses for experts, travel, discovery, etc. would also have to be paid by the IPOF Fund out of that settlement, thus further increasing the costs of a litigation-route to resolve disputes with third parties.  **In short, virtually any contingency arrangement would have resulted in fees that were many times those of the Receiver.**

(*Id*. at 7-8) (emphasis added).[10]

---

[10] The Court revisited this distinction in resolving objections to the Receiver's proposed settlement with Ferris Baker Watts.  (Doc. No. 361.)  In these objections, certain Plaintiffs suggested it was impossible to ascertain the "true value" of the settlement absent a full understanding of the Receivership's fees.  (*Id*. at 21.)  The Court rejected this objection, finding as follows: "The Receivership's fees are hourly, and not contingent – this is critical to resolving the objection for two reasons: (1) the fees have already been incurred; and (2) the settlement value has no bearing on the fees.  Stated another way, the Receivership has already incurred significant fees during its discovery, investigation, pursuit, and marshalling of the assets, as well as during the negotiation process.  Most of those fees have already been approved and, in some cases, paid.  Additionally, in a true sense, because the Receiver's fees are hourly and not

The Court also addressed the Objecting Plaintiffs' assertion the Receiver should be removed for failing to notify them regarding his fees and expenses, in violation of Local Rule 66.1.[11]  (Doc. No. 339 at 10-11.)  Judge O'Malley rejected this argument as follows:

> With respect to the Receiver's reporting requirements, the Court notes that, since the inception of the Receivership, the Receiver has submitted his expenses directly to the Court for approval. Though the [Objecting] Plaintiffs imply otherwise, there was no sinister motive behind not requiring the docketing of monthly reports or individualized notice. Indeed, it was the plaintiffs' own counsel who submitted  a proposed order to the Court suggesting the procedure to be employed – i.e., the submission of requests for interim reimbursement to the Court only.  The reason for this procedure was to guard against improper public disclosures of information which could impact the share price of the Innotrac stock, an understandable and laudable goal.  For fourteen months, thereafter, no party objected to the Receivership, to the mechanism established to fund it, or to the absence of additional reporting or information.  The Court believed that this was the product of: (1) the fact that the court-appointed Receiver was chosen by the Plaintiffs; (2) the Court's understanding, by virtue of its previous Orders, that information in the hands of the Receiver was available to interested parties at their expense; and (3) the parties' desire to minimize the expenditure of resources.
>
> In early 2007, however, it became clear to the Court that there was a schism among the limited partners of the IPOF Fund. One faction, the [Objecting] Plaintiffs, expressed considerable dissatisfaction with the Receiver and demanded, among other things, an accounting. The Court, therefore, ordered an accounting (which the Receiver did not oppose).  More recently, as discussed above, the [Objecting] Plaintiffs have asked the Court to require the Receiver to provide greater detail in its accounting.  Again, though certain

---

contingency-based, the amount of the settlement has no bearing on the fees, and vice-versa.  In other words no matter how the Ferris Baker settlement is valued, the Receivership's fees are flat, and will not change.  Furthermore, at this time it appears likely that, because the Receivership operates on an hourly basis, the fees will be well below the level of fees the Court would expect under a contingency arrangement." (*Id*. at 21.)

[11] In relevant part, Local Rule 66.1 provides as follows: "**(b) Reports.** Within one month after the filing of inventory and at regular intervals of one month thereafter until discharged, or at such times as the Court may direct, the receiver or other similar officer shall file reports of his or her receipts and expenditures and of acts and transactions in an official capacity."

> statements in the [Objecting] Plaintiffs' motion were disputed, the request for
> an accounting itself was not.  As discussed above, the Court has ordered an
> additional accounting.  In brief, given the foregoing, the Court finds that the
> Receiver has responded as directed to the [Objecting] Plaintiffs' requests for
> an accounting, reported in accordance with the Court's directives and, thus, has
> not violated Local Rule 66.1.

(*Id*. at 12.)  The Court also expressly addressed and rejected the Objecting Plaintiffs' request to

remove Mr. Dottore as Receiver, noting as follows: "Since his appointment, the Receiver has

been thorough and diligent in a difficult task that has exposed himself to myriad attacks,

personally and professionally.  Despite these attacks, the Receiver has given the Court no reason

to question his single-minded desire to maximize the assets in the Receivership estate and, thus,

maximize the possible return to all his investors.  The actions and efforts of all of the Receiver's

agents have evidenced a similar level of competence and dedication on their part.  Under such

circumstances, given the two-year investment in the knowledge base of the Receiver and his

agents, the Court finds that all parties would be ill-served by appointing a new receiver at this

time."  (Doc. No. 339 at 11.)

The record reflects the Objecting Plaintiffs nonetheless continued to file numerous

motions objecting to various decisions and actions of the Receiver.  Indeed, as noted by Judge

O'Malley in an Opinion & Order dated June 26, 2009, "one of the most persistent themes of this

litigation has been the Objecting Plaintiffs' vigorous disagreement with the Receiver's various

positions in this action."  (Doc. No. 447 at 18.)  The Court noted that, "[v]ery broadly speaking,

the disputes fall into three categories: (1) substantive strategic objections to each of the

-13-

Receiver's proposed settlements with stakeholder defendants;[12] (2) attempts to terminate the Receivership and/or obtain control of the litigation from the Receiver and; (3) requests for additional information regarding the Receiver's activities and expenditures."  (*Id*. at 18-19.)

As it is of particular relevance herein, the Court focuses on the last of these three categories of disputes.

### 3. The Receiver's fees and expenses – the 2010 Audit

In November 2008, one of the investors filed a purportedly *pro se* motion for leave to bring suit against the Receiver for allegedly fraudulent billing practices.  (Doc. No. 411.)  In response, the Receiver moved to strike the motion (Doc. No. 414) and also requested the Court order an independent audit to avoid any further disputes regarding his fees and expenses.  (Doc. No. 437.)

In a lengthy Opinion & Order dated June 26, 2009, Judge O'Malley struck the motion to bring suit against the Receiver.  (Doc. No. 447 at 47.)  She granted the Receiver's motion for an

---

[12]  For example, the Objecting Plaintiffs objected to the Receiver's proposed settlements with stakeholder defendants Ferris-Baker Watts and McDonald Financial Group.  One of the arguments raised by the Objecting Plaintiffs in their objections was that the Innotrac stock held by the Fund had no real value.  (Doc. No. 447 at 23.)  Thankfully for all concerned (as discussed in more detail below), the Court explicitly rejected this argument and agreed with the Receiver, finding "although illiquid and thus of limited current benefit to the Plaintiffs, as a legal matter shares of Innotrac do indeed have a potential value."  (*Id*. at 24.)  The Court thus approved the Receiver's proposed settlements with both entities, in April and October 2008 respectively.  (Doc. Nos. 361 and 396.)  The settlement with Ferris Baker required it to (1) to deliver 2,999,152 shares of common stock in Innotrac to the Receivership estate, free and clear of all claims, liens, or security interest – including an existing margin debt of over $9,000,000; and (2) to pay the Receivership estate the cash sum of $7,200,000. (Doc. No. 447 at 21.)  The settlement with McDonald required it to (1) deliver to the Fund the roughly 130,000 shares of Innotrac stock held in the McDonald account; and (2) forgive over $550,000 of secured margin debt.  (*Id*. at 25.)

accounting, finding as follows:

> While the Court finds the Receiver's settlements with Ferris Baker and McDonald, and proposed settlement with Innotrac[13] evidence of strong work-product, the Court is not in a position to fly-speck every entry in the Receiver's billings for that work-product, or detect all potentially questionable billing practices.  Furthermore, in a case as large as the one at bar, honest professionals may well disagree about precisely what constitutes an appropriate charge.  Finally, although the Court  can find no analogous case law, the Court concludes that in a case as long and complex as the one at bar, interim audits may be appropriate.
>
> The Court bases this conclusion on four factors: (1) the Objecting Plaintiffs have made their desire for an exceedingly specific accounting clear on many occasions, including details that would violate attorney-client privilege or SEC regulations were they revealed.  Although the Court is concerned, as mentioned before, about allowing these Plaintiffs to deplete the Fund's resources,[14] it is reasonable to seek some measure of independent verification of professionals who are performing such extensive work; (2) the Small Plaintiffs have in the past sought an audit for entirely different reasons – namely, to determine what percentage of the Receiver's expenses are created by arguably frivolous filings from the Objecting Plaintiffs . . . ; (3) the Receiver believes this audit is necessary to satisfy the Objecting Plaintiffs and eliminate needless expenses

---

[13]  In October 2008, the Receiver helped negotiate the sale of 100% of the outstanding Innotrac stock to a third entity, GSI Commerce, Inc. for $4.03 per share.  (Doc. No. 393.)  This sale would have resulted in a recovery for the Fund in excess of $17.5 million over and above the settlement with Ferris Baker.  (*Id.* at 3.)  In a subsequent Order, the Court noted: "This appeared to be an outstanding achievement on the part of the Receiver, given that even the Objecting Plaintiffs had repeatedly taken the position . . . that they believe that any recovery from Innotrac that would provide the Receivership estate with a value of $3.00 or more per share in return for the Innotrac shares held by the estate would be both fair and adequate."  (Doc. No. 447 at 27.)  This sale, however, subsequently fell apart as a result of the crisis in U.S. financial markets and the collapse of stock prices generally, in late 2008.  (*Id.*)

[14]  On several occasions, Judge O'Malley registered concern regarding "the [Objecting] Plaintiffs' willingness to force the Receiver to needlessly expend hundreds of hours responding to unauthorized filings," finding it "impeded the orderly progress of the Receivership and caused the depletion of its assets by the filing of ill-informed pleadings and/or taking insupportable positions."  (Doc. No. 284 at 14-15.)  *See also* Doc. No. 447 at 33 (noting the Objecting Plaintiffs "have at times engaged in behavior that almost seems designed to deplete the limited resources of the Fund.")

caused by the Receiver's many efforts to respond to the requests for information from Objecting Plaintiffs' changing counsel and; (4) the Court believes that independent verification of the Receiver's charges will safeguard the interests of the Fund's partners, and of the Receiver himself, going forward.

The Court, consequently, ORDERS the independent audit of the Receiver and the professionals working with him. Pursuant to a separate Order entered on this date, the Court appoints Dr. B. Thomas Florence ("Dr. Florence"), the Analysis Research Planning Corporation ("ARPC"), and the employees and contractors of ARPC (collectively, the "auditors") as independent auditors in this action.

(Doc. No. 447 at 45-46) (emphasis in original).

Thereafter, on February 1, 2010, the Court released the independent audit prepared by Dr. Florence and the ARPC in response to the above Order. (Doc. No. 482-1.) Among other things, the audit determined "from the start of the case through March of 2009, the Receiver submitted and has been paid for professional fees totaling $2,553,507 plus reimbursement for out-of-pocket expenses totaling $44,031." (*Id*. at 2.) Of that total amount, Mr. Dottore was paid $765,867; his counsel, Robert Rapp, was paid $621,301; and co-counsel Robert Glickman was paid $196,736. (*Id*. at 8.) The audit noted Mr. Dottore's average hourly rate was $214. (*Id*. at 3.) His counsel (Robert Rapp and Robert Glickman) had average hourly rates of $429 and $334, respectively. (*Id*.)

The auditors concluded "[t]he hourly rates charged by professionals in the case are reasonable" and, in fact, "appear to be significantly lower than the average rates charged by other similarly situated professionals." (*Id.* at 2, 6.) With regard to the Receiver in particular, the auditors found "the rates billed by professionals in the Dottore firm are at the low end of the rates charged by professionals in similarly situated firms." (*Id*. at 7.) The audit also concluded "[i]n general, the invoices provided sufficient detail to determine the task undertaken by the

-16-

individual," noting "we found the descriptions of tasks and supporting documentation to be of very high quality."  (*Id*. at 8.)

In April 2010, the Court approved (at the Receiver's request) the First Interim Cash Distribution from the Receivership Estate.  (Doc. No. 490.)  This distribution consisted of $4 million to the plaintiffs on a *pro rata* basis, leaving approximately $2 million in liquid assets with the Receivership Estate (in addition to the 4 million shares of Innotrac stock).  (Doc. Nos. 488, 490.)  Several years later, in June 2012, the Court (through District Judge Christopher Boyko)[15] approved a Second Interim Cash Distribution of $1,100,000, with $400,000 remaining in the Receivership Estate to cover potential future litigation costs (in addition to the 4 million shares of Innotrac stock).  (Doc. No. 554.)

Throughout this time period, the Receiver periodically filed Notices of Accounting Reports, which attached supporting documentation including time sheets associated with professional services rendered.  (Doc. Nos. 292, 352, 363, 372, 405, 423, 439, 454, 475, 481, 492, 495, 511, 520, 532, 533, 539, 546, 548, 556.)  In his Twentieth Accounting Report (for the period from inception through June 30, 2012), the Receiver reported as follows:

> Cash receipts for the period totaled $11,516, 184.71 while cash disbursements totaled  $8,160,592.86 for the period.  Cash balance at June 30, 2012 was $3,355,591.85 while non cash assets were $25,567.65 not including 4,086,644 shares of [Innotrac] common stock recovered.

(Doc. No. 556-1.)  In total, the Receiver reported $4,324,253.34 had been paid in professional

---

[15] On November 8, 2011, this matter was transferred from Judge O'Malley to Judge Boyko.  (Doc. No. 541.)

fees since the inception of the lawsuit in November 2005.[16]  (Doc. No. 556-2 at 1.)

    **C.**    **Sale of the Innotrac Stock**

On November 15, 2013, the Receiver filed a Motion for Conditional and Final Approval of a Support Agreement Entered Into with Innotrac Corporation and Blue Eagle Acquisition Sub., Inc., and an Order Authorizing the Sale of All Innotrac Common Stock held in the Receivership Estate.  (Doc. No. 558.)  In the motion, the Receiver indicated Innotrac and Blue Eagle had entered into a Merger Agreement, under the terms of which Blue Eagle would commence a tender offer to purchase all of the issued and outstanding shares of Innotrac common stock at an offer price of $8.20 per share, payable in cash.  (Doc. No. 558-1 at 1-2.) The Receiver emphasized this would result in a recovery of $35,438,522 for the Fund, and urged the Court to approve the agreement.  (*Id*. at 3.)

On November 18, 2013, the Court granted immediate conditional approval of the terms of the Support Agreement pending further proceedings, finding as follows:

> After an exhaustive process, the Receiver and Innotrac management have been able to identify a buyer for the stock and enter into an agreement where the stock will be purchased for $8.20 per share. . . . This matter has involved complex issues that have involved securities regulation, breach of fiduciary duty, real estate issues, banking law, and numerous actions against financial institutions.  The Receiver has exhaustively pursued the best interests of the Receivership Estate.   Further, the Receiver has been threatened numerous times by various IPOF Fund limited partners, has been the subject of multiple law suits and complaints, but has never abandoned his charge to protect the value of the assets held in the Receivership Estate.  The proposed recovery in this matter is unprecedented and, should this transaction close as contemplated,

---

[16] Of this amount, the Receiver reported he (and his staff) had been paid a total of $2,381,104.75 in fees.  As of October 2011, Mr. Dottore billed at an hourly rate of $265, with his firm billing at an average rate of $247.64. (Doc. No. 556-2 at 14, 17.)  From January to March 2012, Mr. Dottore billed at an hourly rate of $280.  (*Id*. at 25.)

> the Court will take all of these facts and circumstances into consideration when deciding the issue of the reasonable compensation for the Receiver.

(Doc. No. 559 at 2-3.)  The Court further noted "the Receivership Estate appears to be on the verge of an extraordinary recovery," describing it as "unheard of in matters of this type" and noting "in this Court's experience, [this recovery] may be one of the largest of its kind involving a fund that was the victim of a Ponzi scheme."  (*Id.* at 3.)

The Court set a fairness hearing for December 17, 2013.  (*Id.* at 4.)  After conducting the hearing, the Court issued an Order on December 18, 2013, granting immediate final approval of the sale.  (Doc. No. 561.)  In addition, the Court ordered the Receiver to file a Motion for Fees no later than 30 days after the finalization of the sale of stock.[17]  *See* Non-Document Order dated December 17, 2013.

On March 3 2014, the Receiver moved to "distribute funds to the IPOF Fund Investors in excess of 100% of investment."  (Doc. No. 576, 581, 583.)  The Receiver indicated  "a balance of funds to distribute of $36,060,333," of which he proposed to distribute $26,960,280 to the IPOF Fund Investors.  (Doc. No. 581.)  In addition, the Receiver explained as follows:

> In addition to returning 100% of the net cash loss to each investor, the Receiver proposes to distribute on a *pro-rata* basis based on net cash losses of each investor a bonus of $2,881,802 which represents distributions to each investor totaling one hundred and ten percent (110%) of each investor's losses.  The proposed additional ten percent (10%) represents a bonus to compensate the investors for their loss of earnings on their money. * * * Receiver believes that

_____

[17] During the hearing, the Court indicated as follows: "I would like to have the whole package presented to me as far as the disbursements, motions for fees. I would anticipate that, Mr. Dottore, based upon this extraordinary recovery in this case that you would be seeking additional compensation. I think you are certainly entitled to that. The Court will decide that in the end.  But one package would be good for my review so that we can take care of all of that at the same time."  (Doc. No. 769 at 9.)

-19-

the investors will be sufficiently reimbursed for the "loss of the use of their money" under the Receiver's proposed distribution to IPOF Fund investors.

(*Id.* at 2.)  The Receiver's motion was unopposed.

On April 29, 2014, the Court found the Receiver's motion to be "fair and reasonable," and ordered the Receiver to immediately distribute the funds as outlined therein.[18]  (Doc. No. 602.)  The Court further ordered the Receiver to submit a proposed budget for the remaining anticipated litigation fees and expenses, and to provide monthly reports to the investors regarding the ongoing litigation.  (*Id.* at 2.)

> **D.**     **Litigation over the Receiver's Fees and Potential Award of Additional Compensation**

Meanwhile, on March 3, 2014, the Receiver filed a response to the Court's inquiry as to whether it had the authority to award additional compensation to the Receiver based on the extraordinary recovery achieved.  (Doc. No. 576.)  Therein, the Receiver noted the IPOF Fund had obtained a total recovery of $59 million, comprised of $12 million of debt forgiveness and $47 million of cash settlement ($35 million of which resulted from the sale of the Innotrac stock).  (*Id.* at 5.)  He emphasized Plaintiffs had recovered over 100% of their investment, and argued such a recovery was "unprecedented in a Ponzi scheme of this type."  (*Id.* at 11.)  Although he declined to suggest a particular amount of additional compensation, the Receiver argued the Court had the discretionary authority to determine and award a reasonable fee "based

---

[18] The Court, however, ordered the Receiver to distribute a 100% (as opposed to 110%) *pro rata* share to the Estate of Frank Regalbuto until further Order of the Court, in light of a pending motion asking the Court to assess costs and fees against this Estate.  (Doc. No. 602 at 1-2.)  That Motion (filed by the Small Plaintiffs, Doc. No. 572) has since been withdrawn.  (Doc. No. 748.)

on the result obtained in this matter, the incredible complexity and challenges faced by the Receiver, the skill required to obtain such a result, and the fact that the Receiver can certainly afford to make such an award."  (*Id*. at 15-16.)

