# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| **SHELDON GORDON, ET AL.,** | ) | **CASE NO.1:05CV2726** |
| | ) | |
| **Plaintiff,** | ) | **JUDGE CHRISTOPHER A. BOYKO** |
| | ) | |
| **Vs.** | ) | |
| | ) | |
| **DAVID DADANTE, ET AL.,** | ) | **ORDER** |
| | ) | |
| **Defendant.** | ) | |

**CHRISTOPHER A. BOYKO, J:**

There has never been a case like this one in all the years and in all the cases over which this Court has presided.  It started off like so many other tragic cases involving innocent investors being bilked out of millions of dollars by a trusted, yet unscrupulous advisor promising substantial guaranteed returns on investments.  Yet, in actuality, the advisor used the investor funds for his own personal aggrandizement.  The investors sued, the United States Attorney investigated, the advisor was arrested, convicted and incarcerated and, upon the request of the investors, a Receiver was appointed.  There followed almost a decade of intense litigation, contentious hearings, investors pitted against investors, some siding with the Receiver, some seeking his removal.  But during all of this a most extraordinary thing occurred.  An investment the advisor made actually returned a substantial return.  In what appears to the Court to be the first of its kind, the investors have received not only all the monies they invested in the Ponzi scheme but have received substantial monies above and beyond their initial investments.  All due largely to the extraordinary achievements of the Receiver that many of them now seek to vilify.

As a result of this singularly remarkable and unheard of accomplishment, the Receivership has distributed to each defrauded investor 110% of their initial investments with substantial funds remaining in the Receivership estate.  What to do with these remaining funds now weighs on the Court.   In light of this extraordinary recovery, the Court has considered whether to award the Receiver additional compensation for his efforts in achieving the remarkable result in the face of bitter feuding and fighting with many of the investors in whose interest he was acting.  When the Court indicated to the parties its intent to award additional compensation, the blow back was strong and intense with accusations leveled against the Court itself.   In light of the response, the Court decided to step back and refer the matter to a Magistrate Judge for a Report and Recommendation to obtain a fresh perspective from a valued colleague with no history on the case.  The Magistrate Judge produced, in the opinion of the Court, an extraordinarily detailed, thorough and well-reasoned recommendation that the Receiver be given additional fees in light of his efforts and achievements in the context of comparable fees of the market in general.  It is against this recommendation that the investors and Receiver's counsel object and which the Court now addresses.

The Court became involved in the case nearly seven years after its inception, well after the appointment of the Receiver and the method and amount of his compensation had been determined along with the establishment of his reporting and fee application protocols. On April 24, 2014, the Court held a hearing on Receiver's Request to Distribute Funds to IPOF Fund Investors in Excess of 100% of Investment, to Approve Settlement with Wells Fargo Advisors, LLC, the Response to Court's Inquiry About Fee Issues (Doc. # 576), along

with the Amended Supplement thereto (Doc. # 583).  In his Request to Distribute, the Receiver asked the Court for "a reasonable additional fee in this matter based on the extraordinary work of the Receiver that has resulted in an unprecedented result for the benefit of the IPOF Fund limited partners." (ECF # 576 pg 7159).  As part of the hearing, the Court heard objections from the parties and investor representatives on awarding additional compensation to the Receiver.

After hearing arguments for and objections against, and after considering the limited law in this area, the Court, in an Order issued June 20, 2014, found it had the equitable authority to adjust the Receiver's compensation.  The Court ordered the Receiver to file an updated report by an independent auditing firm on comparable hourly rates, which the Receiver provided.  Thereafter followed several additional rounds of briefing and ultimately resulted in referral to the Magistrate Judge.

In his Report and Recommendation, the Magistrate Judge determined that after consideration of the appropriate factors, the Receiver should be given additional compensation in the amount of $1,203,175 and that a total of $106,608.50 be deducted from the Receiver's Fee Application.

**Facts Pertinent to the Issues Remaining in the Case**

The history of the case is lengthy due largely to its age and the contentiousness that permeated it from its inception.  The Court will not recount the background as the Magistrate Judge's Report and Recommendation tells the story with complete accuracy and in great detail.  The Court recounts only those facts from the history of the case it finds pertinent to the Objections of the parties and the ruling of the Court.

Prior to 2005, David Dadante solicited over $50 million dollars from investors to form Investment Funds: IPOF, L.P., IPOF Fund, GSI and IPOF Fund II, L.P.  Dadante encouraged investors to invest with him because he was working with a major Wall Street firm and was obtaining a return rate of 25% per year.  He also represented that his funds were secure.

In November 2005, the initial Complaint in this action was filed, alleging that Dadante's investment scheme was actually a Ponzi scheme intended to swindle investors.  In furtherance of his scheme Dadante made material representations about the nature of the investments, made false account statements and manipulated accounts.  The Complaint alleged federal and state securities violations as well as RICO and common law fraud claims.  Along with the Complaint, Plaintiffs asked for the Court to appoint a Receiver and proposed Mark Dottore as Receiver.

At the time of his appointment, the Receiver's hourly rate was $195 per hour.  The Receiver went about identifying and marshaling the assets of the Receivership, which included 4.3 million shares of Innotrac Corp. stock purchased by Dadante comprising over 34 % of the Innotrac outstanding common stock.  As of 2009, the stock price fluctuated between $2 and $4 per share.

However, the stock was substantially encumbered by millions of dollars of margin debt used to purchase much of the stock.  With brokerage firms threatening to call in the margin debt and force a sale of the stock, the Receiver sought an order from the Court prohibiting the brokerage firms from liquidating Innotrac stock and calling in the margin debt. The Court also gave the Receiver the authority to direct the sale of the stock.