Both the Small Parties and Plaintiffs Gordon and Teresczuk opposed the Receiver's request.  (Doc. Nos. 589, 594.)  They acknowledged the Receiver had done an excellent job, but argued he had been "been fully and fairly paid the reasonable compensation already established in this case."[19]  (Doc. No. 589 at 1.)  The Small Parties, in particular, emphasized repeatedly that "Judge O'Malley expressly assured all of the IPOF Fund investors that the 'Receivership's fees are flat, and will not change,' regardless of the value of any recovery."  (*Id*. at 1) (citing Doc. No. 361 at 21.)  They argued there was no legal authority supporting the Receiver's request for an "extraordinary fee" or "bonus."  To the contrary, they asserted "the Receiver's request for a substantial additional payment, above and beyond his reasonable hourly rates, even though he has never claimed, nor can he claim, that he has not been reasonably compensated, contradicts Judge O'Malley's orders, is entirely inequitable, and . . . is wholly unsupported by any authority."  (Doc. No. 589 at 3.)

In addition, a number of unrepresented investors submitted letters to the Court voicing their strong opposition to an award of any extraordinary fee or bonus to the Receiver.  (Doc. No. 600.)  A common theme of these letters is that the Receiver had already been handsomely paid for his work and, therefore, all remaining money should be awarded to the investors, each of

---

[19] At the time these opposition briefs were filed (in April 2014), Plaintiffs claimed the Receiver and his staff had been paid a total of $3,278,555.25.  (Doc. No. 594 at 3; Doc. No. 589 at 2.)

whom had suffered so greatly as a result of Dadante's dishonesty.[20]  (*Id.*)

After conducting a hearing on April 24, 2014, the Court issued an Order finding it "has the authority to adjust the compensation of the Receiver to reflect a reasonable hourly rate in light of the obstacles encountered during the pendency of the receivership and the recovery achieved."  (Doc. No. 612 at 2.)  The Court determined a lodestar method should be used in establishing a reasonable fee for the Receiver, noting that under this approach "the most useful starting point for determining the amount of a reasonable fee is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate."  (*Id.* at 3.)  The Court then found as follows:

> The Court may also adjust the Receiver's hourly rate to reflect a reasonable rate in relation to the market and in consideration of the results achieved. *See S.E.C. v. Mutual Benefits Corp.*, No 04-60573, 2009 WL 4640654 (S. D. Fl. Dec. 7, 2009).  Therefore, the Court finds it has the discretionary authority to increase the Receiver's billing rate.   However, the Court will not rely on the representations of Receiver or his employees as to a reasonable rate given that he stands to personally benefit.  Therefore, the Court orders the Receiver to obtain and file an updated third-party report by Kennedy Consulting Research and Advisory, the firm previously used by the Receiver and approved by the prior Judge, on the average hourly rate for receivers and staff for the years of the Receivership.  Receiver shall file this updated Report no later than June 25, 2014.

(Doc. No. 612 at 3.)

On June 25, 2014, pursuant to the above Order, the Receiver submitted an updated third-

---

[20] As one investor asserted, the Receiver "earned 3.2 million dollars from this case and now wants a bonus for doing his job.  I think it is a disgrace and insult that he wants a bonus from my stolen money that is my children's future.  He has already earned more money from this case than I will ever earn in my whole life time."  (Doc. No. 600 at 9.)  Another implored the Court to "consider the 101 people that have been suffering and some have even passed away due to stress because of what happened in this mess."  (*Id.* at 14.)  This investor argued the Receiver "did his job and got paid very well for it.  We are greatly appreciated of the outcome, however, . . . any extra money left over should be given to each investor."  (*Id.*)

party report from Kennedy Consulting Research & Advisory (hereinafter "the Kennedy Report"). (Doc. No. 613.) This report contained rate information for management consulting firms with under $10 million in annual revenues. (*Id.*) With respect to "principals/partners," the report indicated the following range of hourly rates[21] for the years 2011 through 2013:

| Year | Principal/Partner Low | Principal/Partner High |
|------|------|------|
| 2011 | $243 | $470 |
| 2012 | $254 | $485 |
| 2013 | $245 | $475 |

(*Id*. at 3.)[22]

On September 18, 2014, the Small Parties responded to the above report by filing the expert report of John Lane, who had "nearly 40 years of financial, business, and technology experience serving clients across the U.S. and abroad," including experience as an operating and liquidating receiver. (Doc. No. 629-1.) Mr. Lane reviewed the Kennedy Report and found numerous flaws, as follows:

• The Kennedy Consulting Research & Advisory rates presented in the Third Party Report are for the broad field of "Management Consultants" and not for Receivers. The functions of Management Consultants and, most importantly, the competitive market drivers are generally very different from those for Receivers.

---

[21] The Report explained that "low" is defined as the hourly rates charged by the lowest 25th percentile of firms and "high" is the rate charged by firms at the 75th percentile. (Doc. No. 613 at 3.)

[22] The Report also contained the "low" and "high" ends of the range for principal/partner compensation for the years 2006 through 2010. In 2006, the low end of the range was $215/hour, while the high end was $373/hour. (Doc. No. 638-1 at 2.) In 2010, the low end of the range was $225/hour, while the high end was $449/hour. (*Id.*)

• A significant driver for rates is the training and expertise of the Management Consultant. . . . The hourly rate information presented in the Third Party Report does not present the impact of specialized expertise, which tend to push the high end of the range for Management Consultants up.

• The information in the Third Party Report further does not assess, or even consider, the functions and expertise specifically of Receivers.  While the general business expertise that a Receiver normally brings to a case is very important, it usually does not command the higher hourly rates that very specialized Management Consultants can charge.

• Another significant driver of hourly rates is the geographic market. The information presented in the Third Party Report does not include a geographic breakdown.  Consulting rates in large market such as New York and Chicago are usually well above those in Northeast Ohio.

• The size and nature of a Management Consultant's clients also have a significant impact on the hourly rates that can be charged.  Regardless of the size of the Management Consulting firm, large, multi-billion dollar revenue clients tend to and are more willing to pay higher rates than smaller multi-million dollar revenue clients.  No information was presented in the Third Party Report regarding this driver of hourly rates.

• The information presented in the Third Party Report included the hourly rates for firms under $10 million in annual revenues.  This is a very broad stratum.  Hourly rates for firms that have annual revenues near $10 million are generally much higher than those for smaller firms or individual practitioners.  No additional segmentation beyond the "under $10 million in annual revenues" was presented in the Third Party Report.

• Finally, the Third Party Report did not assess the supply and demand factors in Northeast Ohio relating to the individuals who may be capable of fulfilling the Receiver role in this case.

(*Id*. at 2-3.)  Mr. Lane concluded by opining that "[b]ased on my background and experience as a Receiver in Northeast Ohio, the hourly rates have ranged from $100 to $250 at the beginning of this case, increasing up to the current hourly rates of $125 to $300."  (*Id*. at 3.)  He, therefore, found "the hourly rates charged to date by the Receiver in this case are at the high end of, but

-24-

entirely consistent with, that range and would be considered reasonable for this community."[23] (*Id.*)

The Receiver filed a supplemental report on November 6, 2014.  (Doc. No. 638.)  This report contained the same range of average rates for management consultant firms as set forth in the Kennedy Report and, further, provided additional detail regarding the specific amounts and rates billed the Receiver and his staff.  In particular, the supplemental Report indicated the Receiver (and his staff) had billed 14,375.9 hours for a total of $3,232,979.75 in fees from the inception of the case through the end of 2013.  (Doc. No. 638-1 at 3-4.)  The Report further noted that "generally, hourly fees increased from 2006 - 2013," and found "The Dottore Companies, LLC billed at an average rate of $225 for senior-level professionals over the entire period in question."  (*Id.*)  The issue recording the highest invoice amount was activity associated with the attempt to sell Innotrac stock.  (*Id.* at 4.)  The report states "approximately $1,347,000 or 42% of total receivership fees were related to this issue."  (*Id.*)

In a filing accompanying the supplemental report, the Receiver argued the Kennedy Report did not apply the "high end" of market rates that would apply in locations such as New York or Los Angeles.  (*Id.*)  He further asserted "it would be appropriate for an experienced Receiver in a metropolitan area such as Cleveland to bill in the seventh fifth percentile of the

---

[23] Meanwhile, in July and September 2014, Plaintiffs Gordon and Teresczuk filed Motions to Enforce the Receiver's Reporting Requirements, arguing the Receiver had "continually violated its statutorily-required reporting duties throughout the duration of this proceeding." (Doc. No. 618 at 3, Doc. No. 624.)  In particular, Plaintiffs complained the Receiver had failed to provide information regarding his fees and costs for the quarterly periods of January 1, 2014 through June 30, 2014.  (Doc. Nos. 618, 624.)  The Small Parties later joined in these Plaintiffs' Motions.  (Doc. No. 626.)

market rates," provided by the Kennedy Report;  i.e., in the high end of the range.  (*Id.*)

Plaintiffs Gordon and Teresczuk responded by filing an Objection to Receiver Fees (Doc. No. 643) and a Motion for Recusal regarding the Receiver's Compensation and Fees (Doc. No. 644.)  On January 15, 2015, the Court agreed with Gordon and Teresczuk that "the Receiver's reporting protocols should be modified" to account for the fact that "there is no longer concern that disclosing certain information may effect" the value of the Innotrac stock. (Doc. No. 647.)  The following month, the Court denied the motion for recusal.[24]  (Doc. No. 652.)

Over the course of the next year and a half, the Receiver continued to submit Accounting Reports and Applications for Receiver and Attorney Fees.  (Doc. Nos. 669, 693, 694.)  Plaintiffs Gordon and Teresczuk objected to each application, citing "undescribed and vague billing entries," a lack of transparency, and a violation of their due process rights.  (Doc. Nos. 671, 710.)

---

[24] Of particular relevance, the Court noted as follows: "[T]he Receiver's compensation protocols were not established by this Court but were put in place by the former judge. Movants did not file an objection to these protocols for years until such time as the Court informed all parties it was contemplating additional compensation for the Receiver. The protocols were established due to the sensitive nature of the chief asset of the Receivership – i.e. the IPOF Fund. These protocols ultimately resulted in a recovery unprecedented in 'Ponzi scheme' litigation. Therefore, this Court's continuation of the compensation protocols cannot reasonably be construed as evidencing bias or prejudice.  However, since the stock has sold and the parties have recovered more than 100 percent of their losses, the Court has agreed to establish a new protocol on the Receiver's compensation, to be determined after a hearing wherein the parties shall have an opportunity to offer proposals on the new protocol. Second, the Court has ordered the Receiver to provide a detailed accounting of all the Receiver and his counsel's billing from the inception of this action and has allowed and will allow all opportunity to object to his compensation. Furthermore, the Court informed all parties of the Court's contemplation of additional fee compensation for the Receiver in light of his extraordinary efforts."  (Doc. No. 652 at 2-3.)

On March 29, 2016, the Court conducted an attorney conference to discuss "how to proceed with the remaining unresolved motions." (Doc. No. 698.)  The Court noted that, in a previous opinion, it "determined it had the authority to award additional compensation to the Receiver." (*Id*.)  The Court then stated "[i]n determining the amount of any additional compensation, the Court will rely on Kennedy Consulting Research & Advisory Report and Supplements and the Inglewood Associates Report provided by John Lane." (*Id*.)  Any investor wishing to challenge these Reports were provided the opportunity to depose the authors of the Reports and submit objections.[25] (*Id*.)

Thereafter, on June 9, 2017, the Court issued an Order identifying two remaining issues for resolution: "The first is the dispute over fees incurred by the Receiver and the second is the Court's intent of increasing the compensation paid the Receiver in light of the Kennedy Report's conclusions on the hourly rate paid Receivers in general." (Doc. No. 755.)  The Court scheduled a hearing on these issues, and invited "any party wishing to be heard" to submit a position statement. (*Id*.)  The Order further provided that "any party not filing a position statement will not be heard." (*Id*.)  The Receiver was ordered to serve the Order on all unrepresented investors. (*Id*.)

Position statements were filed by Plaintiffs Sheldon Gordon and Gae Teresczuk, the Small Parties, and the Receiver. (Doc. Nos. 758, 759, 760.)  Judge Boyko thereafter conducted a hearing on August 14, 2017. (Doc. No. 763.)

On August 18, 2017, Judge Boyko referred the matter to the undersigned for a settlement

---

[25]  Upon review of the record, it does not appear that the authors of any of the Reports at issue were ever deposed.

-27-

conference on all objections to the Receiver's fees and additional compensation.  (Doc. No. 766.)  The undersigned thereafter issued an Order setting a settlement conference for September 19, 2017.  (Doc. No. 768.)  The Order expressly limited the participants in the conference to "those parties who timely filed objections and/or position statements regarding the Receiver's fees and compensation; i.e., (1) Plaintiffs Sheldon Gordon and Gae Teresczuk and counsel, (2) the Small Parties and counsel; and (3) the Receiver and the Receiver's lead counsel."  (*Id*.)  The Receiver was ordered to serve a copy of the Order on all unrepresented investors as soon as possible.  (*Id*.)

On September 13, 2017, the undersigned received an email from Michael Regalbuto, an unrepresented investor in this action, alleging he had not received a copy of Judge Boyko's June 9, 2017 Order.  (Doc. No. 772-1.)  Mr. Regalbuto asserted the Receiver "never sent out" notification of Judge Boyko's Order and further claimed he had "asked many plaintiffs over the past few weeks if they ever received a copy of the judge's order and none did."[26] (*Id*.)

---

[26] In order to clarify this issue, the Court ordered the Receiver to file an affidavit setting forth the actions taken by him and/or his counsel to serve copies of the following Orders on all unrepresented investors in this action: (1)  Judge Boyko's June 9, 2017 Order, and (2) the undersigned's August 22, 2017 Order Setting Settlement Conference.  (Doc. No. 772.)  The settlement conference set for September 19, 2017 was cancelled, to be rescheduled at a later date. On September 25, 2017, affidavits were filed by both the Receiver and his counsel.  (Doc. Nos. 773, 774.) In his affidavit, the Receiver stated that, due to a miscommunication with counsel, "[t]he Court's June 9, 2017 Order was not received by my office from counsel and, therefore, notice was not sent out as directed by the Court."  (Doc. No. 774 at ¶ 5.)  The Receiver further indicated the Court's August 22, 2017 Order Setting Settlement Conference was received by his office and mailed to all investors, but not until September 1, 2017.  (*Id*. at ¶ 6.)  The Receiver's counsel, Mr. Glickman, confirmed in his affidavit that he inadvertently failed to send the Court's June 9, 2017 Order to the Receiver as directed by Judge Boyko.  (Doc. No. 773 at ¶ 7.)

On September 28, 2017, the Court scheduled a supplemental hearing for November 16, 2017 "to ensure that all parties in this matter are provided the opportunity to be heard."  (Doc. No. 775.)  Any party who had not already filed a position statement and wished to be heard was directed to submit a position statement by no later than October 30, 2017.  (*Id*. at 4.)  The Receiver was ordered to serve a copy of the Order on all unrepresented investors.

In response, numerous unrepresented investors submitted letters to the Court, detailing their strong objection to any award of additional compensation to the Receiver.  (Doc. Nos. 779, 781, 782, 783, 785-794, 797-806, 809, 810.)

On November 16, 2017, the undersigned conducted a supplemental hearing.  (Doc. No. 813.)  Several unrepresented investors spoke at the hearing and voiced their objection to any such award.  (*Id*.)  The Court also heard rebuttal argument from counsel for the Small Parties, the Minotti Family Limited Partnership, and the Receiver.  (*Id*.)

Meanwhile, on October 19, 2017, Judge Boyko issued an Order requiring the Receiver to "provide a detailed and complete accounting for the period running from the date of the sale of the Innotrac stock through the present."  (Doc. No. 778.)  Plaintiffs were directed to present all their objections in one written submission "without any reference to or incorporation of prior objections."  (*Id*.)  In addition, Judge Boyko explained as follows:

> The Court will only entertain objections running to the fees and expenses of the Receiver incurred after the date of the sale of the Innotrac stock forward.  In her Order of January 25, 2008, Judge O'Malley described why she ordered the Receiver to submit his fee applications privately without first presenting them to the parties. Judge O'Malley explained that the mechanism was actually proposed by Plaintiffs as was the selection of Mark Dottore as Receiver.  Judge O'Malley merely adopted their recommendation. Judge O'Malley's  intent was to preserve the value of the Innotrac stock. History has borne out the wisdom of Judge O'Malley's decision as the value of the Innotrac stock exceeded all expectations.

-29-

> She further noted that no one objected to the Receiver's submission of his expenses to the Court alone. Now, more than a decade later, the Court will not entertain challenges to the method of expenses incurred by the Receiver pre-sale of the Innotrac stock. Those objections have in this Court's opinion been clearly waived and the Court overrules those objections.

(*Id*. at 2.)

On October 31, 2017, the Receiver filed a Notice of Accounting and Receiver Fee Application for the Period January 6, 2014 through September 30, 2017.  (Doc. Nos. 795, 796.) Therein, the Receiver requests compensation for professional fees in the amount of $791,406.57, with an average hourly rate (for himself and his staff) of $270.94.  (Doc. No. 795 at 3.)  During this time period, the Receiver's hourly rate ranged between $295 and $325.  (Doc. No. 795.) Voluminous documentation supporting the request was attached.  (Doc. No. 795-796.)

On November 15, 2017, the Small Parties[27] filed an Objection to the Receiver's Application for Fees.  (Doc. No. 807.)  Therein, the Small Parties object to any charges arising from the Receiver's request for compensation above his agreed hourly rate, as well as any charges related to the August 14, 2017 and November 16, 2017 hearings.  (*Id*.)  They argue "the Receiver's efforts did not produce neutral information for the benefit of protecting Receivership assets but, rather, produced advocacy briefs solely for the Receiver's benefit."  (*Id*. at 2.)  Thus, the Small Parties maintain "it is the Receiver and not the plaintiff-investors, who must bear the expense for any legal work related to objections to his compensation or request for a bonus."  (*Id.* at 3.)

---

[27] As noted previously, the Small Parties refer to Plaintiffs Cleveland Construction, Inc., Small Brothers Partnership, James W. Small, James Small, Jr., James W. Small as Parent and Next Friend of N.S., Minor, Jon D. Small, and Mark T. Small.

-30-

The Small Parties further argue "the Receiver's time summaries are vague and do not meet his burden to prove he is entitled to the regular hourly rate compensation."  (*Id*. at 4.) Moreover, they assert the Receiver's time entries are not only vague but "block billed" (i.e., multiple tasks are "lumped together"), making it difficult to determine "whether the Receiver's time is compensable or for objectionable work."[28]  (*Id*.)  Thus, they assert the Receiver should be required to "specifically account for the objected to time" and denied any payment for it.  (*Id*. at 7.)  Finally, the Small Parties again object to the use of the Supplemental Kennedy Reports to justify or increase the Receiver's fees, arguing "the Receiver is being well paid at rates consistent with rates and practices in this community and the prior Order of Judge O'Malley." (*Id.* at 7.)

On January 8, 2018, the Court issued an Order requiring the Receiver to produce the following information:

1.  The Receiver is directed to submit specific time entries detailing all work performed by himself, his staff, and counsel for work relating to the issue of a potential award of additional compensation in light of the extraordinary recovery achieved in this matter.  These entries should state the date the work was performed, the number of hours expended, and a general description of the tasks undertaken on that date.

2.  In so doing, the Receiver shall be sure to set forth specific time entries relating to work performed (by himself, his staff, and/or his counsel) to address the notice issues raised in the Court's Order dated September 14, 2017 (Doc. No. 772) and prepare for the supplemental hearing conducted by the undersigned on November 16, 2017.

---

[28] Attached to their Objection, the Small Parties include highlighted time entries from both the Receiver and his counsel that appear to be "directly related to the bonus advocacy." These entries total $203,963.00 in Receiver fees, and $177,690.11 in fees incurred by the Receiver's counsel.  (*Id.* at 5.)