Thereafter, the Receiver implemented several strategies to maximize the investors'

recovery.  These included obtaining tax refunds for investors who paid taxes on the illusory

benefits of the Fund based on the fraudulent statements provided by Dadante.  Using tax

professionals to prepare corrected returns, the Receiver successfully argued for investors to

receive five years worth of corrected tax return relief as opposed to the statutory limitation

period of three years.  He obtained an $8.5 million settlement with Dadante.  He obtained

margin debt forgiveness of between $9 and $12 million and settled with the brokerage firms.

He resisted the efforts of investors and the Innotrac board to sell the shares prematurely,

particularly right after the great economic recession of 2008 when stock prices dropped

precipitously.  Instead, he held onto the shares until he sold them in 2013 for a sale price of

$8.20 a share for a total sale value of $35,438,522.

All these efforts did not come without a cost.  Dating to 2006, the investors became

divided over how the litigation should proceed and how to distribute the assets of the

Receivership.   Those investors who opposed the Receiver's actions moved to terminate the

Receivership in 2007 based largely on the expense of the Receiver.  The Court denied the

Motion but ordered an accounting of his fees and expenses which the Receiver provided.

Shortly thereafter, these same investors, known informally as the "Regalbuto Group,"

sought to liquidate the Receivership assets, arguing in part that the Innoctrac stock lacked any

real value.  A liquidation at that time would have resulted in a loss to all investors of most of

their initial investments.  All of this opposition further cost the Receivership needless monies.

Against the backdrop of continuing objections to the Receiver by the opposing

investors, the Court brought in an independent auditing firm the Analysis Research Planning

Corp. ("ARPC") (also referred to as the "Kennedy Report") to review the billing and fees

5

charged by the Receiver.  That audit found the Receiver and his professionals were not billing at unreasonable rates, but instead were well below the upper end of management fees charged for comparable work.

After the sale of Innotrac stock the Receiver moved to distribute to the investors $26,960,280 of the Receivership assets on top of the approximately $5.1 million previously distributed.  The Court granted the disbursement, allowing the Receiver to retain nearly $5 million in assets for further litigation fees, with the intent of a final distribution at the close of all related litigation.

**Magistrate Judge's Report and Recommendation on Additional Compensation and Fees**

Because the Court had already determined it had the discretion to award additional compensation to the Receiver, the Magistrate Judge confined his Report and Recommendation to determining a reasonable amount.  In his Report and Recommendation, the Magistrate Judge, in reliance on applicable caselaw and prior rulings of the Court, recommended using the lodestar method in determining the reasonable compensation of the Receiver.  As discussed by the Magistrate Judge, the lodestar method calculates a reasonable fee using hours worked multiplied by a reasonable hourly rate.  The Receiver has already received over $3.5 million in fees during the course of the litigation.  However, the Magistrate Judge recognized that the investors had received, as a direct result of the work of the Receiver, 110% of their initial investments.  Such an unusual recovery in a criminal Ponzi scheme is unprecedented and as such, there is no analogous caselaw.  In reaching his recommended additional compensation amount, the Magistrate Judge considered the factors

found in *S.E.C. v. Byers,* 590 F. Supp. 2d 637, 644 (S.D.N.Y. 2008) citing *SEC v. Fifth Ave. Coach Lines, Inc.,* 364 F.Supp. 1220, 1222 (S.D.N.Y.1973); *accord Code Prods. Corp.,* 362 F.2d at 673, *Coskery v. Roberts & Mander Corp.,* 200 F.2d 150, 154 (3d Cir.1952)); and 6 A.L.R. Fed. 817, at §§ 7–12 (discussing factors). The factors to be considered are "the complexity of problems faced, the benefits to the receivership estate, the quality of the work performed, and the time records presented."

Under the complexity of the case factor, the Magistrate Judge recounted the substantial losses incurred by the investors and the efforts of the Receiver to marshal and protect the remaining assets, which required extensive knowledge of securities regulations, real estate, banking, tax and contract law. The case was particularly complex relating to the nature of the Innotrac stock and the difficulties inherent in trading large volumes of thinly traded stock.

Furthermore, the Receiver was confronted with the large margin debt Dadante incurred in order to purchase much of the stock. Fast work by the Receiver prevented the brokerage firms, to whom the margin debt was owed, from calling in the debt and liquidating the stock.

As previously mentioned, the Receiver retained tax professionals to help recover tax refunds for the bilked investors based on the fraudulent statements on the investors gains by Dadante. In fact, the Receiver obtained returns for the investors dating back five years rather than the statutorily limited three year lookback period.

The Magistrate Judge noted that the Receiver did all this in the face of constant and needlessly extensive opposition by many of the investors to his efforts. In light of the above, the Magistrate Judge found the complexity of the case favored additional compensation.

7

The next factor considered by the Magistrate Judge was the time, skill and labor involved in marshaling and securing the assets of the Receivership. Twelve years of working through the case and the obstacles as described above easily satisfies this factor considering the repeated commendations directed to the efforts of the Receiver by this Court and the prior appointing Judge, acknowledging the skill of Receiver and his accomplishments over the protracted litigation.

The "results achieved" factor described by the Eleventh Circuit in *SEC v. Elliott*, 953 F.2d 1560, 1577 (11th Cir. 1992) as the "critical factor" was found by the Magistrate Judge to "weigh heavily" in favor of an award of additional compensation. No party was able to find another Ponzi scheme resulting in 100% recovery of losses let alone an additional 10% recovery for investors on top to date, with more to come. Therefore, the recovery in this matter by the Receiver for the investors can truly be said to be without precedent.

Finally, the Magistrate Judge found the Receivership assets can easily support the additional award. At the writing of this Opinion, the Receivership assets exceed $5 million dollars.

In calculating the additional compensation, the Magistrate Judge looked to the ARPC Report and Supplemental Report for average hourly rates for similar work performed. The ARPC Report is an independent audit provided to the Court upon request of the original appointing Judge when the Receiver's fees and reporting were challenged by certain investors. Finding the Receiver's average hourly rate amounted to $225 per hour over the course of the Receivership, the Magistrate Judge compared that rate to those approved by courts in other cases including courts in this district with the range of rates cited in the ARPC

8

Report.  The Magistrate Judge concluded the Receiver's rate was a "low hourly rate" when compared to market rates for comparable professionals in this region.