3.        With regard to the Receiver's application for professional fees in the total amount of $791,406.57 for the period January 2014 through September 2017, the Receiver is directed to specify how much of this total amount relates to fees incurred by the Receiver (and his staff) versus that incurred by his counsel.

4.        The Receiver is directed to identify the total amount of professional fees that have been paid in this matter from the inception of the case through the present.  In addition, he is directed to identify, of that amount, how much was billed by and paid to the Receiver (i.e., the Receiver himself and his staff).

(Doc. No. 815.)

On January 16, 2018, after receiving an extension of time from the Court, the Receiver filed a Response to the Court's Order.  (Doc. No. 822.)  With regard to the work performed by himself, his staff, and counsel for work relating to the issue of a potential award of additional compensation , the Receiver asserts that, between January 2014 and September 2017, (1) he and his staff billed $7,899.50; and (2) his counsel billed $48,447.50.  (*Id.* at 2-6.)  This results in a total of $56,347.00 in professional fees relating to work performed regarding the issue of a potential award of additional compensation.  The Receiver next asserts he and his counsel billed a total of $3,027.50 responding to the notice issues raised in the Court's Order dated September 14, 2017 and preparing for and attending the supplemental hearing conducted by the undersigned on November 16, 2017.  (*Id.* at 7-8.)  Of this amount, $1,577.50 is also reflected in the previous category of billings, while $1,450.00 is not.

The Receiver then indicates that, during the time period January 6, 2014 through September 30, 2017, the Receiver and his staff invoiced the Receivership Estate a total of $791, 406.57.  (*Id.* at 8.)  Counsel for the Receiver cumulatively invoiced the Estate a total of $904,243.91 during this time period.  (*Id.*)  Finally, the Receiver reports that the total fees paid to

-32-

the Receiver, including staff, since the inception of the instant action are $3,857,578.74.  (*Id*. at

8-9.)  The total amount of fees paid to the professionals retained by the Receiver since the

inception of the instant action are $3,530,682.04.  (*Id*. at 9.)

With leave of Court, the Receiver subsequently submitted briefing regarding the legal

issue of whether he and his counsel are entitled to compensation for fees arising from the

Receiver's request for compensation above his agreed hourly rate.  (Doc. No. 824.)  Therein, the

Receiver argues the fees at issue were reasonably incurred in response to Orders and requests of

this Court and, thus, should be deemed "compensable costs of the Receivership."  (*Id*. at 2.)

The Small Parties responded on January 24, 2018.  (Doc. No. 825.)  They again assert the

Receiver and his counsel should not be compensated for any work relating to the Receiver's

request for additional compensation, above and beyond his agreed hourly rate, asserting such

work was "clearly non-compensable advocacy for [the Receiver's] own benefit."  (*Id*. at 1-7.)

The Small Parties then argue both the Receiver and his counsel understated their billings for

work performed regarding the issue of a potential award of additional compensation, as well as

work performed to address the service issues raised in this Court's Order dated September 14,

2017.  They provide a detailed analysis of the Receiver's and his counsel's time entries,

essentially arguing the Receiver and his counsel spent thousands of dollars more on these issues

than identified in response to the Court's January 8, 2018 Order.  (*Id*. at 8-33.)

## III.   Applicable Law

"A receiver appointed by a court, who reasonably and diligently discharges his duties is

entitled to be fairly compensated for services rendered and expenses incurred."  *SEC v. Byers*,

590 F. Supp.2d 637, 644 (S.D. N.Y. 2008).  It is well established the determination of

-33-

compensation for a receiver "is left entirely to the determination of the court from which he receives his appointment."[29]  *Stuart v. Boulware*, 133 U.S. 78, 81–82, 10 S.Ct. 242, 33 L.Ed. 568 (1890).  *See also Gaskill v. Gordon*, 27 F.3d 248, 253 (7th Cir. 1994); *United States v. Code Products Corp.*, 362 F.2d 669, 673 (3rd Cir. 1966); *Byers*, 590 F. Supp.2d at 644.  *See also SEC v. Harris*, 2016 WL 1555773 at *9 (N.D. Tex. April 18, 2016) ("The amount of compensation to be awarded a court-appointed receiver is within the Court's discretion."); *SEC v. Small Business Capital Corp.,* 2015 WL 432217 at * 1 (N.D. Cal. Feb. 2, 2015) (in receivership context, finding court has "considerable discretion" to fashion " a fee award that is appropriate under the circumstances"); *In re Alpha Telecom, Inc.*, 2013 WL 840065 (D. Or. March 6, 2013) (same); *SEC v. Striker Petroleum, LLC*, 2012 WL 685333 at * 2 (N.D. Texas March 2, 2012) ("The award of fees in a receivership is entrusted to the discretion of the district court.") (quoting *Commodity Futures Trading Comm'n v. Am. Metals Exch. Corp.*, 991 F.2d 71, 79 (3rd Cir. 1993)); *FTC v. Debt Advocacy Center, LLC*, 2012 WL 13026963 at * 3 (N.D. Ohio August 10, 2012).

In exercising that discretion, the Court may consider any factor related to the Receivership, including the complexity of problems faced, the benefits to the receivership estate, and the quality of the work performed.  *See Byers*, 590 F. Supp. 2d at 644.  *See also Stuart*, 133 U.S. at 81–82 ("The compensation [awarded a receiver] is usually determined according to the

---

[29] This is in keeping with this Court's local rule governing compensation of Receivers. Local Rule 66.1.  That Rule provides, in pertinent part: "The compensation of receivers or similar officers, their counsel and all those who may have been appointed by the Court to aid in the administration of the estate, the conduct of its business, the discovery and acquisition of its assets, the formation of reorganization plans, and the like, shall be ascertained and awarded by the Court *in its discretion*." Local Rule 66.1(c)(emphasis added).

-34-

circumstances of the particular case, and corresponds with the degree of responsibility and business ability required in the management of the affairs intrusted to [the receiver], and the perplexity and difficulty involved in that management.").  Indeed, as another court explained, in determining a reasonable fee for a receiver, "[a] basic consideration is the nature and complexity of the legal problems confronted and the skill necessary to resolve them."  *SEC v. W.L. Moody & Co.*, 374 F.Supp. 465, 486 (S.D. Tex.1974), *aff'd* 519 F.2d 1087 (5th Cir.1975).[30]  "Although time is a material factor, the difficulty of the job, the expertise necessary to accomplish it, and the results achieved are far more significant."  *Moody & Co.*, 374 F. Supp. at 486 (citations omitted).  *FTC v. Information Management Forum, Inc.*, 2013 WL 6086047 at * 2 (M.D. Fla. Nov. 19, 2013).  As several courts have noted, "the result obtained is always a 'critical factor.'"  *In re Alpha Telecom, Inc.,* 2013 WL 840065 at * 17 (quoting *SEC v. Elliott*, 953 F.2d 1560, 1577 (11th Cir. 1992)).

As this Court previously determined, a lodestar approach should be used in establishing a reasonable fee for a receiver.  (Doc. No. 612 at 3.)  *See e.g., U.S. v.Oaks, Ltd.,* 798 F.2d 1417 (Table), 1986 WL 17277 at * 4 (6th Cir. 1986) ("the lodestar fee approach generally utilized by the courts is appropriate also in receivership cases");  *Information Management Forum, Inc*.,

---

[30] *See also Code Products Corp.*, 362 F.2d at 673 ("In allowing fees, 'the considerations are the time, labor and skill required . . . , the fair value of such time, labor and skill measured by conservative business standards, the degree of activity, integrity, and dispatch with which the work is conducted, and the result obtained."); *Harris*, 2016 WL 1555773 at *9 (considering the complexity of the problems faced; the time, labor and skill necessary for the job; the results achieved; the time it took to achieve those results; and the ability of the Receivership Estate to afford the requested fees and expenses); 2 R. Clark, *Treatise on the Law & Practice of Receivers* § 641(a) (1969 supp.) ("the court should consider 'the labor and acts involved, the prices usually paid for similar services in connection with a particular kind of business, also the magnitude of the case, and the amount realized.'") (internal citations omitted).

2013 WL 6086047 at * 2 (In determining receivership compensation, "[m]any courts begin their analysis with the lodestar approach, which is based on the reasonable hourly rate in the relevant market of the professionals for whom fees are sought and the reasonable number of hours expended.") (citing *FTC v. Peoples Credit First, LLC*, 2005 WL 3981599, at *3 and n. 7 (M .D. Fla. Apr. 19, 2006) (citing *Johnson v. Ga. Highway Express, Inc*., 488 F.2d 714, 717–19 (5th Cir.1974)); *see also SEC v. Goren*, 272 F. Supp.2d 202, 207 (E.D. N.Y. 2003)).

Under this methodology, the number of hours reasonably expended are multiplied by a reasonable hourly rate.  *See Hensley v. Eckerhart*, 461 U.S. 424, 433, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983); *Lavin v. Husted*, 764 F.3d 646, 649 (6th Cir. 2014); *Goff v. Ruff Neon & Lighting Maintenance, Inc*., 2017 WL 564493 at * 2 (N.D. Ohio Feb. 13, 2017); *Mohn v. Geoffrey Goll, Esq*., 2016 WL 1258578 at *1 (N.D. Ohio Mar. 31, 2016).  "There is a 'strong presumption' that the figure so calculated represents a reasonable fee."  *Mohn*, 2016 WL 1258578 at *1 (citing *Pennsylvania v. Delaware Valley Citizens' Council for Clean Air*, 478 U.S. 546, 565, 106 S.Ct. 3088, 92 L.Ed.2d 439 (1986)).

"The lodestar, however, must be based on the 'prevailing market rates in the relevant community.'"  *Mohn*, 2016 WL 1258578 at *1 (quoting *Blum v. Stenson*, 465 U.S. 886, 895, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984)).  "The 'prevailing market' is the venue of the court of record."  *Mohn*, 2016 WL 1258578 at *2 (quoting *Gonter v. Hunt Valve Co., Inc*., 510 F.3d 610, 618 (6th Cir. 2007)).  "In establishing a fair hourly rate, the district court may 'rely on a party's submissions, awards in analogous cases, state bar association guidelines, and its own knowledge and experience in handling similar fee requests.'"  *Howe v. City of Akron*, 2016 WL 916701, at *6 (N.D. Ohio Mar. 10, 2016) (quoting *Van Horn v. Nationwide Prop. & Cas. Ins. Co.*, 436

Fed.Appx. 496, 499 (6th Cir. 2011)).  However, "the most critical factor governing the reasonableness of a fee award is the degree of success obtained."  *Waldo v. Consumers Energy Co.*, 726 F.3d 802, 822 (6th Cir. 2013) (quoting *Hensley*, 461 U.S. at 436).  *See also Goff*, 2017 WL 564493 at * 2.

In determining reasonable compensation under the lodestar approach, courts must be mindful that "[n]o receivership is intended to generously reward court-appointed officers."  *W.L. Moody & Co.*, 374 F.Supp. at 483 (citations omitted).  Indeed, as one federal court observed, "[i]n considering applications for compensation by receivers and their attorneys, the courts have long applied a rule of moderation, recognizing that 'receivers and attorneys engaged in the administration of estates in the courts of the United States... should be awarded only moderate compensation."  *Byers*, 590 F. Supp. 2d at 645 (quoting *In re New York Investors, Inc.*, 79 F.2d 182, 185 (2nd Cir. 1935)).  *See also Harris*, 2016 WL 1555773 at * 9 ("Fair compensation means moderate compensation . . . .").  Moreover, "a receiver must exercise proper billing judgment in seeking fees from the receivership estate, and should limit his or her work to that which is reasonable and necessary irrespective of the amount of money in the receivership estate."  *Information Management Forum*, 2013 WL 6086047 at * 3.  *See also Peoples Credit First, LLC*, 2005 WL 3981599, at *3–4 and n. 7.

**IV.    Analysis**

As noted *supra*, there are two outstanding matters for resolution in the instant case.  The first is the parties' dispute over fees incurred by the Receiver during the time period January 2014 through September 2017.  (Doc. No. 755.)  The second is the issue of whether the Receiver should be awarded additional compensation above and beyond his agreed hourly rate, in light of

the Kennedy Report's conclusions on the hourly rates paid Receivers in general.[31]  (*Id.*)  The

Court will address each of these issues in turn, below.

> **A.      Fee Application for the Time Period January 2014 through September 2017**

In his Notice of Accounting and Receiver Fee Application for the Period January 6, 2014

through September 30, 2017, the Receiver requests compensation for professional fees in the

total amount of $791,406.57, with an average hourly rate (for himself and his staff) of $270.94.

(Doc. Nos. 795 at 3.)  As explained in a supplementation filed January 16, 2018, this amount

represents time billed by the Receiver and his staff only.  (Doc. No. 822 at 8.)  In fact, the

Application also seeks payment to counsel for the Receiver in the amount of $904,243.91.  (*Id.*)

Voluminous documentation supporting the request was attached.[32]  (Doc. Nos. 795-796.)

> **1.      Compensation for Fees Incurred by the Receiver and his Counsel relating to their Request for an Award of Additional Compensation**

On November 15, 2017, the Small Parties filed an Objection to the Receiver's

Application for Fees.  (Doc. No. 807.)  Therein, the Small Parties object to any charges "to the

extent the Receiver seeks compensation for himself or his counsel for:"

> 1.      The Receiver's activities to obtain or justify requests for his
> compensation or to dispute objections to his billings, including but not

---

[31]  Because the updated Kennedy Report is limited to an evaluation of the hourly rates of staff and principals/partners for management consulting firms, the Court only considers the question of a potential award of additional compensation for the Receiver, and not for the Receiver's counsel.

[32]  The records submitted with the Application indicate that, between January 2014 and September 2017, Mr. Dottore's hourly rate ranged between $295 and $325.  (*Id.*)  Counsel's hourly rates ranged between $100 - $500 (for attorneys at the law firm of McCarthy, Lebit, Crystal & Liffman) and $215 to $425 (for attorneys at the law firm of Calfee, Halter & Griswold).  (*Id.*)

limited to, any fees or expenses in connection with the Receiver seeking additional compensation above his agreed hourly rate, whether characterized as a "bonus," "additional compensation," a "success fee," or otherwise; and

2.  Services purportedly rendered in connection with service on the unrepresented plaintiff-investors for, preparation for, or appearance at the [August 14, 2017] hearing[33] and the November 16, 2017 hearing.

(*Id.*)  With regard to the above categories of charges, the Small Parties argue "the Receiver's efforts did not produce neutral information for the benefit of protecting Receivership assets but, rather, produced advocacy briefs solely for the Receiver's benefit."  (*Id.* at 2.)  Thus, the Small Parties maintain "it is the Receiver and not the plaintiff-investors, who must bear the expense for any legal work related to objections to his compensation or request for a bonus."  (*Id.* at 3.)

The Small Parties further argue "the Receiver's time summaries are vague and do not meet his burden to prove he is entitled to the regular hourly rate compensation."  (*Id.* at 4.)  Moreover, they assert the Receiver's time entries are not only vague but "block billed" (i.e., multiple tasks are "lumped together"), making it difficult to determine "whether the Receiver's time is compensable or for objectionable work."  (*Id.*)  Nonetheless, the Small Parties attach exhibits to their Objection which include highlighted time entries from both the Receiver and his counsel that "appear to be directly related to the bonus advocacy."  (*Id.*)  These entries total $203,963.00 in Receiver fees, and $177,690.11 in fees incurred by the Receiver's counsel.

(*Id.* at 5.)  The Small Parties assert the Receiver should be required to "specifically account for the objected to time" and denied any payment for it.  (*Id.* at 7.)

_____

[33] The Small Parties reference a hearing on July 25, 2017; however, the docket reflects that hearing was cancelled and rescheduled for August 14, 2017.  *See* Doc. No. 755; Non-document Order dated July 7, 2017; Doc. No. 763.

Plaintiff investors Sheldon Gordon, Michael B. Regalbuto and Joseph P. Regalbuto filed *pro se* Objections to the Receiver's Fee Application on November 17, 2017.  (Doc. Nos. 809, 810-1.)  Among other things, these plaintiffs also object to any charges by the Receiver and/or his counsel relating to the Receiver's request for a "bonus," i.e., an award of additional compensation above and beyond his agreed hourly rate.[34]  (*Id*.)

The docket reflects the Receiver failed to respond to the Small Parties' Objection as to these particular issues, either in writing or during the supplemental hearing.  Thus, on January 8, 2018, the Court issued an Order stating it "will not entertain any argument from the Receiver regarding the legal issue of whether he or his counsel are entitled to compensation for work relating to the Receiver's request for compensation above his agreed hourly rate (which the Small Parties describe as 'bonus advocacy')."  (Doc. No. 815 at 3.)  However, as the Small Parties themselves expressed some doubt as to whether all of the highlighted time entries attached to their Objection relate specifically to this issue,[35] the Court ordered the Receiver to

---

[34] These plaintiffs' objections were filed on November 17, 2017, one day after the objection deadline set by Judge Boyko in his October 19, 2017 Order.  (Doc. No. 778.)  In light of Plaintiffs' *pro se* status, the Court will nonetheless consider the arguments raised in the objections filed by Plaintiffs Gordon, Michael Regalbuto, and Joseph Regalbuto. The Court further notes that, in letters opposing any award of a "bonus" to the Receivers, several other unrepresented investors also argued the Receiver should not be compensated for any fees incurred by himself and/or counsel regarding their efforts to obtain an award of additional compensation above and beyond his agreed hourly rate.  *See e.g*, Doc. Nos. 781 at 3, 802.  The Court has considered these arguments as well.

[35] Specifically, the Small Parties indicate the exhibits attached to their Objection "highlight examples of billings during times when the Receiver and his counsel engaged in preparing filings directed, *at least in some part*, to advocating for a bonus or success fee above his agreed hourly rate."  (Doc. No. 807 at 4-5) (emphasis added).  They also note "the highlighted entries are either vague (and therefore *may be* charges for such work) or *appear to be* directly related to the bonus advocacy") (*Id*. at 5) (emphasis added).

-40-

submit specific time entries detailing "all work performed by himself, his staff, and counsel for work relating to the issue of a potential award of additional compensation in light of the extraordinary recovery achieved in this matter," including entries relating to work performed to (1) address the previously described failure to provide proper notice to unrepresented investors (see Order dated September 14, 2017 (Doc. No. 772)) and (2) prepare for the November 16, 2017 supplemental hearing.  (Doc. No. 815.)

The Receiver responded on January 16, 2018.  (Doc. No. 822.)  With regard to the work performed regarding the issue of a potential award of additional compensation, the Receiver asserts that, between January 2014 and September 2017, (1) he and his staff billed $7,899.50; and (2) his counsel billed $48,447.50.  (*Id*. at 2-6.)  This results in a total of $56,347.00 in professional fees relating to work performed regarding the issue of a potential award of additional compensation.  The Receiver next asserts he and his counsel billed a total of $3,027.50 responding to the notice issues raised in the Court's Order dated September 14, 2017, and preparing for and attending the supplemental hearing conducted by the undersigned on November 16, 2017.  (*Id*. at 7-8.)  Of this amount, $1,577.50 is also reflected in the previous category of billings, while $1,450.00 is not.

The Receiver then indicates that, during the time period January 6, 2014 through September 30, 2017, the Receiver and his staff invoiced the Receivership Estate a total of $791,406.57.  (*Id*. at 8.)  Counsel for the Receiver cumulatively invoiced the Estate a total of $904,243.91 during this same time period.  (*Id*.)  Finally, the Receiver reports the total fees paid to the Receiver, including staff, since the inception of the instant action are $3,857,578.74.  (*Id*. at 8-9.)  The total amount of fees paid to the professionals retained by the Receiver since the

-41-

inception of the instant action are $3,530.682.04.  (*Id*. at 9.)