Noting the Receiver and his professional total billing for the case amounted to a little over $8 million dollars, the Magistrate Judge compared it to a standard 25% contingency fee. Given that the Receivership recovered approximately $48 million, not including the forgiveness he obtained of over $12 million in margin debt, a contingency fee would have resulted in a $12 million fee.         Even with additional compensation, the total proposed amount awarded to the Receiver falls short of that amount.

Using a 30% increase in his average hourly rate, the Magistrate Judge recommended an additional compensation award of $1,203,175.  The 30% increase is guided by the United States Supreme Court decision in *Pennsylvania v. Delaware Valley Citizens Council for Clean Air,* 483 U.S. 711 and *In Wright Airlines, Inc.* 147 B.R. 20, wherein both courts determined fee enhancements should be limited to no more than 30% of the lodestar absent special circumstances.

**Investors' Objections**

Understandably, some investors object to any additional compensation for the Receiver.  The Receiver has also submitted objections to the Magistrate Judge's Report and Recommendation.

The investors' object to the Magistrate Judge's Report and Recommendation because they contend the recommended additional award has no legal authority and the Receiver is not entitled to additional compensation.  According to the investors, a Receiver is appointed for the benefit of the beneficiaries and is not entitled to anymore than reasonable

9

compensation.  Because the Receiver was paid at his hourly rate, his compensation was necessarily reasonable.  Now he seeks funds taken from those same beneficiaries he was appointed to protect.  Receiver was paid at his usual and customary rate for over a decade during which time he never complained his rate was unreasonable.  Furthermore, the rates billed were clearly enough to motivate him to take the case which is in keeping with the Supreme Court's guidance in *Perdue v. Kenny A.*, 559 U.S. 542, 552 (2010).

Furthermore, the use of the ARPC Report as a basis for determining the Receiver's hourly rate as compared to the market in general is improper as the ARPC Report concerns the average compensation rates for "management consultants," not receivers.   The Lane Report provided by the investors in response to the ARPC Report specifically addressed the average hourly rate of receivers in this area and concluded that the Receiver's hourly rates billed were at the high end of the range.  In addition, the ARPC Report concluded the Receiver's rates billed in this action were reasonable.

Investors complain that the Magistrate Judge's Report and Recommendation fails to address the billing problems cited by investors, including the acceptance of his billings prior to 2014 in toto and without addressing complaints as to his billing post 2014.  Because the lodestar calculation failed to address the reasonableness of all the Receiver's billing, it is unreasonable to include a 30% increase to fees billed that the investors contend were improperly billed to the Receivership.

The investors also contend that any additional compensation award stands contrary to the compensation agreement that governed the Receivership and was relied on by the investors.  In establishing the Receivership and appointing the Receiver, the appointing Judge

10

determined that the Receiver's rate was hourly and not contingency based and the amount of settlements had no bearing on his fees.

Investors attack the legal authority relied on by the Magistrate Judge in reaching his recommendation, finding each case distinguishable as either dealing with the fees of counsel and not a receiver, or addressed after the fact application for fees and did not address an increase to fees already billed. Furthermore, the Magistrate Judge's Report and Recommendation fails to provide an adequate explanation why the increase is reasonable and in particular, why a 30% increase is reasonable. This arbitrary setting of a 30% increase alone requires the Court reject the recommendation.

The Court necessarily determined that the Receiver's billed hourly rate was reasonable from the inception of the case through its lengthy litigation. To alter that after all these years is unreasonable.

Finally, on the issue of additional compensation, the investors object because no matter what the Receiver's obstacles, "he was already paid for it." The investors have objected to many of the Receiver and his employees' charges over the years that they contend the Magistrate Judge's Report and Recommendation failed to address. These include additional billing for arguments on the additional compensation and entries that are too vague to justify compensation. According to investors, they were prohibited from challenging the reasonableness of pre-2014 charges, yet no scrutiny was given to these charges by the Magistrate Judge. Thus, an across the board increase of 30% to fees that were never scrutinized is improper.

Investors seek to revisit claims against fees billed by the Receiver that were either too

vague or otherwise not chargeable to the Receivership and points the Court to two filings previously made by the investors.

**Receiver's Objections**

The Receiver objects to the Magistrate Judge's recommendation that $13,801.00 in Receiver's fees and $92,807.50 of Receiver's counsel's fees be deducted from the Receiver's fee application, contending only $1437.50 be deducted from his fees and $2150.00 from his counsel's fees. Receiver further argues that the additional award should be increased above the 30% recommended by the Magistrate Judge as it should reflect the high end hourly rate for comparable work as reflected in the ARPC Report. The Magistrate Judge's reliance on *Delaware Valley* for a 30% increase is misplaced as *Delaware Valley* was not a receivership case, dealt with applying a lodestar method to calculate an enhancement that contemplates enhancements for risks involved in taking the case, and was a plurality decision that does not constitute binding precedent. Here, according to the Receiver, he is not seeking an enhancement but seeks only additional compensation by a determination that his billed fees to date were less than reasonable. Furthermore, the Receiver and his counsel objects to the reduction of their fees for filings relating to the award of additional compensation because the filings were in response to Court orders requiring responses.

**Court's Standard of Review**

Under Fed. R. Civ. P. 72(b) and 28 U.S.C. § 636, the District Court is required to review *de novo* any portion of the Magistrate Judge's Report to which a specific objection is made. A party who fails to file an objection waives the right to appeal. *U.S. v. Walters*, 638 F.2d 947, 950 (6th Cir. 1981). The District Court need only review the Magistrate Judge's

12

factual or legal conclusions that are specifically objected to by either party. *Thomas v. Arn*
474 U.S. 140, 150 (1985).