Upon request of the Receiver, the Court reconsidered its decision that it "will not entertain any argument from the Receiver regarding the legal issue of whether he or his counsel are entitled to compensation for work relating to the Receiver's request for compensation above his agreed hourly rate," and allowed the Receiver to submit a brief written statement regarding this issue.  (Doc. No. 821.)

On January 19, 2018, the Receiver thereafter submitted a brief on the legal issue noted above.  (Doc. No. 824.)  Therein, the Receiver argues the fees at issue were reasonably incurred in response to Orders and requests of this Court and, thus, should be deemed "compensable costs of the Receivership."  (*Id*. at 2.)  He emphasizes he "did not file any motion seeking more money[,] [n]or did the Receiver volunteer to gratuitously perform research, provide position statements, update the Kennedy report, or perform other tasks associated with the reasonable compensation issue." (*Id*.)  Rather, the Receiver asserts "virtually all of the work performed with respect to this issue resulted from compliance with orders or requests of the Court."  (*Id*.)

The Small Parties responded on January 24, 2018.  (Doc. No. 825.)  They again assert the Receiver and his counsel should not be compensated for any work relating to the Receiver's request for additional compensation, above and beyond his agreed hourly rate, asserting such work was "clearly non-compensable advocacy for [the Receiver's] own benefit."  (*Id*. at 1-7.) The Small Parties then assert both the Receiver and his counsel understated their billings for work performed regarding the issue of a potential award of additional compensation, as well as work performed to address the service issues raised in this Court's Order dated September 14, 2017 (Doc. No. 772).  They provide a detailed analysis of the Receiver's and his counsel's time

entries, essentially arguing the Receiver and his counsel spent thousands of dollars more on these issues than identified in response to the Court's January 8, 2018 Order.  (*Id.* at 8-33.)

Upon careful review, the Court finds neither the Receiver nor his counsel are entitled to professional fees incurred with regard to the Receiver's request for an award of additional compensation above and beyond the Receiver's agreed hourly rates.  Federal courts have consistently found that "time and effort spent and expenses incurred in proving [receivership] fees are not compensable." *W.L. Moody & Co., Bankers*, 374 F.Supp. at 490.  *See also In re Imperial '400' National, Inc.*, 432 F.2d 232, 239 (3rd Cir. 1970); *United States v. Larchwood Gardens, Inc.*, 420 F.2d 531, 534 (3rd Cir. 1970); *SEC v. Digges*, 2007 WL 4482572 at * 3 (M.D. Fla. Nov. 15, 2007); *Maiz v. Virani*, 2003 WL 22995233 at * 3 (N.D. Tex. Nov. 24, 2003); *In re Polycast Corp.*, 289 F.Supp. 712, 719-720 (D. Conn. 1968).  This conclusion stems from the general principle that receivers and their counsel should be reasonably compensated "for their efforts to *benefit the receivership estate*." *SEC v. Small Business Capital Corp.*, 2013 WL 2146605 at * 2 (N.D. Cal. May 15, 2013) (emphasis added).  *See also SEC v. Capital Cove Bankcorp, LLC*, 2016 WL 6078324 at * 5 (C.D. Cal. June 29, 2016) (reminding counsel that the goal of the Receiver and his professionals is to preserve the receivership estate "as best they can for the *benefit of the investors*") (emphasis added).  Because a receiver's efforts to secure compensation for himself and his counsel do not benefit the receivership estate (and, in fact, are to a certain degree contrary to the interests of the estate), courts have refrained from reimbursing receivers for such fees.[36]

---

[36] The sole case cited by the Receiver, *Ross v. Thomas*, 2011 WL 2207550 (S.D.N.Y. June 6, 2011) is distinguishable, as it did not involve a request for compensation for time spent

-43-

For the following reasons, it is recommended the Court find the Receiver and his counsel should not be compensated for professional fees relating to their request for an award of additional compensation in the instant matter.  It is undisputed these fees and expenditures were solely for the benefit of the Receiver and his counsel.  The substantial costs of these efforts provided no value to the Receivership Estate and, in fact, were directly contrary to the interests of the Plaintiff investors.  Under these circumstances, it is recommended the Court find considerations of equity weigh against requiring the Plaintiffs to bear the cost of the Receiver's efforts to obtain an award of additional compensation, above and beyond his agreed hourly rate.

The Court acknowledges the Receiver's argument that he undertook these expenditures at the request of the Court.  (Doc. No. 824.)  Nonetheless, in the exercise of its equitable discretion, the undersigned recommends the Court find the professional fees associated with the efforts of Receiver and his counsel to obtain this additional award of compensation (above and beyond the Receiver's agreed hourly rate) should not be borne by the Plaintiffs herein.  The Receiver undoubtedly achieved an unprecedented and extraordinary recovery in this action and, for his efforts, the undersigned recommends (as discussed in detail *infra*) that his hourly rates be retroactively increased to reflect this remarkable achievement.  However, the undersigned recommends the Court find that compensating the Receiver and his counsel for the substantial fees and expenses[37] incurred in researching, briefing, and arguing for this upward adjustment, is

seeking a "bonus."

[37] While the Court ordered the Receiver to research and brief the issue, it could not reasonably have been anticipated that the Receiver and his counsel would bill over $50,000 relating to this issue alone.

-44-

inequitable, contrary to the purpose and function of receiverships generally, and not appropriate under the particular circumstances presented.

The Court further recommends the Receiver and his counsel should not be compensated for any professional fees relating to work performed to address the Court's concern that the unrepresented investors had not been served with the Court's June 9, 2017 and August 22, 2017 Orders.  *See* Doc. No. 772.  As set forth *supra*, the Court received an email from an unrepresented investor indicating he was not served with certain Court Orders.  (Doc. No. 772-1.)  On September 14, 2017, the Court ordered the Receiver to file an affidavit setting forth the actions taken by him and/or his counsel to serve copies of the above Orders on all unrepresented investors in this action.  (Doc. No. 772.)  On September 25, 2017, the Receiver filed an affidavit, in which he stated that, due to a miscommunication with counsel, "[t]he Court's June 9, 2017 Order was not received by my office from counsel and, therefore, notice was not sent out as directed by the Court."  (Doc. No. 774 at ¶ 5.)  The Receiver's counsel, Mr. Glickman, confirmed in a separate affidavit that he inadvertently failed to send the Court's June 9, 2017 Order to the Receiver as directed by Judge Boyko.  (Doc. No. 773 at ¶ 7.)  As a result of the Receiver's failure to serve the unrepresented investors, the Court was required to conduct a supplemental hearing on November 16, 2017.  It is recommended the Court find the Receiver and his counsel should not be compensated for time spent either responding to the Court's September 14, 2017 Order, or preparing for and attending the November 16, 2017 hearing, as the expenses incurred relating thereto were the sole result of the Receiver's inadvertent and unfortunate failure to properly serve the unrepresented investors.

Having so recommended, the Court now turns its attention to determining the amount of

fees incurred by Receiver and his counsel regarding these issues.  As noted above, in their

Objection, the Small Parties identified total of $381,653.11 in fees that they believe appear to

relate to "bonus advocacy," of which $203,963.00 represents Receiver fees, and $177,690.11

represents fees incurred by the Receiver's counsel.  (Doc. No. 807.)  In response to this Court's

Order, Receiver submitted more detailed time entries, in which he identifies $57,797.00[38]

incurred by himself, his staff, and his counsel in pursuing an award of additional compensation

and addressing the service issues identified in this Court's Order dated September 14, 2017.

(Doc. No. 822.)

In response, the Small Parties assert the Receiver and his counsel failed to identify

numerous other billing entries that relate to a potential award of additional compensation and/or

the service issues discussed above.  (Doc. No. 825 at 8-34.)  They conduct an extensive analysis

of the Receiver's and his counsel's time entries, identifying numerous "suspect" entries which

they believe also relate principally to these issues.  (*Id.*)  Among other things, the Small Parties

identify several time entries (both from the Receiver and his counsel) which were not identified

---

[38] The Court arrives at this figure as follows.  As noted above, with regard to the work performed regarding the issue of a potential award of additional compensation, the Receiver asserts that, between January 2014 and September 2017, (1) he and his staff billed $7,899.50; and (2) his counsel billed $48,447.50; for a total of $56,347.00.  (Doc. No. 822 at 2-6.)  The Receiver next asserts he and his counsel billed a total of $3,027.50 responding to the notice issues raised in the Court's Order dated September 14, 2017, and preparing for and attending the supplemental hearing conducted by the undersigned on November 16, 2017.  (*Id*. at 7-8.)  Of this amount, $1,577.50 is also reflected in the previous category of billings, while $1,450.00 is not.  The figure arrived at by the Court above (i.e., $57,797.00) includes the sum of the professional fees identified in the first two categories set forth in the Court's January 8, 2018 Order; i.e., $56,347 in professional fees identified by the Receiver as relating to an award of additional compensation, as well as $1,450 in fees not already included in the first category that relate to work performed responding to the notice issues raised in the Court's September 14, 2017 Order and preparing for/attending the November 16,2017 supplemental hearing.

by the Receiver in his response to the Court's January 8, 2018 Order, but relate to the Court's

request the Receiver obtain an updated third-party report by Kennedy Consulting Research and

Advisory regarding the average hourly rate for receivers and staff for the years of the

Receivership.  The Small Parties claim the sole purpose of obtaining this report was to assist the

Court in determining whether to award additional compensation to the Receiver above and

beyond his agreed hourly rate.  Therefore, they assert, neither the Receiver or his counsel should

be compensated for time spent relating to the updated Kennedy Report.

Upon careful review, the Court finds as follows.  As noted above, the Receiver has

identified a total of  $57,797.00 in professional fees relating to the Receiver's request for an

award of additional compensation and/or work performed to address the notice issues raised in

the Court's Order dated September 14, 2017 and prepare for and attend the supplemental hearing

conducted by the undersigned on November 16, 2017.  (Doc. No. 822.)  It is recommended the

Court find, in the exercise of its equitable discretion, that this amount be deducted from the

Receiver's Fee Application.

In addition, the Court has reviewed the arguments and additional billing entries identified

 by the Small Parties.  With regard to the majority of these entries, the Court is not persuaded the

activities described in these entries, in fact, relate to the Receiver's request for additional

compensation above and beyond his agreed hourly rate.  Indeed, most involve "distribution

issues," which the Court does not agree is an indicator that the time spent is necessarily related

to "bonus advocacy" as claimed by the Small Parties.  Rather, as the Receiver has asserted (Doc.

No. 822 at 9), the work described in these entries appears to have involved research and other

work relating to the Receiver's proposed plans to distribute approximately $25 million from the

IPOF Fund.  However, the Court does agree with the Small Parties that all time entries relating

to obtaining and reviewing the updated Kennedy Report (sometimes referred to as the "ARPC"

report) relate solely to the issue of a potential award of additional compensation and are,

therefore, not compensable.[39]  The Small Parties identify the following time entries relating to

the updated Kennedy Report that were not identified by the Receiver in response to the Court's

January 8, 2018 Order:

1.   June 18, 2014 entry by M. Dottore for time spent reviewing email from
     ARPC regarding expert report.  Total $452.33[40]

2.   June 23, 2014 entry by D. Linscott for work on Receiver's report to
     court regarding updated ARPC report.  Total $927.50

3.   July 1, 2014 entry by D. Linscott for meetings and conference calls
     relating to ARPC report.  Total $1,351.50

4.   July 10, 2014 entry by D. Linscott for correspondence with ARPC
     regarding addendum report.  Total $583.00

5.   September 30, 2014 entry by D. Linscott for attention to expert report
     and issues.  Total $344.17[41]

6.   October 3, 2014 entry by M. Dottore for ARPC report and issues

---

[39] In this regard, the Court notes that, in his Response to the Court's Order dated January 8, 2018, the Receiver himself identifies several time entries specifically relating to the "ARPC" report, thus acknowledging work performed relating to the Kennedy Report relates to the Receiver's request for an award of additional compensation.  *See* Doc. No. 822-1 at 1.

[40] This time entry bills $1,357 for work performed on three issues: the Huntington Bank matter, the ARPC report, and "distribution issues."  (Doc. No. 825 at 13-14.)  As the Kennedy (i.e., ARPC) report represents only one of three issues on this date, the Court attributes one third of the total billing amount for that date to the ARPC report, or $452.33.

[41]  This time entry bills $1,032.50 for work performed on three issues: the ARPC report, a meeting with Judge Boyko, and "Regalbuto issues."  (Doc. No. 825 at 14.)  As the Kennedy (i.e., ARPC) report represents only one of three issues on this date, the Court attributes one third of the total billing amount for that date to the ARPC report, or $344.17.

-48-

relative to same.  Total $1,003.00

7.    June 20, 2014 entry by R. Glickman for reviewing Judge's Order and meeting with client regarding updated report.  Total $500

8.    June 26, 2014 entry by R. Glickman for additional updated expert report.  Total $600

9.    June 30, 2014 entry by R. Glickman for preparing for meeting with expert.  Total $1,200

10.   June 25, 2014 entry by M. Kucharson for review and analysis of Third Party expert report pursuant to Rule 26 of Comparable Average Hourly Billing Rates Compiled by Kennedy Consulting Research & Advocacy.  Total $90

(Doc. No. 825 at 13-14, 25-26, 31.)  The sum of the above time entries is $7051.50.  It is recommended the Court find, in the exercise of its equitable discretion, that this additional amount also be deducted from the Receiver's Fee Application.

In addition, the Small Parties identify several billing entries by counsel for the Receiver that charge for time spent reviewing the Small Parties' and Plaintiff Gordon and Teresczuk's filings dated March 20, 2017.  (Doc. No. 825 at 27.)  These Plaintiffs' filings relate solely to the issue of a potential award of additional compensation to the Receiver and, thus, it is recommended the Court find time spent by Receiver's counsel reviewing and responding to these filings is not compensable.  The Small Parties identify three such time entries, each of which is for time spent by R. Glickman on March 20, 2017.  (*Id.*)  These entries represent total billings of $1,200.

Finally, the Small Parties identify additional billing entries they believe relate to addressing the notice issues identified in this Court's Order dated September 14, 2017.  (Doc. No. 825 at 32.)  Of these three, the first (dated August 2, 2017) precedes the Court's September

-49-

14, 2017 Order and is, therefore, not responsive to the Court's request.  The second (dated September 14, 2017) was already identified by the Receiver in his Response to the Court's Order dated January 8, 2018.  (Doc. No. 822-1 at 2.)  The third and final entry (dated September 15, 2017), however, does appear to relate to the notice issues identified in the Court's Order dated September 14, 2017 and was not identified by the Receiver in response to the Court's January 8, 2018 Order.  This entry is for time charged by D. Linscott for "attention to service list issues" on September 15, 2017, for a total charge of $560.00.  (Doc. No. 825 at 32.)  It is recommended the Court find, in the exercise of its equitable discretion, that this additional amount also be deducted from the Receiver's Fee Application.

Accordingly, and for all the reasons set forth above, it is recommended the Court find, in the exercise of its equitable discretion, that the total amount of $66,608.50[42] be deducted from the Receiver's Fee Application for professional fees relating to the Receiver's request for an award of additional compensation and/or work performed to address the notice issues raised in the Court's Order dated September 14, 2017 and prepare for and attend the supplemental hearing conducted by the undersigned on November 16, 2017.[43]

It is further recommended the Court find, in the exercise of its equitable discretion, that the Receiver and his counsel should not be compensated for professional fees incurred by the Receiver, his staff, and/or his counsel relating to a potential award of additional compensation,

---

[42] This figure is the sum of the deductions recommended above; i.e., $57,797.00 plus $7,051.50 plus $1,200.00 plus $560.

[43] Of this total amount, $13,801.00 consists of fees incurred by the Receiver; and $52,807.50 consists of fees incurred by counsel for the Receiver.

above and beyond the Receiver's agreed hourly rate, in any future Fee Applications for the time

period post-dating the Receiver's Fee Application for the period January 2014 through

September 2017.

### 2.    Objections to Amounts of Remaining Fees and Expenses

*Pro se* Plaintiffs Sheldon Gordon, Michael B. Regalbuto, and Joseph Regalbuto also filed

Objections to the Receiver's Fee Application for the period January 6, 2014 through September

30, 2017.  (Doc. Nos. 809, 810-1.)  The Court notes these Objections were filed on November

17, 2017, one day after the objection deadline set by Judge Boyko in his Order dated October 19,

2017.  (Doc. No. 778.)  Although they are untimely, in light of these Plaintiffs' *pro se* status, the

Court will nonetheless consider the arguments raised in these particular Objections, below.

The Receiver did not timely file a response to these Plaintiffs' Objections.  However, on

January 16, 2018, the Court issued an Order expressly stating as follows: "If the Receiver wishes

to be heard with respect to the issues raised [in these *pro se* Objections], he may address them in

his written statement, due no later than noon on Friday, January 19, 2018."  (Doc. No. 821 at 6.)

The Receiver filed his written statement on that date in which he purported to address these

Plaintiffs' Objections.  (Doc. No. 824 at 6-11.)  A review of the Receiver's statement, however,

indicates it fails to meaningfully address any of the specific arguments raised by these Plaintiffs,

discussed below.  (*Id*.)

Plaintiffs first argue the Receiver's billings with regard to the sale of the Innotrac stock

are excessive.  (Doc. No. 809 at 2; Doc. No. 810-1 at 1.)  They argue "[a]fter the sale of

Innotrac stock [in December 2013], the Receiver still charged us over $228,000 to deal with

issues related to the stock sale, while the law firm of McCarthy Lebit charged us over $59,000

and Calfee Halter charged over $6,000."  (Doc. No. 810-1 at 1.)  Plaintiffs assert this is excessive, "extremely questionable," and constitutes a "clear violation of the Receiver's fiduciary responsibility to protect receivership assets."  (Doc. No. 809 at 2; Doc. No. 810-1 at 1-2.)

The Court disagrees.  Upon careful review of the Receiver's Fee Application, the Court finds the professional fees incurred by the Receiver and his counsel with regard to the Innotrac stock issue to be reasonable.  While Plaintiffs question the necessity and scope of the professional fees incurred after the Court granted final approval of the Innotrac stock sale, a review of the Receiver's and his counsel's time entries indicate numerous issues remained to be addressed in the months following the sale.  These issues related to effectuating the stock transfer, determining brokerage fees and commissions, assessing potential tax consequences, and communications with the Court and investors regarding the same.  Given the fact this sale involved over 4.3 million shares of stock at a purchase price of over $35 million, it is neither surprising or unreasonable that substantial professional fees were incurred in the weeks following final approval of the sale.  Upon careful review, the Court finds the Receiver's and his counsel's fees relating to the Innotrac stock sale to be reasonable under the circumstances.[44]

Plaintiffs next argue the Receiver's billings with regard to the Huntington Bank

---

[44] Plaintiffs do not articulate how they arrive at the conclusion that the Receiver and this team billed $293,000 in fees relating to the Innotrac stock sale.  The Court is not convinced the Plaintiffs' estimate is accurate.  Nonetheless, the Court has independently reviewed the time sheets of the Receiver and his counsel and find the fees billed relating to this issue to be reasonable.

litigation[45] are excessive.  (Doc. No. 809 at 2; Doc. No. 810-1 at 2.)  They assert the Receiver

and his counsel charged $858,000 to pursue this litigation, but then settled the matter for

$650,000, resulting in "a  net loss to the investors of over $200,000."  (Doc. No. 809 at 2-3.)