Local Rule 72.3(b) recites in pertinent part:

The District Judge to whom the case was assigned shall make a de novo
determination of those portions of the report or specified proposed findings or
recommendations to which objection is made and may accept, reject, or
modify, in whole or in part, the findings or recommendations made by the
Magistrate Judge. The District Judge need conduct a new hearing only in such
District Judge's discretion or where required by law, and may consider the
record developed before the Magistrate Judge, making a determination on the
basis of the record. The District Judge may also receive further evidence,
recall witnesses or recommit the matter to the Magistrate Judge with
instructions.

## Objections to Additional Compensation for the Receiver

In reviewing the Objections of the Investors and the Receiver and Receiver's Counsel,
the Court finds they are without merit.

## Without Legal Authority

The investors contend this Court lacks legal authority to increase the Receiver's
compensation. The Court, in previously finding it had the authority (See Court order of June
20, 2014), relied on the United States Supreme Court's holding in *Stuart v. Boulware,* 133
U.S. 78, 82 (1890) wherein the Supreme Court held:

Nor is there any doubt of the power of courts of equity to fix the compensation
of their own receivers. That power results necessarily from the relation which
the receiver sustains to the court; and, in the absence of any legislation
regulating the receiver's salary or compensation, the matter is left entirely to
the determination of the court from which he derives his appointment. The
compensation is usually determined according to the circumstances of the
particular case, and corresponds with the degree of responsibility and business
ability required in the management of the affairs intrusted to him, and the
perplexity and difficulty involved in that management.

13

The Court further relied on its own Local Rule 66.1(c), which provides that the compensation of receivers, counsel and those aiding in the administration therein "shall be ascertained and awarded by the Court in its discretion."  The Court further determined the lodestar method to be the appropriate method used under guiding precedent by the Sixth Circuit.  *U.S.  V. Oaks, Ltd.*, 798 F.2d 1417 (6th Cir. 1986).

Investors are partially correct in that there is a lack of precedent expressly authorizing an increase in fees in these circumstances.  There is in general a lack of caselaw on receiverships but more specifically there is NO caselaw concerning the increase of fees for a receiver presided over the recovery of assets of a Ponzi scheme where the bilked investors received greater than 100% of their damages, simply because it appears to be unprecedented. At least one other Court decreased a Receiver's compensation due in part to ***poor*** results achieved.  See *SEC v. Harris*, No.3:09CV1809 2016 WL 1555773 at *15 (April 18, 2016 N.D. Tex.).   And, as the Magistrate Judge reasoned, to argue that a District Court Judge cannot alter the compensation of a receiver is directly contrary to the clear precedent that compensation of receivers lies within the discretionary authority of the Court.

Both investors and the Receiver challenge the Magistrate Judge's reliance on the Supreme Court case of *Pennsylvania v. Delaware Valley Citizens' Council for Clean Air*, 483 U.S. 711 (1987) and the Bankruptcy Court decision in *In re Wright Airlines, Inc.,* 147 B.R. 20 (N.D. Ohio 1992).  The Court agrees that neither case is dispositive of the issue of additional compensation and further agrees they are not factually similar, as *Delaware Valley* and *In re Wright* concerned additional compensation issues for counsel and bankruptcy receivers and not for equitable receivers.  However, the Court notes that the Magistrate Judge's Report and

14

Recommendation does not assert these cases as binding precedent, but merely cites them as "relevant" to the issue of an award of additional compensation for receivers because they were analogous.

In reviewing the analogous case law, the Court finds sufficient legal authority to support an award of additional compensation as described above, laid out in its own Order of June 20, 2014 and more exhaustively addressed and amplified by the Magistrate Judge's Report and Recommendation. As the Court in *In Re Wright* stated, "Fee enhancements are rarely sought and are rarely granted." *Id* at 22-23. However, in *Wright,* the Court considered a number of factors and found a 25% enhancement was warranted because counsel achieved an extraordinary success in turning a no-asset Chapter 7 bankruptcy into a dividend producing Chapter 11 bankruptcy in spite of the fact that counsel received no help from the Debtor. The Court in *Wright* found that where creditors receive no dividend from an estate, no enhancement is warranted but where an extraordinary result is obtained, an enhancement may be warranted. This is exactly the situation before the Court. Many investors engaged in actions and insisted on an early sale of the Innotrac stock that would have resulted in little to no recovery for the receivership estate. Due solely to the efforts of the Receiver, those minimal assets were maintained until they produced over a 100% recovery for the investors. While the positions and posture of *Wright* differs from this case in that it was a counsel and not receiver seeking an enhancement, the circumstances surrounding both are highly analogous and the reasoning applies to both situations.

*Delaware Valley* was cited by the Magistrate Judge for the broad principle that in rare circumstances fee enhancements may be considered. See *Delaware Valley,* 483 U.S. at 730,

("We deem it desirable and an appropriate application of the statute to hold that if the trial court specifically finds that there was a real risk-of-not-prevailing issue in the case, an upward adjustment of the lodestar may be made, but, as a general rule, in an amount no more than one-third of the lodestar. Any additional adjustment would require the most exacting justification").   Investors argue that *Delaware Valley* is not relevant as it concerned a fee enhancement for counsel who accept the risk of losing a case via contingency fee agreements. This Court, as did the Magistrate Judge, acknowledges that *Delaware Valley* is not a receivership case and concerns a distinct issue (contingency fees and risk of loss) not present in this case.   However, this Court holds that the reasoning in *Delaware Valley* is highly instructive to this case where the Supreme Court found that where a court finds a real risk of losing, an upward adjustment may be made and any adjustment above one-third must be made with only the most exacting justification.   Investors claim comparing risk of losing and contingency fee enhancements to enhancing a fixed fee for a receiver is comparing apples and oranges, and, in most respects, is correct, except that the Court found *Delaware Valley* provides some guidance to the court in an otherwise barren legal landscape as to the circumstances when an enhancement may be made and in the setting of the parameters as to how much.