Plaintiffs claim "only the Receiver and the attorneys profited from this litigation."  (*Id*.)

The Court finds this argument without merit.  As an initial matter, the Plaintiffs, again,

do not explain how they arrive at the conclusion that the Receiver and his counsel billed

$858,000 regarding the Huntington Bank litigation between January 2014 and September 2017,

citing no specific time entries and offering no further explanation.  Moreover, while Plaintiffs

state generally the professional fees incurred are excessive, they do not articulate any specific

examples of allegedly excessive billing entries or otherwise offer a reasoned explanation as to

why they believe the professional fees incurred relating to this matter are unreasonable.  Instead,

Plaintiffs appear to base their argument solely on the fact that the dollar amount of Huntington

Bank settlement ($650,000) was allegedly less than the amount of professional fees incurred by

the Receiver and his counsel relating to this litigation.

Assuming *arguendo* the professional fees incurred in addressing the Huntington Bank

litigation exceeded the settlement amount, it does not automatically follow the Receiver and his

---

[45] On November 10, 2009, the Receiver filed a separate lawsuit in this Court against Huntington National Bank, alleging Huntington breached its duty of care to the fund investors and aided Dadante in committing fraud.  *See Dottore v. Huntington National Bank*, Case No. 1:09cv2636 (N.D. Ohio).  Several years later, with approval of the Court, the Receiver filed an Amended Complaint adding claims for negligence, fraud, and civil conspiracy.  *Id*. at Doc. No. 61.  In November 2015, after extensive discovery and motion practice, the Receiver filed a motion for approval of a settlement with Huntington for $650,000.  *Id*. at Doc. No. 93.  The Receiver's motion was unopposed and granted by the Court on January 26, 2016.  *Id*. at Doc. No. 95.

counsel should not be compensated for their efforts.  As set forth above, in evaluating receiver compensation, an appointing court has "considerable discretion" to fashion a fee award "based on *all* the circumstances surrounding the receivership."  *See Small Business Capital Corp.*, 2015 WL 432217 at * 1; *W.L. Moody & Co., Bankers*, 374 F.Supp. at 480 (emphasis added). Applying this principle here, the Court finds it would not be appropriate to view the outcome of the Huntington Bank litigation in isolation from the overall context and result of the Receivership as a whole.  In that regard (as has been, and will further be, discussed in this decision), it is undisputed the Receiver and his team's success in this matter was extraordinary, as evidenced by the fact the Plaintiff investors recovered an unprecedented 110% of their initial investments.  While Plaintiffs Gordon, Michael Regalbuto, and Joseph Regalbuto may be disappointed with the outcome of the Huntington Bank litigation in particular, the Court finds it would not be equitable to reduce the Receiver's compensation on this basis in light of the tremendous success of the Receivership as a whole.

Plaintiffs Michael and Joseph Regalbuto next assert the professional fees attributed to the Receiver's accountant, Dave Linscott, are excessive.  (Doc. No. 810-1 at 3.)  They maintain Mr. Linscott "charged over $117,000 to 'update the investor database,' work on the third distribution, and perform the year-end accounting for the receivership."  (*Id*.)  Plaintiffs assert they "cannot fathom how that many hours and that much money could be spent on these activities," arguing "the investor data didn't change much over the 3+ year period and calculating the distribution amount seems like it should be a pretty simple task of just dropping a number into a spreadsheet that was created for the first two distributions."  (*Id*.)  Plaintiffs further question why these tasks were performed by Mr. Linscott (who billed at an hourly rate of

$265 to $280) and assert "the vast majority of these activities could have been performed by someone at a billing rate well below $90 per hour."  (*Id*.)

The Court finds this argument without merit.  Contrary to Plaintiffs' assertions, the Receiver's recommendation regarding the third distribution was not a simple matter of "dropping a number into a spreadsheet."  Rather, the Receiver expended significant time and effort calculating an appropriate method to compensate the investors for the loss of earnings on their money, as follows:

> To evaluate whether the proposed bonus is reasonable and sufficient, the Receiver has calculated the loss of earnings and the cumulative investor net loss using a time value of money theory commonly used in practice by professionals (Exhibit B).  The calculation yielded a loss of earnings of approximately $2,000,000 which represents the sum of the risk free after tax rate of return the investors could have earned on their money from 2005 (the date that the fraud was discovered) to 2014.  The calculation incorporated the tax benefits and distributions investors received during the Receivership.
>
> The Receiver also calculated a cumulative investor net loss to evaluate the overall reasonableness of the investor's position.  The total proposed distribution of $26,960,280 is subject to income taxes at the investor level, therefore, the after tax benefit was compared to the calculated cumulative investor net loss to determine if the total proposed distribution is sufficient compared to the position the investors could have otherwise attained investing their losses on an after tax risk free basis.
>
> The after tax distribution equals $20,220,210. The actual income tax rates for each investor vary, therefore, the Receiver performed a  sensitivity analysis on the assumed income tax rate by applying tax rates of 40% and 10% to all of the calculations. Those results are summarized at the bottom of Exhibit B.
>
> The Receiver proposes to distribute a bonus that is in excess of the calculation for "loss of earnings" and believes the bonus to be reasonable and sufficient to compensate the investors for their loss of earnings. In addition, the proposed total after tax distribution to the investors exceeds the calculated cumulative net losses for the period of the Receivership. Based on these calculations, the Receiver believes that the investors will be sufficiently reimbursed for the "loss of the use of their money" under the Receiver's

-55-

proposed distribution to IPOF Fund investors.

(Doc. No. 581 at 2-3.)  In light of the above, and upon careful review of the Receiver's time

entries, the Court finds the professional fees attributed to Mr. Linscott during the relevant time

period are reasonable.[46]

Lastly, Plaintiffs object to the increase in the hourly rate of counsel for the Receiver,

Robert Glickman.  (Doc. Nos. 809 at 3; 810-1 at 3.)  They note that, in May 2014, Mr. Glickman

billed at an hourly rate of $400.  In June 2014, however, he "gave himself a raise to $500 per

hour," which Plaintiffs correctly note is a 25% increase.  (*Id*.)  Plaintiffs argue a raise of this

magnitude is excessive and led to "over $40,000 of additional charges by Mr. Glickman during

the time period in question."  (*Id*.)

Although expressly provided an opportunity to do so, the Receiver failed to address this

issue in his statement filed January 19, 2018.  (Doc. No. 824.)  He offers no explanation for the

sudden increase in his hourly rate,[47] nor does he contest Plaintiffs' assertion that this increase led

to "over $40,000 in additional charges . . .during the period in question."  (Doc. No. 809 at 3.)

---

[46] In this regard, the Court also finds it was not unreasonable for Mr. Linscott himself to undertake these activities (rather than "someone with a billing rate of $90 per hour"), due to the complexity of the issues involved.

[47] A review of the Receiver's Fee Applications over the years indicates the increase in counsel's hourly rate from $400 to $500 is uncharacteristically large.  Specifically, the record reflects Mr. Glickman's hourly rate increased from $315 in July 2006 to $325 by January 2007; $340 by August 2007; $350 by January 2009; $375 by April 2011; and $400 by January 2014. *See, e.g.*, Doc Nos. 352-3 at 210, 366;  372-1 at 107; 454-1 at 45; 546-1 at 30-31; 633-1 at 41. Thus, throughout the majority of this litigation, Mr. Glickman's hourly rate increases tended to be in the range of $10 to $25.  In June 2014, however, his hourly rate suddenly increased by $100, from $400 to $500.  (Doc. No. 796-2 at 25-26.)  In the absence of any explanation for an increase of this magnitude, the Court cannot assume it to be reasonable, particularly given Mr. Glickman's previous pattern of much smaller, incremental increases.

-56-

The party seeking a fee award bears the burden of proving the reasonableness of the hourly rates claimed.  *Hensley*, 461 U.S. at 437.  *See also Lonardo v. Travelers Indem. Co.*, 706 F.Supp.2d 766, 792  (N.D. Ohio 2010).  Given the fact he failed to respond in any fashion regarding this issue, the Court finds counsel for Receiver has failed to carry his burden of demonstrating his $500 hourly rate is reasonable.  Moreover, counsel for the Receiver has not challenged Plaintiffs' assertion this rate increase resulted in $40,000 in additional charges during the period in question.  Accordingly, and in light of the fact this argument is unopposed, it is recommended the Court find counsel for Receiver is not entitled to compensation at an hourly rate of $500.  It is further recommended that, in addition to the amount set forth above in Section IV.A.1, an additional $40,000 be deducted from the fees incurred by McCarthy, Lebit, Crystal & Liffman as set forth in the Receiver's Fee Application (Doc. No. 795).

Accordingly, it is recommended the Receiver's Application for Fees (Doc. No. 795) be granted in part and denied in part as follows.  It is recommended a total of $106,608.50 be deducted from the Receiver's Fee Application, consisting of $13,801.00 in  Receiver fees and $92,807.50 in fees incurred by the Receiver's counsel.

### B.  Award of Additional Compensation

The sole remaining issue in this case is whether the Receiver should be awarded additional compensation above and beyond his agreed hourly rate, in light of the Kennedy Report's conclusions on the hourly rates paid Receivers in general.  (Doc. No. 755.)  On August 1, 2017, in response to an Order issued by Judge Boyko, several parties submitted Position Statements regarding this issue.  (Doc. Nos. 758, 759, 760.)  Judge Boyko conducted a hearing on the matter on August 14, 2017.  Numerous unrepresented investors subsequently submitted

letters to the Court, detailing their strong objection to any award of additional compensation to the Receiver.  (Doc. Nos. 779, 781, 782, 783, 785-794, 797-806, 809, 810.)

On November 16, 2017, the undersigned conducted a supplemental hearing.  (Doc. No. 813.)  Several unrepresented investors spoke at the hearing and voiced their objection to any such award.  (*Id.*)  The Court also heard rebuttal argument from counsel for the Small Parties, the Minotti Family Limited Partnership, and the Receiver.  (*Id.*)  In resolving this issue, the Court will confine its review to the position statements and letters noted above, as well as the arguments raised during the August 14, 2017 and November 16, 2017 hearings.[48]

In his Position Statement, the Receiver argues "this Court has discretion to increase the Receiver's fees and . . . such an increase would be particularly appropriate in this case."  (Doc. No. 760 at 1.)  He asserts the Court should, first and foremost, consider the "extraordinary, one-of-a kind result" achieved in this matter, asserting that "through creativity, patience, and uncommon determination, he not only recovered funds sufficient to reimburse all investors for 100% of their net cash losses, but also recovered excess funds enabling the Receivership to pay those investors a 10% return on their principal investments." (*Id.* at 3.)  In this regard, the Receiver emphasizes his success in negotiating complex settlements with the stakeholder defendants, as a result of which he obtained substantial cash settlements and "free and clear"

---

[48] The Court also notes that, in addition to the arguments raised in his Position Statement, the Receiver filed a brief regarding this issue in March 2014.  (Doc. No. 576.)  Moreover, both the Small Parties and Plaintiffs Gordon and Teresczuk filed briefs in April 2014 opposing the Receiver's request for an award of additional compensation above and beyond his agreed hourly rate. (Doc. Nos. 589, 594.)  At that time, a number of unrepresented investors submitted letters opposing such an award.  (Doc. No. 600.)  In resolving this issue, the Court has also considered the arguments raised in these briefs and letters, which were discussed at length *supra* in this Report & Recommendation.

ownership of the vast majority of the Innotrac stock. (*Id*.) He details his successful strategy regarding the Innotrac stock, as well as the substantial effort involved in negotiating a block sale of that stock. (*Id*.) Moreover, the Receiver reminds the Court of the "roadblocks erected by uncooperative and actively hostile interested parties," and argues his ability to deliver a successful outcome despite these impediments weighs in favor of an increase in fees. (*Id*. at 5.)

The Receiver also highlights his skill, experience, reputation and professionalism as a factor to be considered in evaluating an increase in compensation. (*Id*. at 6.) He notes his substantial experience as a court-appointed receiver in this region, as well as the fact he was asked to joint the National Association of Federal Equity Receivers, an invitation-only organization made up primarily of individuals who have been asked by federal agencies to serve as receivers in complex cases. (*Id*. at 8.) Finally, the Receiver asserts the Receivership Estate has sufficient assets from which an increase in compensation can be funded, noting the Receivership's remaining cash balance is $5,081,568.71. (*Id*. at 9.)

Plaintiffs Gordon and Teresczuk submitted a Position Statement on August 1, 2017. (Doc. No. 758.) Therein, these Plaintiffs assert "no legal basis exists to provide the Receiver with any additional compensation." (*Id*. at 4.) To the contrary, Plaintiffs maintain "the case law that exists expressly rejects that notion," citing *Maiz v. Virani*, 2003 WL 22995233 at * 3 (N.D. Tex. Nov. 24, 2003) an unreported decision from the Northern District of Texas in which the court declined to award a Receiver a "final fee" based on the success of the Receivership. (*Id*. at 5.) These Plaintiffs assert " while the case law relied upon by the Receiver recognizes the discretion of the court in awarding compensation to a receiver, in general, that discretion has been limited to allowing a court to reduce fees or, where a Receiver has expressly undercharged,

-59-

to allow a court to increase fees so that the receiver is receiving his standard, market hourly rates." (*Id.* at 6.)  They note, here, the Receiver's hourly rates have increased 30% from the inception of the case through April 2014; the Receiver provided no discounts from his regular hourly rates; and the Receiver never indicated to Plaintiffs or the Court that he thought his fees were too low or that he would seek additional fees for work already paid for by the Receivership Estate. (*Id.* at 3.)  Under these circumstances, these Plaintiffs assert there is no basis for providing additional compensation to the Receiver.

Finally, Plaintiffs Gordon and Teresczuk argue "one critical aspect that appears to have been overlooked is the undisputed fact that any money in the Receivership Estate is the property of the investors, who solely bore all of the previous risk and are entitled to any potential monetary benefits that exist in the Receivership Estate." (*Id.* at 3.)  They maintain the fact they have recouped their principal plus 10% interest "does not make them whole," as it fails to "make up for the loss of the use of their funds for many in excess of 15 years."[49] (*Id.*)

---

[49] Plaintiffs Gordon and Teresczuk also raise objections regarding "the validity of the processes and protocols with respect to the Receiver securing his fees and the fees of his service providers," arguing these processes resulted in a "lack of transparency and timely financial reporting" throughout the course of this entire litigation. (*Id.* at 4.)  As noted previously, in an Order dated October 19, 2017, Judge Boyko expressly overruled any objections regarding the reporting methods/protocols and amounts of fees and expenses incurred prior to the sale of the Innotrac stock. (Doc. No. 778.)  Thus, the Court will not address these issues to the extent they relate to the time period pre-dating the Innotrac stock sale.  With regard to the period post-dating the sale of that stock, Judge Boyko ordered the Receiver to submit a full accounting of all fees and expenses from the date of the sale of the Innotrac stock to the present. (Doc. No. 778.)  Any objections to the Receiver's fees during this time period were required to be based on the Receiver's Fee Application submitted in response to Judge Boyko's Order, and "all prior objections" were deemed moot. (*Id.*)  The Receiver filed his Application for Fees in response to Judge Boyko's Order, on October 31, 2017. (Doc. No. 795.)  As Plaintiff Gordon and Teresczuk's Position Statement (Doc. No. 758) was submitted on August 1, 2017, well prior to the Fee Application submitted by the Receiver, the undersigned will not consider any fee

-60-

In their Position Statement, the Small Parties similarly argue there is no legal basis to award the Receiver additional compensation.  (Doc. No. 759.)  They assert the Receiver has already been fairly compensated and, therefore, a bonus would be inappropriate and unsupported by federal case law.  (*Id*. at 5-6.)  In addition, the Small Parties maintain they (and other plaintiff investors) "have operated for years under the understanding, as per Judge O'Malley's orders, that the Receiver's compensation would be based upon a fixed hourly rate, and that no additional compensation would be provided outside of this metric."  (*Id*. at 2.)  They claim they "relied on Judge O'Malley's Orders regarding the Receiver's fee requests including the fact that the Receiver was to be paid an hourly rate without any contingency or recalculation, in making determinations as to how they would or would not proceed in this case."  (*Id.* at 3.)  The Small Parties assert, if the Court increases the payment to the Receiver, the Plaintiff Investors will have been "unfairly prevented from factoring the true cost of the Receivership into their decisions as to how to proceed throughout this matter."  (*Id.*)

Finally, the Small Parties argue the "Kennedy Report does not provide any grounds to award the Receiver bonus compensation, even if there were legal authority supporting such a *post hoc* increase in compensation, which there is not."  (*Id*. at 1.)  They claim the Kennedy Report does not reflect fees generally paid to receivers in this area and "as such, is not an accurate measure of what sort of hourly fee a typical receiver in this area can fairly command."  (*Id*.)  Relying on Mr. Lane's expert report, the Small Parties argue the Court "should decline to

---

objections raised therein.  As noted *supra*, the Court has, however, considered the arguments raised in Plaintiff Gordon's *pro se* objections to the Receiver's Fee Application, despite the fact it was filed one day late, on November 17, 2017.  (Doc. No. 809.)

award the Receiver additional compensation because he has already been paid an hourly rate near the high end of the range for receivers in this area."[50]  (*Id*. at 2.)

Plaintiff Minotti Family Limited Paternship (hereinafter "the Minotti Family") filed a Position Statement on October 30, 2017.  (Doc. No. 785.)  Like the other Plaintiffs noted above, the Minotti Family opposes an award of additional compensation to the Receiver.  (*Id*. at 2.) They assert "the Receiver here took on no risk in connection with this assignment, and has already been handsomely compensated on an ongoing basis throughout the 12-year life of these proceedings for doing the job he was engaged to do, at an ever-increasing hourly rate (from $195, up to $295 per hour by the end of 2015, and $325 per hour for 2016-2017)."  (*Id*.)  The Minotti Family argues there is no legal basis for awarding fees in excess of "the previously agreed and ordered hourly compensation," and that to do so in this case would result in an "unprecedented windfall."  (*Id*.)  Finally, while the Minotti Family recognizes it recouped 110% of its $1 million investment in the IPOF Fund, it argues "it has still not been fully compensated for the amount it would have obtained through compounding by investing the same $1 million in even one-year bank certificates of deposit over the same period of time, let alone a comparable

---

[50]  The Small Parties also argue "to the extent that the Court considers Beverly Dadante's request for a distribution of $160,745.03 held by the Receiver pursuant to the Court's February 23, 2006 Order (Doc. No. 58) as part of its disposition of any 'dispute over fees incurred by the Receiver (Doc. No. 755),' the Small Parties object to any such distribution." (Doc. No. 759 at 6-7.)  The record reflects Ms. Dadante twice moved for release of assets in the amount of approximately $160,000 (Doc. Nos. 534, 580), and both motions were denied.  (Doc. Nos. 550, 649.)  Ms. Dadante then moved for Fed. R. Civ. P. 54(b) Certification to file an interlocutory appeal, which this Court denied.  (Doc. No. 659.)  Ms. Dadante then filed a Petition for Writ of Mandamus in the Sixth Circuit, which was denied on June 9, 2017.  (Doc. No. 756.)  A review of this Court's docket shows no further filings on this issue by Ms. Dadante subsequent to the Sixth Circuit's denial of mandamus.  Thus, the undersigned will not address the Small Parties' argument with respect to this issue.

legitimate investment." (*Id*. at 1.)