Therefore, the Court finds Investors's Objection that the Court is without legal authority to enhance the Receiver's fees is without merit in light of the authority cited above and that cited by the Magistrate Judge in his Report and Recommendation.  The Court further finds that it unquestionably possesses the discretionary authority to award compensation to the Receiver and that the dearth of case law on the issue is as much a reflection on the

discretionary nature and fact-specific nature of receivership cases as anything else.

**<u>Receiver is not entitled to Additional Compensation</u>**

Investors argue that the Receiver's efforts in this matter do not entitle him to additional compensation.  They contend the extraordinary recovery was due largely to the wholly unrelated success of Innotrac and not to the efforts of the Receiver.  But this argument is belied by the facts of the case.  This receivership faced serious obstacles from the beginning which the Receiver moved to counter, including the attempts by the various brokerage firms to call in the margin debt and force the sale of Innotrac stock while its value was low.  Many of the investors brought suit against the Receiver and other investors, while some investors demanded he sell the stock early in the case when its value was minimal.  Furthermore, and perhaps more damaging, were the efforts of some investors advocating that the Court find the IPOF Fund was not a limited partnership and to end the Receivership.  This potentially would have exposed individual investors to liability for margin debts owed to the various brokerage firms.  The Receivers efforts directly thwarted these ill-conceived efforts of some investors.  It is not unusual for investors to disagree with a Receiver's strategy in receiverships, but it is wholly a different matter for the Receiver to save many investors from themselves.

Furthermore, there are accounts of contentious hearings, physical confrontations and conduct aimed at thwarting the Receiver's efforts to maximize the value of the Receivership by some of the same investors on whose behalf the Receiver was working.

Finally, the Receiver masterfully managed the Innotrac stock to sell it at its maximum value.  This includes his management role in Innotrac itself, pressuring the Board to resist efforts to sell at a much lesser value, all of which resulted in the extraordinary recovery of the

17

receivership.  Therefore, the Court finds the investors' objection that the Receiver is not entitled to the enhancement meritless.

**The Reasonableness of the Receiver's Fee was Already Determined**

Investors object to an award of additional compensation because the Receiver's fees were already determined to be reasonable by both the appointing Judge and the ARPC Report. Furthermore, they argue an enhancement now would run contrary to the appointing Judge's determination that his hourly rate sufficiently compensated him for the work.  Investors further contend that the Receiver's hourly rate was reasonable in that it sufficiently induced him to take the job.

There are a number of equitable reasons for finding an increase in fees is warranted. For instance, the appointing Judge in her Order of June 26, 2009 stated that as a "general rule" it is the "sound practice" of courts "to make adjustments to fee and expense awards as needed" at the conclusion of a receivership."  (Order at ECF #447 pg.45).  While true that the Receiver agreed to take on the job for a fixed hourly rate set by the appointing Judge, neither the appointing Judge nor the Receiver could ever have envisioned that the result he would obtain would result in such an exceptional return.  In addition, the appointing Judge routinely approved hourly fee increases for the Receiver during the course of the litigation. Furthermore, if the Receiver knew then what he knows now about how contentious this litigation was going to be, how he would be personally and physically attacked, had his reputation impugned, had numerous attempts to remove him from the case and thwart his efforts to recover for the investors, he would not have taken the job for the hourly rate set at the beginning of the case.  For these and the additional reasons stated previously, the Court

18

finds this objection meritless.

**The ARPC Report  is not Applicable as a Representation of Reasonable Receiver Hourly Rates**

During the course of the litigation around 2009 some investors complained about the Receiver's billing, reporting and the rates at which he billed.  In response, the appointing Judge commissioned a third party analysis of the Receiver's billing and rates as compared to those in the industry.  As a result, the third party auditing firm of Analysis Research Planning Corp. ("ARPC") issued a Report on these issues.  The ARPC Report compared the Receiver's hourly rate to those of management consulting firms with under $10 million dollars in revenue.  It found these management consultant firms to be the relevant market, and found the Receiver's billed rates to be at the low end of the relevant market.  While finding his billed hourly rate reasonable as compared to the relevant market, the ARPC Report did not address that an increase to the upper end of the billed hourly rate for management consultants would be unreasonable.  While investors contend the Lane Report submitted by investors is a better indicator of the relevant receiver market in this area, the Court finds that the ARPC Report is the best source as it was ordered by the appointing Judge, was provided by an unbiased third party with no ties to any party, its conclusions were previously relied on by the appointing Judge on other matters, and no investor objected to the Report or its Conclusions.

Furthermore, while attacking its relevance to receivers, no party sought to depose the authors of the ARPC Report and Supplement even when invited to do so by the Court and cannot now challenge its conclusions.  Lastly, given that under the facts of this case the Receiver engaged in activity unquestionably management-related regarding controlling the

IPOF Fund and its assets, including Innotrac, the ARPC Report and its Supplement are the best and most reliable resources for determining reasonable compensation in the market. Undoubtedly, the decisions of the Receiver which generated the greatest amount of recovery for the investors were high-level management decisions. Therefore, the Court finds these objections meritless.

Having reviewed the Magistrate Judge's Report and Recommendation on additional compensation for the Receiver, the Court adopts, in part and modifies in part, the Magistrate Judge's Report and Recommendation. The Court finds the Receiver's compensation should be increased to the upper rate of compensation for management consultants as outlined in the ARPC Report and Supplement. The Court further finds this case to be that exceptional circumstance warranting such an increase and that neither *Delaware Valley* nor *Wright Airlines* limits the Court's ability to equitably redress the Receiver's compensation beyond the 30% threshold. In weighing all the equities, the Court finds that the Receiver's compensation should be increased.

As recounted above, the Court finds there are a number of reasons that militate in favor of increasing the Receiver's hourly fees. These include the following: First, it is consistent with the practice of the prior Judge in this case to periodically increase the Receiver's hourly compensation upon a request by the Receiver.