Finally, numerous plaintiff investors filed *pro se* letters opposing an award of additional compensation (or "bonus") to the Receiver.  (Doc. Nos. 779, 781, 782, 783, 785-794, 797-806, 809, 810.)  The Court has carefully reviewed each and every one of these letters.  Although the Court will not discuss each letter individually in this decision, several common arguments and themes are raised in these investors' statements.  Many of the Plaintiff investors argue the Receiver has already been fully compensated for his work in this matter and should not be awarded a bonus simply for doing the job he was hired to do.[51]  *See e.g*, Doc. No. 782, 789, 798, 799, 804, 805.  A number of Plaintiffs decry the Receiver's allegedly excessive billing practices, citing specific examples over the many years of this case of alleged improprieties in his charges. *See e.g.*, Doc. Nos.  783, 787, 800, 802.  As one investor asserted, "[a]s far as I'm concerned [the Receiver] already received his bonus just from all the hours they charged for 12 years."  (Doc. No. 790.)

Numerous investors also questioned whether the Receiver's efforts had anything to do "with getting our money back" or the successful sale of the Innotrac stock.[52]  (Doc. No. 783, 789,

_____

[51] One investor argued: "Does a prominent doctor save a patient's life, beating the high possibility of death, turn to the family and say, 'Since I did such a good job here, I want additional payments for a job well done.' Does a plumber find that impossible leak, fix it, then put on the invoice his hourly wage with a bonus for doing a good job? Finally does an employee at a gas station who's friendly, trustworthy, and valuable take from the cash drawer and demand, 'I'm owed this in addition to my pay because I feel I have performed a good job. I will hold and not spend it until I am told otherwise.' Across our employed environment this would be viewed as a complete and utter absurdity as well as illegal and unethical."  (Doc. No. 798.)

[52] With regard to the sale of Innotrac stock, one investor argued: "The fact is he and we got lucky! * * * Innotrac worked hard to build their brand, expand their markets, manage their expenses, and increase their profits.  After 5 years, the result of their efforts was a much higher

-63-

794, 800. )  Many emphasized it would be grossly unfair to increase Receiver's compensation in light of the fact Judge O'Malley specifically promised the Receiver was only to be paid an "hourly rate, nothing more, nothing less."  (Doc. No. 788, 790, 797, 802.)  Another investor took issue with the Kennedy Report, arguing it does not reflect hourly rates of receivers (as opposed to "management consultants") and, further, does not offer an opinion regarding typical receiver rates in this region.  (Doc. No. 783.)  Nearly all of the Plaintiff investors implored the Court to understand they have suffered greatly over the years and have not been made whole, while the Receiver has been paid millions of dollars.  *See e.g.*, Doc. No. 789, 792.  One investor, in particular, asked the Court to show "compassion for us at the end of this long journey."  (Doc. No. 793.)

It is against this backdrop and with due consideration to all the arguments raised by the Plaintiffs (both represented and unrepresented) that the Court considers (1) its authority to award additional compensation to the Receiver above and beyond his agreed hourly rate; and (2) whether such an award would be warranted under the particular circumstances presented herein.

### 1.    Authority to award additional compensation

This Court has already indicated "it has the authority to adjust the compensation of the Receiver to reflect a reasonable hourly rate in light of the obstacles encountered during the pendency of the receivership and the recovery achieved." (Doc. No. 612 at 2.)  As discussed below, this legal conclusion is well supported by federal case law.

It is undisputed that the determination of compensation for a receiver "is left entirely to

---

stock price.  None of this has to do with the Receiver.  Why is he trying to take credit for other people's success?  He's been paid millions already." (Doc. No. 783.)

the determination of the court from which he receives his appointment."  *Stuart,* 133 U.S. at

81–82.  *See also Gaskill*, 27 F.3d at 253; *Code Products Corp*., 362 F.2d at 673; *Byers*, 590 F.

Supp.2d at 644.  *See also Harris*, 2016 WL 1555773 at *9 ("The amount of compensation to be

awarded a court-appointed receiver is within the Court's discretion.").  Indeed, in the

receivership context, courts have emphasized the appointing court has "considerable discretion"

to fashion a "fee award that is appropriate under the circumstances."  *Small Business Capital*

*Corp.,* 2015 WL 432217 at * 1.  *See also In re Alpha Telecom, Inc*., 2013 WL 840065 at * 17

(same); *Striker Petroleum, LLC*, 2012 WL 685333 at * 2 ("The award of fees in a receivership is

entrusted to the discretion of the district court."); *Debt Advocacy Center, LLC*, 2012 WL

13026963 at * 3.

　　　　In exercising this discretionary power, courts are guided by the principle that receivers

should be "reasonably compensated" for their efforts to benefit the receivership estate.  *Small*

*Business Capital Corp*., 2013 WL 2146605 at * 2**.**  Federal courts have broad authority to

consider the facts and circumstances of each particular case in determining what constitutes a

"reasonable compensation."  As one court noted, "[i]n general, a reasonable fee is based on all

circumstances surrounding the receivership."  *W.L. Moody & Co., Bankers*, 374 F.Supp. at 480.

"Accordingly, although authorities provide convenient guidelines, the unique fact situation of

each case renders direct reliance on precedent impossible."  (*Id*.)  Based on these authorities, it is

clear that, in determining a reasonable compensation for a receiver, the appointing court has the

inherent authority to fashion compensation that takes into account the unique circumstances of

that particular case.

　　　　Notably, nothing in these general principles suggest an appointing court is only permitted

-65-

to decrease a receiver's compensation, as Plaintiffs herein have suggested.  Indeed, the legal principle advocated by Plaintiffs in this case (i.e., that an appointing court is not legally permitted to increase a receiver's compensation) is directly contrary to the discretionary nature of the Court's equitable authority in this regard, including its ability to consider the unique facts and circumstances of each case in determining what is "reasonable."

Plaintiffs nonetheless insist the Receiver's request for an award of additional compensation above and beyond agreed hourly rate should be denied because he has cited no cases in which such an award has been made.  Rather, these Plaintiffs assert virtually every court to decide the issue has exercised its discretionary authority to *decrease* a receiver's compensation.  However, in cases where a court decreased a receiver's compensation, the court did so (at least in part) on the basis that the results achieved had been "poor" and the investors had not recovered anywhere near their full investment.  *See e.g., Harris*, 2016 WL 1555773 at * 15 (reducing receivership team compensation because, although the receivership "was complex and required much time, labor and skill, . . . it reached a poor result after an unreasonably long time"); *Code Products,* 362 F.2d at * 673-674 (reversing district court award of "additional fee" where "'the result obtained, a critical factor to be considered in the allowance of fees, was in the minus column on the performance score cards of the Receiver and his counsel"); *In re Alpha Telecom*, 2013 WL 840065 at * 19 (reducing receiver and counsel fees by 25% due to "meager result ultimately obtained in this matter.")

In the instant case, however, it is undisputed the Plaintiff investors recovered 110% of their investment, which this Court has described as an "extraordinary recovery," "unheard of in matters of this type," and potentially "one of the largest of its kind involving a fund that was the

-66-

victim of  Ponzi scheme."  (Doc. No. 559 at 3.)  Indeed, none of the parties to this action have directed this Court's attention to any other receivership relating to a Ponzi scheme in which the investors recouped more than 100% of their original investment.  Based on the undersigned's research, the recovery achieved by the Receiver and his counsel in this matter is, in fact, truly extraordinary and without precedent in this context.

As a recovery of this nature is so unusual, it is not surprising there are few examples of court decisions increasing a receiver's compensation.  The fact that it is *uncommon* for courts to be presented with a situation where an increase in compensation is warranted, however, does not mean an appointing court is *without legal authority* to award a receiver additional compensation where the unique facts and circumstances of a particular case warrant such an award.  In fact, in analogous circumstances, several courts have exercised their discretionary authority to increase an award of compensation where warranted under the particular circumstances presented.

For example, in *In re Wright Airlines, Inc.*, 147 B.R. 20 (N.D. Ohio 1992), the bankruptcy court awarded a Chapter 7 Trustee's attorney[53] a 25% fee enhancement based on the "extraordinary" services rendered and results achieved.  In that case, the Trustee opposed the request, arguing "such a premium should be disallowed as the Applicant achieved results which he was hired to accomplish."  *Id*. at 21.  The court rejected this argument, explaining as follows:

> In addressing fee enhancement issues in nonbankruptcy fee shifting cases, the U.S. Supreme Court held that fee enhancements could not be based on the complexity, novelty, special skill, experience, quality, or the results obtained, as those factors

[53] Although the *Wright Airlines* case is a bankruptcy case, the Court finds it relevant due to the similarities between equitable receivers and trustees and receivers in bankruptcy.  *See e.g., W. L. Moody & Co., Bankers*, 374 F.Supp. at 481 ("Compensation to equitable receivers is analogous to compensation to receivers in bankruptcy").

-67-

presumably were accounted for in determining the reasonableness of the rate and time components considered in the lodestar computation. *Blum v. Stetson*, 465 U.S. 886, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984). In a later fee-shifting decision, however, the Supreme Court acknowledged certain instances in which a fee enhancement could be considered notwithstanding the use of a lodestar approach. (Where appropriately justified in exceptional cases, the Supreme Court suggests the additional amount should not exceed one-third of the lodestar.) *Pennsylvania v. Delaware Valley Citizens Council*, 483 U.S. 711, 730, 107 S.Ct. 3078, 3089, 97 L.Ed.2d 585, 601 (1987); *See also, American Bankruptcy Institute National Report on Professional Compensation In Bankruptcy Cases*, May, 1991. LRP Publications. The Supreme Court has not addressed the issue of awarding fee enhancements in bankruptcy matters.

Fee enhancements are rarely sought and are rarely granted. *Id*. at 150. Considering the history and applying the aforementioned factors to this case, however, the award of a premium is justified. **In a word, the professional services rendered by the Applicant were "extraordinary." Herein, not only was the Trustee enabled through the Applicant's efforts to generate a distributive estate, this occurred under exceptional circumstances. Through the Applicant's efforts, the Debtor's earlier Chapter 7 case was reconverted to Chapter 11 in order to generate a dividend from what initially was perceived as a "no-asset" case in which general unsecured creditors would receive no distribution. In doing so, the Applicant received no assistance from the Debtor's officers and directors. These extraordinary efforts resulted in the creation of an estate with assets in excess of $3 Million which now affords a dividend to the general unsecured creditors.** Where general unsecured creditors will not receive a dividend from a debtor's estate, a fee enhancement is unjustified, even where the applicant's services rendered were exceptional in nature. This, however, did not occur in the present case. **Not only did the Applicant's efforts create a dividend for such creditors, the dividend created is of a respectable amount. A premium award of $20,000.00 is both reasonable and justifiable and is well within the suggested maximum (no more than 30% of lodestar) suggested by the U.S. Supreme Court in Delaware Valley, supra.** *See also, Grant v. G. Schumann Tire & Battery Co.*, 908 F.2d 874, 880 (11th Cir. 1990) (Lodestar rates may be enhanced based on risk of nonrecovery, excellent or exceptional results, or delay in receipt of payment.); *In re White Motor Credit Corp*., 50 B.R. 885 (Bankr. N.D. Ohio 1985). The award of fee premiums are discretionary with the bankruptcy court. *See, Matter of Consolidated Bancshares, Inc*., 785 F.2d 1249, 1257 (5th Cir.1986).

*Id*. at 22-23.

Similarly, in *SEC v. Mutual Benefits Corp*., 2009 WL 4640654 (S.D. Fla. Dec. 7, 2009),

-68-

the court substantially increased the hourly rate of receiver's counsel based on the "extended and complex nature of the case," counsel's "excellent representation," and the positive results achieved.  In that case, the court acknowledged it had "arbitrarily reduced the interim fee requests submitted by the Receiver's counsel, holding off until there was a final resolution of the receivership."  *Id*. at *1.  Noting "that time has come," the court explained "this receivership was indeed unique, requiring work and expertise beyond the typical litigation to simply recover funds from third parties."[54]  *Id*.

The court went on to explain the value of the Receiver's and his counsel's efforts, noting "the Receiver and his counsel have recovered millions of dollars that the investors would not have recovered but for the excellent work of the law firms," including $117.5 million in the Asset Recovery Pool, $4 million an operating account, and $3.8 million in unclaimed funds in a Pre–Closing Purchase Escrow account.  *Id*. at *2.  In this regard, the court noted "[f]ew would disagree that, in complex matters, you get what you pay for.  A receivership with available funds should be no different."  *Id*.

In that case, the receiver's counsel had been compensated at rates ranging between $218 and $264 per hour.  *Id*.  Based on the uniqueness and complexity of the issues, counsel's "substantial skill, expertise, and tenacity," and the results achieved, the court found counsel's

_____

[54] Specifically, the court noted: "In this case, the Receiver and his counsel administered over 7,000 insurance policies with a face value of $1.5 billion, disposed of policies after the Court gave investors a choice to continue paying the premiums, processed claims after the deaths of insureds, and preserved assets to continue the legitimate work of assuring that policies would not lapse for lack of payment, etc. All this work was done in addition to 'offensive' and 'defensive' litigation in state and federal courts, including the Eleventh Circuit Court of Appeals and regulatory agencies. Litigation, criminal investigation, policy administration, and investor frustration reached the point of death threats being made against the Receiver himself."  *Id*.

-69-

hourly rates should be increased to $450 per hour.  *Id.* at *3.  This adjustment resulted in an additional award of over $5 million dollars to receiver's counsel, which the court found "reasonable when spread among all of the investors and in view of the work and results."  *Id.*  In conclusion, the court further noted as follows:

> Understandably, the investors victimized by the wrongdoers (some of whom are already serving time in prison) will always be less than satisfied.  However, such is the nature of fraudulent schemes.  Only when there are capable attorneys and other professionals ready to accept the call from the Court can victims be compensated.  To appoint only inexperienced and relatively inexpensive attorneys who seek receiverships will inure to the detriment of future investors who are entitled to the protections that Congress intended by its passage of the securities fraud laws.  To those members of Congress, SEC lawyers, prosecutors, federal judges, and other public servants, we 'owe our thanks' but no compensation other than their salaries.  But to private lawyers and firms, we owe reasonable compensation.  A blended hourly rate of $450 in a receivership of this extended and complex nature is a reasonable fee.  The firms shall be entitled to an additional award of $5,056,919 to be paid first from the Pre–Closing Purchase unclaimed funds, with the balance to be paid from the Mutual Benefits Corporation operating account and the Asset Recovery pool, if necessary.

*Id.* at * 4. [55]

Based on the above authority, the Court agrees with the Receiver that "equity [doesn't] work one way;" i.e., the Court's equitable authority is not limited to decreasing a receiver's compensation.  (Doc. No. 813 at 20.)  Rather, the Court finds it has the authority, in the exercise

---

[55] Plaintiffs rely heavily on *Maiz v. Virani*, 2003 WL 22995233 (N.D. Tex. Nov. 24, 2003).  In that case, the court rejected the receiver's request for a "final fee" over and above the monthly fees he had already received, finding "Receiver has not cited to any legal authority, nor can the Court locate any, that would allow this Court to award a Receiver a final fee based on the success of the receivership where Receiver has already been paid a presumptively 'fair and reasonable' fee pursuant to an agreed fee payment procedure."  *Id.* at *2. While this case supports the Plaintiffs' argument, it is an unreported decision from the N.D. Texas and not binding on this Court.  Upon review, the Court finds the reasoning set forth in *Wright Airlines* and *Mutual Benefits* cases more persuasive.

of its discretion, to award the Receiver additional compensation above and beyond his agreed

hourly rate should it determine such an award warranted based on the unique facts and

circumstances presented herein.

### 2.  Determination of Whether Additional Compensation is Warranted

The undersigned will now consider whether an award of additional compensation to the

Receiver, above and beyond his agreed hourly rate, is warranted in light of the particular facts

and circumstances of the instant case.  Consistent with the case law cited *supra*, the Court will

consider the following factors in making this determination: (1) the complexity of case; (2) the

time, skill and labor involved; (3) the results achieved; and (4) the ability of receivership estate

to fund an award.  *See Byers*, 590 F. Supp. 2d at 644 (in determining reasonable compensation, a

court may consider any factor related to the receivership, including the complexity of problems

faced, the benefits to the receivership estate, and the quality of the work performed); *Code

Products Corp.*, 362 F.2d at 673 ("In allowing fees, 'the considerations are the time, labor and

skill required . . ., the fair value of such time, labor and skill measured by conservative business

standards, the degree of activity, integrity, and dispatch with which the work is conducted, and

the result obtained."); *Harris*, 2016 WL 1555773 at *9 (considering the complexity of the

problems faced; the time, labor and skill necessary for the job; the results achieved; the time it

took to achieve those results; and the ability of the receivership estate to afford the requested

fees and expenses).

### a.  Complexity

The instant matter has undoubtedly presented complex and substantial challenges to the

Receiver and his team.  From the inception of the case, it was clear Plaintiff investors had

-71-

suffered substantial losses due to Dadante's misrepresentations and deceit.  The Receiver was

required to work quickly and effectively to identify and protect Fund assets, including Dadante's

various personal assets and the Innotrac stock.  Evaluating and resolving these matters involved

a myriad of complicated issues relating to securities regulation, real estate issues, as well as

banking, tax, and contract law.

Developing a strategy for maximizing the Receivership Estate's recovery relating to the

Innotrac stock was an especially complex task.  As Judge O'Malley explained in a previous

order, the illiquidity of that stock posed particular challenges:

> The Fund's holdings in Innotrac, unfortunately, are illiquid.  Generally, thinly
> traded stock cannot be sold in the open market in volume, and efforts to dispose
> of the Fund's holdings in Innotrac face an additional difficulty: although the
> Fund owns over 34% of Innotrac, this is not a controlling stake in the company.
> Rather, Innotrac's "officers and directors own[] approximately 46.8% of the
> outstanding common stock." 2009 ANNUAL REPORT OF INNOTRAC
> CORPORATION at 10.  In other words, not only is the large volume of stock
> held by the Fund essentially impossible to sell in the open market, the Fund's
> ability to sell the shares as a block is significantly impaired because it
> represents a minority position.  (*See generally* Order of October 7, 2008 (Doc.
> 393).)

(Doc. No. 447 at 6.)  Compounding this problem was the fact the Innotrac stock was

"encumbered by several millions of dollars of margin debt accumulated by Dadante."  (*Id*. at 7.)

The brokerage firms holding this debt (joined in this case as "stakeholder" defendants)

threatened to "engage in immediate and disorderly liquidation of the Fund's stock," which would

have had "essentially no value if disposed of in this matter."  (*Id*.)  The Receiver was, thus,

required to act quickly to seek Court intervention to prevent the brokerage firms from liquidating

any Fund Assets or attempting to collect on any outstanding margin debt without Court

permission.  (*Id*. at 8.)

-72-

In order to ultimately be able to sell the Innotrac stock at a profit, the Receiver systematically entered into complex settlement negotiations with each of these brokerage firms/stakeholder defendants.  As a result of these efforts, the Receiver secured releases for alleged liability arising from the accumulated margin debt, obtained substantial cash settlements for the benefit of the Fund, and took "free and clear ownership of the vast majority of the Innotrac stock."[56]  (Doc. No. 760.)  Throughout this time period, the Receiver asserts he "closely monitored Innotrac's business activities and plans; regularly discussed Innotrac with investment bankers and professionals familiar with the company; conferred with Innotrac management personnel regarding the company's business prospects; evaluated Innotrac's progress and improvement with respect to its strategic growth and capacity; and assisted in facilitating discussions with various potential buyers and transaction partners."  (*Id*. at 4.)  The Receiver's substantial and continued efforts in this regard ultimately led to the negotiation of the block sale of the Fund's 4.3 million shares of Innotrac stock for $8.20 per share, resulting in a recovery of $35,438,522 for the Fund.  (Doc. Nos. 558, 559, 576, 581, 583, 602.)