Second, the unusually acrimonious proceedings in this matter (as documented by Judge O'Malley in ECF # 282 & 447) that dragged on for years, needlessly increased the expense of the Receivership and required the Receiver to defend not only his professional actions, but personal integrity as well, warrants an increase in compensation.

Third, the Receiver faced well documented, vehement opposition to his efforts to hold the stock, yet he stayed the course, relying on his best management judgment despite tremendous pressures to sell at a loss.  Using his business skills, judgment and his collaboration with Scott Dorfman, the CEO of Innotrac, to ascertain the prime time to sell the stock, resulted in the extraordinary and unprecedented recovery as discussed above.  The Court finds Scott Dorfman's letter endorsing the Receiver's extraordinary efforts in achieving this result weighs heavily in favor of additional compensation.  The Court also notes that the Receiver previously challenged Dorfman and the Innotrac Boards actions in suppressing the value of the stock, threatening to sue Dorfman and the Board.  The Court gives great weight to Dorfman's support of the Receiver.

Fourth, the independent report of ARPC demonstrates the Receiver's hourly rates fall well below the upper tier rates.  Given the Receiver's achievements in this matter, the Court concludes it is reasonable to increase the Receiver's rates to what is appropriate for upper level comparable management.

Further, the Court acknowledges that investor dollars generated significant returns in this matter and they should likewise recover significant profits.  However, a substantial portion of the Innotrac Stock was purchased not with investor dollars, but with margin debt.  Given that the value obtained in the final recovery was based in large part on margin debt purchases and stock manipulation, the Court believes that full recovery by the investors of all the Receivership assets cannot be classified as investor profits and therefore, any additional compensation for the Receiver does not diminish the profits realized by the investors based on the investment of their own monies.

Finally, if the Court were to follow the investors' logic, no company or organization would ever give cash bonuses, grants or other monetary or non-monetary awards for extraordinary achievement, nor would the military bestow medals of honor or courage for actions beyond the call of duty, because of course, all of these recipients were "already paid for it."

**Objections to the Fees and Billing Reports of the Receiver**

Before discussing the Magistrate Judge's recommendation on the challenges to the Receiver's and his Counsel's fees, the Court must first discuss how the Receiver submitted his fee applications for approval with the Court from the onset of the case.  Unlike most receiverships that this Court has presided over where the Receiver first circulates his fee request to the parties for comment of objection, the appointing Court allowed the Receiver to submit his fee applications directly to the Court.  Upon approval, the Receiver would then submit an accounting report detailing the Receiver and his Counsel's billing and rates on the Court docket.  In adopting this fee application protocol, the appointing Judge was attacked for the clandestine nature of the Receiver's fee applicaitons.  In her Order of June 26, 2009 the appointing Judge addressed this head on, writing:

> The Court was, furthermore, concerned that the Objecting Plaintiffs implied subterfuge on the part of the Court itself in "preventing" the Objecting Plaintiffs from receiving a full accounting. The Court explained:
>
> The Court notes that, since the inception of the Receivership, the Receiver has submitted his expenses directly to the Court for approval. Though the [Objecting] Plaintiffs imply otherwise, there was no sinister motive behind not requiring the docketing of monthly reports or individualized notice. ***Indeed, it was the plaintiffs' own counsel who submitted a proposed order to the Court suggesting the procedure to be employed – i.e., the submission of requests for interim reimbursement to the Court only. The reason for this procedure was to guard against improper public disclosures of information which could***

22

> *impact the share price of the Innotrac stock, an understandable and laudable*
> *goal. For fourteen months, thereafter, no party objected to the Receivership,*
> *to the mechanism established to fund it, or to the absence of additional*
> *reporting or information. The Court believed that this was the product of: (1)*
> *the fact that the court-appointed Receiver was chosen by the Plaintiffs; (2)*
> *the Court's understanding, by virtue of its previous Orders, that information*
> *in the hands of the Receiver was available to interested parties at their*
> *expense; and (3) the parties' desire to minimize the expenditure of resources.*
> (Court's emphasis added).

Thus, the parties did not challenge the Receiver's reporting or fee applications until

2009.  With objections being raised as to the fee application protocol and objections to the

Receiver and his Counsel's billing, the appointing Judge had the Receiver's billing audited by

ARPC.  On February 1, 2010, the Court entered the audit on the docket.  The audit concluded

that the Receiver's billing was well supported and provided sufficient explanation and the

supporting information was of a very high quality.  It found only one percent of the billing

was in error.

Thereafter, the Receiver continued to submit his fee applications for approval to the

Court and then file a detailed accounting report thereafter.  The parties have never explained

to this Court's satisfaction why they could not have objected to the Receiver's or his

Counsel's fees as they were presented in the accounting reports during the course of the

litigation.  It was only after the sale of the Innotrac stock and money suddenly appeared that

the parties complained that the Receiver was not filing monthly reports and complained that

the established protocol for his fee applications be changed.  The Court agreed and from that

point the Receiver's fee applications were made publicly.  However, because the parties did

not explain why they were prohibited from objecting to his fees via the information provided

in his accounting reports, the Court deemed any challenges to the Receiver and his Counsel's

fees predating the sale of the Innotrac stock were waived.  Furthermore, to allow objections to fees running to the inception of the case that had already been approved by the appointing Judge under the former protocol would place this Court in the position of overturning or reviewing the orders of the appointing Judge.  This Court will not engage in such inappropriate review.  Therefore, for these reasons,  the Magistrate Judge was asked to make a recommendation on the fee disputes running from 2014 thereafter.