Perhaps less heralded but also significant, the Receiver successfully pursued efforts to secure tax refunds for investors.  As discussed *supra*, as a consequence of Dadante's Ponzi scheme, the Fund's limited partners had paid income taxes on what they believed to be the

---

[56] For example, the Receiver negotiated a settlement with Ferris Baker, which  required it to (1) to deliver 2,999,152 shares of common stock in Innotrac to the Receivership estate, free and clear of all claims, liens, or security interest – including an existing margin debt of over $9,000,000; and (2) to pay the Receivership estate the cash sum of $7,200,000. (Doc. No. 447 at 21.)  The settlement with McDonald required it to (1) deliver to the Fund the roughly 130,000 shares of Innotrac stock held in the McDonald account; and (2) forgive over $550,000 of secured margin debt.  (*Id*. at 25.)

Fund's profits between 2001 and 2004.  (Doc. No. 447 at 12.)  The limited partners' tax returns were incorrect, however, as each of them paid income tax on income that did not exist.  (*Id.*)  The Receiver engaged tax professionals to prepare corrected Partnership returns for the Fund and to issue proper tax forms.  (*Id.*)  The Receiver and these tax professionals also presented to the Court the basis for determining that originally filed tax returns were invalid.  (*Id.*)  Due to the efforts of the Receiver and his tax professionals, the Fund's investors were able to secure tax refunds for five years, rather than being limited by the three year statute of limitations.  (*Id.*)

It is also important to note that, throughout much of this time period, the Receiver's job was made more complicated by the near constant opposition he faced from the Objecting Plaintiffs.  The record reflects these Plaintiffs repeatedly moved to terminate the Receivership, remove the Receiver, and/or hold the Receiver in contempt.  *See e.g.*, Doc. Nos. 179, 315.  Indeed, one group of Plaintiffs went so far as to file suit against the Receiver in state court.  *See Frank Regalbuto, Jr., et al., v. Mark Dottore, et al.*, Cuyahoga County Court of Common Pleas Case No. CV 07 622036.  Judge O'Malley expressed concern about the effect of the Objecting Plaintiffs' actions on the Receivership, as follows:

> Further, the Court is particularly troubled by the [Objecting] Plaintiffs' willingness to force the Receiver to needlessly expend hundreds of hours responding to unauthorized filings.  Indeed, the Court observes that the [Objecting] Plaintiffs, though it may not be their conscious intent, often have impeded the orderly progress of the Receivership and caused the depletion of its assets by the filing of ill-informed pleadings and/or taking insupportable positions.  [footnote omitted]

(Doc. No. 284 at 14-15.)  Despite these obstacles, Judge O'Malley remarked that "since his appointment, the Receiver has been thorough and diligent in a difficult task that has exposed himself to myriad attacks, both personally and professionally."  (Doc. No. 339 at 11.)  Indeed,

-74-

Judge O'Malley went on to praise the Receiver for his "single minded desire to maximize the assets in the Receivership Estate and, thus, maximize the possible return to all his investors."[57] (*Id*.)

Based on the above, it is recommended the Court find the complexity involved in this Receivership weighs heavily in favor of awarding additional compensation to the Receiver, above and beyond his agreed hourly rate.  *See e.g., Stuart*, 133 U.S. at 82 (holding that compensation usually corresponds with "the degree of responsibility and business ability required"); *W.L. Moody*, 374 F.Supp. at 481 (recognizing the "[a]bility, reputation and other professional qualities of Receiver necessary for the job");  *Mutual Benefits Corp*., 2009 WL 4640654 at * 4 (in determining "reasonable compensation," court considered "extended and complex nature of the case").  It is further recommended the Court find the complications caused by the opposition faced by the Receiver also weigh in favor of an award of additional compensation.  *See e.g., W.L. Moody & Co., Bankers*, 374 F.Supp. at 481 ("Receiver accomplished this without assistance from defendant and his associates, and in some instances despite their interference. . . This opposition increases the significance of Receiver's accomplishments.")

**b.      Time, skill and labor involved**

In evaluating reasonable compensation for a Receiver, the Court also considers the time, skill, and labor involved in managing the Receivership Estate.  *See, e.g., Code Prods. Corp*., 362

---

[57] Similarly, in approving the sale of the Innotrac stock, the Court more recently observed: "[T]he Receiver has been threatened numerous times by various IPOF Fund limited partners, has been the subject of multiple law suits and complaints, but has never abandoned his charge to protect the value of the assets held in the Receivership Estate."  (Doc. No. 559 at 2-3.)

-75-

F.2d at 673 (noting, as a consideration, "the fair value of such time, labor and skill measured by conservative business standards"); *City of New Orleans v. Malone*, 12 F.2d 17, 19 (5th Cir. 1926) (giving due consideration for "labor and skill needed or expended").

Given the complicated nature of the many issues involved, it is clear significant time, effort, skill, and judgment were required to function effectively as the Receiver in this matter. As noted *supra*, Mr. Dottore was appointed Receiver (at the Plaintiff's request) at the very inception of this case in November 2005. (Doc. No. 7.) Over the following twelve years, the Receiver and his team continued to work diligently to identify, protect, and preserve Fund Assets. Indeed, on several occasions throughout the course of this litigation, the Court has praised the Receiver for his dedication, "strong work product," and determination to protect the Plaintiff investors' interests. *See e.g.* Doc. No. 284 at 17 ("The Court remains convinced that, but for the Receivership, all fund assets would have been depleted long ago"); Doc. No. 339 at 11 (describing Receiver as "thorough and diligent" and praising him for his "single minded desire to maximize the assets in the Receivership Estate and, thus, maximize the possible return to all his investors."); Doc. No. 447 at 45-46 (describing Receiver's settlements with stakeholder defendants Ferris Baker and McDonald "evidence of strong work product"); Doc. No. 559 at 2 ("The Receiver has exhaustively pursued the best interests of the Receivership Estate").

As evidenced by the extraordinary recovery in this matter, the Receiver has shown tremendous skill, judgment, and experience throughout the course of this lengthy and protracted Receivership. It is recommended the Court find this factor weighs in favor of awarding additional compensation to the Receiver, above and beyond his agreed hourly rate.

      **c.**      **Results achieved**.

As several courts have noted, in evaluating Receiver compensation, "the result obtained is always a 'critical factor.'" *In re Alpha Telecom, Inc.,* 2013 WL 840065 at * 17 (quoting *SEC v. Elliott*, 953 F.2d 1560, 1577 (11th Cir. 1992)).  *See also Elliott*, 953 F.2d at 1577 ("Whether a receiver merits a fee is based on the circumstances surrounding the receivership, and 'results are always relevant.'") (quoting *W.L. Moody & Co., Bankers,* 374 F.Supp. at 480)); *Byers*, 590 F.Supp.2d at 648 ("[T]he results achieved and benefit to the receivership estate are critical factors that a court must consider in setting a fee award."); *Striker Petroleum*, 2012 WL 685333 at * 4 (same).

Here, it is recommended the Court find this factor weighs heavily in favor of an award of additional compensation.  It is undisputed the Plaintiff investors recovered 110% of their investment.  As this Court has previously indicated, this is, without a doubt, an "extraordinary recovery."  (Doc. No. 559 at 3.)  Indeed, none of the parties to this action have been able to direct this Court's attention to any other receivership involving a Ponzi scheme in which the investors recouped more than 100% of their original investment.  By all accounts, the recovery achieved by the Receiver and his counsel in this matter is truly extraordinary and without precedent in this context.[58]

Many of the Plaintiffs have suggested the Receiver "had nothing to do with" the remarkable recovery in this matter, arguing the successful sale of the Innotrac stock was due entirely to the efforts of Innotrac management or the result of luck.  This argument is without

---

[58] *See, e.g.*, Gradwohl, David A., Karen Corbet, *Equity Receiverships for Ponzi Schemes*, 34 Seaton Hall Legis.J. 181, 207 fn 173 (2010) ("Most Ponzi scheme receivers fail to recover fifty percent of the money invested in the scheme by the victims.")

merit.  Throughout this lawsuit, the Receiver "closely monitored Innotrac's business activities

and plans; regularly discussed Innotrac with investment bankers and professionals familiar with

the company; conferred with Innotrac management personnel regarding the company's business

prospects; evaluated Innotrac's progress and improvement with respect to its strategic growth

and capacity; and assisted in facilitating discussions with various potential buyers and

transaction partners."  (Doc. No. 760 at 4.)  Moreover, as the Receiver's counsel explained

during the supplemental hearing, the Receiver's efforts were crucial to the eventual sale of the

Innotrac stock:

> Mr. Dorfman [the CEO of Innotrac] was given credit for [the merger agreement
> that resulted in the sale of the Fund's Innotrac stock].  Mr. Dorfman didn't want to
> sell his company.  He liked his company.  He lived off of it.  He liked to have a
> company because that's how he funded his private plane, with his investors' money.
> That's how he funded his salary.  This is a successful business.  I'm not saying it
> wasn't.  But its stock is manipulated, and its stock was artificially low, but that
> didn't affect his salary; it didn't affect his airplane.  The only people it affected
> were the people in this room,  because they couldn't sell their minority interest in
> that company.  He controlled 51 percent of the stock.

> So the receiver didn't sit and hold that stock, hoping someday Mr. Dorfman would
> sell his company.  He's a 50-year-old man.  He wasn't looking to retire.  What the
> receiver did was obtain  counsel who did research and quite literally told Mr.
> Dorfman, you have a choice.  We believe you didn't do your due diligence with
> what Mr. Dadante was doing to your company.  We believe you are subject to
> liability for that, and you can either agree along with us to interview investment
> banks and actively market your company or you can buy us out for a reasonable
> price or you can get sued.  And he elected the former.

> The receiver, along with Mr. Dorfman, interviewed investment banks to liquidate
> that company.  The receiver, along with Mr. Dorfman, was part of every
> negotiation to attempt to sell the company.  And the receiver approved the eventual
> sale.

(Doc. No. 813 at 17-18.)

In light of the above, the Court rejects Plaintiffs' arguments the Receiver had no role in

the tremendous recovery in the instant case.  From the very inception of the Receivership, the Receiver worked quickly and diligently to protect the Fund from a disorderly liquidation of the Innotrac stock.  He thereafter negotiated settlements with the stakeholder defendants to ensure the Fund had "free and clear ownership" of the stock, thus clearing the way for an eventual block sale of all 4.3 million shares.  Additionally, the Receiver negotiated with Innotrac management, interviewed investment banks, and "was part of every negotiation to attempt to sell the company."  (Doc. No. 813 at 18.)

Accordingly, and for all the reasons set forth above, it is recommended the Court find the extraordinary recovery in this matter weighs heavily in favor of an award of additional compensation to the Receiver, over and above his agreed hourly rate.

### d.      Ability of fund to pay additional award.

Lastly, in evaluating "reasonable compensation" for a receiver, courts may consider the ability of the receivership estate to afford the requested fees and expenses.  *Striker Petroleum*, 2012 WL 685333 at * 3.  *See also WL Moody & Co., Bankers*, 374 F. Supp. at 481 (noting that the size of the receivership estate and its ability to afford expenses and fees "must be given considerable weight").

Here, the Receiver asserts the Receivership estate has sufficient assets from which an increase in compensation can be funded, noting the Receivership's remaining cash balance is $5,081,568.71.  (Doc. No. 760 at 9.)  Taking into account the undersigned's recommendation that $106,608.50 be deducted from the Receiver's Fee Application for the period January 6, 2014 through September 30, 2017 (Doc. No. 795), it is recommended the Receiver be awarded professional fees (for himself, his staff, and his counsel) in the total amount of $1,589,041.98.

(Doc. No. 822-2.)  Subtracting this amount from the Receivership's remaining cash balance leaves a total of $3,492,526.73 in the Receivership Estate.

Thus, the Court finds that, based on the efforts of the Receiver and his team, the Receivership Estate can well afford an award of additional compensation to the Receiver, above and beyond his agreed hourly rate.  Thus, it is recommended the Court find this factor weighs in favor of a such an award.

Accordingly, and for all of the above reasons, it is recommended the Court find an additional award of compensation to the Receiver is warranted under the unique circumstances presented herein.  Thus, the Court now considers the issue of the appropriate amount of compensation.

### 3.    Determination of amount of additional compensation

To determine an appropriate award, the Court will apply the lodestar method.  *See Oaks Ltd.*, 1986 WL 17277 at * 4 (6th Cir. 1986); *FTC v. The Debt Advocacy Center*, Case No. 1:09CV2712 (N.D. Ohio Aug. 21, 2012) (Doc. No. 226 at 4) ("In establishing a reasonable fee for receiver and for receiver's counsel, the Court should use the lodestar fee method");  *First Merit Bank v. Miles & Miles Group*, 2014 WL 51491 at * 1 (N.D. Ohio Jan. 7, 2014).  As the Sixth Circuit has explained:

> [T]he lodestar fee approach generally utilized by the courts is appropriate also in receivership cases.  *See United States v. Larchwood Gardens, Inc*., 404 F.2d 1108 (3d Cir.1968), appeal after remand, 420 F.2d 531 (3d Cir.1970).  While the lodestar approach is not necessarily mandatory, since factors such as success of operation and outcome and special and complex legal difficulties involved may be taken into account, the primary considerations should be time expended and a reasonable rate per hour with application of a reasonable bonus award where clearly indicated.

*Oaks*, 1986 WL 17277 at * 4.

To determine the appropriate award of attorney's fees under this method, the Court must first determine the lodestar amount; i.e., "the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate." *Hensley*, 461 U.S. at 433.  A court must afford a "strong presumption" that the lodestar "represents a 'reasonable' fee [.]" *Pennsylvania v. Del. Valley Citizens' Council for Clear Air* (hereinafter *Delaware Valley I*), 478 U.S. 546, 565, 106 S.Ct. 3088, 92 L.Ed.2d 439 (1986).

A district court has broad discretion to determine what constitutes a reasonable hourly rate. *Wayne v. Vill. of Sebring*, 36 F.3d 517, 533 (6th Cir.1994).  Typically, a court should look to the "prevailing market rates in the relevant community[.]" *Blum v. Stenson*, 465 U.S. 886, 895, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984).  The "prevailing market rate" is defined as "that rate which lawyers of comparable skill and experience can reasonably expect to command[.]" *Adcock Ladd v. Sec'y of Treasury*, 227 F.3d 343, 350 (6th Cir. 2000).

The party seeking a fee award bears the burden of proving the reasonableness of the hours and the rates claimed.  *Hensley*, 461 U.S. at 437.  *See also Lonardo*, 706 F.Supp.2d at 792. "The key requirement for an award of attorneys fees is that the documentation offered in support of the hours charged must be of sufficient detail and probative value to enable the court to determine with a high degree of certainty that such hours were actually and reasonably expended in the prosecution of the litigation." *Imwalle v. Reliance Med. Prod. Inc*., 515 F.3d 531, 553 (6th Cir. 2008) (internal quotation omitted).

After determining the lodestar amount, a district court "may then, within limits," make adjustments "to reflect relevant considerations peculiar to the subject litigation." *Adcock-Ladd*,

-81-

227 F.3d at 349. *See also Reed v. Rhodes*, 179 F.3d 453, 471–72 (6th Cir. 1999); *Lonardo*, 706 F.Supp.2d at 789 ("The Court may then adjust the lodestar figure up or down based on a number of factors designed to account for case-specific circumstances"). "The factors which the district court may consider, either in determining the basic lodestar fee and/or adjustments thereto, include the twelve listed in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717–19 (5th Cir.1974)." *Adcock-Ladd*, 227 F.3d at 349. *See also Hensley*, 461 U.S. at 434 n. 9; *Paschal v. Flagstar Bank*, 297 F.3d 431, 435 (6th Cir. 2002) ("This court has held that a trial court may apply the *Johnson* factors during its initial calculation of the attorney-fee award or when the court is considering a request for an enhancement."). These factors are: (1) the time and labor required by a given case; (2) the novelty and difficulty of the questions presented; (3) the skill needed to perform the legal service properly; (4) the preclusion of employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the 'undesirability' of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases. *Reed*, 179 F.3d at 471–72 n. 3 (citing *Johnson*, 488 F.2d at 717–19).[59]

A highly important *Johnson* factor is the result achieved. *Adcock-Ladd,* 227 F.3d at 349 (citing *Hensley*, 461 U.S. at 435–36). "Where a plaintiff has obtained excellent results, his

---

[59] "Some of the above factors ordinarily may be considered only when resolving the basic lodestar fee, and thus cannot be used to augment that lodestar." *Adcock Ladd*, 227 F.3d at 349 (citing *Delaware Valley I*, 478 U.S. at 565; *Blum*, 465 U.S. at 898–901, *Van Gerwen v. Guarantee Mutual Life Co.*, 214 F.3d 1041, 1045 (9th Cir.2000)).

attorney should recover a fully compensatory fee." *Hensley,* 461 U.S. at 435.  Generally, a

"strong presumption" favors the prevailing lawyer's entitlement to his lodestar fee.  *See City of*

*Burlington v. Dague*, 505 U.S. 557, 562, 112 S.Ct. 2638, 120 L.Ed.2d 449 (1992); *Delaware*

*Valley I,* 478 U.S. at 564.  Accordingly, "modifications [to the lodestar amount] are proper only

in certain 'rare' and 'exceptional' cases, supported by both 'specific evidence' on the record and

detailed findings by the lower courts." *Delaware Valley I*, 478 U.S. at 565 (citing *Blum*, 465

U.S. at 898–901).  *See also Geier v. Sundquist,* 372 F.3d 784, 793-794 (6th Cir. 2004);  *Adcock-*

*Ladd*, 227 F.3d at 350.

Here, the Court has already found that "in determining the amount of any additional

compensation [using the lodestar method], the Court will rely on Kennedy Consulting Research

& Advisory Report and Supplements and the Inglewood Associates Report provided by John

Lane."  (Doc. No. 698.)  As noted *supra*, the first "Kennedy Report" is the independent audit

performed by Dr. Florence and the ARPC pursuant to Judge O'Malley's Order dated June 26,

2009.  (Doc. No. 447.)  This Report, filed on February 1, 2010, concluded "the hourly rates

charged by professionals in this case are reasonable" and "appear to be significantly lower than

the average rates charged by other similarly situated professionals."  (Doc. No. 482-1 at 2, 6.)

With regard to the Receiver in particular, the auditors noted the average hourly rate charged by

the Receiver (i.e., Dottore Companies, LLC) was $151 for staff and $209 for partners/principals.

(*Id*. at 6.)

The Report then compared the average rates charged by Dottore Companies, LLC to rates

charged by management consultants.  (*Id*. at 7.)  Specifically, comparison was made in the

context of the "low" and "high" ends of the ranges[60] for the hourly rates of both "staff" and

"partners/principals" at consulting firms with annual revenues less than $10 million.  (*Id.*)  With

regard to "staff," the low end of the range was $128 per hour while the high end of the range was

$222 per hour.  (*Id.* at 7.)  With regard to "partners/principals," the low end of the range was

$215 per hour and the high end of the range was $373.  (*Id.*)  Based on these figures, the Report

concluded the "rates billed by professionals in the Dottore firm are at the low end of the rates

charged by professionals in similarly situated firms."  (*Id.*)  Lastly, the Report concluded "[i]n

general, the invoices provided sufficient detail to determine the task undertaken by the

individual," noting "we found the descriptions of tasks and supporting documentation to be of

very high quality."  (*Id.* at 8.)