The Receiver and his staff have already been paid $3,857,578.74.   Professionals retained by the Receiver have been paid $3,530,682.04.  In his Report and Recommendation, the Magistrate Judge noted that the Receiver seeks $791,406.57 in fees with an average hourly rate for him and his staff of $270.94.  He further seeks fees for his counsel in the amount of $904,243.91.  These fee requests were objected to by the investors on the basis that some fee requests were related to the Receiver's pursuit of additional compensation above his agreed hourly rate and fees associated with the Receiver's service on unrepresented investors in preparation for the August 14 and November 16, 2017 hearings.  According to the Objectors, because these fees were incurred for the benefit of the Receiver and not the Receivership, the costs should be borne by Receiver himself.  The Objectors further contend that the Receiver's time summaries are vague and block billed conflating time spent on different tasks.  The Objectors provided highlighted time entries to which they object as directly related to bonus advocacy totaling $203,963.00 in Receiver fees and $177,690.11 in Receiver's counsel fees that they contend Court should deny as non-compensable.

The Magistrate Judge recommends reducing the Receiver's and his counsel's fees for any work related to his request for additional fees.  Citing numerous cases standing for the

proposition that the Receiver may recover for fees for efforts benefitting the receivership estate, the Magistrate Judge found that these efforts were for the sole benefit of the Receiver, therefore, no reimbursement should awarded.

The Receiver objects to the exclusion of these fees because all of his efforts were pursuant to Court orders. It was the Court that ordered him to research and brief this issue in a number of filings and in the course of several hearings. While true, the Court finds that but for his request for additional compensation, the Court would not have needed to make these orders. The Court needed to determine first whether it had the authority to award additional compensation and then it had to allow the investors a full and fair opportunity to be heard on the issue. It would be inequitable to require the receivership to bear the costs associated with these issues. Therefore, the Court agrees with the Magistrate Judge and adopts his recommendation on the reduction of fees for work by the Receiver and his counsel on the additional compensation issue.

The Magistrate Judge further determined that the Receiver and his counsel should not be compensated for work performed to address the Receiver's failure to serve investors the Court's June 9, 2017 and August 22, 2017 Orders. As Receiver's counsel admitted to these errors, the Court adopts the Magistrate Judge's recommendation that no compensation should be awarded for this work.

The Magistrate Judge then compared the entries the investors contended were related to the additional compensation with those the Receiver argued were so related. Upon review, the Magistrate Judge adopted the Receiver's arguments finding that many of the investors' line-by line challenges were unrelated to the compensation issue. These entries generally

25

involved "distribution" issues that the Magistrate Judge determined were related to the research and other work relating to distribution of $25 million in receivership assets.

In total, the Magistrate Judge recommends reducing the fee applications of the Receiver and his counsel in the amount of $13,801.00 for the Receiver and $52,807.50 for his Counsel for fees relating to additional compensation for the Receiver.

The Magistrate Judge considered and rejected the investor complaints that the Receiver's fees associated with the Innotrac stock sale were excessive.  In finding the fees reasonable, the Magistrate Judge noted the record was replete with a number of issues the Receiver had to address concerning the stock sale.  These included the stock transfer, brokerage fees, tax consequences and other related matters.  Given the large number of shares and the high value of the purchase price, the Magistrate Judge determined that substantial fees were reasonable under the circumstances.

The Magistrate Judge also rejected the investors' arguments that the Receiver's fees associated with the Huntington Bank litigation were unreasonable.  Investors argued that the fees exceeded the recovery.  The Magistrate Judge determined there was no support for this conclusion as the investors pointed to no time records and did not articulate any specific examples of excessive billing records.  Thus, they could not show that any were unreasonable or excessive.   Furthermore, the Magistrate Judge determined that even if true that the fees exceeded the recovery, it would not have per se rendered his fees unreasonable.

In addition, the investors argued the Receiver's accountant's fees were excessive but the Magistrate Judge rejected these arguments outlining the time and effort that went in to calculating an appropriate compensation for investors on their loss of earnings.

Finally, the Magistrate Judge recommends reducing the Receiver's counsel, Robert Glickman's fees by $40,000 due to Glickman's failure to offer any support why his increase fee increased in June 2014 from $400/hr. to $500/hr.  When invited to respond to this argument by the investors, the Receiver failed to offer any argument supporting the increase. Because he failed to make any argument in support of the increase, the Magistrate Judge recommends reducing his fee application by $40,000 for fees billed at the unsupported rate of $500/hr.  Therefore, the Magistrate Judge recommends total deductions of $13,801.00 in Receiver's fees and $92,807.50 in deductions from counsel's fees.

The investors contend the Magistrate Judge failed to conduct a sufficient analysis of the reasonableness of the hours expended by failing to analyze each timekeeper on the Receiver's bills, the tasks they conducted and the reasonableness thereof.  Instead, they contend the Magistrate Judge gives the Receiver the benefit of the doubt.

Investors also argue that the recommendation fails to review pre-2014 billings for redundancy, vagueness or other issues.

Finally, the investors point to their objections before the Magistrate Judge contending the Magistrate Judge failed to analyze a number of entries cited by investors as either vague or unreasonable.  These are not cited in the Objections but merely referred to by pointing the Court to the original filing without specifically identifying the allegedly improper fee.

The Court finds the investors' objections to the Magistrate Judge's recommendation on fees to be meritless.  As the appointing Judge in this case stated in her June 26, 2009 Order, "the Court is not in a position to fly-speck every entry in the Receiver's billings for work-product, or detect all potentially questionable billing practices."  (Order at ECF # 447

pg.45).  Instead, the Court is tasked with reviewing the fee applications to determine that they present sufficient information for the parties and the Court to determine whether they are reasonable.  The Magistrate Judge's Report and Recommendation clearly and exhaustively reflects that analysis.  Although he does not go line by line through every objected to billing entry, the Magistrate Judge's Report evidences that he thoroughly considered all the objections.  Some he rejected out of hand as too vague or unsupported by reference to the billing records.  Others he went line by line in the Report and Recommendation analyzing them.  He accepted some challenges finding the Receiver billed for work unrelated to the benefit of the receivership.  Others he rejected, finding for example, that claims related to "distribution" were not related to the additional compensation issues.  In short, a review of the Magistrate Judge's Report and Recommendation clearly evidences that he exhaustively reviewed the billing records and made his recommendations after a full opportunity for the parties to brief the issues and after conducting a hearing.  Thus, the record does not reflect the investors' argument that the Magistrate Judge failed to analyze many of their objections.