      In June 2014, the Court ordered the Receiver to "obtain and file an updated third-party

report by Kennedy Consulting Research and Advisory . . . on the average hourly rate for

receivers and staff for the years of the Receivership." (Doc. No. 612 at 3.)  The updated Kennedy

report ("hereinafter Supplemental Kennedy Report") was filed on June 25, 2014.  (Doc. No.

613.)  In a table entitled "Comparable Average Hourly Rates by Professional Category and

Professional Level," it provided the following information regarding hourly rates for

principals/partners at managing consulting firms:

| Year | Principal/Partner Low | Principal/Partner High |
|------|------------------------|-------------------------|
| 2006 | $215 | $373 |

---

[60] The Report is based on information solely for the year 2006.  It explains the "high and low [hourly rates] are estimated at the 25th and 75th percentile."  (Doc. No. 482-1 at 8.)

| | | |
|---|---|---|
| 2007 | $225 | $445 |
| 2008 | $233 | $480 |
| 2009 | $219 | $440 |
| 2010 | $225 | $449 |
| 2011 | $243 | $470 |
| 2012 | $254 | $485 |
| 2013 | $245 | $475 |

(*Id*. at 3.)

On September 18, 2014, the Small Parties responded by filing Mr. Lane's expert report. (Doc. No. 629-1.)  Mr. Lane opined the information contained in the Kennedy Reports was not relevant because it (1) failed to address the hourly rates for "receivers" as opposed to "management consultants;" (2) failed to specify average hourly rates for this geographic market (i.e. northeastern Ohio); (3) failed to account for specialized training and/or expertise; and (4) failed to assess supply and demand factors in this region.  (*Id*.)  Mr. Lane concluded by opining that "[b]ased on my background and experience as a Receiver in Northeast Ohio, the hourly rates have ranged from $100 to $250 at the beginning of this case, increasing up to the current hourly rates of $125 to $300."  (*Id*. at 3.)  He, therefore, found "the hourly rates charged to date by the Receiver in this case are at the high end of, but entirely consistent with, that range and would be considered reasonable for this community." (*Id*.)

The Receiver filed a supplemental report on November 6, 2014.  (Doc. No. 638.)  This report contained the same range of average rates for management consulting firms as set forth in the previous Kennedy Report and, further, provided additional detail regarding the specific

-85-

amounts and rates billed by the Receiver.  In particular, the supplemental Report indicated the Receiver billed 14,375.9 hours for a total of $3,232,979.75 in fees from the inception of the case through the end of 2013.  (Doc. No. 638-1 at 1, 3-4.)  The Report further noted "generally, hourly fees increased from 2006 - 2013," and found "The Dottore Companies, LLC billed at an average rate of $225 for senior-level professionals over the entire period in question;" i.e. from 2006 through 2013.[61]  (*Id.*)

Upon careful review, the Court finds the information and conclusions set forth in the 2010 Kennedy Report and 2014 Supplemental Reports (Doc. Nos. 482-1, 613, 638-1) to be persuasive.  Each of these Reports are independent audits conducted by third parties with no direct interest in the instant case.  The Court finds this fact weighs heavily in favor of according greater weight to these Reports, particularly given the contentious nature of the instant action.  Moreover, while Plaintiffs were provided the opportunity to depose the authors of the 2014 Supplemental Reports, the docket reflects none of the Plaintiffs chose to do so.  Finally, the Court notes that, in the course of reviewing hourly rates charged by receivers in various actions in this District, it was not uncommon to find receivers charging well above the average hourly rate charged by the Receiver herein (i.e., $225 per hour), thus lending further support to the conclusions of the Kennedy Report and Supplements.  *See e.g., Citizens Bank v. Leyland Investment Co., LLC*, Case No. 5:12CV1142 (N.D. Ohio) (Doc. No. 35 at 13-14; Doc. No. 36)

---

[61] In a filing accompanying the supplemental report, the Receiver argued the Kennedy Report did not apply the "high end" of market rates that would apply in locations such as New York or Los Angeles.  (Doc. No. 638)  He further asserted "it would be appropriate for an experienced Receiver in a metropolitan area such as Cleveland to bill in the seventh fifth percentile of the market rates," provided by the Kennedy Report;  i.e., in the high end of the range.  (*Id.*)

(approving receiver fee application in which receiver charged an hourly rate of $350 in 2012); *Citizens Bank v. Fran-Den, LTD*., Case No. 5:12CV1883 (N.D. Ohio) (Doc. No. 22 at 6; Doc. No. 23) (approving receiver fee application in which receiver charged an hourly rate of $350 in 2013); *Federal Trade Commission v. Repair All PC, LLC*, Case No. 1:17cv869 (N.D. Ohio) (Doc. No. 97 at 5; Doc. No. 101) (approving receiver fee applications in which receiver charged an hourly rate of $450 in 2017); *SEC v. Abdallah, et al.*, Case No. 1:14cv1155 (N.D. Ohio) (Doc. No. 292 at 5; Doc. No. 294) (approving receiver fee application in which receiver charged an hourly rate of $350 per hour in 2016-2017).

Accordingly, the Court will rely on the "low" and "high" hourly rates for principals/partners in management consulting firms (as set forth in the 2014 Supplementary Reports) in evaluating whether the Receiver has been paid a "reasonable" hourly rate during the pendency of the instant action.  As noted above, the 2014 Supplementary Report found the Receiver (i.e., The Dottore Company, LLC) "billed at an average [hourly] rate of $225 for senior-level professionals over the entire period in question;" i.e. from 2006 through 2013. (Doc. No. 638-1 at 1, 3-4.)  The Supplementary Reports indicate that, for the year 2006, the "low" end of the range for hourly rates was $215 while the "high" end of the range was $373. (*Id*. at 2.)  For the year 2009 (midway between the period in question), the "low" end of the range for hourly rates was $219 and the "high" end of the range was $440.  (*Id*.)  Finally, for the year 2013, the "low" end of the range for hourly rates was $245, while the "high" end of the range was $475.  (*Id*.)

Thus, comparing the Receiver's overall average hourly rate for the time period in question to the hourly rates for principals/partners at management consulting firms for the years

2006 through 2013, the Court finds the Receiver has consistently been paid a low hourly rate as compared to prevailing market rates for comparable professionals in this region.

For the following reasons, the Court further finds an upward adjustment to the Receiver's hourly rate is warranted in light of the facts and circumstances of this particular case. As noted above, there are several factors a district court may consider in determining the basic lodestar amount, including the time, skill, and labor required by a given case; the novelty and difficulty of the questions presented; the experience, reputation and ability of the professionals involved; and the results obtained. *Adcock-Ladd*, 227 F.3d at 349. *See also Hensley*, 461 U.S. at 434 n. 9. Here, each of these factors weighs heavily in favor of increasing the Receiver's average hourly rate. The Court has already discussed the complexity of the many issues involved in this Receivership, particularly those relating to developing a strategy for and successfully effectuating the sale of the Innotrac stock. Moreover, the Receiver has been required to expend an enormous amount of time and labor over the past twelve years to effectively identify, protect, and preserve Fund assets. Given the complicated nature of the issues involved, there is no question a great deal of skill and experience has been required to successfully perform these functions. On numerous occasions during the pendency of this case, the Court has commended the Receiver for his dedication, strong work product, and "single-minded desire to maximize the assets in the Receivership Estate and, thus, maximize the possible return to all his investors." (Doc. No. 339 at 11). *See also* Doc. No. 559 at 2.

Perhaps most significant, however, is the extraordinary result achieved. As has been noted on many occasions in this decision, it is undisputed the Plaintiff investors recovered 110% of their initial investment. As this Court has previously indicated, this is, without a doubt, an

-88-

"extraordinary recovery." (Doc. No. 559 at 3.)  Indeed, none of the parties to this action have been able to direct this Court's attention to any other receivership involving a Ponzi scheme in which the investors recouped more than 100% of their original investment.  The recovery achieved by the Receiver and his counsel in this matter is truly extraordinary and without precedent in this context.

Considering all of the above factors, it is recommended the Court find an upward adjustment to the Receiver's hourly rate is warranted in light of the facts and circumstances of this particular case.  In reaching this conclusion, the Court acknowledges the Plaintiffs' argument they "have operated for years under the understanding, as per Judge O' Malley's orders, that the Receiver's compensation would be based upon a fixed hourly rate, and that no additional compensation would be provided outside of this metric." (Doc. No. 759 at 2.)  These Plaintiffs claim they "relied on Judge O' Malley's Orders regarding the Receiver's fee requests including the fact that the Receiver was to be paid an hourly rate without any contingency or recalculation, in making determinations as to how they would or would not proceed in this case." (*Id.* at 3.)

The Court is not persuaded by this argument.  When Judge O' Malley remarked "the Receivership's fees are hourly and not contingent" (Doc. No. 361 at 21), she did so in the context of explaining that the amount of the Ferris Baker settlement "has no bearing on the fees, and vice versa." (*Id.*)  In this regard, Judge O'Malley noted "at this time it appears likely that, because the Receivership operates on an hourly basis, the fees will be well below the level of fees the Court would expect under a contingency arrangement." (*Id.*)  Time has shown Judge O'Malley's prediction was correct.  Had the Court terminated the Receiver and hired outside

counsel on a contingency basis (which many Plaintiffs advocated for), the fees would have been far greater than those billed by the Receiver and his counsel herein, even with an upward adjustment of the Receiver's agreed hourly rate.  Specifically, the Receiver notes he recovered approximately $48,000,000 (not including the eradication of twelve million dollars of margin debt) for the Estate.  A standard contingency agreement calling for 25% in fees would have resulted in a fee award of $12,000,000, well above the total professional fees incurred by Receiver and his counsel in the instant case.[62]

Moreover, setting aside the context in which Judge O' Malley discussed the issue of hourly fees, the fact remains that at the time Judge O' Malley made these remarks no one could have predicted the phenomenal success of the instant Receivership.  As has been noted on numerous occasions, the Court has broad discretion to determine "reasonable" compensation based on the facts and circumstances of the individual case.  Here, the Court's equitable discretion is not circumscribed by the fact Judge O'Malley at one time indicated, in the separate context of approving a proposed settlement agreement, that the Receiver's fees "are hourly and not contingent."  Given the tremendous recovery achieved by the Receiver in the instant case, as well as the many other factors discussed above, the Court finds this argument to be without merit.

Plaintiffs also argue an award of additional compensation is not warranted because, although they recouped 110% of their investment, this "does not make them whole" because it

_____

[62] The Receiver indicates the total professional fees billed in this matter from inception through September 2017 is $8,020,204.98.  (Doc. No. 822-3.)  Even adding the award of additional compensation discussed *infra*, the total amount of professional fees billed in this matter is well below a likely contingency fee award.

-90-

"fails to make up for the loss of the use of their funds for many in excess of 15 years."  (Doc. No. 758 at 3.)  Sadly, however, no amount of money will ever make up for the true losses suffered by the Plaintiffs in this case.  This, unfortunately, "is the nature of fraudulent schemes."  *Mutual Benefits Corp.*, 2009 WL 4640654 at *4.  The Court has tremendous empathy for the victims of Dadante's *Ponzi* scheme.  However, the issue for the Court today is the separate and distinct question of what is a "reasonable" compensation for the Receiver.  Applying the many factors set forth above, and considering the remarkable recovery achieved in this case, it is recommended the Court find, in the exercise of its equitable discretion, that an additional award of compensation is warranted, above and beyond the Receiver's agreed hourly rate.

In consideration of all the various factors discussed above, the Court finds it would be inequitable to calculate the lodestar amount for the Receiver using the average hourly rates he has billed throughout the course of the instant case.  As set forth above, the Court finds the Kennedy Reports persuasive and concludes the Receiver and his staff have consistently been paid low hourly rates as compared to prevailing market rates for comparable professionals in this region.  In light of the time, skill, and labor required by the instant case, the novelty and difficulty of the questions presented, and the extraordinary results obtained, the Court finds the lodestar should be calculated using an increased average hourly rate for the Receiver and his staff.  Thus, upon careful consideration and consistent with Supreme Court precedent, it is recommended the average hourly rate for the Receiver and his staff should be increased by 30% to account for the unprecedented recovery in this action, as well as the Receiver's tremendous skill and judgment in achieving this outcome.  *See Pennsylvania v. Delaware Valley Citizens Council for Clean Air* (hereinafter *"Delaware Valley II"*), 483 U.S. 711, 730, 107 S.Ct. 3078, 97

-91-

L.Ed.2d 585 (where appropriately justified in exceptional cases, a fee enhancement may be awarded but should be limited to no more than one-third of the lodestar); *Geier*, 372 F.3d at 794 (noting the Supreme Court has held that, where justified in exceptional cases, an upward adjustment "may be no more than one third of the lodestar.").  *See also In re Wright Airlines, Inc.*, 147 B.R. at 22-23 (finding fee enhancement "both reasonable and justified" where it was "within the suggested maximum (no more than 30% of lodestar) suggested by the U.S. Supreme Court in *Delaware Valley, supra*.")  It is further recommended this 30% increase apply to the Receiver's average hourly rates from the inception of the case through termination of the Receivership.[63]

In making the lodestar calculation, the Court next considers "the number of hours reasonably expended on the litigation."  *Hensley*, 461 U.S. at 433.  The 2014 Supplemental Kennedy Report determined the Receiver and his staff billed a total of 14,375.9 hours from the inception of the case through 2013.  (Doc. No. 638-1 at 4.)  With regard to the time period January 2014 through September 2017, the Receiver reports he billed a total of 2,921 hours. (Doc. No. 795 at 3.)  Thus, the total number of hours billed by the Receiver from the inception of the case through September 2017 is 17, 296.9 hours.

For the following reasons, the Court finds the number of hours expended by Receiver and

---

[63] The Court does not have updated figures from Kennedy Consulting Research & Advisory regarding the low and high ends of range for partners/principals in management consulting firms for the period 2014 through 2017.  However, the Receiver reports the average hourly rate for himself and his staff during that time period is $270.94.  (Doc. No. 795 at 3.) Given that the low end of the range for 2013 was $245 and the high end was $475, it is reasonable to conclude the Receiver's average hourly rate (for himself and his staff) of $270.94 for the following three years was similarly near the low end of the range for partners/principals in managing consulting firms.

his staff to be reasonable.  As noted *supra,* the Receiver was appointed on November 23, 2005.

(Doc. No. 7.)  Thus, between November 2005 and September 2017, the Receiver has served in

that capacity for nearly twelve years.  While 17,296.9 seems a high number of hours, the Court

finds it to be reasonable when considered over the duration of the instant case.  Specifically, the

total number of hours expended by the Receiver and his staff in this action (17, 296.9 hours)

divided over 12 years results in approximately 1, 441.4 hours per year of time billed by the

Receiver and his staff (i.e., M. Dottore, D. Linscott, T. Dottore, and C. Dottore).  Dividing this

yearly amount further, this figure results in average monthly billings of 120 hours per month.

Given the complexity of the matters involved and the numerous actions that needed to be taken

to effectively identify, protect, and preserve Fund Assets, the Court finds average monthly

billings of 120 hours per month (spread among the Receiver and his three staff members) is

entirely reasonable under the circumstances.

Accordingly, the Court recommends calculating the lodestar amount as follows.  The

Receiver states that, from the inception of the case through September 2017, he has billed a total

of $4,024,386.32 (including the $791,406.57 for which he has not yet been paid).[64]  (Doc. No.

822-3.)  As set forth *supra,* the Court recommends a total of $13,801 be deducted from this

amount as relating to time billed by the Receiver (1) in connection with his request for an award

---

[64] The Court arrives at this figure as follows.  From the inception of the case through
2013, the Supplemental Kennedy Report states the Receiver billed (and was paid) a total of
$3,232,979.75.  (Doc. No. 638-1.)  For the period January 2014 through September 2017, the
Receiver's Fee Application states he has billed a total of $791,406.57.  (Doc. No. 795.)  The sum
of these two figures is $4,024,386.32.  The Court notes this figure is $54,528.50 less than the
amount reported by the Receiver in his most recent filing.  (Doc. No. 822-3.)  The Court will,
however, calculate the total amount billed by the Receiver using the Supplemental Kennedy
Report, as it is an audit from an independent non-party.

of additional compensation and/or (2) work performed to address the notice issues raised in the Court's Order dated September 14, 2017 (Doc. No. 772) and prepare for and attend the supplemental hearing conducted by the undersigned on November 16, 2017.  This leaves a total of $4,010,585.32 in approved billings by the Receiver and his staff from the inception of the case through September 2017.

To apply a 30% increase in the average hourly rate for the Receiver (as recommended above), the Court has calculated 30% of the total amount of the Receiver's billings of $4,010,585.32, resulting in a figure of $1,203,175.[65]  Based on this calculation, it is recommended the Court order an additional award of compensation to the Receiver in the amount of $1,203,175 in light of the time, skill, and labor required by the instant case, the novelty and difficulty of the questions presented, and, most significantly, the extraordinary results obtained.

## V.  Conclusion

Equitable principles have guided the Court's analysis of the above compensation issues.

---

[65]  The Court notes the Supreme Court's decision in *Delaware Valley II, supra* could be read as suggesting the maximum allowable 30% fee enhancement applies only at the second step of the lodestar analysis, i.e., a fee enhancement occurring after the calculation of the "lodestar amount" (reasonable number of hours multiplied by a reasonable hourly rate).  Here, the Court applied this upward adjustment in determining the lodestar figure; i.e., the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate.  However, even if the Court had applied a 30% increase at the second step of the lodestar analysis (rather than in its initial calculation of the lodestar amount), the result would be the same.  Specifically, if the Court calculated the lodestar amount using the existing number of hours and hourly rates charged by the Receiver and his staff, the lodestar amount would be $4,010,585.32.  *See* Doc. No. 822-3.  Thereafter applying a 30% fee enhancement based on the extraordinary recovery achieved would result in an additional fee award of $1,203,175.  This is the same award resulting from the Court's application of a 30% increase to the Receiver's average hourly rates in arriving at the lodestar amount at the initial step of the inquiry.  Thus, in either case, the additional award of compensation recommended is within the 30% maximum dictated by *Delaware Valley II, supra*.

-94-

The United States Supreme Court has acknowledged an upward adjustment of the lodestar may be appropriate under certain exceptional circumstances.  *See Blum,* 465 U.S. at 898-901; *Delaware Valley I*, 478 U.S. at 565; *Delaware Valley II*, 483 U.S. at 730.  Given the remarkable recovery in this action, and the hard work, skill, and judgment that went into achieving it, the Court finds this to be one of those exceptional circumstances.

Accordingly, and for all the reasons set forth above, it is recommended, based on a variety of factors including the complexity of the instant case and the unprecedented recovery achieved by the Receiver, that the Court order an award of additional compensation to the Receiver in the amount of $1,203,175.

It is further recommended the Receiver's Application for Fees (Doc. No. 795) be granted in part and denied in part as follows.  It is recommended a total of $106,608.50 be deducted from the Receiver's Fee Application, consisting of $13,801.00 in  Receiver fees and $92,807.50 in fees incurred by the Receiver's counsel.

Finally, on October 12, 2017, counsel for Plaintiffs Gordon and Teresczuk filed a Motion for Leave to Withdraw as Counsel.  (Doc. No. 777.)  It is recommended the Motion be GRANTED.

The Receiver is ordered to serve this Report & Recommendation on all unrepresented investors as soon as possible.


Date:  February 1, 2018                          s/ *Jonathan D. Greenberg*
                                                 JONATHAN D. GREENBERG
                                                 U.S. MAGISTRATE JUDGE

-95-

## <u>OBJECTIONS</u>

Any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).