Second, the Magistrate Judge was not tasked with reviewing the billing records predating the sale of Innotrac because the parties failed to explain why they could not have objected to the billings at the time the Receiver filed his numerous accounting reports.  Furthermore, it would have been improper for the Magistrate Judge to do so since the appointing Judge had already necessarily determined those fees were reasonable when she authorized payment of the fees to the Receiver upon application.  The Magistrate Judge could not act as an appellate Judge by reviewing fees already approved by the appointing Judge.

Also, the Court notes that the Receiver kept his billing records post-Innotrac sale the

28

same as his pre-sale billing records insofar as how he tracked his billable hours.  These same practices were found to be reasonable in that he recorded sufficient information for review in the ARPC Report.  No party requested an additional audit for the present fee application.  Therefore, for the foregoing reasons, the Court rejects the objections of the investors.

The Court also adopts the Magistrate Judge's recommendation that the Receiver's counsels fees be reduced by $40,000 because he failed to justify the $100/hr. increase in his fees in June of 2014.   The Court may not substitute "judicial notice" for the factors it must consider when assessing the reasonableness of a fee increase.[1]  It is the Receiver's burden to demonstrate the reasonableness of his and his counsel's fees.  By wholly failing to contest and explain the reasonableness of the increase and the amount of fees resulting from the increase, the Court agrees with the Magistrate Judge that Receiver failed to meet his burden.

Therefore, for the foregoing reasons, the Court adopts the Magistrate Judge's recommendation that the Receiver's fees be reduced by $13,801.00 and his counsel's fees be reduced by $92,807.50.  Thus, the Magistrate Judge recommends and the Court adopts fees for the Receiver in the amount of $777,605.57 and for his counsel in the amount of $811,436.41.

**Final Compensation Increase**

Having reviewed the Magistrate Judge's Report and Recommendation, the Court agrees with his analysis and conclusions concerning the basis for an increase in the Receiver's compensation.  However, the Court modifies the Magistrate Judge's Recommendation as to the amount of the fee award.  The Receiver objects to the 30% increase because it still places

---

[1]     No matter how the Court views counsel's skill and experience.

him at the lower end of comparable management consultants according to the Supplemental

ARPC Report.  For the reasons described in the Magistrate Judge's Report and

Recommendation and above, the Court finds the Receiver's efforts warrant an increase in

compensation to the high end of the average hourly rate for management consultants as

outlined in the ARPC 2014 Updated Report, upon which the Court informed the parties it

would rely upon in determining the amount.  Although the Magistrate Judge recommended a

30% increase in the Receiver's compensation, he determined that at least in part, the Supreme

Court's guidance in *Delaware Valley* constrained any additional compensation to a 30% cap.

The Court finds that under these particular facts and limited and singular circumstances, ***this***

***is that rarest of rare cases where an extraordinary award of additional compensation is***

***warranted***.  See *Delaware Valley,* 483 U.S. at 751 ("Extra enhancement...should be awarded

in exceptional cases only.")   Using the 2014 ARPC Update, the Court calculates the average

high hourly rate for Principal Partner as $459/hr. for the years 2006 -2017.[2]   The Court

further calculates the average hourly rate for Staff over the same time period to be $274/hr.[3]

The Magistrate Judge found the Receiver reasonably billed the receivership for 17,296.9

hours for work performed by the Receiver and his staff.  The Receiver's hours constitute 53%

of the hours billed which amounts to approximately 9,167.4 hours.[4]  When multiplied by

---

[2]        The ARPC 2014 Update does not include rates for the years 2014-2017. The Court used the $475 hourly rate for the last year of the update 2013, and applied it for the years 2014-2017 in reaching its average of $459/hr.. The Court believes this to be a conservative estimate of the average hourly rate for these years given the strong economy during this time period.

[3]        The Court uses the same methodology it used for Principal Partners for Staff, applying the last high hourly rate average of $288 for the years 2014-2017.

[4]        Per Receiver's Certified Public Accountant.

$459/hr. his total compensation is $4,207,818.24 and his staff's total compensation for 8,129.54 hours billed times an hourly rate of $274/hr. equals $2,226,816.50.  This amounts to additional compensation for the Receiver and his staff in the amount of $2,424,049.42.   This additional compensation still places the Receivership well below a standard 25% contingency fee rate as discussed in the Magistrate Judge's Report and Recommendation[5] and will still allow a further substantial distribution to the investors.

Therefore, for the foregoing reasons, the Court adopts the Magistrate Judge's recommendations on the fees of the Receiver and his counsel for the time period from 2014-2017 in the amount of $777,605.57 for the Receiver and for his counsel in the amount of $811,436.41.  In addition, the Court modifies the amount recommended by the Magistrate Judge and awards the Receiver additional compensation in the amount of $2,424,049.42.  The Court orders the Receiver to distribute the above fees from the assets of the Receivership and further orders the Receiver to distribute the  remainder of the assets of the Receivership on a pro rata basis as previously established to the investors.  Within 30 days of the above distributions, the Receiver shall file his Final Report of the Receivership with the Court.

IT IS SO ORDERED.

s/ Christopher A. Boyko
CHRISTOPHER A. BOYKO
United States District Judge

Dated:  July 24, 2018

---

[5]     The Magistrate Judge estimated a 25% contingency fee would have amounted to $12 million dollars in fees for the Receiver, his staff and counsel.  This figure did not take into account the $12 million dollars in margin debt forgiveness the Receiver obtained which, if added to the total recovered for the investors, would have made the contingency fee $15 million at the standard 25% fee rate.